EMN:PT/SPN/MKM/KDE
F.#2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                    Docket No. 15-CR-252 (S-1) (PKC)

ALFREDO HAWIT et al.,

           Defendants.

– – – – – – – – – – – – – – – – – –X


THE GOVERNMENT'S MEMORANDUM IN RESPONSE
TO THE DEFENDANTS' INITIAL PRE-TRIAL MOTIONS


                            ROBERT L. CAPERS
                            UNITED STATES ATTORNEY
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201


Evan M. Norris
Samuel P. Nitze
Paul Tuchmann
M. Kristin Mace
Keith D. Edelman
Assistant United States Attorneys
      (Of Counsel)

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... i

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 2

    A.    The Enterprise .............................................................................................. 2

    B.    The Defendants and Their Co-Conspirators ................................................. 5

    C.    The Corruption of the Enterprise ................................................................. 7

    D.    The Centrality of the U.S. Financial System ................................................ 8

    E.    The Charged Schemes ................................................................................... 9

ARGUMENT .......................................................................................................................... 12

    I.    Marin ........................................................................................................................ 12

        A.    Count One Adequately Alleges the Elements of RICO Conspiracy......... 12

            1.    Legal Standard ................................................................................. 12

                a.    Motions to Dismiss Generally ........................................... 12

                b.    RICO Conspiracy ............................................................... 14

            2.    Analysis............................................................................................ 17

                a.    Count One Adequately Alleges the Existence of an
Enterprise ............................................................................ 17

                b.    Count One Adequately Alleges Marin's Involvement in the
RICO Conspiracy ............................................................... 20

        B.    Count One Is Not Duplicitous.................................................................... 22

            1.    Legal Standard ................................................................................. 22

            2.    Analysis............................................................................................ 24

    II.    Napout.................................................................................................................... 26

        A.    The Indictment Does Not Impermissibly Seek Extraterritorial Application
of the Charged Statutes ............................................................................. 26

            1.    Legal Standard ................................................................................. 26

                 a.    The Supreme Court's Two-Step Framework for Addressing
Extraterritoriality Issues.................................................... 26

                b.    Wire Fraud and Extraterritoriality .................................... 28

                c.    Money Laundering and Extraterritoriality ....................... 31

                d.    RICO and Extraterritoriality ............................................. 33

    e.  Other RICO Predicates and Extraterritoriality ................. 34

  2.  Analysis ........................................................................ 35

    a.  The Wire Fraud Conspiracy Counts ................................. 35

    b.  The Money Laundering Conspiracy Counts .................... 40

    c.  The RICO Conspiracy Count ............................................ 43

B. Napout's Alternative Argument that the Prosecution Against Him Is Unreasonable Also Fails ........................................................................ 47

C. Napout Has Not Established His Need for a Bill of Particulars ............... 49

  1.  Legal Standard ............................................................... 49

  2.  Analysis ........................................................................ 51

    a.  The Indictment, Court Filings, and Discovery Provide Sufficient Detail About the RICO Conspiracy and Other Charges ............................................................................ 51

    b.  The Government Is Not Required to Disclose the Names of Unindicted Co-Conspirators ............................................. 63

CONCLUSION .......................................................................................... 66

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

<u>Boyle v. United States</u>, 556 U.S. 938 (2009) ......................................................................... 14, 15

<u>Chevron Corp. v. Donziger</u>, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ............................................ 32

<u>Ford v. United States</u>, 273 U.S. 593 (1927) ................................................................................. 37

<u>Francis v. Franklin</u>, 471 U.S. 307 (1985) ..................................................................................... 26

<u>Hamling v. United States</u>, 418 U.S. 87 (1974) ....................................................................... 12, 49

<u>Kiobel v. Royal Dutch Petroleum Co.</u>, 133 S. Ct. 1659 (2013)..................................................... 27

<u>Laydon v. Mizuho Bank, Ltd.</u>, No. 12-CV-3419 (GBD), 2015 WL 1515487
(S.D.N.Y. Mar. 31, 2015) ............................................................................................................. 45

<u>Morrison v. Nat'l Australia Bank Ltd.</u>, 561 U.S. 247 (2010) ............................................... passim

<u>Pasquantino v. United States</u>, 544 U.S. 349 (2005)............................................................... 28, 39

<u>Petroleos Mexicanos v. SK Engineering & Const. Co.</u>, 572 Fed. App'x 60
(2d Cir. 2014)........................................................................................................................... 42, 45

<u>Richardson v. Marsh</u>, 481 U.S. 200 (1987) ................................................................................... 25

<u>RJR Nabisco, Inc. v. European Comm.</u>, 136 S. Ct. 2090 (2016)............................................ passim

<u>United States v. Alfonso</u>, 143 F.3d 772 (2d Cir. 1998) ................................................................. 13

<u>United States v. Allen</u>, 160 F. Supp. 3d 698 (S.D.N.Y. 2016) ..................................................... 29

<u>United States v. Applins</u>, 637 F.3d 59 (2d Cir. 2011) ................................................................... 15

<u>United States v. Approximately $25,829,681.80 In Funds (Plus Interest) In The Court Registry
Investment System</u>, No. 98-CV-2682 (LMM), 1999 WL 1080370
(S.D.N.Y. Nov. 30, 1999) ....................................................................................................... 32, 43

<u>United States v. Aracri</u>, 968 F.2d 1512 (2d Cir. 1992)................................................................. 22

<u>United States v. Barrett</u>, 153 F. Supp. 3d 552 (E.D.N.Y. 2015)................................................... 65

<u>United States v. Barton</u>, 647 F.2d 224 (2d Cir. 1981) ................................................................. 23

United States v. Basciano, 599 F.3d 184 (2d Cir. 2010) ............................................. 24

United States v. Bin Laden, 92 F. Supp. 2d 225 (S.D.N.Y. 2000) ............................... 58

United States v. Bodmer, 342 F. Supp. 2d 176 (S.D.N.Y. 2004) ..................... 31, 41, 43

United States v. Bonventre, 646 Fed. App'x 73 (2d Cir. 2016) .................................... 57

United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987) ....................... 50, 56, 57, 58

United States v. Cassese, 273 F. Supp. 2d 481 (S.D.N.Y. 2003) ........................... 13, 44

United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002) .......................................... 15, 16

United States v. Coffey, 361 F. Supp. 2d 102 (E.D.N.Y. 2005) ................................... 64

United States v. Coffman, 574 Fed. App'x 541 (6th Cir. Jul. 22, 2014) ...................... 30

United States v. Columbo, No. 04-CR-273 (NRB), 2006 WL 2012511
(S.D.N.Y. July 18, 2006) .............................................................................................. 58

United States v. Daly, 842 F.2d 1380 (2d Cir. 1988) ................................................... 17

United States v. Diecidue, 603 F.2d 535 (5th Cir. 1979)............................................. 24

United States v. Droms, 566 F.2d 361 (2d Cir. 1977) ................................................. 22

United States v. D'Amico, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) ............................... 25

United States v. Esposito, 912 F.2d 60 (3d Cir. 1990) ................................................ 24

United States v. Ferguson, 758 F.2d 843 (2d Cir. 1985) ............................................. 15

United States v. Finazzo, No. 10-CR-457 (RRM), 2013 WL 619571
(E.D.N.Y. Feb. 19, 2013)............................................................................................. 18

United States v. Friedman, 854 F.2d 535 (2d Cir. 1988)............................................. 16

United States v. Fruchter, 104 F. Supp. 2d 289 (S.D.N.Y. 2000)......................... passim

United States v. Galvis-Pena, No. 09-CR-25 (TCB), 2011 WL 7268437
(N.D Ga. Dec. 6, 2011) ................................................................................................ 32

United States v. Gambino, 809 F. Supp. 1061 (S.D.N.Y. 1992) ................. 13, 20, 39, 44

United States v. Georgiou, 777 F.3d 125 (3rd Cir. 2015)...................................................... 30, 40

United States v. Gilboe, 684 F.2d 235 (2d Cir. 1982) ............................................................ 29

United States v. Glisson, No. 03-CR-148 (DAB), 2003 WL 21709502
(S.D.N.Y. July 23, 2003) ........................................................................................................ 64

United States v. Gonzalez, 921 F.2d 1530 (11th Cir. 1991) ...................................................... 24

United States v. Gotti, No. S4 02-CR-743 (RCC), 2004 WL 32858
(S.D.N.Y. Jan. 6, 2004)........................................................................................................ 13, 44

United States v. Gotti, 784 F. Supp. 1013 (E.D.N.Y. 1992)................................................. 63, 64

United States v. Hayes, 118 F. Supp. 3d 620 (S.D.N.Y. 2015) ....................................... 29, 36, 40

United States v. Hayes, 99 F. Supp. 3d 409 (S.D.N.Y. 2015) ..................................................... 30

United States v. Helmsley, 941 F.2d 71 (2d Cir. 1991).............................................................. 22

United States v. Hijazi, 845 F. Supp. 2d 874 (C.D. Ill. 2011) ................................................... 30

United States v. Jabali, No. 01-CR-801 (SJ), 2003 WL 22170595 (E.D.N.Y. Sept. 12, 2003) ... 58

United States v. Jones, 482 F.3d 60 (2d Cir. 2006) .................................................................. 23

United States v. Kazarian, No. 10-CR-895 (PGG), 2012 WL 1810214
(S.D.N.Y. May 18, 2012)......................................................................................................... 24

United States v. Kazzaz, 592 Fed. App'x 553 (9th Cir. Nov. 26, 2014) ...................................... 30

United States v. Kim, 246 F.3d 186 (2d Cir. 2001).................................................... 28, 30, 39, 45

United States v. Krasniqi, 555 Fed. App'x 14 (2d Cir. 2014) ..................................................... 15

United States v. Lloyds TSB Bank PLC, 639 F. Supp. 2d 314 (S.D.N.Y. 2009)............. 43, 46, 47

United States v. Mahaffy, 446 F. Supp. 2d 115 (E.D.N.Y. 2006) ......................................... 63, 64

United States v. Manuel, 371 F. Supp. 2d 404 (S.D.N.Y.2005)................................................. 37

United States v. Murray, 618 F.2d 892 (2d Cir. 1980) ............................................................. 22

United States v. Nachamie, 91 F. Supp. 2d 565 (S.D.N.Y. 2000)............................................. 57

iii

United States v. Panza, 750 F.2d 1141 (2d Cir. 1984)................................................. 50

United States v. Perez, 575 F.3d 164 (2d Cir. 2009) ...................................... 13, 39, 44

United States v. Pforzheimer, 826 F.2d 200 (2d Cir. 1987) ................................... 26

United States v. Pierce, 785 F.3d 832 (2d Cir. 2015) .......................................... 15, 18

United States v. Pimentel, No. 99-CR-1104 (SJ), 2001 WL 185053
(E.D.N.Y. Jan. 22, 2001) ........................................................................................... 50

United States v. Prevezon Holdings, Ltd., 122 F. Supp. 3d 57 (S.D.N.Y. 2015) ........................ 42

United States v. Price, No. 05-CR-492 (NGG), 2010 WL 1949361
(E.D.N.Y. May 11, 2010) .......................................................................................... 13

United States v. Rastelli, 870 F.2d 822 (2d Cir. 1989)........................................... 16, 20

United States v. Reale, No. S4 96-CR-1069 (DAB), 1997 WL 580778
(S.D.N.Y. Sept. 17, 1997) ........................................................................................ 13

United States v. Rivera, No. 09-CR-619 (SJF), 2011 WL 1429125
(E.D.N.Y. Apr. 13, 2011).......................................................................................... 51

United States v. Rodriguez, No. 99-CR-367 (DLC), 1999 WL 820558
(S.D.N.Y. Oct. 13, 1999) .......................................................................................... 64

United States v. Ruggiero, 726 F.2d 913 (2d Cir. 1984) ....................................... 23

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998) ............................................ 37

United States v. Salinas, 522 U.S. 52 (1997)................................................ passim

United States v. Sattar, 314 F. Supp. 2d 279 (S.D.N.Y. 2004)...................... 50, 52, 56

United States v. Shkreli, No. 15-CR-637 (KAM) (E.D.N.Y. Dec. 16, 2016).................. 50, 65

United States v. Shteyman, No. 10-CR-347 (SJ), 2011 WL 2006291
(E.D.N.Y. May 23, 2011) .......................................................................................... 51

United States v. Singhal, 876 F. Supp. 2d 82 (D.D.C. 2012) .............................. 30, 31

United States v. Stein, No. A 93-CR-375, 1994 WL 285020 (E.D. La. June 23, 1994) ............. 32

United States v. Sturdivant, 244 F.3d 71 (2d Cir. 2001) ...................................... 22

iv

United States v. Teitler, 802 F.2d 606 (2d Cir. 1985) ................................................. 15

United States v. Torres, 901 F.2d 205 (2d Cir. 1990)....................................... 50, 63, 64

United States v. Trapilo, 130 F.3d 547 (2d Cir. 1997) ......................................... passim

United States v. Trippe, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ................................. 51

United States v. Turkette, 452 U.S. 576 (1981)........................................................... 15

United States v. Viola, 35 F.3d 37 (2d Cir. 1994) ...................................................... 17

United States v. Wedd, No. 15-CR-616 (KBF), 2016 WL 1055737
(S.D.N.Y. March 10, 2016)........................................................................... 60, 61, 62

United States v. Yannotti, 541 F.3d 112 (2d Cir. 2008) ........................................ passim

United States v. Yousef, 327 F.3d 56 (2d Cir. 2003)................................................... 30

United States v. Zichettello, 208 F.3d 72 (2d Cir. 2000)....................................... 17, 21

Worldwide Directories, S.A. De C.V. v. Yahoo! Inc., No. 14-CV-7, 349 (AJN),
2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016) ............................................................ 45

## STATUTES

18 U.S.C. § 1343............................................................................................... passim

18 U.S.C. § 1512............................................................................................... passim

18 U.S.C. § 1952.................................................................................................. 6, 8, 34

18 U.S.C. § 1956............................................................................................... passim

18 U.S.C. § 1957............................................................................................... passim

18 U.S.C. § 1961(4) ............................................................................................. 14, 15

18 U.S.C. § 1962(c) ...................................................................................... 13, 14, 17

18 U.S.C. § 3077........................................................................................................ 34

18 U.S.C. §§ 1961-1968 ............................................................................................ 14

18 U.S.C. § 1962(d) ................................................................................................... 13, 14, 33

18 U.S.C. § 1964(c) ................................................................................................... 46

## RULES

Fed. R. Civ. P. 12(b)(1) ................................................................................................ 43

Fed. R. Crim. P. 7(c) ............................................................................................ 12, 20, 49

Fed. R. Crim. P. 7(f) ................................................................................................... 50

## OTHER AUTHORITIES

Restatement (Third) of Foreign Relations Law of the United States § 403(2)(a) ........................ 47

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the pre-trial motions filed by the defendants José Maria Marin and Juan Ángel Napout.  The defendants are charged by superseding indictment with conspiratorial racketeering, wire fraud, and money laundering offenses in connection with their participation in various schemes to enrich themselves and their co-conspirators through the corruption of international soccer.  See United States v. Hawit, et al., 15-CR-252 (S-1) (PKC) (Docket Entry No. 102).  By written motion dated November 21, 2016, defendant Marin moves to dismiss Count One of the superseding indictment, charging him with RICO conspiracy, on the grounds that (1) the government failed adequately to allege the enterprise and agreement elements of the offense, and (2) the count is duplicitous.  (Docket Entry No. 487-1, hereafter "Marin Br.").  By written motion dated November 21, 2016, defendant Napout moves to dismiss all five counts against him, charging conspiratorial racketeering, wire fraud, and money laundering, on the grounds that (1) the court lacks jurisdiction over the alleged offenses because the charges impermissibly rely on an extraterritorial application of the relevant statutes, and (2) the exercise of jurisdiction would be unreasonable in any event because, among other things, the superseding indictment does not allege criminal conduct by Napout in the United States.  (Docket Entry No. 491-1, hereafter "Napout Br. A.").  Napout also moves for a bill of particulars.  (Docket Entry No. 490-1, hereafter "Napout Br. B.")

For the reasons set forth below, the defendants' motions are without merit and should be denied in their entirety.

BACKGROUND

On May 20, 2015, a grand jury in the Eastern District of New York returned a 47-count indictment charging 14 individuals, including Marin, with RICO conspiracy and wire fraud and money laundering offenses, among other crimes.  See United States v. Webb et al., 15-CR-252.  The original indictment was unsealed on May 27, 2015, following the arrests of some of the charged defendants.  On November 25, 2015, the grand jury returned a 92-count superseding indictment charging 16 additional defendants, including Napout, with RICO conspiracy and wire fraud and money laundering offenses, among other crimes.[1]  See United States v. Hawit et al., 15-CR-252 (S-1).  The superseding indictment (hereafter, "indictment" or "Ind.") was unsealed on December 3, 2015, following the arrests of some of the newly charged defendants.

The allegations summarized below are of particular relevance to the defendants' motions:

A.      The Enterprise

Count One of the indictment, charging RICO conspiracy, alleges an enterprise consisting of a group of legal entities associated in fact, specifically, the Fédération Internationale de Football Association ("FIFA"), its six constituent continental confederations (including the confederations covering North America, Central America, and the Caribbean ("CONCACAF") and South America ("CONMEBOL")), affiliated regional federations, national member associations (also known as "federations"), and sports marketing companies.  (Ind. ¶ 1). The indictment further alleges that this enterprise "constituted an ongoing organization whose

---

[1] Three of the defendants charged in the original indictment pleaded guilty before the grand jury returned the superseding indictment, so the superseding indictment charged a total of 27 defendants.

2

members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise," and that the enterprise engaged in, and its activities affected, interstate and foreign commerce.  (Id.).  The members of the enterprise carried out its principal purpose of promoting and regulating the sport of soccer in the Eastern District of New York and elsewhere by, among other things, creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport.  (Id. ¶ 2).

As alleged, FIFA, the international body governing organized soccer, was composed of as many as 209 national member associations from around the world, including federations representing the United States and the U.S. commonwealths or territories of Puerto Rico, Guam, American Samoa, and the U.S. Virgin Islands.  (Id. ¶ 4).  FIFA was governed by a congress, which was the highest legislative body for the association, composed of delegates from all of its member associations; an executive committee that functioned as the executive body of the organization; several standing committees; and a general secretariat that administered the organization.  (Id. ¶¶ 6-7).  FIFA also had a president, who was elected by the congress and served on FIFA's executive committee, to represent the associations worldwide.  (Id. ¶¶ 6-8).  The other members of the executive committee were appointed by the continental confederations.  (Id. ¶ 8).  The FIFA executive committee was responsible for, among other things, selecting the host nations for various FIFA tournaments, including the quadrennial World Cup tournament.  (Id. ¶¶ 9-10).  The United States hosted the World Cup in 1994 and in 2010 unsuccessfully bid to host the 2022 World Cup.  (Id. ¶ 10).

FIFA's code of ethics governed not only those directly employed by or affiliated with FIFA itself, but all soccer "officials," that is, individuals with responsibilities within FIFA

3

as well as within the continental confederations, national associations, leagues, and clubs.  (Id. ¶ 14).  This code of ethics imposed a duty of loyalty on all such soccer officials to FIFA and its constituent organizations and prohibited them from accepting bribes or cash gifts.  (Id.).  Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including the responsibility to comply with and enforce FIFA's statutes, regulations, and decisions (such as the FIFA code of ethics), and to work closely with FIFA to organize its competitions.  (Id. ¶ 11).  FIFA, in turn, helped finance the confederations and member associations.  (Id. ¶ 13).  All FIFA member associations were required to pay dues to FIFA and join one of the six continental confederations.  (Id. ¶¶ 4-5).  A large portion of FIFA's revenue was derived from the media and marketing rights to the quadrennial World Cup – 83% (or nearly $3.5 billion) during the 2007-2010 period, and 70% (or over $4 billion) during the 2011-2014 period, including hundreds of millions of dollars in sponsorship fees from U.S.-based sponsors. (Id. ¶ 12).

Leaders and representatives of the confederations conducted business with each other, as well as with the leaders and associates of FIFA, throughout the year.  (Id. ¶ 15).  For example, CONCACAF, which was headquartered in the United States, organized the Gold Cup, a tournament for men's national teams from the CONCACAF region, and also, on occasion, from other confederations.  (Id. ¶ 16).  Similarly, CONMEBOL organized the Copa América tournament for the CONMEBOL region's men's national teams, as well as two non-CONMEBOL teams, including the United States men's team on three occasions since 1993.  (Id. ¶ 17).  CONMEBOL and CONCACAF also jointly organized a special edition of the tournament to commemorate its centennial, the Copa América Centenario, which was to be played in the United States (id.) and was in fact played in the United States last summer.  More generally, "the

4

confederations also organized World Cup qualifying matches, using a variety of formats, and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA." (Id. ¶ 22).

FIFA and its constituent entities often entered into contracts with sports marketing companies to commercialize the media and marketing rights to soccer events, including the World Cup and other tournaments. (Id. ¶ 28). The sports marketing companies sold these rights to television and radio broadcast networks, sponsors, and licensees. (Id.). Some of the sports marketing companies, as well as some of the purchasers of these rights, were located in the United States, and the United States was an increasingly important and lucrative market for the commercialization of those rights. (Id. ¶¶ 28-29; see also id. ¶¶ 155-56). "The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for the enterprise." (Id. ¶ 29).

B.      The Defendants and Their Co-Conspirators

Various of the defendants and their co-conspirators, both those identified by name in the indictment and those identified by number, were members of the FIFA executive committee or other FIFA standing committees, employees of the FIFA general secretariat, or FIFA development officers. (See generally Ind. ¶¶ 30-93). Some of the defendants and their co-conspirators were officials of continental confederations, regional federations, or national associations. (Id.). And some of the defendants and co-conspirators were sports marketing company owners or executives, or their intermediaries.[2] (Id.). Some of the defendants and co-

_____

[2] Many of the defendants and co-conspirators held multiple positions in international soccer. Jeffrey Webb, for example, held positions at various times at FIFA and at the confederation, regional federation, and national member association level. (Ind. ¶ 65).

conspirators were U.S. citizens or legal permanent residents.  (Id. ¶¶ 40, 48, 54, 57, 61-62).  And some of the defendants owned or controlled real property in the United States.  (Id. ¶¶ 34, 47-48, 50).

Count One of the indictment charges Napout and Marin and their co-defendants with RICO conspiracy in connection with their participation in the corruption of international soccer through a pattern of racketeering activity consisting of acts indictable under 18 U.S.C. §§ 1343, 1956, 1957, 1952, and 1512, as well as acts chargeable under New York's and New Jersey's commercial bribery laws.  Counts Nine and Eighty-Three allege that Napout, Marin, and others joined wire fraud and money laundering conspiracies, respectively, involving the payment of bribes to obtain media and marketing rights associated with CONMEBOL's Copa Libertadores soccer tournament (the "Copa Libertadores Scheme #2") and the promotion of that scheme through wire transfers to and from the United States.  Counts Ten and Eighty-Four allege that Napout, Marin, and others joined wire fraud and money laundering conspiracies, respectively, involving the payment of bribes to obtain media and marketing rights associated with the CONMEBOL Copa América and CONMEBOL/CONCACAF Copa América Centenario (the "Copa América Centenario Scheme"), and the promotion of that scheme through wire transfers to and from the United States.  Counts Eleven and Twelve allege that Marin and others joined wire fraud and money laundering conspiracies, respectively, involving the payment of bribes in exchange for media and marketing rights associated with the Copa do Brasil soccer tournament sponsored by Confederação Brasileira de Futebol ("CBF"), the Brazilian soccer federation, and the promotion and concealment of the proceeds of that scheme through wire transfers to and from the United States.

6

The indictment alleges that Marin was an individual employed by and associated with the enterprise.  (Id. ¶ 50).  Specifically, between March 2012 and April 2015, Marin was president of CBF, which was a national member association of FIFA and CONMEBOL.  (Id.).  At various times relevant to the indictment, Marin was a member of various FIFA standing committees and maintained a residence in New York.  (Id.).

Napout also is alleged to have been an individual employed by and associated with the enterprise.  (Id. ¶ 41).  At various times relevant to the indictment, Napout was a member of multiple FIFA standing committees.  (Id.).  Between 2003 and 2013, Napout was vice president and then president of the Asociación Paraguaya de Fútbol, the Paraguayan soccer federation, which was a national member association of FIFA and CONMEBOL.  (Id.).  From August 2014 to at least the time of the indictment, Napout was the CONMEBOL president; prior to that, he was one of CONMEBOL's vice presidents.  (Id.).  And starting on May 29, 2015, and continuing until at least the date of the indictment, Napout was a member of FIFA's executive committee and a FIFA vice president.  (Id.).

C.     The Corruption of the Enterprise

The enterprise was corrupted by a pattern of racketeering activity involving the defendants and their co-conspirators.  Specifically, the indictment alleges that these individuals, "being persons employed by and associated with the enterprise," conspired to "conduct and participate, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity."  (Ind. ¶ 363).  The indictment further alleges that the defendants and co-conspirators "conspired with one another to use their positions within the enterprise to engage in schemes involving the solicitation, offer, acceptance, payment, and receipt of undisclosed payments, bribes, and kickbacks," and conspired with and abetted co-conspirators in

7

their abuse of their positions of trust.  (Id. ¶ 95).  More specifically, the indictment alleges that

the defendants and their co-conspirators agreed to conduct and participate in the conduct of the

affairs of the enterprise through a pattern of racketeering activity that included multiple acts

indictable under 18 U.S.C. §§ 1343 (wire fraud, including honest services wire fraud), 1956 and

1957 (money laundering and money laundering conspiracy), 1952 (Travel Act), and 1512

(obstruction of justice and obstruction of justice conspiracy), as well as multiple acts of bribery

chargeable under New York and New Jersey state law.  (Id. ¶ 364).

      D.     The Centrality of the U.S. Financial System

      As set forth in the indictment, in furtherance of both the operation of the

enterprise and the corruption of the enterprise through a pattern of racketeering activity,

members of the enterprise, including the defendants and their co-conspirators, frequently used

the financial system of the United States, and the wire facilities of the United States, to hold and

transfer funds and otherwise further and promote their schemes.  (Ind. ¶¶ 118-119).  Their

reliance on the U.S. financial system was "was significant and sustained and was one of the

central methods and means through which they promoted and concealed their schemes."  (Id.

¶ 118).

      The indictment is replete with such examples.  For instance, (1) many of the

defendants and their co-conspirators maintained bank accounts located in the United States (id.

¶¶ 108, 119, 148, 152, 153, 163, 185, 193, 228, 252, 268, 281, 291, 325, 327, 349, 350, 351);

(2) the defendants and their co-conspirators caused tens of millions of dollars in bribe payments

to be sent from, through, and/or to bank accounts located in the United States (id. ¶¶ 108, 116,

148, 152, 163, 164, 171, 184, 185, 193, 210, 213, 227, 228, 239, 249, 252, 256, 257, 258, 261,

262, 265, 268, 273, 274, 276, 278, 281, 291, 311, 325, 327, 331, 337, 349, 350, 351);

8

(3) multiple soccer organizing bodies conducted business using U.S. bank accounts (id. ¶¶ 119, 337, 357); (4) sports marketing companies, which paid millions of dollars in illicit payments, conducted business at U.S. financial institutions (id. ¶¶ 119, 148, 153, 164, 171, 184, 185, 193, 210, 213, 239, 249, 252, 256, 257, 258, 261, 262, 265, 268, 273, 274, 275, 276, 278, 281, 325, 337, 349); and (5) payments on contracts procured through bribery were made to or from the United States (id. ¶¶ 153, 185, 239, 275, 337, 349, 357).

      E.      <u>The Charged Schemes</u>

Count One describes 15 criminal schemes that include acts indictable under federal law and/or chargeable under state law as part of the alleged pattern of racketeering activity, many of which schemes were also charged against various defendants in the indictment as non-RICO standalone wire fraud, money laundering, or obstruction offenses.  All 15 schemes involved the agreement to make undisclosed bribe or kickback payments to officials of FIFA and its constituent bodies in exchange for acts they took in their capacities as soccer officials, in breach of their fiduciary duties to their respective soccer organizations.  Twelve of the schemes involved illicit payments in exchange for contracts awarding media and marketing rights to soccer tournaments or matches (Schemes A, B, C, D, E, G, I, J, L, M, N, O); two involved payments to influence actions at the FIFA level: the 2011 election of the FIFA president and the selection of the host nation for the 2010 World Cup (Schemes H and K); and one involved payments made to secure a federation's sponsorship rights (Scheme F).  Eight of the schemes involved the deprivation of honest services owed to CONCACAF or its member federations

(Schemes B, G, I, J, L, M, N, O); six schemes involved CONMEBOL or its member federations (Schemes A, C, D, E, F, O); and two related directly to FIFA itself (Schemes H and K).[3]

Though varied in time and particulars, certain themes are present through the schemes.  For instance:

- All 15 of the schemes involved the use of U.S. wire facilities (e.g., emails, telephone calls, and wire transfers) in furtherance thereof (Schemes A, B, C, D, E, F, G, H, I, J, K, L, M, N, O);

- Fourteen involved the payment of bribes or kickbacks from, through, and/or to U.S. bank accounts (Schemes A, B, C, D, E, F, G, H, I, J, L, M, N, O);

- Twelve involved meetings in the United States in furtherance of the schemes (Schemes B, D, E, F, H, I, J, L, M, N, O);

- Ten involved illicit payments made (or to be made) by U.S.-based sports marketing companies (Schemes A, B, C, F, G, I, J, M, N, O);

- Seven involved competitions played (or to be played) in the United States (Schemes B, D, J, L, M, N, O); and

- Six explicitly referenced the importance of the U.S. market for tournaments' media and marketing rights (Schemes A, B, C, D, G, O).

As set forth above, in addition to Count One, Napout is charged in Counts Nine, Ten, Eighty-Three, and Eighty-Four for his participation in the Copa Libertadores Scheme #2 (Scheme D) and the Copa América Centenario Scheme (Scheme O).  Marin is charged in these counts, as

---

[3] As detailed in the indictment, Scheme O is the CONMEBOL/CONCACAF Copa América Centenario Scheme, involving Napout and Marin, in which both CONMEBOL and CONCACAF were defrauded as officials from both confederations agreed to receive bribe payments from a company called Datisa in exchange for awarding the media and marketing rights to the Copa América Centenario, a tournament jointly-organized by CONCACAF and CONMEBOL.

well as in Counts Eleven and Twelve for his participation in the Copa do Brasil Scheme (Scheme E).

Summaries of the three schemes in which Napout and Marin are specifically named are set forth below:

· Copa Libertadores Scheme #2 – over the course of several years, representatives of T&T Sports Marketing Ltd. ("T&T"), a company part owned by Torneos y Competencias S.A., paid bribes to Napout, Marin, and other CONMEBOL officials to obtain the broadcasting rights to the Copa Libertadores, as well as to two other club tournaments, the Copa Sudamericana and the Recopa Sudamericana, which was played in the United States on two occasions. (Ind. ¶¶ 174-185). Various of the defendants and co-conspirators used U.S. financial institutions and wire facilities to make and receive bribe payments and to transfer payments related to contracts secured through bribery. (Id. ¶ 185). The defendants and co-conspirators also held meetings in the United States in furtherance of the scheme. (Id.).

· CONMEBOL/CONCACAF Copa América Centenario Scheme – representatives of a consortium of sports marketing companies called Datisa agreed to pay bribes to various CONMEBOL and CONCACAF officials, including Napout and Marin, in exchange for the commercial rights to the 2015, 2019, and 2023 editions of the Copa América, as well as the 2016 Copa América Centenario. (Ind. ¶¶ 131, 341-360). At a press conference in Miami on May 1, 2014, CONCACAF and CONMEBOL officials announced the concept of the Copa América Centenario and the fact that it would be played in the United States. (Id. ¶¶ 134, 353). Various of the defendants and co-conspirators used U.S. financial institutions and wire facilities to make and receive bribe payments and to transfer payments related to contracts secured through bribery. (Id. ¶¶ 349-50, 357). The defendants and co-conspirators also held meetings in the United States in furtherance of the scheme. (Id. ¶ 360).

· Copa do Brasil Scheme – various officials of the Brazilian soccer federation, including Marin, received bribes from two sports marketing companies in exchange for the federation's commercial rights to the Copa do Brasil, a club competition the federation sponsored. (Ind. ¶¶ 186-194). Various of the defendants and co-conspirators used U.S. wire facilities in furtherance of the scheme, and meetings were held in the United States in connection with the scheme. (Id. ¶¶ 189, 193).

11

Additional details regarding the foregoing schemes, as well as the other 12 schemes noted above, are set forth in the indictment.

ARGUMENT

Given the number of separate contentions in Marin's and Napout's motions, the government responds to their arguments seriatim.  For the reasons set forth below, the defendants' motions are without merit and should be denied.

I.    Marin

Marin argues that Count One should be dismissed on the grounds that it fails to allege essential elements of the crime of RICO conspiracy and is duplicitous.  Both arguments are meritless.

   A.    Count One Adequately Alleges the Elements of RICO Conspiracy

      1.    Legal Standard

         a.    Motions to Dismiss Generally

Racketeering indictments, like all indictments, are governed by Rule 7(c)(1) of the Federal Rules of Criminal Procedure.  See United States v. Fruchter, 104 F. Supp. 2d 289, 296 (S.D.N.Y. 2000).  Rule 7(c)(1) provides that an indictment need only contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  An indictment satisfies that rule when it contains the elements of an offense, notice of the charges against which the defendant must defend, and information sufficient to protect the defendant against double jeopardy.  See Hamling v. United States, 418 U.S. 87, 117 (1974); Fruchter, 104 F. Supp. 2d at 296.  Generally, to withstand a motion to dismiss, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  United States v. Yannotti, 541 F.3d 112, 127 (2d

12

Cir. 2008) (quoting United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998)) (affirming denial of motion to dismiss racketeering act); United States v. Price, No. 05-CR-492 (NGG), 2010 WL 1949361, at *5 (E.D.N.Y. May 11, 2010) (noting that motion to dismiss racketeering acts would have failed where the indictment tracked the statute and stated the time and place of alleged crimes), aff'd, 443 Fed. App'x 576, 580 (2d Cir. 2011) (summary order); United States v. Reale, No. S4 96-CR-1069 (DAB), 1997 WL 580778, at *6-7 (S.D.N.Y. Sept. 17, 1997) (denying motion to dismiss racketeering charges because the indictment tracked 18 U.S.C. §§ 1962(c) and 1962(d) and stated the time and place of the alleged crimes).

A defendant's factual arguments challenging facially valid pleadings do not justify pre-trial dismissal of the indictment.  The government is entitled to marshal and present its evidence at trial and, if warranted, have its sufficiency tested by a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  But a motion to dismiss a properly pled indictment "confuses standards of pleading with standards of proof." Reale, 1997 WL 580778, at *7; see United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009) ("The Defendants, however, had no basis to challenge the sufficiency of the indictment before trial because it met the basic pleading requirements and was valid on its face."); United States v. Cassese, 273 F. Supp. 2d 481, 484-85 (S.D.N.Y. 2003); Fruchter, 104 F. Supp. 2d at 298; see also United States v. Gotti, No. S4 02-CR-743 (RCC), 2004 WL 32858, at *2 (S.D.N.Y. Jan. 6, 2004) ("Defendants will have other opportunities to contest the sufficiency of the Government's evidence, but a pretrial motion to dismiss part of the indictment is not the time nor the proper occasion."); United States v. Gambino, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("[A] defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency.").

13

b.    RICO Conspiracy

The Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§§ 1961-1968, was enacted on October 15, 1970 as Title IX of the Organized Crime Control Act

of 1970.  The substantive crime of racketeering, which is the goal of the conspiracy charged in

Count One of the indictment, provides as follows:

> It shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect,
> interstate or foreign commerce, to conduct or participate, directly
> or indirectly, in the conduct of such enterprise's affairs through a
> pattern of racketeering activity . . . .

18 U.S.C. § 1962(c).  To establish a violation of RICO's conspiracy provision, 18 U.S.C.

§ 1962(d), the government must prove three elements: (1) the existence of an enterprise or an

agreement that an enterprise would exist; (2) that the enterprise was or would be engaged in, or

its activities affected or would affect, interstate or foreign commerce; and (3) that the defendant

knowingly agreed that a conspirator, which may but need not include the defendant himself,

would commit a violation of 18 U.S.C. § 1962(c).  See, e.g., United States v. Salinas, 522 U.S.

52, 62-65 (1997).  There is no overt act requirement.  Id. at 63 ("The RICO conspiracy provision

. . . is even more comprehensive than the general conspiracy offense in § 371.").  Moreover, "the

RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial

purposes.'"  Boyle v. United States, 556 U.S. 938, 944 (2009) (quoting § 904(a), 84 Stat. 947,

note following 18 U.S.C. § 1961).

The "enterprise" element, one of the elements challenged by Marin, "includes any

individual, partnership, corporation, association, or other legal entity, and any union or group of

individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  In Boyle, a 2009

case rejecting a challenge to a conviction in this District, the Supreme Court held that an

14

association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946; see also id. at 944 (observing that the statutory definition of "enterprise" in 18 U.S.C. § 1961(4) "does not specifically define the outer boundaries of the 'enterprise' concept," and that the definition is "obviously broad" and has a "wide reach").

> An enterprise does not require a "hierarchy" or "regular meetings regarding enterprise affairs," id. at 948, or "a set membership" or "established rules," United States v. Krasniqi, 555 Fed. App'x 14, 17 (2d Cir. 2014) (summary order). An association-in-fact enterprise "is simply a continuing unit that functions with a common purpose." United States v. Pierce, 785 F.3d 832, 838 (2d Cir. 2015) (quoting Boyle, 556 U.S. at 948).[4]

> With respect to the agreement element, also challenged by Marin, there are two alternative ways to establish a conspiratorial agreement to violate the RICO statute. First, as the substantive RICO offense requires two or more predicate acts, the government may establish the agreement by proving that the defendant personally agreed to commit at least two predicate acts of racketeering in furtherance of the conduct of the affairs of the enterprise. See, e.g., Salinas, 522 U.S. at 63; United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002); United States v.

---

[4] The enterprise element and the pattern element are separate elements. See United States v. Turkette, 452 U.S. 576, 583 (1981) (holding, in the context of an association-in-fact enterprise, that "[w]hile the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."). At the same time, "RICO charges may be proven even when the enterprise and predicate acts are functionally equivalent, and the proof used to establish them coalesced." United States v. Ferguson, 758 F.2d 843, 853 (2d Cir. 1985) (internal quotation marks and alterations omitted); accord United States v. Applins, 637 F.3d 59, 73 (2d Cir. 2011).

Teitler, 802 F.2d 606, 612-13 (2d Cir. 1985).  Second, as "[a] conspiracy may exist even if a

conspirator does not agree to commit or facilitate each and every part of the substantive offense,"

the RICO statute does not require the government to prove that the defendant agreed to

personally commit two racketeering acts.  Salinas, 522 U.S. at 63-66; id. at 64 ("The RICO

conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an

overt act; it did not, at the same time, work the radical change of requiring the Government to

prove each conspirator agreed that he would be the one to commit two predicate acts.").

Accordingly, "a conspirator charged with racketeering conspiracy need not commit or even agree

to commit the predicate acts that are elements of a substantive count to be found guilty of the

racketeering conspiracy, for 'it suffices that he adopt[ed] the goal of furthering or facilitating the

criminal endeavor.'"  Ciccone, 312 F.3d at 542 (quoting Salinas, 522 U.S. at 65).

        Moreover, "the government need not prove that a [RICO] conspirator-defendant

agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of

all the details of the conspiracy."  United States v. Rastelli, 870 F.2d 822, 828 (2d Cir. 1989)

(affirming RICO conspiracy conviction); see also United States v. Friedman, 854 F.2d 535, 562

(2d Cir. 1988) ("[T]here is no requirement that each member of a conspiracy conspire directly

with every other member of the conspiracy.  This is especially true with respect to a RICO

conspiracy.").  Rather, under Salinas, "to be found guilty of RICO conspiracy, a defendant need

only know of, and agree to, the general criminal objective of a jointly undertaken scheme."

Yannotti, 541 F.3d at 122.  This is so because "there is no rule requiring the government to prove

that a [RICO] conspirator knew of all criminal acts by insiders in furtherance of the conspiracy.

No theory requires co-conspirators to have such knowledge.  To be convicted as a conspirator,

one must be shown to have possessed knowledge of only the general contours of the conspiracy."

16

United States v. Zichettello, 208 F.3d 72, 100 (2d Cir. 2000) (affirming RICO conspiracy conviction).  Relatedly, there is no requirement that a defendant charged with RICO conspiracy personally operate or manage the enterprise, a requirement for the substantive offense.  See id. at 99; see also id. (noting that a defendant can be guilty of RICO conspiracy "even if he is not among the class of persons who could commit the crime directly" (quoting United States v. Viola, 35 F.3d 37, 43 (2d Cir. 1994)).  Finally, participation in a RICO conspiracy can be shown through only circumstantial evidence.  See United States v. Daly, 842 F.2d 1380, 1389 (2d Cir. 1988).

    2.  Analysis

    The indictment properly alleges the elements of a RICO conspiracy, because it alleges: (1) the existence of an association-in-fact enterprise comprising FIFA and its constituent continental confederations, regional federations, national associations, and sports marketing companies; (2) that the enterprise affected interstate and foreign commerce; and (3) that each defendant agreed that a conspirator would violate 18 U.S.C. § 1962(c) by conducting the affairs of the enterprise through a pattern of racketeering activity.

    a.  Count One Adequately Alleges the Existence of an Enterprise

    Marin asserts that Count One must be dismissed because it "does not adequately allege an 'enterprise.'"  (Marin Br. at 8).  The argument ignores explicit allegations in the indictment to the contrary.  In addition to identifying FIFA and the other members of the enterprise (see Ind. ¶¶ 1-29), the indictment includes the following allegations that define various facets of the enterprise:

       · "The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise" (id. ¶ 1);

17

&middot; "The principal purpose of the enterprise was to regulate and promote the sport of soccer worldwide" (id. ¶ 2);

&middot; "The members of the enterprise carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport" (id.); and

&middot; "Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions" (id. ¶ 11).

The allegations in the indictment, including those relating to the existence and nature of the enterprise, must be assumed true at the pleading stage.  See United States v. Finazzo, No. 10-CR-457 (RRM), 2013 WL 619571, at *2 (E.D.N.Y. Feb. 19, 2013).  The indictment has properly alleged that the enterprise operated as a "continuing unit that functions with a common purpose." Pierce, 785 F.3d at 835 (internal quotation marks omitted).  Nothing more is required at this stage.

Marin argues, puzzlingly, that "despite its 522 paragraphs, the Indictment never alleges a connection between the Confederations."  (Marin Br. at 9 (emphasis in original)).  His argument is directly contradicted by the indictment's explicit allegations of the very connections he claims are lacking.  For instance:

&middot; "[T]he six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis" (Ind. ¶ 15) (emphasis added);

&middot; "The leaders and representatives of the confederations conducted business with one another . . ." (id.) (emphasis added);

&middot; "The confederations also organized World Cup qualifying matches, using a variety of formats, and, from time to time, worked together to organize

18

inter-confederation competitions, often with the support and approval of FIFA" (id. ¶ 22) (emphasis added);

·   "The FIFA executive committee, often referred to as the 'ExCo,' was composed of the FIFA president and a number of ordinary members, some of whom also held the title of vice president. . . . Each confederation was entitled to appoint a specific number of vice presidents and ordinary members, as set forth in the FIFA statutes. . . . Among other duties, the executive committee was responsible for selecting the host nations of FIFA tournaments . . . . Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions" (id. ¶¶ 8, 9, 11); and

·   "Over time, the organizations formed to promote and govern soccer in regions and localities throughout the world, including the United States, became increasingly intertwined with one another and with the sports marketing companies that enabled them to generate unprecedented profits through the sale of media rights to soccer matches" (id. ¶ 98.).

Finally, as Marin himself acknowledges in a footnote that all but swallows the argument, the Copa América Centenario Scheme (see id. ¶¶ 341-60) – which alleges that Marin and his co-conspirators agreed to receive tens of millions of dollars in exchange for awarding the media and marketing rights to the Copa América to a sports marketing venture called Datisa – involved, among other editions, a "jointly organized [] soccer competition related to the Copa América Centenario tournament supposedly organized by CONMEBOL and CONCACAF."  (Marin Br. at 9 n.4).[5]

_____

[5] While the strength, let alone the veracity, of the allegations in the indictment is not at issue in these pre-trial motions, it is hard to understand Marin's skepticism that the Copa América Centenario was jointly organized by CONCACAF and CONMEBOL.  The joint organization of the tournament was widely known and the subject of official joint pronouncements from the confederations themselves.  See, e.g., http://www.concacaf.com/article/concacaf-and-conmebol-release-joint-rfp-for-copa-america-

In short, the government has satisfied Rule 7(c)(1) as the indictment adequately alleges the existence of an enterprise.  Marin's arguments about the perceived insufficiency of the government's evidence of the enterprise, including that the enterprise was actually a "disjointed group" comprised of "wholly unconnected Confederations" (Marin Br. at 9), "must await a Rule 29 proceeding or the jury's verdict."  <u>Gambino</u>, 809 F. Supp. at 1079.  Accordingly, Marin's motion to dismiss must be denied.

    b. <u>Count One Adequately Alleges Marin's Involvement in the RICO Conspiracy</u>

In addition to challenging the existence of the enterprise, Marin asserts that the indictment does not allege that he knowingly joined the conspiracy because the "actual substantive allegations of conduct by Marin concern exclusively a role with one Confederation, CONMEBOL, its constituent members, and the operation of that Confederation's own business." (Marin Br. at 10).  This, too, fails.

As set forth above, the indictment need not allege that Marin was aware of, knew, or agreed with all of the other members of the enterprise or that he knew all of the details of the conspiracy.  <u>See</u> <u>United States v. Rastelli</u>, 870 F.2d 822, 828 (2d Cir. 1989).  All that is required is that Marin allegedly agreed to further "the general criminal objective of a jointly undertaken scheme."  <u>Yannotti</u>, 541 F.3d at 122.  The indictment so alleges.  For instance:

- Marin "was an individual employed by and associated with the enterprise" (Ind. ¶ 50);

- Marin and others, including Marin's co-defendants, "conspired with one another to use their positions within the enterprise to engage in schemes

---

centenario-2016-commercial-rights (joint statement of CONCACAF and CONMEBOL issuing request for proposals to purchase commercial rights to tournament) (last visited Dec. 21, 2016).

involving the solicitation, offer, acceptance, payment, and receipt of undisclosed and illegal payments, bribes, and kickbacks" (id. ¶ 95);

·   Marin and others, including Marin's co-defendants, "corrupted the enterprise by engaging in various criminal activities, including fraud, bribery, and money laundering, in pursuit of personal and commercial gain" (id.);

·   Marin and his co-defendants "participated in the corruption of the enterprise by conspiring with and aiding and abetting their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties" (id.); and

·   Marin and his co-codefendants "each . . . agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, the last of which would occur within 10 years of a prior act of racketeering activity" (id. ¶ 364).

United States v. Zichettello, cited by Marin (see Marin Br. at 11), is instructive in this regard. There, the defendants were convicted of RICO conspiracy for their participation in various schemes involving awarding contracts in exchange for bribes and kickbacks. See 208 F.3d at 79. The Second Circuit rejected the defendants' challenge to the sufficiency of the evidence, explaining that even if they "did not know of certain acts of the RICO enterprise," they were still liable so long as "each defendant was aware of the general nature of the conspiracy and that the conspiracy extended beyond the defendant's individual role." Id. at 100 (internal quotation marks omitted). Because the defendants "each knew that the kickback schemes extended beyond themselves individually and involved at least each other" and other co-conspirators, the court held that the evidence "easily suffice[d]." Id.

The same logic applies here, and particularly so at this earlier stage in the case. In addition to the general allegations outlined above, the three schemes in which Marin is specifically named – the Copa Libertadores Scheme #2, the Copa do Brasil Scheme, and the Copa América Centenario Scheme – all contemplate his knowledge and awareness of the

21

involvement of multiple bribe payors and multiple bribe recipients.  (See, e.g., Ind. ¶¶ 114, 133, 183, 192).  For example, as part of the Copa do Brasil Scheme, Marin is alleged to have met with co-conspirator José Hawilla and discussed "the status of the payments due to him and the defendant MARCO POLO DEL NERO" as well as "whether it was really necessary to continue to pay bribes to the defendant RICARDO TEIXEIRA."  (Id. ¶ 194).

Accordingly, Marin is alleged to have knowledge of the general contours of the conspiracy.  No more specific allegations are required at this stage.  This aspect of his motion must therefore be denied as well.

B.   Count One Is Not Duplicitous

1.   Legal Standard

Duplicity is a pleading defect resulting from the joining of "two or more distinct crimes in a single count."  United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992).  A duplicitous pleading can be problematic because it creates the "possibility of a non-unanimous jury verdict" by obscuring whether the jury found the defendant guilty of one crime or multiple crimes.  United States v. Helmsley, 941 F.2d 71, 91 (2d Cir. 1991); see also United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980) (explaining that duplicitous pleadings may result in inadequate notice to the defendant of the charges and impede a defendant's ability to later raise a double jeopardy challenge).  When an indictment is held to be duplicitous before trial, the remedy is reformulation, not dismissal.  See United States v. Droms, 566 F.2d 361, 363 n.1 (2d Cir. 1977).  After trial, prejudice from a duplicitous indictment can be avoided at sentencing. See United States v. Sturdivant, 244 F.3d 71, 80 (2d Cir. 2001) ("[A] court can avoid prejudice

22

to the defendant by sentencing him based upon a conviction for only one offense, . . . as long as that one offense does not carry a higher penalty than the other . . . .").

The duplicity argument is infrequently made in the RICO context, likely because, as the Supreme Court made clear nearly 20 years ago in Salinas, a racketeering conspiracy is not a conspiracy to commit the alleged predicate acts but rather a conspiracy to participate in the affairs of an enterprise through a pattern of racketeering activity – and thus to agree to further the overall objective of the enterprise and its conspiratorial members.  522 U.S. at 65 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.  He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion.").  A RICO conspiracy thus may properly allege predicate acts of racketeering that are themselves conspiracies because the RICO conspiracy and the predicate conspiracies are distinct offenses with different objectives.  See, e.g., United States v. Ruggiero, 726 F.2d 913, 923 (2d Cir. 1984) (holding that RICO conspiracy does not "violate the principle of Kotteakos v. United States, 328 U.S. 750 (1946)), which prohibits conviction of multiple conspiracies under an indictment charging a single conspiracy"), abrogated on other grounds by Salinas, 522 U.S. at 61-64.[6]

_____

[6] The Second Circuit has similarly rejected multiplicity challenges to indictments alleging RICO conspiracy and other conspiracy violations.  See, e.g., United States v. Jones, 482 F.3d 60, 73 (2d Cir. 2006) (rejecting multiplicity challenge to indictment charging RICO conspiracy, two narcotics conspiracies, and two conspiracies to commit murder in-aid-of racketeering); cf. United States v. Barton, 647 F.2d 224, 234-38 (2d Cir. 1981) (rejecting double jeopardy challenge to indictment charging RICO conspiracy and violation of the general conspiracy statute, 18 U.S.C. § 371).

Other circuits have followed the same approach. In United States v. Diecidue, the Fifth Circuit rejected a duplicity challenge because the various offenses alleged as part of the RICO conspiracy were "merely descriptive of the single overall agreement" to conduct and participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity. 603 F.2d 535, 546 (5th Cir. 1979); see also United States v. Gonzalez, 921 F.2d 1530, 1536 (11th Cir. 1991) (concluding that "Congress intended RICO and its predicate crimes to be separate offenses and allow successive prosecutions"); United States v. Esposito, 912 F.2d 60, 64-65 (3d Cir. 1990) (holding that where defendant had been acquitted on a RICO charge, double jeopardy did not bar a subsequent prosecution for the underlying predicate acts).

2.     Analysis

Marin asserts that because the RICO conspiracy charged in Count One does not (he argues) allege the existence of a "proper enterprise," it is duplicitous of the wire fraud and money laundering conspiracies with which he is also charged. (Marin Br. at 12-13). This argument fails on its face.

It is well established that RICO conspiracy is not the agreement to commit the charged racketeering acts; it is the agreement for the commission of a substantive RICO offense. See, e.g., Salinas, 522 U.S. at 478; United States v. Kazarian, No. 10-CR-895 (PGG), 2012 WL 1810214, at *23 (S.D.N.Y. May 18, 2012) (rejecting multiplicity challenge to RICO conspiracy count where "predicate acts listed in the RICO conspiracy count . . . are charged as conspiracies" in substantive counts); cf. United States v. Basciano, 599 F.3d 184, 205 (2d Cir. 2010) ("[T]he law permits a defendant to be prosecuted – either simultaneously or at separate times – for both

24

substantive racketeering and the predicate crimes evidencing the pattern of racketeering.").[7]  As set forth above, the indictment sufficiently alleges all the elements of the RICO conspiracy charged in Count One, including the existence of an enterprise and Marin's participation in the RICO conspiracy.  As such, Count One is not duplicitous of the wire fraud and money laundering conspiracy charges.[8]

Marin's claims of "prejudice" also do not require dismissal of Count One.  (Marin Br. at 13-14).  There is no reason to believe, as Marin asserts, that there will be "potential uncertainty as to the meaning of a guilty verdict."  (Id. at 14).  The jury will be instructed on the elements of RICO conspiracy, i.e., that Marin agreed that the enterprise would be conducted through a pattern of racketeering activity, and on the elements and scope of the wire fraud and money laundering conspiracies he is charged with in the non-RICO counts.  Marin has failed to establish why the presence of other conspiracy counts along with the RICO conspiracy count alters the general rule that juries are presumed to follow their instructions.  See, e.g., Richardson v. Marsh, 481 U.S. 200, 206 (1987) (stating that it is an "almost invariable assumption of the law

---

[7] For this reason, the indictment does not, as Marin argues, charge "the very same conspiracies twice; once as part of Count One and then again as part of a distinct conspiracy charge."  (Marin Br. at 13 n.7).  "[P]rosecutions for RICO and for its substantive predicates are distinct for double jeopardy purposes."  United States v. D'Amico, 734 F. Supp. 2d 321, 341 (S.D.N.Y. 2010) (internal quotation marks omitted).

[8] Even if Marin's challenge to Count One for failure to properly allege the enterprise element were meritorious – and for the reasons discussed above, it is not – that defect would not transform the charged RICO conspiracy into a generic conspiracy somehow duplicitous of the other counts.  Rather, the proper remedy would be dismissal of Count One as facially invalid, with continued prosecution of the wire fraud and money laundering conspiracy charges; it would not render a proper RICO conspiracy charge invalid on the basis of duplicity.

25

that jurors follow their instructions"); <u>Francis v. Franklin</u>, 471 U.S. 307, 324 n.9 (1985) (same);

<u>United States v. Pforzheimer</u>, 826 F.2d 200, 205 (2d Cir. 1987) (same).

II.      <u>Napout</u>

      Napout moves to dismiss all five counts against him on the grounds that the Court

lacks or, in the alternative, should not exercise jurisdiction over the charged offenses.[9]  He also

seeks a bill of particulars.  For the reasons discussed below, Napout's motions are meritless and

should be denied in their entirety.

    A.      <u>The Indictment Does Not Impermissibly Seek Extraterritorial Application of the Charged Statutes</u>

      Napout argues that the charges against him should be dismissed because they

impermissibly rely on extraterritorial application of the relevant criminal statutes.  Napout is

wrong.  As discussed below, the indictment properly charges Napout with domestic violations of

the wire fraud and money laundering statutes, and with conspiring to participate in the affairs of

the charged enterprise through a largely domestic pattern of racketeering activity.

     1.      <u>Legal Standard</u>

        a.      <u>The Supreme Court's Two-Step Framework for Addressing Extraterritoriality Issues</u>

      The Supreme Court has articulated a two-step framework for addressing

challenges relating to the extraterritorial reach of federal statutes:

> At the first step, we ask whether the presumption against
> extraterritoriality has been rebutted – that is, whether the statute

---

[9] Although framed as an attack on the Court's jurisdiction, Napout's motion is properly viewed as an argument that the relevant statutes do not reach his alleged conduct.  <u>See</u> <u>Morrison v. Nat'l Australia Bank Ltd.</u>, 561 U.S. 247, 253-54 (2010) (distinguishing between a statute's "extraterritorial reach," which is a "merits question," and jurisdiction, which "refers to a tribunal's power to hear a case" (internal quotation marks omitted)).

26

> gives a clear, affirmative indication that it applies extraterritorially.
> We must ask this question regardless of whether the statute in
> question regulates conduct, affords relief, or merely confers
> jurisdiction.  If the statute is not extraterritorial, then at the second
> step we determine whether the case involves a domestic application
> of the statute, and we do this by looking to the statute's "focus."

RJR Nabisco, Inc. v. European Comm., 136 S. Ct. 2090, 2101 (2016) (citing Morrison v. Nat'l

Australia Bank Ltd., 561 U.S. 247 (2010) and Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct.

1659 (2013)).  Thus, the first step of the inquiry turns on whether the statutory text, viewed in

context, clearly indicates that the statute applies extraterritorially.  See RJR Nabisco, 136 S. Ct.

at 2102 (holding that "a clear indication of extraterritorial effect" is required, but that "an express

statement of extraterritoriality is not essential.  Assuredly context can be consulted as well."

(internal quotation marks and citations omitted)).

       If the statute does not clearly indicate extraterritorial effect, the question at the

second step is whether the challenged application of the statute is extraterritorial or domestic, an

inquiry that turns on the "focus" of the statute at issue.  See Morrison, 561 U.S. at 266-67.[10]  "If

the conduct relevant to the statute's focus occurred in the United States, then the case involves a

---

[10] In Morrison, the parties disputed whether a civil securities fraud lawsuit brought
pursuant to § 10(b)(5) of the Securities Exchange Act of 1934 (the "Exchange Act") in
connection with a foreign bank whose shares traded exclusively on foreign exchanges
impermissibly sought extraterritorial application of the statute.  561 U.S. at 250-51.  Examining
the language of the Exchange Act, which states that its object is to regulate domestic securities
exchanges, the Court found that the "focus" of the Exchange Act is "not upon the place where
the deception originated, but upon purchases and sales of securities in the United States."  Id. at
266 (emphasis added).  Accordingly, the Court held, if a claim brought under the Exchange Act
does not relate to securities traded on a domestic exchange, it is impermissibly extraterritorial,
regardless of any other connections between the claim and the United States; conversely, if a
claim under the Exchange Act involves securities traded on a domestic exchange, it is a
permissibly domestic, regardless of any other connections between the claim and conduct
overseas.  Id. at 266-69.

permissible domestic application even if other conduct occurred abroad; but if the conduct

relevant to the focus occurred in a foreign country, then the case involves an impermissible

extraterritorial application regardless of any other conduct that occurred in U.S. territory." RJR

Nabisco, 136 S. Ct. at 2101; see also Morrison, 561 U.S. at 267-70 (concluding that because the

"focus" of the Exchange Act is upon "purchases and sales of securities in the United States," the

inquiry is a "transactional test" of "whether the purchase or sale is made in the United States, or

involves a security listed on a domestic exchange," not whether "significant and material

conduct" occurred in the United States); Pasquantino v. United States, 544 U.S. 349, 371 (2005)

(stating that the use of "U.S. interstate wires to execute a scheme to defraud" is the "domestic

element of [the defendants'] conduct . . . [and] what the Government is punishing"); United

States v. Kim, 246 F.3d 186, 190 (2d Cir. 2001) ("[A]s the statute plainly states, what is

proscribed is use of the telecommunication systems of the United States in furtherance of a

scheme . . . . Nothing more is required.  The identity and location of the victim, and the success

of the scheme, are irrelevant." (quoting United States v. Trapilo, 130 F.3d 547, 552 (2d Cir.

1997)).

### b.     Wire Fraud and Extraterritoriality

The Supreme Court, Second Circuit, and other courts have made clear that a wire

fraud or wire fraud conspiracy charge alleging the use of the wire facilities of the United States

in furtherance of a fraudulent scheme constitutes a domestic application of the wire fraud statute

because the focus, or "intended purpose," of the statute is "to prevent the use of [U.S. wires] in

furtherance of fraudulent enterprises."  Kim, 246 F.3d at 191 (internal quotation marks and

citations omitted); see also Pasquantino, 544 U.S. at 371 (holding that the "domestic element of

petitioners' conduct is what the Government is punishing" in prosecution involving defendants'

28

use of U.S. wires to execute a scheme to defraud a foreign sovereign of tax revenue); <u>Trapilo</u>,

130 F.3d at 552 ("what is proscribed is use of the telecommunication systems of the United

States in furtherance of a scheme"); <u>United States v. Gilboe</u>, 684 F.2d 235, 238 (2d Cir. 1982)

(holding that "jurisdiction under § 1343 is satisfied by defendant's use of the wires to obtain the

proceeds of his fraudulent scheme"); <u>United States v. Allen</u>, 160 F. Supp. 3d 698, 707 (S.D.N.Y.

2016) (holding that because wires between the United States and foreign countries were used as

part of the scheme, "[s]uch acts [the wire transmissions] were properly prosecuted as a domestic

criminal violation") (citing, among other cases, <u>Kim</u> and <u>Gilboe</u>); <u>United States v. Hayes</u>, 118 F.

Supp. 3d 620, 628 (S.D.N.Y. 2015) (holding in context of wire fraud conspiracy charge that

"Congress's legislative concern was to prevent the use of [U.S. wires] in furtherance of

fraudulent enterprises," so "the location of the wires is the court's primary concern" (internal

quotation marks and citations omitted)).

   <u>Trapilo</u>, which held that the wire fraud statute's "<u>focus</u> is upon <u>the misuse of the

wires</u>, not the regulation of state affairs," is particularly instructive, as it anticipates the reasoning

and language the Supreme Court would later employ in the cases cited above.  130 F.3d at 552

(internal quotation marks and citation omitted) (emphasis added).  Noting that "[w]e concern

ourselves only with what has been expressly forbidden by statute – the use of the [U.S.] wires in

the scheme to defraud," the court explained: "[A]s the statute plainly states, what is proscribed is

the use of <u>the telecommunications systems of the United States</u> in furtherance of a scheme . . . .

<u>Nothing more is required</u>.  The identity and location of the victim, and the success of the scheme,

are irrelevant."  <u>Id.</u> at 552, 553 (emphasis added, citations omitted).  The court then emphasized

that "[o]ur goal is simply to vindicate the intended purpose of the statute, that is, to prevent the

use of our telecommunications systems in furtherance of fraudulent enterprises." Id. at 553

(internal quotation marks, citation and alterations omitted).[11]

Courts in other circuits have reached the same conclusion in both wire fraud and

mail fraud cases.[12]  See, e.g., United States v. Georgiou, 777 F.3d 125, 137-38 (3rd Cir. 2015);

United States v. Coffman, 574 Fed. App'x 541, 557-58 (6th Cir. Jul. 22, 2014) (citing

Pasquantino); United States v. Kazzaz, 592 Fed. App'x 553, 554-55 (9th Cir. Nov. 26, 2014);

United States v. Singhal, 876 F. Supp. 2d 82, 96-97 (D.D.C. 2012) (citing Morrison); United

States v. Hijazi, 845 F. Supp. 2d 874, 906-07 (C.D. Ill. 2011).[13]  Singhal expressed the point

most clearly in rejecting the defendant's protest that an exclusive focus on the mailings would

mean that every alleged mail fraud was automatically a domestic application of the statute:

> But that is precisely the point of the mail fraud statute: once a
> person uses the U.S. mails, they are subject to the mail fraud
> statute pursuant to their domestic activity [i.e., the use of the mails]

---

[11] The analysis is the same with respect to wire fraud and wire fraud conspiracy.  See Kim, 246 F.3d at 191 n.2; United States v. Hayes, 99 F. Supp. 3d 409, 421 (S.D.N.Y. 2015), aff'd, 118 F. Supp. 3d 620 (S.D.N.Y. 2015); cf. United States v. Yousef, 327 F.3d 56, 87-88 (2d Cir. 2003) (stating that "if Congress intended United States courts to have jurisdiction over the substantive crime . . . it is reasonable to conclude that Congress also intended to vest in United States courts the requisite jurisdiction over an extraterritorial conspiracy to commit that crime").

[12] As the Second Circuit has held, the wire fraud statute is the "lineal descendant" of the mail fraud statute and is analyzed the same way.  See Trapilo, 130 F.3d at 551, n.7.

[13] The courts in Georgiou and some of the other cited cases describe mail or wire fraud charges involving the use of U.S. mail or wire facilities as permissibly "extraterritorial."  See, e.g., Georgiou, 777 F.3d at 137-38.  Notwithstanding the references in those cases to the "extraterritorial" application of the wire fraud statute, these conclusions support the principle, clarified again in RJR Nabisco, that any wire fraud case involving the use of U.S. wire facilities is a domestic application of the statute, not an extraterritorial one.

– making an analysis of the statute's extraterritorial application unnecessary in a case such as this one.

876 F. Supp. 2d at 97.

c.      Money Laundering and Extraterritoriality

The money laundering conspiracy counts Napout faces charge him with conspiring to violate 18 U.S.C. § 1956(a)(2)(A).  The plain language of this provision, which is sometimes referred to as the international promotion prong of the money laundering statute, makes clear that Congress's focus in enacting it was the transmission of monetary instruments and funds into, out of, or through the territory of the United States:

> Whoever transports, transmits or transfers. . . a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States – with the intent to promote the carrying on of specified unlawful activity [is guilty of a crime.]

18 U.S.C. § 1956(a)(2)(A)).[14]  See generally United States v. Bodmer, 342 F. Supp. 2d 176, 191 (S.D.N.Y. 2004) ("The language of [§ 1956(a)(2)(A)] clearly penalizes the transportation of monetary instruments in promotion of unlawful activity, not the underlying unlawful activity; in passing the money laundering statute, Congress determined that the transportation of monetary instruments in promotion of unlawful activity itself constitutes a crime." (emphasis in original)).[15]  Accordingly, any money laundering charge that alleges a prohibited transmission of

---

[14] The case law is relatively undeveloped regarding the "focus" of the money laundering statute, and the government is not aware of any precedent that examines the focus of this particular subsection.

[15] The international concealment prong of the statute, 18 U.S.C. § 1956(a)(2)(B)(i), which prohibits, among other things, the transportation of monetary instruments from, to, or through the United States with knowledge that the transaction is designed to conceal the location, source, or ownership of the proceeds of specified unlawful activity, is also among the money

31

funds into, out of, or through the United States – as a properly pled charge must to satisfy every element of the international promotion prong – by definition alleges a domestic application of the statute under the framework articulated in Morrison and RJR Nabisco.

    The money laundering statute also provides for extraterritorial reach in certain cases.  In pertinent part, the statute provides that its prohibitions reach money laundering conduct engaged in by U.S. citizens, as well as conduct involving non-U.S. citizens in which "the conduct occurs in part in the United States; and . . . the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000."  18 U.S.C. §1956(f).  Courts that have considered the issue have concluded that a wire transfer that begins or ends in the United States constitutes "conduct" that occurs at least in part in the United States within the meaning of this provision.  See, e.g., United States v. Approximately $25,829,681.80 In Funds (Plus Interest) In The Court Registry Investment System, No. 98-CV-2682 (LMM), 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999); United States v. Stein, No. A 93-CR-375, 1994 WL 285020, at *3-5 (E.D. La. June 23, 1994); United States v. Galvis-Pena, No. 09-CR-25 (TCB), 2011 WL 7268437, at *7-8 (N.D Ga. Dec. 6, 2011) (citing Approximately $25,829,681.20 in Funds and Stein); cf. Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 600 (S.D.N.Y. 2014) (available at 2014 WL 815961) (noting that money laundering overcomes the presumption against extraterritoriality, because the statute "by its terms applies to money sent to and from the United States").[16]

---

laundering offenses encompassed by the racketeering activity alleged in connection with the RICO conspiracy charged in Count One.  (Ind. ¶ 364(b)).

 [16]  The money laundering statute thus provides for extraterritorial application of the statute to conduct properly viewed as domestic under the Supreme Court's decisions in Morrison

d.    RICO and Extraterritoriality

In RJR Nabisco, the Supreme Court held that the RICO statute applies

extraterritorially to the extent the predicate offenses alleged in a particular case apply

extraterritorially.  136 S. Ct. at 2102-03.  The Court thus made clear that the permissible reach of

a RICO charge is defined by the reach of the pattern of racketeering activity alleged in support of

the charge.  In other words, to the extent a RICO charge alleges a pattern of racketeering activity

consisting of "predicate offenses that were either committed in the United States or committed in

a foreign country in violation of a predicate statute that applies extraterritorially," it does not

involve an impermissibly extraterritorial application of RICO.  Id. at 2105-06.[17]

The Supreme Court rejected the argument that RICO's "focus" is the enterprise

being corrupted, and that, therefore, the statute does not apply to foreign enterprises, holding that

because there is a clear indication at step one that RICO applies extraterritorially, "[w]e therefore

do not proceed to the 'focus' step."  Id. at 2103.  RICO "applies abroad, and so we do not need to

determine which transnational (or wholly foreign) patterns of racketeering it applies to; it applies

to all of them, regardless of whether they are connected to a 'foreign' or 'domestic' enterprise."

Id. at 2104.  The RJR Nabisco Court also rejected a proposed "nerve center" test for determining

whether an enterprise is foreign or domestic, observing that such a test, "developed with ordinary

corporate command structures in mind," would be "ill-suited to govern RICO association-in-fact

_____

and RJR Nabisco, indicating some overlap in the permissible domestic and extraterritorial
applications of the statute.

    [17] The complaint in RJR Nabisco alleged a RICO conspiracy violation, 18 U.S.C.
§ 1962(d), and the Court "assume[d] without deciding that § 1962(d)'s extraterritoriality tracks
that of the provision underlying the alleged conspiracy."  RJR Nabisco, 136 S. Ct. at 2103.

enterprises, which need not have a hierarchical structure or a 'chain of command.'" Id. at 2104-05 (internal quotation marks omitted). The Court thus concluded that Congress intended RICO "to apply extraterritorially in tandem with the underlying predicates, without regard to the locus of the enterprise." Id. at 2105.[18]

### e.   Other RICO Predicates and Extraterritoriality

Several other predicate offenses, in addition to violations of 18 U.S.C. §§ 1343 and 1956, are alleged in Count One as part of the pattern of racketeering activity underpinning the charged RICO conspiracy. The other money laundering statute alleged as part of the pattern, 18 U.S.C. § 1957, applies extraterritorially in limited circumstances.[19] The language of § 1957(a) also makes clear, however, that Congress's focus in enacting the statute was "monetary transaction[s]" in criminally derived property, and thus a permissibly domestic application of the statute would involve a transaction that takes place within the United States. The Travel Act, 18 U.C. § 1952, does not appear to apply extraterritorially, but like the mail and wire fraud statutes, the language of the statute makes clear that Congress's focus in enacting it was the mail and wire facilities of the United States, as well as travel to, from, or within the

---

[18] In RJR Nabisco, the Supreme Court further held that private civil RICO plaintiffs, unlike the government, also needed to allege and prove a domestic injury in order to sustain jurisdiction over their private civil claim. As the Supreme Court explained, this requirement does not apply to cases brought by the government because "providing a [private] civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct," a potential for friction that the executive branch of the U.S. government has the unique responsibility for weighing when deciding whether and how to file a RICO action that may have international implications. RJR Nabisco, 136 S. Ct. at 2106-07.

[19] Extraterritorial jurisdiction exists over offenses committed by U.S. persons, as that term is defined in 18 U.S.C. § 3077. See 18 U.S.C. § 1957(d).

34

United States.  Thus, any scheme involving U.S. mail or wire facilities, or travel to, from, or within the United States, with the intent to, for example, promote a bribery or money laundering offense, would constitute a domestic racketeering act.  Finally, there is extraterritorial jurisdiction over violations of any provision of 18 U.S.C. § 1512.  See 18 U.S.C. § 1512(h).

        2.    <u>Analysis</u>

The applicable Supreme Court and Second Circuit precedents make clear that when, as here, the government charges a defendant with using or conspiring to use the wire facilities of the United States in furtherance of schemes to defraud, as the conduct underlying money laundering offenses, or as the basis for racketeering activity involving wire fraud and money laundering, such charges constitute permissible domestic applications of the relevant criminal statutes.  Accordingly, and for the reasons discussed below, the Court should reject Napout's argument seeking dismissal of the charges on the ground that they impermissibly charge extraterritorial conduct.

        a.    <u>The Wire Fraud Conspiracy Counts</u>

Counts Nine and Eighty-Three of the indictment clearly and properly charge Napout with domestic wire fraud conspiracies under the framework articulated in <u>Morrison</u> and <u>RJR Nabisco</u>.  Accordingly, Napout's motion to dismiss these counts should be denied.

The indictment expressly alleges that Napout and others conspired to use and did use the wire facilities of the United States in furtherance of the Copa Libertadores Scheme #2 and the Copa América Centenario Scheme.  (<u>See, e.g.</u>, Ind. ¶¶ 185 ("In the course of the [Copa Libertadores Scheme #2], various of the defendants and their co-conspirators used wire facilities and financial institutions located in the United States, among other countries, to make and receive bribe payments and to transfer payments related to contracts secured through bribery

. . . ."); 349 (alleging that sports marketing company Traffic, one of the Datisa shareholders, sent bribe-related wire transfers from its U.S. account to the accounts of co-conspirators overseas); 350 ("Bribe payments were subsequently wired from bank accounts in Switzerland controlled by Datisa and its partners . . . to accounts controlled by CONMEBOL officials throughout the world, including accounts in the United States."); 357 ("On or about April 1, 2014, the first payment pursuant to the 2014 Centenario Contract of $7 million was made from Datisa's account at Bank Hapoalim in Zurich, Switzerland, to an account in CONCACAF's name at JP Morgan Chase bank in Miami, Florida."); see also ¶¶ 379 (alleging in Count Nine that Napout and others, "for the purpose of executing such scheme and artifice [to defraud, did conspire] to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343"); 502 (same for Count Eighty-Three)).  As such, the counts properly allege domestic violations of the wire fraud statute.  See, e.g., Hayes, 118 F. Supp. 3d at 628 (holding that because the defendant conspired to defraud "using United States wires . . . there is no extraterritoriality here; the complaint alleges a domestic application"); see also supra at section II.A.1.b (collecting cases).

        Napout ignores the above-cited allegations and authorities and argues that the wire fraud conspiracy counts, as well as the RICO and money laundering counts discussed below, are impermissibly extraterritorial because the focus of the charged schemes is outside the United States.  (Napout Br. A at 11-15).  In support of his argument, Napout asserts variously that he was located outside of the United States, that he is not alleged to have used bank accounts in the United States to send or receive money, that the schemes primarily relied on foreign bank accounts, that he "is not named as having committed or been involved in any specific acts of

36

bribes or kickbacks, let alone in the United States"; and that he was not "recorded or otherwise heard participating in any conspiracy in the United States (or elsewhere)." (Id. at 3-4, 15-17). Napout urges the conclusion that the indictment "fails to allege sufficient conduct by Mr. Napout in the United States" to support the Court's exercise of jurisdiction over the charges. (Id. at 3).

Napout's arguments fail for several reasons. First, he misstates the allegations in the indictment and mischaracterizes important aspects of the government's evidence. For example, as noted, the indictment alleges repeatedly that Napout and his co-conspirators conspired to use and did use wire facilities and banking institutions in the United States to further their corrupt schemes.[20] Second, Napout is charged with wire fraud, money laundering, and racketeering conspiracies, not with the underlying substantive offenses. Accordingly, the government need only allege and prove Napout's agreement that a conspirator would commit the substantive offenses, not that he committed any specific acts of bribery or money laundering.[21]

_____

[20] Napout comes close to suggesting that his connections to the United States must be assessed independently from those of his co-conspirators (see, e.g., Napout Br. A at 3), but under well-established conspiracy principles, actions taken by co-conspirators can be imputed to other co-conspirators. See United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998); see also United States v. Manuel, 371 F. Supp. 2d 404, 410 (S.D.N.Y.2005) (stating that because the defendant and his co-conspirators were in "agreement on the essential nature of the plan, and on the kind of criminal conduct . . . in fact contemplated," and the "co-conspirators committed acts on American soil . . . [u]nder basic conspiracy law, he is guilty of joining their conspiracy, and is brought under American jurisdiction by their acts" (internal quotation marks omitted) (first alteration in original)); cf. Ford v. United States, 273 U.S. 593, 622 (1927) ("[J]urisdiction exists to try one who is a conspirator[ ] whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against . . . .").

[21] Nevertheless, as discussed in greater detail infra at section II.C.2.a, the government has alleged and will prove at trial, among other things, that bribe payments were made to Napout, that Napout's co-conspirators laundered money on Napout's behalf, and that Napout and his co-conspirators engaged in racketeering activity. The government also will prove that Napout engaged in conduct in the United States in furtherance of the charged conspiracies. For instance, on May 1, 2014, Napout and several of his co-defendants were in Miami, Florida to promote the

See, e.g., Salinas, 522 U.S. at 65 ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.").

Third, and most importantly in the context of a motion to dismiss based on extraterritoriality, Napout's argument invites the Court to revive and apply a variant of the "conduct and effects" test expressly rejected by the Supreme Court in Morrison and its progeny.[22] (See, e.g., Napout Br. A at 2 ("[T]he Superseding Indictment fails to assert that [Napout] engaged in any criminal conduct within a United States territory or that impacted the United States.")). The Court should decline the invitation. The Supreme Court has held that in determining whether a statute is being applied domestically, courts are to look "to the statute's 'focus.' If the conduct relevant to the statute's focus occurred in the United States, then the case

---

Copa América Centenario Scheme by attending the press conference announcing the joint CONCACAF/CONMEBOL tournament to be played in the United States in 2016. (Ind. ¶ 353; see also ¶ 358 (alleging that Napout thereafter stated publicly, "I believe in a single America in a working context with CONCACAF and we've reached something real which will go ahead in 2016.")). It was the same day that Napout was recorded telling another individual, among other things, that "I'm not in anything," "If they use my name, f___ them," and "I am not a snitch." (Napout Br. A at 16). As he has done previously, Napout argues that the recording is exculpatory. He is wrong. Understood in context, including in light of Napout's and his co-conspirators' suspicions that they were under investigation at the time of the recording, Napout's statements constitute powerful evidence of his consciousness of guilt and of his repeated efforts, even after the original indictment was unsealed, "to portray himself as an agent of reform, notwithstanding his own long-standing involvement in the solicitation and receipt of bribe and kickback payments in exchange for his influence as a CONMEBOL and FIFA official." (Ind. ¶ 137).

[22] It bears emphasizing that even under the now-defunct test proposed by Napout, his argument fails. As noted, the allegations in the indictment and the government's proof at trial will establish the conspirators' systematic reliance on and abuse of the U.S. financial system and wire facilities in furtherance of the charged schemes, as well as significant additional conduct in and effects on the United States in connection with the charged offenses. See supra at background sections D & E.

38

involves a permissible domestic application even if other conduct occurred abroad." <u>RJR</u>
<u>Nabisco</u>, 136 S. Ct. at 2101 (emphasis added).  That is, if the charge before the court alleges
conduct in the United States that falls within the "focus" of the statute, the inquiry is over, and
the crime constitutes a domestic application of U.S. law.  Courts do not look any further and do
not weigh, as Napout urges, the amount of conduct alleged to have occurred in the United States
against the amount of conduct alleged to have occurred abroad.[23]

In addition to misstating the relevant test, Napout ignores the relevant precedent
governing the proper domestic application of the wire fraud statute.[24]  As noted, the Supreme
Court, the Second Circuit, and other courts have repeatedly held that the focus of the wire fraud
statute is the wire transmission, and that a wire fraud or a wire fraud conspiracy prosecution
involving the use of U.S. wire facilities in furtherance of the scheme is a valid domestic
application of the statute.  <u>See, e.g., Pasquantino</u>, 544 U.S. at 371 (holding that the offense "was
complete the moment [the defendants] executed the scheme inside the United States[]" because
the "domestic element of [the defendants'] conduct is what the Government is punishing"); <u>Kim</u>,
246 F.3d at 191 (stating that the "intended purpose" of the statute is "to prevent the use of [U.S.
wires] in furtherance of fraudulent enterprises" (internal quotation marks omitted)); <u>Trapilo</u>, 130

_____

[23] Napout's further invitation to weigh the government's evidence (<u>see</u> Napout Br. A at
18 (arguing that "the government's evidence . . . fail[s] to show that the focus of any alleged wire
fraud involving Mr. Napout occurred in the United States")), should be rejected for the same
reason, and also because "the sufficiency of the evidence is not appropriately addressed on a
pretrial motion to dismiss an indictment."  <u>Perez</u>, 575 F.3d at 166-67 (internal quotation marks
omitted).  Rather, "a defendant must await a Rule 29 proceeding or the jury's verdict before he
may argue evidentiary insufficiency."  <u>Gambino</u>, 809 F. Supp. at 1079.

[24] The cases Napout <u>does</u> cite, a collection of largely non-binding, pre-<u>RJR Nabisco</u> civil
RICO cases, are discussed <u>infra</u> at section II.A.2.c.

39

F.3d at 552 ("[A]s the statute plainly states, what is proscribed is the use of the telecommunications systems of the United States in furtherance of a scheme . . . .  The identity and location of the victim, and the success of the scheme, are irrelevant."); Hayes, 118 F. Supp. 3d at 628 (reiterating that use of U.S. wires is a "domestic application" of wire fraud statute even if, as the defendant argued, "the location of the wires is 'ancillary' to the location of the scheme to defraud . . . because the location of the wires is the Court's primary concern"); see also Georgiou, 777 F.3d at 138 ("[T]he statute's only jurisdictional requirement is that a communication be transmitted through interstate or foreign commerce for the purpose of executing a scheme to defraud.").

Because the indictment alleges that Napout and his co-conspirators agreed to use and did use the wire facilities of the United States in furtherance of the wire fraud conspiracies charged in Counts Nine and Eighty-Three, those counts properly allege domestic violations of the wire fraud statute.  The defendant's motion to dismiss these counts therefore must be denied.

b.    <u>The Money Laundering Conspiracy Counts</u>

Counts Ten and Eight-Four of the indictment clearly and properly charge Napout with domestic money laundering conspiracies predicated on the domestic wire fraud schemes discussed above.  Napout's arguments in support of his motion to dismiss the counts are derivative of his arguments relating to the wire fraud conspiracy charges, and they fail for the same reason.  Napout argues that because these counts allege conspiracies to launder money in furtherance of wire fraud offenses, and because the wire fraud offenses are extraterritorial, the money laundering charges are impermissibly extraterritorial.  The argument is unavailing.

Under the framework established by RJR Nabisco and Morrison, in determining whether the money laundering charges allege domestic offenses, the Court must determine the

40

"focus" of the money laundering statute.  As noted above, based on the plain language of the statute, it is clear that Congress's focus in enacting the money laundering provisions with which Napout is charged was the transmission of monetary instruments and funds into, out of, or through the territory of the United States.  See 18 U.S.C. § 1956(a)(2)(A) (providing for criminal punishment of anyone who "transports, transmits, or transfers. . . a monetary instrument or funds" into or out of the United States); Bodmer, 342 F. Supp. 2d at 191 (finding that this provision "clearly penalizes" the transportation of monetary instruments in promotion of unlawful activity, not the underlying unlawful activity); cf. Trapilo, 130 F.3d at 553 (stating that to determine Congress's focus, courts must assess "only . . . what has been expressly forbidden by statute").

Here, Counts Ten and Eighty-Four allege that Napout and others conspired to execute prohibited transmissions into or out of the United States, i.e., domestic conduct that was the subject of Congress's focus in enacting the international promotion prong.  (See Ind. ¶¶ 381 and 504 (alleging that Napout and his co-conspirators agreed "to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud").  Moreover, the allegations detailing the Copa Libertadores Scheme #2 and the Copa América Centenario Scheme specifically allege the use of wire transfers into or out of the United States in furtherance of the underlying bribery schemes.  (See, e.g., id. ¶¶ 185 ("In the course of the [Copa Libertadores Scheme #2], various of the defendants and their co-conspirators used wire facilities and financial institutions located in the United States, among other countries, to make and receive bribe payments and to transfer payments related to contracts

41

secured through bribery . . . ."); 349 & 350 (specifying wire transfers made to or from the United

States in furtherance of the Copa América Centenario Scheme)).  Because Counts Ten and

Eighty-Four allege the domestic transmission of funds to promote the specified wire fraud

activity, they are properly charged as domestic money laundering offenses.[25]

        In urging dismissal of the money laundering charges, Napout relies heavily on

United States v. Prevezon Holdings, Ltd., 122 F. Supp. 3d 57 (S.D.N.Y. 2015).  (Napout Br. A at

13-14).  The case does not do the work Napout asks of it.  In Prevezon, Judge Griesa stated that

because the government did not plead in its civil complaint that the underlying fraud scheme was

formed in the United States, the one-time use of the U.S. wires was not "sufficient to overcome

the presumption against the wire fraud statute's extraterritorial application," which, in turn,

rendered the associated money laundering counts impermissibly extraterritorial.  Id. at 71-72.

The case does not support dismissal of the charges against Napout because (1) it is not binding

on this Court; (2) its analysis was dicta[26]; (3) it was decided before the Supreme Court's opinion

in RJR Nabisco; and (4) likely for this reason, never properly determined the "focus" of the wire

fraud or money laundering statutes, instead balancing the amount of foreign and U.S.-based

conduct, an approach expressly forbidden by RJR Nabisco.[27]  As explained in detail above,

---

     [25] In the alternative, these charges satisfy the requirements of 18 U.S.C. § 1956(f), which
specifies that "extraterritorial jurisdiction" exists over, among other things, money laundering
transactions by a non-U.S. citizen involving more than $10,000.  Thus, because the charged
conduct also would be covered by the explicit grant of "extraterritorial jurisdiction" in § 1956(f),
Napout's challenge to the money laundering charges fails under any rubric.

     [26] Ultimately, the court in Prevezon concluded that the civil complaint adequately alleged
a permissibly extraterritorial violation of an "offense against a foreign nation," in violation of 18
U.S.C. § 1956(c)(7)(B)(iv), rendering its discussion about the wire fraud statute dicta.

     [27] The other cases Napout cites in support of his money laundering argument (Napout Br.
A at 14) are also distinguishable.  The first, Petroleos Mexicanos v. SK Engineering & Const.

Congress's focus in enacting the wire fraud and money laundering statutes was the use of U.S. wire facilities and U.S. monetary transmissions, respectively. Because the indictment alleges U.S.-based wire transfers, it sets forth domestic applications of 18 U.S.C. §§ 1343 and 1956. As such, Napout's motion must be denied.

> c.    The RICO Conspiracy Count

Count One of the indictment properly charges Napout and others with conspiring to conduct the affairs of the charged enterprise through a pattern of racketeering activity encompassing properly alleged domestic and extraterritorial offenses, including the domestic wire fraud and money laundering activity discussed above. For example, the indictment is replete with allegations that Napout and his co-conspirators agreed to corrupt the enterprise through a pattern of wire fraud and money laundering that relied on the use and abuse of the U.S. financial system and its attendant wire facilities in furtherance of various bribery schemes. At this stage in the case, nothing more is required. See RJR Nabisco, 136 S. Ct. at 2102 (holding

_____

Co., did not address predicate acts of money laundering whatsoever. 572 Fed. App'x 60 (2d Cir. 2014) (summary order). The second, United States v. Lloyds TSB Bank PLC, a pre-Morrison and RJR Nabisco district court decision, dismissed a civil action for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), holding that there was no extraterritorial jurisdiction under § 1956(f)(1) because the alleged unlawful transmissions did not occur "in part in the United States," as they were only between foreign accounts and the defendant was not properly alleged to have participated in the underlying domestic fraud. 639 F. Supp. 2d 314, 318-24 (S.D.N.Y. 2009). Here, by contrast, the unlawful promotional wire transfers underlying Counts Ten and Eighty-Four either originated or ended in the United States. As such, they are either (i) domestic applications of § 1956(a)(2)(A) (as they are U.S.-based transmissions, which is that statute's "focus," see Bodmer, 342 F. Supp. 2d at 191), or (ii) permissible extraterritorial applications under § 1956(f)(1) (as they did occur "in part in the United States," see, e.g., Approximately $25,829,681.80 In Funds, 1999 WL 1080370, at *4).

43

that the RICO statute applies to foreign racketeering activity to the extent that the predicates alleged in a particular case themselves apply extraterritorially).

In support of his motion to dismiss Count One, Napout relies on the same flawed arguments that the underlying wire fraud and money laundering offenses alleged as racketeering activity in support of the RICO conspiracy charge are impermissibly extraterritorial.  The argument fails because, for the reasons stated above, the wire fraud and money laundering predicates are properly alleged as domestic offenses.  Napout cites RJR Nabisco for the proposition that in cases involving the second step of the two-step framework for determining a particular statute's proper domestic application, courts must determine "whether the alleged conduct relevant to the 'focus' of those charges occurred in the United States."  (Napout Br. A at 15).  But RJR Nabisco made clear that a court must consider the focus of the statute and not on the focus of the alleged conduct when considering whether a statute is being applied domestically.  136 S. Ct. at 2101; see also Morrison, 561 U.S. at 267-70.

Napout ignores the relevant cases, several of which constitute binding authority, relying instead on a line of non-binding, pre-RJR Nabisco civil RICO cases for the proposition that "minimal contacts" with the United States are "insufficient to establish jurisdiction where Congress has not clearly intended extraterritorial jurisdiction." [28]  (Napout Br. A at 17-18 (citing

---

[28] As the indictment makes clear, Napout's and his co-conspirators' contacts with the United States were hardly minimal.  Even under the minimum contacts test proposed by Napout contrary to binding precedent, his argument fails.  This response does not address Napout's factual claims in detail, however, because the motion before the Court seeks dismissal based on a purported defect in the pleadings.  Napout "must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency."  Gambino, 809 F. Supp. at 1079; see also Perez, 575 F.3d at 166; Gotti, 2004 WL 32858, at *2; Cassese, 273 F. Supp. 2d at 484-85; Fruchter, 104 F. Supp. 2d at 298.

Petroleos Mexicanos v. SK Engineering & Const. Co., 572 Fed. App'x 60, 61 (2d Cir. 2014);

Worldwide Directories, S.A. De C.V. v. Yahoo! Inc., No. 14-CV-7349 (AJN), 2016 WL

1298987 (S.D.N.Y. Mar. 31, 2016); Laydon v. Mizuho Bank, Ltd., No. 12-CV-3419 (GBD),

2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015)).  Napout's reliance on these three cases is

misplaced.

    First, none of the cases – two district court decisions and one unpublished Second

Circuit decision without precedential effect – is binding on this Court.  Second, all of the cases

are distinguishable as they arose not in the context of a criminal wire fraud prosecution mounted

by the executive branch of the U.S. government, but rather a private plaintiff's civil RICO action

for which jurisdiction over the RICO claim was predicated on claims of wire fraud that were

never prosecuted criminally.  That pre-RJR Nabisco courts may have applied a "minimal

contacts" or similar kind of test for jurisdiction over civil defendants in this very different private

litigation context has no bearing on whether a criminal wire fraud prosecution brought by the

United States, to protect the integrity of wire facilities on its own territory, constitutes a domestic

or extraterritorial application of American criminal law.  Tellingly, none of the three decisions

Napout relies on mentions, let alone addresses, the Morrison, Pasquantino, Kim, Trapilo, Gilboe

line of case cited supra.  See Kim, 246 F.3d at 190 (rejecting the defendant's efforts to have the

court "discard the teaching of Trapilo and Gilboe in favor of two civil cases" involving RICO

predicate acts of wire fraud, including by noting that "these two civil cases are not directly on

point").  Indeed, in creating a domestic injury pleading requirement for private plaintiffs seeking

to establish extraterritorial jurisdiction over civil RICO claims, the RJR Nabisco Court explicitly

premised its reversal of the Second Circuit's decision below on the notion that civil RICO is

different because Congress made it different in 18 U.S.C. § 1964(c).  See 136 S. Ct. at 2108-11.[29]

   Third, and perhaps most importantly, none of the cases Napout cites can be reconciled with the jurisprudence the Supreme Court has been developing for the past several years, and developed even further in RJR Nabisco, for resolving extraterritoriality challenges. The indictment makes clear, and the government will prove at trial, that the charged RICO conspiracy involves various uses of the U.S. wires, including the movement of tens upon tens of millions of dollars through the U.S. financial system, in furtherance of the charged schemes, including in connection with the payment and laundering of bribe money.  The government will prove myriad other U.S. contacts by Napout and his confederates to establish the pattern of racketeering activity as well.  But at this stage, all that is required is that the government adequately allege facts that, if proven, establish violations of extraterritorial predicates or domestic applications of non-extraterritorial predicates, and the government has done that here.[30]

---

[29] Napout likewise cites Lloyds, another non-binding, pre-Morrison and RJR Nabisco decision, for the proposition that the indictment must allege "sufficient conduct by Mr. Napout in the United States" to support the RICO conspiracy and other charges.  (Napout Br. A at 17).  Lloyds, however, did not even involve a civil RICO complaint, let alone a criminal prosecution.  As explained supra at n.27, Lloyds held that transfers occurring entirely outside of the United States could not support a "civil monetary remedy" under the money laundering statute because they did not satisfy § 1956(f)(1).  It is thus entirely irrelevant to the question of whether RICO (and therefore its predicates) (1) apply extraterritorially, and (2) if not, whether the conduct that is the subject of the statute's "focus" (or the RICO predicate statute's focus) occurred within the United States.

[30] Napout does not challenge the Court's jurisdiction over the other violations that are listed as part of the pattern of racketeering activity alleged in Count One.  However, the government has pleaded proper applications of these predicates, including the Travel Act, 18 U.S.C. § 1957, 18 U.S.C. § 1512, and state law commercial bribery.

In light of the foregoing, Napout's motion to dismiss charges against him in the indictment should be denied.

B.    Napout's Alternative Argument that the Prosecution Against Him Is Unreasonable Also Fails

In the alternative, Napout argues that, even if the charges against him are properly domestic or extraterritorial, the Court should nonetheless dismiss the indictment. (Napout Br. A at 19-20). Relying on the Restatement (Third) of Foreign Relations Law (1987) and the district court's decision in United States v. Lloyds TSB Bank PLC, 639 F. Supp. 2d 314 (S.D.N.Y. 2009), Napout asserts that his motion should be granted because the "exercise of extraterritorial jurisdiction" would be "unreasonable." (Id. at 19). This argument is meritless.

First, the doctrine Napout cites only permits a court to decline to exercise extraterritorial jurisdiction if doing so would be unreasonable. See Lloyds, 639 F. Supp. 2d at 324 ("The rule in the Second Circuit is that to be enforceable by the courts, legislation prohibiting extraterritorial conduct must be reasonable in the circumstances."). It has no application to domestic prosecutions. Because, for the reasons set forth above, Counts One, Nine, Ten, Eighty-Three, and Eighty-Four are domestic applications of the RICO, wire fraud and money laundering statutes, this alternative argument must be dismissed.

Second, even if the Court were to exercise extraterritorial jurisdiction over any of the charged offenses, doing so would not be unreasonable. As set forth above and in the indictment, the charged offenses involved, among other things, (1) meetings in the United States; (2) co-defendants and co-conspirators who were U.S. citizens and residents; (3) the commercial rights to soccer tournaments that were broadcast in, played in, and hosted by the United States; (4) reliance on the growing U.S. market for soccer to generate profits; (5) an enterprise in which

United States plays a substantial role and has a substantial interest; and (6) the extensive use of U.S. wire facilities and the U.S. financial system.  As Napout's cited authority reveals, the United States has a substantial interest in regulating such conduct and thus exercise of jurisdiction would not be unreasonable.  (See Napout Br. A. at 19-20 (quoting Restatement (Third) of Foreign Relations Law of the United States § 403(2)(a) for the proposition that factors to determine reasonableness include "the extent to which the [regulated] activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory")).[31]

The exercise of jurisdiction over Napout for his involvement in conspiratorial racketeering, wire fraud, and money laundering offenses in connection with his efforts to enrich himself and his co-conspirators through bribery and by means of the U.S. financial system is entirely appropriate.  Nothing in the authorities cited by Napout suggests that the U.S. government should refrain from protecting the U.S. financial system and its other interests jeopardized by the conduct at issue through the enforcement of criminal statues enacted for just that purpose.  No other forum has a greater interest than the United States in the enforcement of U.S. criminal laws.  For these reasons, Napout's alternative basis for dismissal also fails.

---

[31] To be sure, in announcing the indictments in this case, the Attorney General made clear that the United States is not the only jurisdiction that has an interest in combatting corruption in international soccer.  Indeed, it is entirely foreseeable that not just Paraguay, as Napout asserts (Napout Br. A at 19), but Argentina, Switzerland, and still other countries might have an interest in prosecuting Napout.  This does not render the U.S. indictment unreasonable.  The Paraguayan authorities, for their part, have not taken Napout's view of the case to date, having twice executed treaty requests on behalf of the United States in aid of the instant investigation: (1) in May 2015, arresting and then commencing extradition proceedings against defendant and Paraguayan citizen Nicolás Leoz, one of Napout's predecessors as CONMEBOL president and FIFA executive committee member; and (2) in January 2016, executing a U.S. mutual legal assistance request to search CONMEBOL headquarters for evidence of the crimes of, among others, Napout and Leoz.

C.    Napout Has Not Established His Need for a Bill of Particulars

Napout also contends that the indictment provides insufficient detail for him to prepare his defense and that a bill of particulars is necessary "in light of the vague and insubstantial nature of the allegations" against him.  (Napout Br. B at 2-3).  As set forth below, his arguments are without merit and his motion for a bill of particulars should be denied.

1.    Legal Standard

As set forth above in section I.A.1.a, under the Federal Rules of Criminal Procedure, an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense."  Fed. R. Crim. P. 7(c).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Hamling, 418 U.S. at 117 (citations omitted); see also Fruchter, 104 F. Supp. 2d at 296 (quotations and citations omitted). The Second Circuit has made clear that an indictment satisfies the requirements of Rule 7(c) if it "do[es] little more than [] track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  Yannotti, 541 F.3d at 127.  For example, in Yannotti, the Second Circuit upheld an indictment charging RICO conspiracy that the defendant claimed "included overly broad temporal and geographic spans," and which did not detail the alleged "conspiratorial conduct" or identify the alleged co-conspirators.  541 F.3d at 127.  In upholding the indictment, which merely tracked the language of the statute, the court concluded that the "contested portions of the [indictment] provided Yannotti with sufficient notice of the

49

allegations . . . so that he could defend against those allegations in the instant prosecution and in any future prosecutions."  Id.

Additional details, in the form of a bill of particulars, see Fed. R. Crim. P. 7(f), are appropriate only when the indictment is too vague to inform the defendant of the nature of the charges to allow the preparation of a defense, avoid unfair surprise, and assert a double jeopardy claim.  See United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (bill of particulars required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused") (internal quotation marks omitted).  If the information sought by the defendant is provided in the indictment or through some other means, a bill of particulars is not warranted.  See Bortnovsky, 820 F.2d at 574.  "The defendant bears the burden of showing 'the information sought is necessary,' and that he will be prejudiced without it."  United States v. Shkreli, No. 15-CR-637, at 11 (KAM) (E.D.N.Y. Dec. 16, 2016) (quoting Fruchter, 104 F. Supp. 2d at 312).  The decision to grant or deny a bill of particulars is committed to the sound discretion of the trial court.  Fruchter, 104 F. Supp. 2d at 311 (quoting United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984)).

A defendant cannot use a bill of particulars as an investigative tool or as a pre-trial discovery device.  See United States v. Pimentel, No. 99-CR-1104 (SJ), 2001 WL 185053, at *4 (E.D.N.Y. Jan. 22, 2001) (citations omitted).  Rule 7(f) also may not be used to limit the government's evidence at trial or flush out its prosecutorial theories or methods of proof in advance of trial.  See Shkreli, No. 15-CR-637, at 13 (collecting cases); see also United States v. Sattar, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges,

the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories.") (citation omitted).

Thus, "courts have routinely held that the 'wheres, whens and with whoms' of a charged offense are beyond the proper scope of a bill of particulars." United States v. Shteyman, No. 10-CR-347 (SJ), 2011 WL 2006291, at *5 (E.D.N.Y. May 23, 2011) (quoting United States v. Rivera, No. 09-CR-619 (SJF), 2011 WL 1429125, at *8 (E.D.N.Y. Apr. 13, 2011)); see also United States v. Trippe, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) ("demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied") (collecting cases).  "The ultimate test in determining whether a bill of particulars is appropriate is whether the information is necessary, not whether it is helpful to the defendant." Rivera, 2011 WL 1429125, at *8 (emphasis added and citations omitted).

        2.     Analysis

Napout contends that the indictment does not sufficiently set forth (1) specific information concerning the bribes he is alleged to have solicited and received and (2) the names of the unindicted co-conspirators.  (Napout Br. B at 1-2).  Napout's claims are without merit. The indictment, the various court filings filed in these proceedings, and the materials disclosed during discovery are more than sufficient to meet the government's obligation to inform Napout of the nature of the charges against him.

        a.     The Indictment, Court Filings, and Discovery Provide Sufficient Detail About the RICO Conspiracy and Other Charges

Napout first argues that a bill of particulars is required because the indictment does not sufficiently specify the bribes he is alleged to have solicited and received.  (Napout Br.

51

B at 1-2).  In particular, he seeks a listing of (a) "any information regarding any bribe solicited and/or received," (b) "any transaction" evidencing a bribe, (c) "any use of wire facilities and/or financial institutions in the United States or elsewhere used to make or receive any bribe," (d) "any conduct engaged in to prevent detection of illegal activities" and (e) "any documentary evidence" that the government may offer against him.  (Id.).  In light of the ample detail already provided by the government about the charged conduct, it is clear that Napout is requesting "the manner in which [the government] will attempt to prove the charges" against him and "a preview of the Government's evidence or legal theories," which is not the proper purpose of a bill of particulars.  Sattar, 314 F. Supp. 2d at 318 (citation omitted).

The detailed "speaking" indictment, various papers the government has filed in court, and the extensive discovery disclosed to Napout adequately inform him of the nature of the charged offenses.  For instance, the government's October 28, 2016 opposition to Napout's motion for a bail modification (Docket No. 460) provides clear detail about the two bribery schemes in which Napout is specifically alleged to have participated as a member of FIFA's executive committee and a FIFA vice president (positions he held from May 29, 2015 to the time of his arrest on December 3, 2015), as president of CONMEBOL (from August 2014 to December 2015), and as vice president and later president of the Asociación Paraguaya de Fútbol, the Paraguayan soccer federation (from 2003 to 2014).  This filing, and the longer indictment itself, describe Napout's involvement in the agreements to solicit and accept bribe payments in connection with the sale of CONMEBOL's and CONCACAF's commercial rights to two soccer tournaments: the Copa Libertadores and the Copa América.

As set forth in the indictment, other government filings, and discovery disclosed to Napout to date, the Copa Libertadores is an annual club tournament featuring CONMEBOL's

52

top men's club teams.  From 1999 through 2015, an affiliate of Torneos y Competencias S.A. ("Torneos"), a sports media and marketing business headquartered in Argentina, obtained and maintained the exclusive worldwide broadcasting rights to each edition of the Copa Libertadores. Beginning in approximately 2009, a group of six South American soccer federation presidents (the "Group of Six"), including Napout, who was then the president of the Paraguayan soccer federation, demanded annual bribe payments in exchange for their continued support of Torneos as the holder of broadcasting rights to the Copa Libertadores.[32]  A principal of Torneos agreed to make and did make annual bribe payments to Napout and other CONMEBOL officials.  The Torneos principal relied on two of Napout's co-conspirators, defendants Hugo and Mariano Jinkis, among others, to facilitate the payment of bribes and kickbacks through their company Full Play to the CONMEBOL officials in connection with the Copa Libertadores tournament.[33] In order to make and receive these bribe payments and other payments related to contracts secured through bribery, the conspirators used wire facilities and financial institutions located in the United States, among other countries.

As to the second bribery scheme, Napout is alleged to have participated in a scheme involving the sale of CONMEBOL's commercial rights to certain editions of the Copa

_____

[32] In addition to Napout, the Group of Six consisted of Manuel Burga (Peru), Carlos Chávez (Bolivia), Luís Chiriboga (Ecuador), Rafael Esquivel (Venezuela), Luis Bedoya (Colombia), and, starting in 2012, Sergio Jadue (Chile).

[33] The defendant Hugo Jinkis and his son, the defendant Mariano Jinkis, are both charged in the indictment.  At various times relevant to the indictment, the Jinkises were the controlling principals of Full Play Group S.A., a sports media and marketing business with its principal offices in Argentina.  The Jinkises also controlled subsidiaries and affiliates of Full Play Group S.A., including, among others, Cross Trading S.A. and Yorkfields S.A.  The Jinkises' companies are referred to collectively herein as "Full Play."

América.  The Copa América is an international tournament that features the national teams of

CONMEBOL's ten member associations as well as teams invited from other confederations.  In

May 2013, CONMEBOL sold its commercial rights to the 2015, 2016, 2019 and 2023 editions of

the Copa América to Datisa S.A. ("Datisa"), a Uruguayan corporation, for $317.5 million.  The

creation of the new company, Datisa, was formalized in a shareholders' agreement dated May

21, 2013.  Among other things, the agreement provided that Traffic, Torneos, and Full Play each

held a one-third interest in the company.  Datisa subsequently entered into a $35 million contract

with CONCACAF, in its capacity as the co-organizer of the Copa América Centenario (the 2016

edition), to acquire CONCACAF's media rights to the tournament.

During the negotiations for the sale of these rights to Datisa, CONMEBOL and

CONCACAF officials involved in the scheme conditioned the sale of the commercial rights to

the 2015, 2016, 2019 and 2023 editions of the Copa América upon Datisa executives agreeing to

make bribe payments to the officials in exchange for the contract.  Ultimately, Datisa

representatives agreed to pay tens of millions of dollars in bribes to CONMEBOL officials in

exchange for the Copa América contract, including bribe payments for each of the four editions

of the tournament and for the contract signature.[34]  The bribery agreement called for seven-figure

bribe payments to be made to each of the "top" three CONMEBOL officials (the president of the

confederation and the presidents of the Brazilian and Argentinian federations) and to as many as

seven other CONMEBOL federation presidents.  Additionally, bribe payments reaching six

figures were to be made to the CONMEBOL general secretary.  Napout was among the

---

[34] Datisa representatives further agreed to pay $10 million to defendant Jeffrey Webb, then the CONCACAF president, in exchange for CONCACAF's agreement to host the Copa América Centenario.

CONMEBOL officials who solicited and agreed to receive bribe payments in connection with the Copa América tournament.  Hugo and Mariano Jinkis, among others, facilitated the payment of bribes and kickbacks to the CONMEBOL officials in connection with the Copa América tournament.  Again, in order to make and receive these bribe payments and other payments related to contracts secured through bribery, the conspirators used wire facilities and financial institutions located in the United States, among other countries.

Napout and his co-conspirators did not disclose the existence of the schemes described above to FIFA, CONMEBOL, or CONCACAF, or to their respective executive committees, congresses or constituent organizations, thereby depriving these entities of their right to the honest and loyal services of Napout and the other soccer officials involved.

To establish Napout's membership in the charged criminal conspiracies, the government need not prove that any bribes were paid to soccer officials, but only that Napout <u>agreed</u> that bribes would be paid to soccer officials.  Nevertheless, in addition to proving that Napout entered these agreements, the government will prove, among other things, that bribes were actually paid to Napout and others.  For example, the government will prove that Alejandro Burzaco, a principal of Torneos, caused annual bribe payments of at least $400,000 to be made to Napout for the 2011, 2012, 2013, 2014, and 2015 editions of the Copa Libertadores.  These payments were wired to one or more Full Play-affiliated bank accounts controlled by Napout's co-conspirators Hugo and Mariano Jinkis, who facilitated the payment of the Copa Libertadores bribes, as well as bribes in relation to the Copa América Centenario Scheme, to Napout and other members of the Group of Six.  The Jinkises held and periodically distributed money from these accounts to the members of the Group of Six, among others.  The conspirators sought to prevent the detection of these bribe payments through various means, including by having the Jinkises

hold the payments for periodic disbursements to the bribe recipients through the use of bank accounts around the world, including at banks in the United States.

This description of the bribe payments to Napout, along with the allegations in the indictment and other government filings, provides a degree of notice and specificity that is more than sufficient to avoid double jeopardy or unfair surprise, and no further disclosure is necessary or justified. Contrary to his claim, Napout is not entitled at this stage of the proceedings to a list of the "documentary evidence" or witness statements against him, which would reveal the precise manner in which the government will present its proof at trial. (Napout Br. B at 2); see Sattar, 314 F. Supp. 2d at 318.[35]

In support of his request for the evidentiary detail by which the government will prove its case, Napout relies on three cases, which he claims require the government to list its evidence in advance of trial. None of the cited cases stand for that proposition or apply to the circumstances presented here.

Napout primarily relies on United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987), in which the Second Circuit held that it was an abuse of discretion to deny a motion for a bill of particulars where the defendant was charged in connection with a scheme to defraud, among others, the Federal Emergency Management Administration through the submission of false and inflated insurance claims. (Napout Br. B at 10). While the defendant in that case was provided in discovery with approximately 4,000 documents concerning 15 burglaries, at trial

---

[35] The government will, of course, provide an exhibit list and Jencks Act material well in advance of trial. After the resolution of the scheduled motions, the government will propose to the Court a pretrial schedule, which will include, among other things, the dates by which these materials will be provided to the defendants.

only four of the robberies were alleged to be fake and only three of these documents were alleged at trial to be false.  Bortnovsky, 820 F.2d at 574-75.  Particularly in light of the fact that defense counsel "had only four days within which to prepare a defense," the Second Circuit held that the district court should have compelled the government to disclose in advance of trial which of the robberies were alleged to have been fake and which of the documents were alleged to have been false so that the defendant was not forced to explain the circumstances of all 15 robberies and 4,000 documents.  Id.  Napout also relies on United States v. Nachamie, 91 F. Supp. 2d 565, 576 (S.D.N.Y. 2000), a case similar to Bortnovsky in which the district court ordered the government to identify which of 2,000 Medicare claims it intended to prove were fraudulent. (Napout Br. B at 11).

        In Bortnovsky and Nachamie the courts expressed concern that the indictments left the defendants guessing as to which of their numerous statements to the government were even alleged to be false, where the statements at issue were the core of the alleged fraudulent schemes.  Unlike in Bortnovsky and Nachamie, Napout need not guess what conduct he is alleged to have participated in – he took bribes in connection with the Copa Libertadores Scheme #2 and the Copa América Centenario Scheme, which have been described in detail.  In addition, Napout and his counsel will have had almost two years to prepare for trial (not four days, as in Bortnovsky) and, while the discovery is extensive, the government has provided Napout with detailed descriptions of the material in each section of the discovery productions so he can focus on what is most relevant to his specific conduct.  Through the indictment, various filings, and discovery, Napout has been sufficiently informed of the nature of the charges against him and his own alleged conduct; he is not entitled to the "evidentiary detail" he seeks through his motion. United States v. Bonventre, 646 Fed. App'x 73, 79 (2d Cir. 2016) (summary order)

57

(distinguishing <u>Bortnovsky</u> and explaining that the defendant was not entitled to "evidentiary detail" as to which investment adviser and broker-dealer records were alleged to be false, why they were false, and how the defendant knew of their falsity); <u>see also</u> <u>United States v. Jabali</u>, No. 01-CR-801 (SJ), 2003 WL 22170595, at *3 (E.D.N.Y. Sept. 12, 2003) (distinguishing <u>Bortnovsky</u> and noting that "[r]equests for exact dates, places, and times in which events occurred and the respective roles and manner of participation of others in such events ignore the proper scope and function of a bill of particulars."); <u>United States v. Columbo</u>, No. 04-CR-273 (NRB), 2006 WL 2012511, at *8 (S.D.N.Y. July 18, 2006) (distinguishing <u>Bortnovsky</u> and denying bill of particulars where the defendant was alleged to have "received kickback payments of at least $90,000 . . . during the period between 1999 and 2002 in exchange for his approval of fraudulent invoices").

Napout also relies on <u>United States v. Bin Laden</u>, 92 F. Supp. 2d 225 (S.D.N.Y. 2000). (Napout Br. B at 11-12). The facts and circumstances at issue in <u>Bin Laden</u>, however, were also materially different from this case. In <u>Bin Laden</u>, the indictment charged 15 defendants with 267 discrete criminal offenses, charged certain defendants with 229 counts of murder, and alleged 144 overt acts in connection with al Qaeda's organization, financing, inspiration and facilitation of a variety of violent attacks against U.S. personnel and property around the world. 92 F. Supp. 2d at 227-29.

As in <u>Bortnovsky</u>, a key factor in the court's assessment in <u>Bin Laden</u> was the significant limitations on defense counsel's ability to prepare a defense. Whereas in <u>Bortnovsky</u>, defense counsel had only four days to prepare for trial, in <u>Bin Laden</u>, the defendants were subjected to the very restrictive conditions of pre-trial confinement often used for terrorism suspects, which made it difficult for them to assist their counsel in preparing for trial, particularly

58

in light of the special procedures in place for handling the classified material in the case.  Id. at

231-32, 235.  These restrictions, particularly in preparing for a trial that was expected to last six

months, made preparation of a defense uniquely difficult.  See id. at 232.  Another important

factor in the district court's analysis was that many of the alleged co-conspirators used several

aliases and/or code names, which significantly magnified the difficulty of the task for defense

counsel, whose access to their own clients was constrained.  Id. at 241 (referring to the case

caption, which listed, for example, the first defendant as "Usama Bin Laden, a/k/a "Usamah Bin–

Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a

"Mujahid Shaykh," a/k/a "Hajj," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor").

In light of these extraordinary circumstances, the court explained that, "[t]o the extent that the

filing of a bill of particulars will expedite Defendants' preparation for trial and permit a more

efficient and expeditious resolution of this matter, the Court, in the exercise of its discretion,

orders that such a bill be filed," but only with regard to certain defense requests.  Id. at 235.  The

court then went on to deny most of the defendants' requests, but required the government to

provide certain information, such as clarifying overt acts that were "described only in terms as

general as engaging in 'travel' and conducting 'business'" in furtherance of the conspiracy.  Id.

at 236.

        In his motion, Napout seeks to compare the challenges facing defense counsel in

the terrorism case against members of al Qaeda with the present case alleging corruption by

soccer officials and sports marketing executives.  (Napout Br. B at 11-12).  Needless to say, the

comparison quickly breaks down after Napout's superficial comparisons between the length and

international aspects of the alleged conspiracies.  Unlike in Bin Laden, the defendants in this

case are not under restrictive pre-trial confinement conditions limiting defense counsels' access

to them.  In fact, none of the defendants currently before the Court is detained.  Napout has

privately retained multiple lawyers and can continue to freely meet and work with them over the

next year in preparation for a trial that is expected to last several weeks, not six months as in <u>Bin

Laden</u>.  In addition, none of the discovery produced by the government in this case is classified

or requires special handling, other than compliance with the protective order, which does not

limit Napout's or his counsel's review and analysis of it.  Moreover, the concern regarding the

challenges posed by code names and aliases is not present in this case, where Napout and his co-

conspirators generally appeared in public and communicated with one another under their true

names.  Finally, and perhaps most significantly, Napout is not alleged to have simply "traveled"

or conducted "business" in furtherance of the RICO conspiracy.  Rather, he is alleged to have

agreed to solicit and accept bribe payments in connection with the sale of commercial rights to

two identified tournaments, and his specific conduct is detailed in the indictment and above.  The

concerns that led the district court to grant a limited bill of particulars in <u>Bin Laden</u> are simply

absent here.

      A more analogous and instructive case is <u>United States v. Wedd</u>, which was

recently decided in the Southern District of New York.  No. 15-CR-616 (KBF), 2016 WL

1055737 (S.D.N.Y. March 10, 2016).  There, the defendants were charged in a detailed

"speaking" indictment with mail fraud, wire fraud and money laundering conspiracy in

connection with a multimillion-dollar scheme to defraud mobile telephone customers by placing

unauthorized charges on the customers' telephone bills.  <u>Id.</u>  The indictment provided an

overview of the alleged scheme, the roles of the charged defendants, a chronology of events

leading to the creation of the scheme (including approximate dates), and the defendants' efforts

to conceal the scheme.  <u>Id.</u> at *1.  Prior to the defendants' motions, the government produced "a

60

large amount of data, including: the returns from numerous email search warrants, a large

volume of subpoenaed documents (bank records, investment account records, credit card records,

phone records, etc.), and emails from [an] email server that had been obtained by the Federal

Trade Commission" as part of a civil suit.  Id. at *2 (internal quotation omitted).  The

government also provided an index of discovery material.  Id.

        In his motion for a bill of particulars, one of the Wedd defendants complained that

the indictment failed to name the alleged shell companies used or "outline the payments that

Wedd allegedly received" or "provide any information regarding the financial transactions

underlying the fraud scheme."  Id.  Both defendants claimed that "the volume of material

provided in discovery ma[de] it exceedingly difficult for counsel to determine the basis for the

charges against them," and thus sought, inter alia, "the dates and locations of conversations and

meetings where the defendants engaged in unlawful conduct in furtherance of the conspiracy, the

dates, times and form of payments made in furtherance of the conspiracy, . . . a list of specific

bank transfers referenced in the Indictment," and a list of "all documents provided to the defense

in discovery that corresponds to each of defendants' requests."  Id.

        Just like Napout, the defendants in Wedd cited Bortnovsky, Nachamie and Bin

Laden, arguing that the circumstances were analogous to those cases.  Id. at *4.  The court

rejected the comparisons and noted that the concerns at issue in those cases were absent, given

that the defendants were charged in a "'speaking' Indictment that provides a significant amount

of detail as to the Government's theory of the case and the nature of the proof that will underlie

the charges at trial," including "a chronology of the formation of the scheme and . . . the

approximate dates of key events that were part of the scheme."  Id. at *3.  The court noted that,

although it recognized "the burdens on defense counsel imposed by the volume of discovery in

th[e] case, defendants are not entitled to a roadmap of the Government's proof to facilitate their review of that discovery." Id. The court concluded that, "[t]o the extent that [the defendants] argue that this 'speaking' Indictment lacks adequate information regarding their particular roles in the alleged fraud and conspiracy, they ask for more than what the Federal Rules of Criminal Procedure provide." Id. at *4. The court denied the defendants' motions, noting that "[a] bill of particulars is wholly unnecessary to avoid prejudicially surprising [the defendants] at trial." Id.

Here, just as in Wedd, Napout is charged in a detailed "speaking" indictment that, as described above, provides an overview of the alleged schemes, the roles of the charged defendants, a chronology of events leading to the creation of the schemes (including approximate dates), and the defendants' efforts to conceal the scheme. See id. at *1. The government, as in Wedd, has produced a large volume of discovery that includes the results and returns from multiple search warrants and subpoenas, accompanied by an index of the discovery material. See id. at *2. And Napout, just like the defendants in Wedd, has sought the dates and attendees at conspiratorial meetings, specific bank transfers evidencing bribes and "any documentary evidence which would support any criminal act alleged in the Superseding Indictment for which the government seeks to hold Mr. Napout responsible." See id.; (Napout Br. B at 2). Thus, as in Wedd, in light of the detailed information provided in the "speaking" indictment and other filings, a bill of particulars is unnecessary and would serve only to reveal the government's theory of the case and the evidence it intends to introduce at trial, which is not the purpose of a bill of particulars. See id. at *3. Napout's motion for bill of particulars should be denied.

b.      The Government Is Not Required to Disclose the Names of
Unindicted Co-Conspirators

In his motion, Napout also seeks the names of the unindicted co-conspirators

because the indictment alleges that Napout committed the charged crimes "together with others."

(Napout Br. B at 2, 13).  Both the Second Circuit and district courts within this circuit have

recognized the appropriateness of denying similar requests.  See Torres, 901 F.2d at 233-34;

United States v. Mahaffy, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006) (collecting cases).  In

Torres, the Second Circuit affirmed the denial of a request for the disclosure of co-conspirators'

identities, holding that the indictment sufficiently advised the defendant of the charged crimes

and that the government had provided "a wealth of evidentiary detail" through the items

disclosed in discovery.  Torres, 901 F.2d at 234.  See also United States v. Gotti, 784 F. Supp.

1013, 1017 (E.D.N.Y. 1992) (denying disclosure of co-conspirators in organized crime

racketeering case).

Here, of course, the government has disclosed the names of many of Napout's co-

conspirators in the charged RICO conspiracy and in the particular schemes in which he is alleged

to have participated both as part of the RICO conspiracy and as stand-alone wire fraud and

money laundering conspiracy counts.  More is not required.  Nevertheless, Napout argues that,

due to the length of the conspiracies and the volume of discovery, he is entitled to a list of all

uncharged co-conspirators.  (Napout Br. B at 14).

This same request was considered by Judge Glasser in Mahaffy, a complex

securities fraud case.  446 F. Supp. 2d at 120.  Using the same legal framework as is used for

requests for other types of information sought through a bill of particulars, Judge Glasser

concluded that, "[c]onsidering the specificity of the allegations in the Indictment and the

discovery that the Government has provided, it is the estimation of this Court that Defendants have received adequate information on which to prepare their defenses." Id. While the court noted that there is a line of district court cases requiring disclosure of co-conspirators, there is "no appellate authority requiring such disclosure." Id. Thus, the court concluded that "'[t]he better authority . . . mandates that the question of granting the request of these defendants for a bill of particulars on this point is entirely a matter of the sound discretion of the court.'" Id. (quoting Gotti, 784 F. Supp. at 1019; also citing United States v. Coffey, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005) ("Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved."); United States v. Rodriguez, No. 99-CR-367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial."); United States v. Glisson, No. 03-CR-148 (DAB), 2003 WL 21709502 at *3 (S.D.N.Y. July 23, 2003); see also Torres, 901 F.2d at 233-34 (upholding denial of bill of particulars where defendant requested, in part, "the identity of those other persons 'known and unknown' as alleged in . . . the indictment . . . [and] precise dates and locations," and noting that defendant was not entitled to such "evidentiary detail").

Here, as explained above, government has provided a degree of notice and specificity that is more than sufficient to avoid double jeopardy or unfair surprise, and no further disclosure is necessary or justified. While Napout invites the Court to consider other factors used by some district courts, the government respectfully submits that, for the reasons explained in Mahaffy, the analysis governing the request for a list of co-conspirators should be analyzed within the same legal framework governing other types of bill of particulars requests. Id. If,

64

however, the Court reaches consideration of the additional factors that go beyond the sufficiency of the notice as to the nature of the charges in light of the scope of the alleged conspiracies and discovery – namely, "the potential danger to coconspirators" and "the potential harm to the Government's investigation" – the Court should find that these factors also weigh against granting Napout's request in this case.  (See Napout Br. B at 14 (quoting United States v. Barrett, 153 F. Supp. 3d 552, 572-73 (E.D.N.Y. 2015))).

        For example, the government's October 28, 2016 opposition to Napout's motion for a bail modification (Docket No. 460) describes the high risk of obstruction of justice in this case.  In particular, several of Napout's co-conspirators are either subjects or targets of the government's ongoing investigation or witnesses who will testify at trial about Napout's participation in the charged crimes.  While some witnesses are in undisclosed locations in the United States, others are living at home in various countries around the world, making it more difficult for U.S. law enforcement to protect the witnesses' safety and the integrity of the government's case.  A list of Napout's co-conspirators would include many of the government's witnesses and needlessly draw attention to them and potentially put them at risk of harm or influence, which weighs heavily against disclosure.  See Shkreli, No. 15-CR-637, at 18 (concluding that disclosure through a bill of particulars of the identities of unindicted co-conspirators "puts these parties at risk of being threatened and intimidated . . . and could affect the government's ability to present testimony by these individuals should they be called as witnesses").  For this reason, in addition to the fact that the government has provided a degree of notice and specificity that is more than sufficient to avoid unfair surprise, a bill of particulars is not warranted in this case.

65

CONCLUSION

For the reasons set forth above, the government respectfully submits that the

defendants' motions are without merit and should be denied.

Dated: Brooklyn, New York
       December 21, 2016

                                        Respectfully submitted,

                                        ROBERT L. CAPERS
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Evan M. Norris
Samuel P. Nitze
Paul Tuchmann
M. Kristin Mace
Keith D. Edelman
Assistant United States Attorneys
       (Of Counsel)

66