UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

      - against -

JUAN ANGEL NAPOUT, *et al.,*

                 Defendants.

--------------------------------------------------------X

**MEMORANDUM & ORDER REGARDING GOVERNMENT'S MOTION TO ADMIT RACKETEERING EVIDENCE**
15-CR-252 (PKC)

PAMELA K. CHEN, United States District Judge:

      The government has moved *in limine* to admit certain racketeering evidence at the trial of Defendants Juan Angel Napout, Jose Maria Marin, and Manuel Burga (Dkt. 622), scheduled to begin on November 6, 2017. Though not specifying the precise evidence or acts it intends to introduce or prove at trial, the government has identified categories of racketeering evidence it will seek to introduce and has provided representative examples of this evidence. In response, Defendants principally argue that the government's motion fails to provide sufficient detail regarding the racketeering acts or evidence to permit Defendants to assess whether the evidence should be admitted, and that the Court should not rule on the motion unless and until the government provides additional details. (*See* Marin's Memorandum of Law, Dkt. 629 ("Marin Mem.") at 1, 8; Napout's Memorandum of Law, Dkt. 631 ("Napout Mem.") at 6; Burga's motion to adopt Marin's and Napout's memoranda of law, Dkt. 634 ("Burga Mem.") at ECF[1] 4.) For the reasons set forth herein, the Court finds that the anticipated racketeering evidence described in the government's motion is relevant conduct and not unfairly prejudicial, and will be, subject to objections on other grounds, admissible at trial. (*See* Government's Motion *In Limine* ("Govt.

---

[1] "ECF" refers to the pagination generated by the Electronic Court Filing system and not the document's internal pagination.

Mot."), Dkt. 622 at 10-17.)  However, because the government's motion does not clearly indicate whether it intends to introduce evidence involving obstruction of justice, nor describe such evidence, the Court directs the government to do so by September 22, 2017.

## BACKGROUND

### I.    Government's Motion *In Limine*

In its motion, the government describes the pattern of racketeering activity that it will seek to prove at trial and then provides an overview and examples of the type of evidence it will offer to prove these racketeering acts.

### A.    Pattern of Racketeering Activity

The government first describes, in some detail, what it intends to prove with respect to the pattern of racketeering alleged in the Second Superseding Indictment ("Indictment" or "S-2 Ind."):

> [T]he government . . . anticipate[s] that, in the course of presenting its case in chief, it will offer evidence of the conspirators' agreements to use their positions in the enterprise to engage in schemes involving the solicitation, offer, acceptance, payment, and receipt of bribes and kickbacks in connection with the following:
>
> - *The purchase and sale of certain media and marketing rights held by CONMEBOL to various competitions, including the Copa América and Copa Libertadores.*  As noted above, the defendants were not the first – or the only – soccer officials to receive bribes and kickbacks in connection with Copa América and Copa Libertadores rights.  The evidence will show that the defendants, alongside other conspirators, engaged in this conduct for several years after other soccer officials solicited and received such bribes and kickbacks over many more years.  In the case of the Copa América, the bribes were paid first by Traffic, then by Full Play, and finally by a consortium of Traffic, Full Play and Torneos (at the same time that Torneos was also paying the Copa Libertadores bribes).  With regard to the Copa Libertadores, bribes were paid by ISM and Torneos (which in some cases paid bribes through Full Play acting as an intermediary).  In addition, Torneos, Full Play, and others at one point sought to consolidate the sponsorship rights to the Copa Libertadores and the Copa Sudamericana through the proposed payment of bribes and kickbacks to various CONMEBOL officials, including Napout.
>
> - *The purchase and sale of certain media and marketing rights held by CONCACAF to various competitions, including the Gold Cup and the*

*CONCACAF Champions League.* A few years after Traffic began paying bribes to CONMEBOL officials in connection with the Copa América, Traffic's Miami-based affiliate, known as Traffic USA, entered into a similar scheme with CONCACAF officials in connection with CONCACAF's analogue to the Copa América: the Gold Cup. Full Play again followed Traffic and, when it sought to win business with CONCACAF, which had not historically sold media and marketing rights to Full Play, Full Play paid bribes to three CONCACAF officials in exchange for their agreement to use their influence to try to cause CONCACAF to sell to Full Play media and marketing rights for CONCACAF tournaments, including the Gold Cup. This effort was unsuccessful, however, and Traffic USA secured the rights for the later period by bribing a different CONCACAF official.

- *The purchase and sale of certain media and marketing rights held by the CBF to various competitions, including the Copa do Brasil.* As with its proof of the Copa América and Copa Libertadores schemes, in proving the Copa do Brasil scheme, the government will prove that in addition to Marin, other soccer officials – including [alleged co-conspirators Ricardo Teixeira, long-time president of the CBF] and [Marco Polo Del Nero, CBF official] – received bribes in connection with the purchase and sale of media and marketing rights to the Copa do Brasil.

- *The purchase and sale of certain media and marketing rights to (1) World Cup qualifier matches held by certain national federations, including the Paraguayan, Bolivian, Venezuelan, Ecuadoran, and Argentine federations, the member federations of the Caribbean Football Union (the "CFU"), and certain Central American federations, and (2) friendly matches held by certain national federations, including matches played by the national teams of Argentina, Brazil, Bolivia, Ecuador, Colombia, and Chile.* In both the CONMEBOL and CONCACAF regions, the sports marketing companies sought to gain influence over federation presidents by paying bribes and kickbacks in connection with World Cup Qualifier matches and/or friendly matches. Some of the same companies, including Full Play and Torneos, paid these bribes and kickbacks in exchange for the loyalty of the soccer officials, not only with regard to the transfer of the rights to the specific matches, but also in connection with the sale of the rights to the Copa América, Copa Libertadores and other tournaments.

- *The offer, solicitation, and receipt of bribes and kickbacks in connection with certain broadcast rights and/or the site selection for certain competitions organized by FIFA, and sponsorship rights for footwear, apparel, accessories, and equipment.* Throughout the period during which co-conspirator soccer officials were receiving bribes in connection with the media rights to the tournaments and matches described above, some of the same officials were offered and received bribes in connection with FIFA

competitions, including the World Cup and the Club World Championship (now known as the Club World Cup), while others solicited and were offered bribes in connection with federation sponsorship rights.

(Govt. Mot. at 11-13.)[2]

### B.    Evidence of Racketeering Acts

The government next provides an "Overview of Some [of] the Racketeering Evidence in the Government's Case in Chief".[3]  (Govt. Mot. at 14-17.)  In this section, the government explains, *inter alia*, that:

Specifically, in proving the racketeering pattern, the government will demonstrate that the defendants' conduct with regard to the Copa América, Copa Libertadores, Copa do Brasil, World Cup qualifier and friendly match bribes falls within the larger racketeering pattern of bribery of soccer officials employed by or associated with the enterprise.  In doing so, the government will show how the criminal acts by the defendants and their co-conspirators had "the same or similar purposes, results, participants, victims, [and] methods of commission" as other bribery schemes within the pattern and were "not isolated events."  This will necessarily involve the introduction of evidence going beyond each defendant's individual conduct.

(Govt. Mot. at 14 (citation omitted) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)).)

The government then describes the evidence that it will seek to introduce to prove the racketeering pattern, including several examples:

For example, in proving the Copa América, Copa Libertadores, and World Cup qualifier schemes in which the defendants directly participated, the government

---

[2] Marin summarizes these "five categories" of evidence, but omits the details supplied by the government regarding the nature of its anticipated proof in each of these categories, as set forth above.  (Marin Mem. at 3.)

[3] As the government acknowledges, its motion "does not purport to provide a list of the exhibits to be offered or the anticipated testimony of the witnesses[;]" rather, "it describes 'in categorical terms' the conduct the government will prove."  (Government's Reply Memorandum ("Govt. Reply"), Dkt. 646 at 3-4.)

will present contemporaneous business records of Full Play and Torneos that detail the bribes to each of the defendants. These same records also detail bribes to numerous other soccer officials in connection not only with these tournaments and matches, but also in connection with World Cup qualifier matches involving the Bolivian, Venezuelan, Ecuadoran, and Argentine federations, and friendly matches played by the national teams of Argentina, Brazil, Bolivia, Ecuador, Colombia, and Chile, among other bribes. Some of these bribes will not be proven beyond the introduction of these records and testimony relating to the records, while others will be corroborated by other documents and/or by witnesses who paid or accepted the bribes and who will also testify about the defendants' direct participation in the Copa América, Copa Libertadores, and Copa do Brasil Schemes. Similarly, some of these same witnesses to the Copa América, Copa Libertadores and Copa do Brasil Schemes will also admit to their own payment or receipt of bribes in connection with the other schemes described above, and their testimony will thus be corroborated by the Torneos and Full Play business records.

(Govt. Mot. at 14-15 (footnote omitted).)

The government similarly provides examples of evidence it intends to introduce to show that "multiple sports marketing companies in the enterprise had similar purposes, results, and methods of bribing soccer officials in connection with World Cup qualifier and friendly matches", as well as Full Play's efforts "to expand into the CONCACAF region by bribing three CONCACAF officials in connection with CONCACAF tournaments, including the Gold Cup and CONCACAF Champions League":

For example, evidence of the purchase and sale of rights to World Cup qualifier matches held by the CFU member federations, and certain Central American federations, will demonstrate that these schemes had similar purposes, results and methods of commission as Napout's receipt of bribes in connection with the APF's World Cup qualifier matches. This evidence will be presented mainly through the testimony of cooperating witnesses – often supported by records and other corroborating testimony – who will already be testifying about other aspects of the case that directly implicate the defendants' own conduct, such as one witness who will testify about the bribe agreements in connection with both the Copa América Centenario and the CFU World Cup qualifiers.

(Govt. Mot. at 15-16.)

Lastly, the government describes evidence it will present to establish that Defendants and their co-conspirators "relied heavily on the United States legal and financial systems, including the wire facilities of the United States, and used the same or similar methods of concealing bribes":

> Just a few of the examples of the methods used by the defendants that were also used by their co-conspirators include: Napout's receipt of bribe payments in cash, Burga's use of structuring, by obtaining payment through multiple checks in the amount of $10,000, and Marin's use of shell companies to conceal illicit bribe payments.

(Govt. Mot. at 16 (citations to Indictment omitted).)

## DISCUSSION

The government moves *in limine* to introduce certain racketeering evidence at trial. To be sure, the government does not specify or provide a detailed description of all of this evidence, but, because of the nearly identical nature of the crimes with which Defendants and their co-conspirators are all charged, the lack of specificity as to the particular acts or evidence relating to Defendants' co-conspirators does not preclude Defendants from raising categorical objections to this evidence. Nor does it preclude the Court from finding that the evidence is relevant to the government's case, and that it is not unfairly prejudicial to Defendants. Accordingly, subject to objections raised by Defendants with respect to specific evidence closer to or during trial, the government will be permitted to introduce racketeering evidence of the type described in its motion.

## I.      Government's Burden to Prove RICO Elements

At trial, the government must prove, *inter alia*, corruption of the RICO enterprise and a pattern of racketeering activity of which Defendants' conduct was a part. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2096-97 (2016) (citing *H.J. Inc.*, 492 U.S. at 239 (RICO defendant's conduct must be part of alleged pattern of racketeering activity, *i.e.*, "a series of related

predicates that together demonstrate the existence or threat of continued criminal activity")); *United States v. Pizzonia*, 577 F.3d 455, 463-64 (2d Cir. 2009) (RICO conspiracy "is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs *through* a pattern of racketeering"; "'it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes,' but '[r]ather the combination of these two elements'" (alteration in the original) (quoting *United States v. Russotti*, 717 F.2d 27, 33 (2d Cir. 1983))); 18 U.S.C. §§ 1962(c), (d) (making it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," or to conspire to do same).

To prove a pattern of racketeering activity, the government must establish, at minimum, two predicate racketeering acts that occurred within ten years of one another. *See* 18 U.S.C. § 1961(1), (5). Furthermore, it is not enough to simply prove two or more predicate acts, but the government must show that the racketeering acts are related to each other and to the enterprise, and together pose a threat of continuing criminal activity. *See H.J. Inc.*, 492 U.S. at 239; *RJR Nabisco, Inc.*, 136 S. Ct. at 2096-97; *Pizzonia*, 577 F.3d at 465 (predicate acts must bear a relationship to each other that "manifest[s] the continuity required to prove a pattern"); *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) ("RICO does not apply to 'the perpetrators of "isolated" or "sporadic" criminal acts[;]'" "[c]riminal conduct only 'forms a pattern if it embraces criminal acts'" that are related (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (*en banc*) and *H.J. Inc.*, 492 U.S. at 240)).

With regard to the relatedness requirement, the "[p]redicate crimes must be related both to each other (termed 'horizontal relatedness') and to the enterprise as a whole ('vertical

relatedness')." *Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017) (citation omitted). Horizontal relatedness can be shown through predicate acts that "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted); *see also Indelicato*, 865 F.2d at 1382 (relatedness shown by "temporal proximity, or common goals, or similarity of methods, or repetitions"); *Vernace*, 811 F.3d at 615 (relatedness demonstrated by predicate acts that have "same or similar purposes, results, participants, victims, or methods of commission, [and] otherwise are interrelated by distinguishing characteristics" and "are not isolated events." (emphasis omitted) (quoting *H.J. Inc.*, 492 U.S. at 240 (1989))). Vertical relatedness requires only "that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010).

With regard to the continuity requirement, the government must put forth evidence regarding the timing and temporal scope of the alleged racketeering acts to demonstrate either closed- or open-ended continuity. *See Reich*, 858 F.3d at 60 ("Criminal activity that occurred over a long period of time in the past has closed-ended continuity, regardless of whether it may extend into the future[;]" whereas, criminal activity "'that by its nature projects into the future with a threat of repetition'" has open-ended continuity (quoting *H.J. Inc.* 492 U.S. at 241-42)); *id.* (indicating that the general requirement for closed-ended continuity is at least two years). Notably, the government can establish the continuity requirement by showing that the "predicate acts were the regular way of operating that business", even where the business itself was primarily lawful. *Id.* (quoting *Confacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999)).

8

As the Second Circuit noted in *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992), "[p]roof of these elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant . . . ." *Id.* at 843; *see United States v. Basciano*, 599 F.3d 184, 207 n.17 (2d Cir. 2010) ("[J]ury is entitled to rely not only on evidence of the defendant's own crimes, but also on evidence of the crimes of those with whom he is alleged to have thrown in his lot because the judgment required is not simply what acts the defendant committed at particular moments, but whether those acts were parts of a pattern, *i.e.*, committed as part of [the] defendant['s] association with a subculture of crime." (internal quotation marks and citations omitted)).

In this case, given the wire fraud conspiracies alleged, the government must also demonstrate that the wire fraud predicate acts charged as part of the RICO conspiracy in the Indictment were domestic violations of the U.S. wire fraud statute. (*See* M&O on Defendants' Motions to Dismiss, Dkt. 542, at 13-15 (finding that government adequately alleged domestic application of wire fraud statute based on Defendants' and co-conspirators' alleged use of U.S. financial system).)

## II.    Government's Disclosure of Racketeering Acts Is Sufficient to Enable Defendants To Raise Objections

As explained in the government's motion and summarized above, the government intends to offer at trial evidence of bribery, kickbacks, wire fraud, and money laundering committed by Defendants' co-conspirators, in order to establish the key elements of the RICO conspiracy charged in this case, *i.e.*, the existence of the enterprise, the continuity and relatedness of the pattern of racketeering activity, and the centrality of the U.S. financial system to the pattern of racketeering activity engaged in by Defendants and their co-conspirators. The government also

seeks to introduce this evidence to provide necessary background to the jury on how the RICO conspiracy and Defendants' relationships with their alleged co-conspirators developed.

In this case, there is no mystery as to either the identity of the enterprise or the precise pattern of alleged racketeering activity. The enterprise is FIFA, its constituent confederations and associations, and certain sports marketing companies. The pattern of racketeering activity consists of repeated acts of bribery, kickbacks, wire fraud, and money laundering over the course of FIFA's 20-year history, carried out by the sports marketing companies and FIFA's officials at all levels. (*See* S-2 Ind. at ¶¶ 60, 122-23 (alleging that Defendants and co-conspirators agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity that included multiple acts of bribery, wire fraud, money laundering, and obstruction of justice[4]).) Not surprisingly, the racketeering evidence that the government intends to introduce relates to the solicitation, acceptance, receipt, and delivery of bribes by and between Defendants' alleged RICO co-conspirators during the existence of the enterprise, *i.e.*, FIFA. And, as the government further explains in its motion, because "the primary focus of the evidence presented at trial" will be the three schemes in which Defendants participated (Govt. Mot. at 6), the government intends to streamline its presentation of evidence by using some of the same evidence to prove both Defendants' criminal conduct and that of their alleged RICO co-conspirators. (*See* Govt. Mot. at 14 ("It will not be necessary, however, to prove all aspects of the bribery and kickback schemes that were perpetrated by the defendants' co-conspirators. In fact, much of the evidence that the government will introduce of such conduct will be through the same witnesses and documents that provide proof of the defendants' own conduct.").)

---

[4] As discussed *infra*, obstruction of justice is the only racketeering act not specifically identified or described in the Indictment or the government's motion.

Nonetheless, Defendants argue that the government's disclosure lacks sufficient detail for them to assess the relevance and potential prejudice of the government's anticipated racketeering evidence. (Marin Mem. at 1 (arguing that government "offers essentially no specific information as to the nature of that [racketeering] evidence, thereby precluding a fair assessment of the issue by both the defense and the Court"); Napout Mem. at 6 (arguing that government "utterly fails to set forth specifically the other acts, much less to do so 'defendant by defendant'").) Marin, in particular, argues that the government's disclosure is deficient because it does not set forth "when payments were made, the amounts of the payments, the methods or means of the payments, the identities of the 'other soccer officials' who purportedly received them, and the circumstances as to how the agreements were reached (*i.e.*, in person meeting, email, other written form)." (Marin Mem. at 3-4.) This level of detail, Marin argues, is necessary to "allow the defense (and the Court) to assess fairly the extent to which that co-conspirator conduct actually shared many of the factors cited in *HJ, Inc.* as relevant to determining if the relationship among various predicate acts make[s] them part of a pattern of racketeering or, in other words, their probative value." (*Id.* at 4.) The Court disagrees.

In reality, Defendants' argument is that only a detailed roadmap of the government's case will enable them to assess the relevance and potential prejudice of the government's racketeering evidence. However, as is evident from Marin's own words, this argument improperly conflates the ability to assess whether the evidence *proves* the government's case—*i.e.*, whether "co-conspirator conduct *actually* shared many of the factors cited in *HJ, Inc.*" (*Id.* (emphasis added))—with the ability to assess whether the evidence is *relevant* to that task—*i.e.*, whether co-conspirator conduct involving bribery, wire fraud, and money laundering undertaken in connection with the same enterprise, among some of the same individuals, using some of the same methods, for the

same or similar purposes, and with the same or similar results is *relevant* to proving a RICO conspiracy involving Defendants. While details about the who, what, when, where, and how are necessary to determine whether the government has *proved* its RICO case, they are not necessary to determine whether the type of evidence the government intends to introduce is *relevant* to its case or whether that racketeering evidence is unfairly prejudicial to Defendants.[5]

In an effort to explain why more detailed information is required, Marin posits that if, for example, payments made to a co-conspirator far exceed those allegedly received by a Defendant, that "could have an outsize prejudicial impact on the jury. Or if such a payment were made in a form that would be viewed as particularly secretive or concealing, it too could be overly harmful." (Marin Mem. at 5.) Even assuming that the government will introduce such evidence, as it almost certainly will do as part of proving a pattern of racketeering (*see* S-2 Ind. at ¶¶ 60–120), this type of evidence, as discussed further below, would not warrant a finding of unfair prejudice and, therefore, is not essential to an assessment of its admissibility at this stage. While Defendants may seek to argue about the merits or weight of this evidence at trial—*e.g.*, arguing that the jury should find that the substantially larger or more secretive bribes are not part of the pattern of racketeering in which Defendants are accused of participating—that argument does not support a finding that the evidence is unfairly prejudicial under Rule 403. *See infra* at 20, Sec.III.B.

Here, because of the singular nature of the RICO enterprise and crimes alleged in this case as to all of the defendants and their co-conspirators, the same issues of relevance and prejudice are

---

[5] The government makes a similar observation: "Marin goes so far as to suggest that the government must present evidence 'sufficient for this Court to conclude' that the co-conspirator conduct is part of the racketeering pattern. (Marin Resp. at 4.) To the contrary, it is the jury that must determine whether the government has met its burden of proof as to the pattern element. The Court, at this stage, need only determine if the evidence is relevant and rule on any categorical objections under Rule 403 or otherwise." (Govt. Reply at 5 n.6.)

not implicated as in other RICO prosecutions, such as *United States v. Ashburn*, No. 11-CR-303 (NGG), 2015 WL 588704, at *13 (E.D.N.Y. Feb. 11, 2015), which all parties regard as "instructive". (Govt. Mot. at 24; Marin Mem. at 6.)   In *Ashburn*, the alleged RICO enterprise was a street gang that was involved in a multitude of different criminal activities varying in severity, everything from theft to murder.   2015 WL 588704, at *3-5.   In connection with a similar racketeering acts motion, it was necessary for the government to provide, as it did, a much more detailed description of the racketeering acts it intended to prove, because the wide disparities in the severity of the crimes that each of the charged members of the enterprise were involved in created the potential for prejudice. *See id.* at *12-21.  That is simply not the situation here.  Rather, Defendants and their co-conspirators are *all* alleged to have engaged in the same type of non-violent financially-related crime: giving or receiving bribes in connection with FIFA-related soccer tournaments and/or concealing the proceeds of those crimes.[6]  Whether the bribes were made in connection with one soccer confederation or another, or one tournament or another, does not make the crime committed by one conspirator of any greater or lesser or different in kind than the crimes allegedly committed by Defendants.   In contrast to *Ashburn*, the potential for prejudicial spillover due to the disparity in the nature and seriousness of the crimes committed by co-conspirators is virtually non-existent in this case.   *See*, *e.g.*, *Ashburn*, 2015 WL 588704, at *15 (discussing "graphic nature" of anticipated testimony about an assault and finding it not unfairly prejudicial because it did not involve conduct "more inflammatory than the charged conduct" (internal quotations omitted)). The racketeering acts allegedly carried out by Defendants' co-conspirators in this case, in contrast to the racketeering acts alleged in *Ashburn*, are virtually identical in

---

[6] Again, the possible exception may be obstruction of justice, which is alleged as a racketeering predicate (S-2 Ind. at ¶ 123), but not otherwise described in the Indictment or the government's motion.

purpose, method, and result, thus obviating the need for a detailed description of every single act of bribery, wire fraud, or money laundering in order to provide sufficient notice to Defendants for purposes of objecting to the introduction of this evidence. Thus, to extent that the government provided, or was required to provide, more detailed information about the racketeering acts it sought prove at trial in *Ashburn*, the Court finds that *Ashburn* does not dictate the same approach in this case.

Moreover, Defendants overlook the fact that, for certain categories of the government's anticipated evidence, the court in *Ashburn* ruled on the admissibility of evidence, even when the evidence was described only in categorical terms. Specifically, while *Ashburn* addressed specific instances of assault and murder by defendants, for other categories of acts such as sales of narcotics, thefts, robberies, and the purchase, sale, and possession of firearms, the court's analysis did not identify specific details but rather more general descriptions of conduct. *See* 2015 WL 588704, at *18-21. For example, *Ashburn* found admissible the government's proffered evidence that members of defendants' gang often sold drugs to earn money for themselves and the gang, *id.* at *18, "would steal cell phones from people walking down the street and resell them for cash," *id.* at *19, and would sell, purchase, and stockpile weapons for the purpose of committing violence, *id.* at *20. Notably, the *Ashburn* court made this determination without discussing details such as when these thefts, drug sales, and weapons transactions occurred, the amount of drugs or weapons involved, the amount of money involved in each of these transactions, or to whom the drugs and guns were sold—*i.e.*, the type of information Marin claims that the government should have included in its *in limine* motion and that the Court needs to determine the admissibility of the anticipated racketeering evidence. Thus, even the court in *Ashburn* did not require the degree of detail Defendants contend is necessary to evaluate the admissibility of the government's RICO

evidence.  *See also United States v. Canales*, 718 F. Supp. 2d 327, 328 (S.D.N.Y. 2010) (rejecting defendant's argument that the government's proffer was too vague to determine admissibility under Rule 404(b) because the government had not identified with "specificity . . . dates, location, and time of occurrence [of proffered Rule 404(b) evidence]"; finding sufficient information to establish relevance and probative value of proffered evidence where the government had identified the witnesses who were likely to testify and "the approximate time frame" for the prior act).

Indeed, for some of the evidence the government intends to introduce—all of which is included in the Indictment—the government's *in limine* motion *does* provide specificity with regard to the anticipated evidence.  For example, the government, in discussing the Copa América Schemes, stated the following:

> [B]eginning with the 1987 edition and continuing thereafter through 2011, co-conspirator and former CONMEBOL president Nicolás Leoz solicited and received bribe payments from the sports marketing company Traffic in connection with the editions of the Copa América played during that period.
>
> Hugo Jinkis and Mariano Jinkis agreed to pay bribes to various CONMEBOL officials, including Napout and Burga, in exchange for CONMEBOL's entry into the 2010 agreement with Full Play.  In or about 2013, representatives of a consortium of sports marketing companies called Datisa – consisting of Traffic, Full Play, and the sports marketing company Torneos – agreed to pay bribes to various CONMEBOL and CONCACAF officials, including Napout, Burga, and Marin, in exchange for the commercial rights to the 2015, 2019, 2023 editions of the Copa América Centenario.

(Govt. Mot. at 7 (citing S-2 Ind. ¶¶ 90, 91, 97).)

In discussing the Copa Libertadores Schemes, the government stated, in its *in limine* motion that:

> Beginning in or about the early 2000s, Leoz solicited and received bribe payments from co-conspirator Zorana Danis – operating through ISM, the New Jersey-based sports marketing company that Danis founded and owned – in exchange for Leoz's support of Danis and her company as the exclusive marketing agent for the sponsorship rights to the Copa Libertadores.

15

> Beginning in or about 2008 and continuing thereafter through 2012, co-conspirator Eduardo Deluca – then general secretary of CONMEBOL – solicited bribe and kickback payments from Danis.  Danis agreed to make and did make bribe payments to Leoz and Deluca . . . .
>
> In or about 2009, [co-conspirator Alejandro Burzaco] agreed to pay and did pay annual bribes to six presidents of the traditionally less-powerful member associations of CONMEBOL (referred to by some as the "Group of Six"), including Napout and Burga, in exchange for their support of T&T as the holder of broadcasting rights to the Copa Libertadores, as well as to two other club tournaments, the Copa Sudamericana and the Recopa Sudamericana.

(Govt. Mot. at 9 (citing S-2 Ind. ¶¶ 39, 106, 111-12).)

In discussing the Copa do Brasil Scheme, the government identifies, *inter alia*, the following instances of bribery:

> In or about 2011, another sports marketing company entered into a contract with the CBF to purchase the commercial rights for all editions of the Copa do Brasil between 2015 and 2022.  In order to secure the contract with the CBF, the company agreed to pay an annual bribe to Teixeira . . . .

(Govt. Mot. at 9 (citing S-2 Ind. ¶¶ 118).)  Though the government has not *itemized* every racketeering evidence it intends to introduce and the specifics of how each bribe was solicited or executed presumably varied, the nature of the racketeering acts and the proof of those acts are highly predictable and, to a large extent, have already been disclosed to Defendants.

Lastly and relatedly, the Court observes that Defendants' suggestion that, without more specific information, they have no way of knowing what racketeering evidence the government intends to offer at trial is overblown, if not baseless.  (*See*, *e.g.*, Napout Mem. at 16 (claiming that government's reservations of the right to, *inter alia*, offer additional evidence of bribes to soccer officials and offer other evidence of the enterprise and pattern of racketeering "make[] it utterly impossible for the Court to conduct any sort of meaningful Rule 403 analysis before trial").)  Despite the many players and schemes alleged as part of the racketeering enterprise and

16

conspiracy, this case is not rocket science.  As the Indictment, discovery, Bill of Particulars, and instant motion make clear, the government will seek to prove that, over the course of 20 years, many officials of FIFA, CONCACAF, CONMEBOL, and their constituent associations solicited or accepted bribes from various sports marketing groups, in exchange for broadcasting and other commercial rights relating to FIFA soccer tournaments, and that these schemes were conducted through and using the U.S. financial system.

Thus, the Court finds that given the nature of this case and the RICO conspiracy with which Defendants are charged, the detailed nature of the Indictment and the government's Bill of Particulars, and the voluminous discovery that has been produced, the government's motion—though not itemizing each racketeering act by a co-conspirator that the government will seek to prove—sufficiently identifies and describes the categories of racketeering acts and evidence it intends to introduce.  The Defendants, therefore, are in a position to meaningfully assess the relevance and potential prejudice of this evidence, and to raise objections regarding the categorical admissibility of this evidence.[7]

## III.    Government's Anticipated Racketeering Evidence Is Relevant and Not Unfairly Prejudicial

Based on the descriptions of the racketeering acts and evidence provided in the government's motion, the Court finds that this evidence is relevant and that the danger of unfair prejudice does not substantially outweigh the probative value of the proffered evidence.

---

[7] Given this finding, the Court declines Napout's proposal to defer deciding on the admissibility of the government's racketeering evidence, at least on a categorical basis, until trial. (Napout Mem. at 13-17.)

## A.    Relevance of Government's Anticipated Racketeering Evidence

Clearly, evidence relating to the solicitation or receipt of bribes, wire fraud, and money laundering committed by Defendants' alleged co-conspirators, allegedly as part of the RICO conspiracy, is relevant to proving the existence of the enterprise and pattern of racketeering activity, especially with respect to establishing the relatedness and continuity of Defendants' and their co-conspirators' criminal acts.[8] *See United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012) (finding that evidence of illegal Genovese and Gambino activity, distinct from the charged racketeering activity and not directly involving defendant, was admissible to prove both the "enterprise" and "pattern" elements of the racketeering crimes); *Basciano*, 599 F.3d at 207 ("'[E]vidence of [criminal acts by those other than the defendant] is relevant to the RICO charges against each defendant[]' 'to prove (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities.'" (quoting *DiNome*, 954 F.3d at 843-44)); *United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003) (finding no abuse of discretion in district court's admission of sixteen uncharged robberies because evidence was "relevant to the central issues of the trial: the existence of [ ] racketeering enterprise and [ ] conspiracy"); *see also United States v. DeLance*, --

---

[8] The Court agrees with the government that, because these co-conspirators' acts form a part of the alleged RICO conspiracy, their admissibility is not governed by Fed. R. Evid. 404(b). *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (holding that evidence of uncharged crimes, which was admissible as "enterprise evidence", was not subject to Rule 404(b)); *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) (criminal act committed in relation to the alleged RICO conspiracy is "not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged"); *United States v. Wong*, 40 F.3d 1347, 1378 (2d Cir. 1994) (affirming district court's admission of evidence of uncharged shoot-out and finding that "evidence [of uncharged acts] was admissible to prove the existence and nature of the [charged] 'enterprise' and the participation of defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b)"); Fed. R. Evid. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

- F. App'x ---, 2017 WL 2350221, at *2 (2d Cir. 2017) (holding that the government was entitled to introduce evidence of uncharged violent acts to show existence of racketeering enterprise, and that admission of such evidence was not subject to Rule 404(b) (citing *Baez*, 349 F.3d at 93-94)). Furthermore, the government's evidence of co-conspirator conduct is relevant to demonstrating that the U.S. financial system was central to the RICO conspiracy in which Defendants are charged, as well as providing necessary background regarding the RICO conspiracy and Defendants' involvement in it.

The relevance of the government's racketeering evidence is reinforced by Defendants' anticipated challenges to the relatedness of the racketeering schemes with which they are charged. (*See* Motions for Severance by Marin, Dkt. 530 at 9, Napout, Dkt. 462-1 at 24, Burga, Dkt. 541-1 at 2; *see also* Transcript of Oral Argument, dated April 6, 2017, at 9 (Trujillo's counsel: "we can probably reasonably anticipate a number of Rule 29s on this issue at trial"), 22 (Burga's counsel: "In this particular case, the only commonality we have . . . is that they all involve allegations of bribery. Well, you know, there could be all kinds of allegations that are the same. That doesn't mean that they should all be joined under a RICO umbrella."), and 25 (Burga's counsel: "But this relatedness, this pattern, all things that the subsequent more recent case law have said that RICO must be – there must be some showing of that in order to sustain the RICO charge, there is – the only pattern is a similarity of crime. . . . There must be some relationship or some knowledge of that. And I don't think there is in this case, at least I haven't seen it thus far.").) Defendants cannot argue that their conduct was completely isolated from the other racketeering schemes alleged in the Indictment, yet dispute the relevance of the government's evidence offered to establish the relatedness of all of the alleged racketeering schemes. (*See* Marin Mem. at 8 (arguing that the government's motion did not establish the relevance of the proposed racketeering evidence).)

19

Accordingly, the Court finds the racketeering evidence discussed in the government's *in limine* motion to be relevant as direct evidence of the crimes charged.

### B.      Government's Evidence Is Not Unfairly Prejudicial

"Under Rule 403, whether to exclude evidence that is otherwise relevant and admissible is a matter committed to the discretion of the district court." *Ashburn*, 2015 WL 588704, at * 23 (citing *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999)).  In determining whether to exclude evidence of crimes by defendant's co-conspirators under Rule 403, the Court must balance the probative value of the evidence with the potential for unfair prejudice to the defendant, *i.e.*, whether the evidence "involve[s] conduct any more sensational or disturbing than the crime[] with which [the defendant has been] charged." *United States v. Lyle*, 856 F.3d 191, 207 (2d Cir. 2017) (citation and quoting omitted); *see also Coppola*, 671 F.3d at 245-26 (upholding district court's admission of evidence that defendant's co-conspirators committed extortion of businesses, because the evidence was "not 'especially worse or [more] shocking'" than the extortion and wire fraud sub-predicates of defendant's RICO charge (quoting *United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009))); *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (finding that testimony regarding defendant's death threats to informants were no more inflammatory than the charged murder itself and thus rejecting defendant's Rule 403 challenges); *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) (upholding admission of prior cocaine convictions to show that defendant, who was charged of possessing cocaine, was aware that substance he had was cocaine, because the prior conviction did not "involve conduct more inflammatory than the charged crime[s]").[9]  While the Court recognizes that the introduction of racketeering evidence to

---

[9] The Rule 403 balancing in *Lyle*, *Quiones*, and *Paulino* considered the potential prejudice of allowing the government to introduce evidence of the defendant's own prior bad acts under Rule 404(b), rather than a co-conspirator's bad acts, as the government seeks to do in this case.  *See* 856

prove the elements of the RICO conspiracy could result in prejudice to a defendant, *Mejia*, 545 F.3d at 207 (finding "likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice" (quoting *United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007))), the Court finds that there is little risk of prejudice in this case, given, as previously discussed, the nearly identical nature of the co-conspirators' criminal acts and the crimes with which Defendants are charged.  As described in its motion, the government intends to introduce evidence of bribery, wire fraud, and money laundering by the co-conspirators that are similar, if not identical, in terms of nature and severity, to the criminal conduct of which Defendants are accused; therefore, the government's anticipated racketeering evidence does not involve conduct more sensational or disturbing than the charges that Defendants face.  As previously discussed, at most, Marin has suggested that the payment of more money to a co-conspirator or the use of more secretive means to deliver a bribe could be unfairly prejudicial to Defendants.  The Court finds that such differences simply do not meet the standard for prejudice, namely, that the co-conspirators' acts must involve conduct that is "more sensational or disturbing" than Defendants' alleged conduct.  *See Ashburn*, 2015 WL 588704, at *24 ("[T]raditional test for unfair prejudice under Rule 403 is whether the evidence of uncharged acts involves criminal conduct that is more inflammatory than the crimes charged in the indictment." (citing *Baez*, 349 F.3d at 94)).  A larger bribe or use of a more covert method of delivery simply are not more "sensational", "disturbing", or "inflammatory", so as to support a finding of unfair prejudice.

---

F.3d at 207; 511 F.3d at 309; 445 F.3d at 223.  Nonetheless, because the relevant legal inquiry is the same in both situations—*i.e.*, whether the other bad acts are more inflammatory or disturbing than the defendant's charged crime—these decisions are applicable here.  Indeed, there is arguably less of a concern about unfair prejudice resulting from evidence of a co-conspirators' bad acts than from evidence of a defendant's own 404(b) conduct, as were the situations addressed in *Lyle*, *Quiones*, or *Paulino*.  *Cf.* Fed. R. Evid. 404(b)(1) (expressly limiting the introduction of propensity evidence).

Indeed, even in cases involving a defendant's prior bad act or co-conspirator conduct that is inflammatory or disturbing, courts have not found the evidence unfairly prejudicial where that conduct is no more inflammatory or disturbing than the defendant's alleged crimes. *Compare United States v. Lopez*, 572 F. App'x 1, 3 (2d Cir. 2014) (holding that district court did not err in admitting evidence of uncharged murder where defendants were charged with conspiracy to distribute cocaine), *with United States v. Colombo*, 909 F.2d 711, 714 (2d Cir. 1990) (finding "[e]vidence linking a defendant to a rape he is not charged with and [was allegedly committed by his criminal confederates was] . . . extremely prejudicial," where defendant in the case had been charged with RICO conspiracy and conspiracy to distribute narcotics). *See also United States v. Ulbricht*, 79 F. Supp. 3d 466, 487 (S.D.N.Y. 2015) (finding Rule 403 did not require exclusion of murder-for-hire evidence because defendant was "charged not with participating in a run-of-the-mill drug distribution conspiracy, but with designing and operating an online criminal enterprise of enormous scope, worldwide reach, and capacity to generate tens of millions of dollars in commissions"; "[e]vidence that defendant sought to protect his sprawling enterprise by soliciting murders-for-hire is, in this overall context, not unduly prejudicial"); *United States v. Barret*, No. 10-CR-809 (KAM), 2011 WL 6704862, at *6-7 (E.D.N.Y. Dec. 21, 2011), *aff'd*, 677 F. App'x 21 (2d Cir. 2017) (finding that government's proffered evidence that one of the defendants offered a thirty-pound marijuana bounty for the murder of his former drug trafficking partner and instructed his crew to commit the murder when defendant was out of town so that he would have an alibi was "[n]o more sensational or disturbing" than the various narcotics trafficking crimes with which defendants were charged); *United States v. Kassir*, No. 04-CR-356 (JFK), 2009 WL 976821, at *6 (S.D.N.Y. Apr. 9, 2009) (finding that "danger of unfair prejudice [to be] relatively low since [d]efendant's association with terrorist groups other than al Qaeda . . . 'did not involve conduct

more inflammatory' than [d]efendant's charged conduct—providing material support to al Qaeda" (quoting *Livoti*, 196 F.3d at 326)); *see also Diaz*, 176 F.3d at 79 (affirming district court's finding of no unfair prejudice as to evidence of uncharged crimes and other bad acts, such as drug trafficking and acts of violence, committed by defendants and government witnesses because the uncharged crimes were probative of how the enterprise's racketeering and drug conspiracies evolved, and issues such as existence, nature, and operations of the RICO enterprise were disputed by the parties).  If anything, the fact that Defendants may have received substantially less money than their alleged co-conspirators could make their crimes seem less serious or even trivial in the eyes of the jury.

The only potential prejudice that the Court can foresee with respect to the racketeering evidence described in the government's motion is one of unnecessary cumulativeness, which has the potential of improperly persuading the jury to find Defendants guilty based on association, rather than proof of Defendants' individual guilt.  *See Ashburn*, 2015 WL 588704, at *24 (noting "non-trivial risk that the Government's evidence becomes needlessly cumulative, given the number of other acts it has proffered").  However, that possibility can, and should, be addressed at trial, in the context of the government's evidence as it is presented.  *Id.* (reserving "the right to decide, in the context of other evidence introduced at trial, that testimony related to certain other acts may eventually become needlessly cumulative or otherwise prejudicial" (citing *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009))); *McCallum*, 584 F.3d at 477 (observing that, for purposes of applying Rule 403 balancing test, no item of evidence should be treated like an island)).  In addition, at trial, the Court can address any potential prejudice through a curative instruction.  *See United States v. Mickens*, 926 F.2d 1323, 1328-29 (2d Cir. 1991); *United States v. Clemente*, 22 F.3d 477, 483 (2d Cir. 1994) (approving the district court's instruction that the

defendants were "not on trial for any crimes except for those that were charged in the indictment"); *Ashburn*, 2015 WL 588704, at *24 (noting that court will instruct jury as necessary that defendants are "'not on trial for any crimes except for those that [are] charged in the indictment'" (quoting *Clemente*, 22 F.3d at 483)).

* * *

Accordingly, based on its findings that the racketeering evidence described in the government's motion is both relevant and will not unfairly prejudice Defendants, the Court holds that the government will be permitted to introduce the type of evidence described in its motion, subject to objections on other grounds.[10]

## IV. Government's Motion Does Not Identify or Describe Evidence Involving Obstruction of Justice

While the Indictment alleges obstruction of justice and obstruction of justice conspiracy as predicate acts committed as part of the pattern of racketeering activity (S-2 Ind. at ¶ 123),[11] neither the Indictment nor the government's motion *in limine* describes those acts of obstruction or what the government intends to prove at trial with respect to these alleged racketeering acts. Unlike the acts of bribery, wire fraud, and money laundering committed by Defendants' co-conspirators, conduct involving obstruction of justice could be significantly different in kind and severity than the crimes with which Defendants are charged and could therefore present the risk of unfair

---

[10] The Court notes that, with the exception of possible Rule 404(b) motions, the Court has construed the government's various statements about reserving the right to introduce additional racketeering evidence at trial to refer to evidence that is of the same type or in the same categories as described in its motion *in limine*. The Court cautions the government that it might be precluded from introducing racketeering evidence at trial that is not encompassed by the descriptions in its motion, unless in response to defense arguments or evidence.

[11] Defendants have not been separately indicted for obstruction of justice.

prejudice.  However, because the government has not indicated whether it intends to introduce any racketeering evidence relating to obstruction of justice by Defendants' co-conspirators, there is no way for the Court to make that determination.  Accordingly, the government will provide notice and a description, by September 22, 2017, of any racketeering evidence it intends to introduce regarding obstruction of justice allegedly committed by Defendants' co-conspirators.[12]

## V.    The Court Will Not Enforce Napout's Proposed Stipulation

In addition to arguing that the government has not provided sufficient detail regarding its proposed racketeering evidence and that the Court should defer any decision on the admissibility of this evidence until trial, Napout offers to stipulate to the existence of the charged enterprise and pattern of racketeering.  Napout also argues that the Court should enforce his proffered stipulation, and preclude the government from offering evidence to prove the existence of the enterprise and pattern of racketeering activity.  (Napout Mem. at 12.)  Napout's argument is premised on the government's purported refusal to limit its racketeering evidence to anything less than proof of all 15 schemes alleged in the Indictment.  (Napout Mem. at 11.)

The Court rejects Napout's proposal for three reasons.  First, neither of Napout's co-Defendants has indicated a willingness to similarly stipulate.  In fact, Burga, though joining and adopting Napout's memorandum of law, specifically carved out an exception indicating that he "is not prepared at this point to stipulate to the existence of the RICO enterprise."  (Burga Mem. at 1 n.1.)  Second, because Napout's proposed stipulation does not include a stipulation to the

---

[12] Based on references the government has made in other submissions, (*see, e.g.*, Government letter responding to Defendants' motion to compel transcripts and other discovery, Dkt. 648, at 5), the Court is aware that the government may seek to introduce evidence of Napout's own obstructive conduct.  The Court considers such evidence to constitute possible Rule 404(b) evidence as to Napout, as opposed to racketeering evidence, and will consider its admissibility pursuant to the schedule set forth *infra* for deciding Rule 404(b) motions.

corruption of the enterprise (S-2 Ind. at ¶¶ 60-63, 86), it does "not relieve the government of having to prove many aspects of the racketeering conspiracy, including the racketeering conduct that took place within the United States." (Govt. Reply at 9.)  Nor does Napout's proposed stipulation relieve the government of showing the relatedness of Defendants' conduct to the enterprise and other racketeering acts.  Third, Napout's contention regarding the unlimited scope of the government's racketeering proof is expressly contradicted by the government's motion.  (Govt. Mot. at 11, 14-15 (explaining that government will not prove all of the charged schemes).)  In any event, as Napout recognizes, any unnecessary or prejudicial cumulativeness in the government's racketeering proof can be addressed through Rule 403 objections at trial.  (Napout Mem. at 14-17 (urging Court to defer Rule 403 analysis until trial).)

## CONCLUSION

For all of the foregoing reasons, the Court finds that the racketeering evidence described by the government in its motion *in limine* is admissible at trial, subject to objections on grounds other than relevance and unfair prejudice.  The government will provide notice, by **September 22, 2017**, of any obstruction of justice evidence it intends to introduce as proof of the pattern of racketeering.  In addition, given that the parties have suggested a willingness to stipulate to certain aspects of the RICO conspiracy charge (Napout Mem. at 2; Govt. Reply at 10 n.11), they should confer to discuss such a stipulation and, if they reach an agreement, inform the Court of the stipulation no later than **October 13, 2017**.  Lastly, the government shall provide Rule 404(b) notice with regard to anticipated evidence of Defendants' other or prior bad acts by **October 20, 2017**.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 13, 2017
      Brooklyn, New York