UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,

- against -

**MEMORANDUM & ORDER
REGARDING MOTION *IN LIMINE***
15-CR-252 (PKC)

JUAN ANGEL NAPOUT, *et al.*,

Defendants.

-------------------------------------------------------X

PAMELA K. CHEN, United States District Judge:

On November 8, 2017, the Court ruled from the bench on a motion *in limine* by the government (Dkt. 718) addressing several evidentiary issues related to the trial of Defendants Juan Angel Napout, Jose Maria Marin, and Manuel Burga ("Defendants"). (Trial Tr. ("Tr.") 55-127.) The Court also indicated that a written order would be issued setting forth the legal authorities and analyses on which the Court relied in reaching certain of its rulings from the bench. (Tr. 58:15-22.) Thereafter, the Court requested additional briefing from the parties on one of the issues raised in the motions *in limine*, namely, whether evidence regarding Defendants' beliefs about foreign law could or should be admitted at trial. (Tr. 2618-2623.) On December 8, 2017, the Court orally ruled on the foreign law issue, partially modifying its November 8 ruling on that issue. (Tr. 3600-3616.)

This Memorandum & Order ("Order") sets forth the legal authorities and analyses underlying the Court's November 8 and December 8 rulings, specifically that (1) subject to certain conditions, the government may introduce the audio recordings listed in its motion pursuant to Federal Rule of Evidence ("FRE") 801(d)(2)(E); (2) under Federal Rule of Criminal Procedure 16, Defendants are required to identify in advance the exhibits they intend to introduce for non-impeachment purposes at trial, whether such exhibits will be introduced through a witness called by Defendants or a witness called by the government during its case in chief; and

(3) Defendants are permitted to testify about their beliefs regarding whether commercial bribery is illegal in their home countries, to the extent those beliefs informed their understanding of the fiduciary duties owed to the professional soccer organizations of which they were officers, but that they would not be permitted to present the testimony or documents they proffered during the December 8 hearing, including the proffered testimony from alleged co-conspirators about the co-conspirators' beliefs about *their* countries' laws on commercial bribery—specifically, José Hawilla (Brazil) and Sergio Pena (Argentina).

## I.  The Audio Recordings Are Non-Hearsay Statements Under FRE 801(d)(2)(E)

In its motion, the government identifies audio recordings containing statements made by alleged co-conspirators of Defendants.  The government seeks to introduce these audio recordings at trial pursuant to FRE 801(d)(2)(E), which creates an exemption to the hearsay bar for statements made by co-conspirators during and in furtherance of a conspiracy involving the defendant.  Under FRE 801(d)(2)(E), a district court may admit an out-of-court declaration that would otherwise be hearsay if it finds "by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy."  *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (citation omitted). Defendants raise various objections to the government's introduction of the audio recordings, which the Court considers in turn.

### A.  Napout's Interpretation of FRE 801(d)(2)(E) Is Incorrect

As a threshold argument, Napout contends that the audio recordings cannot be introduced for their truth under FRE 801(d)(2)(E).  To construct this argument, Napout points to FRE 801(c), which defines "hearsay" as a statement offered "to prove the truth of the matter asserted in the

statement," and FRE 801(d)(2)(E), which classifies a co-conspirator's statement as "not hearsay." (Dkt. 748 at 6.) According to Napout, because Rule 801(d)(2)(E) classifies a co-conspirator's statement as "not hearsay," the co-conspirator's statement cannot be treated as "hearsay" as defined by 801(c), *i.e.*, an out-of-court statement offered "to prove the truth of the matter asserted in the statement[,]" thus rendering the co-conspirator statement inadmissible because it cannot be offered for its truth. (Dkt. 748 at 6.)

The Court rejects Napout's unique interpretation of FRE 801(d)(2)(E). The well-established function of FRE 801(d)(2)(E) is to allow admission of co-conspirators' statements for their truth. *See, e.g.*, *United States v. Garcia-Duarte*, 718 F.2d 42, 45 (2d Cir. 1983) ("Fed. R. Evid. 801(d)(2)(E) provides that an out-of-court statement offered to prove the truth of the matter asserted is nevertheless admissible against a party as non-hearsay if made by a coconspirator of the party during the course and in furtherance of the conspiracy."); *United States v. Gasperini*, No. 16-cr-442, 2017 WL 3140366, at *5 (E.D.N.Y. July 21, 2017) ("Under the Federal Rules of Evidence, out of court statements made by a party's co-conspirator 'during and in furtherance of the conspiracy' may be introduced for their truth against that party." (citing Fed. R. Evid. 801(d)(2)(E))). The fact that FRE 801(d)(2)(E) accomplishes that function by classifying such statements as "not hearsay" does not mean the statements cannot be offered for their truth. Plainly, the opposite is true; indeed that is the very purpose of Rule 801(d)(2)(E), *i.e.*, to allow the admission of co-conspirator statements *for their truth*. Thus, recorded statements by co-conspirators in furtherance of the conspiracy or conspiracies in which Defendants are charged are admissible.

### B. The Audio Recordings Need Not "Implicate" a Defendant To Be Admissible.

Napout and Marin both argue that the audio recordings do not implicate them and should therefore be excluded. The Court rejects the premise of this argument. Under FRE 801(d)(2)(E),

co-conspirators' statements are admissible as non-hearsay irrespective of whether the statements themselves implicate a defendant in the conspiracy. So long as the government establishes that a statement was made by a co-conspirator of a defendant during and in furtherance of a conspiracy in which both the defendant and the co-conspirator were involved, the statement is admissible under FRE 801(d)(2)(E), even if the statement does not relate specifically to the defendant. *See Bourjaily v. United States*, 483 U.S. 171, 173 (1987). This is particularly true in racketeering conspiracy cases, such as this one, where a co-conspirator's statement may be admitted to prove, among other things, the existence and conduct of the broader racketeering conspiracy. *See Coppola*, 671 F.3d at 246-47 (upholding admission of statements as in furtherance of "the broader racketeering conspiracy" even if not part of the "narrower [predicate] extortion conspiracy"); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir 1999) ("In the context of a RICO prosecution . . . the relevant conspiracy may grow quite large . . . and Rule 801(d)(2)(E) must expand accordingly to encompass the full extent of the conspiracy."). Accordingly, the Court declines to exclude any of the audio recordings merely because they do not specifically implicate one of the Defendants.

### C. Statements by Cooperating Witnesses Are Admissible To Prove Context

The audio recordings at issue were created by alleged co-conspirators of Defendants who agreed to record their conversations with other alleged co-conspirators as part of their cooperation with the government. For this reason, Marin argues that all statements made by a then-cooperating witness cannot be admitted as a co-conspirator statement under FRE 801(d)(2)(E). In one sense, Marin is correct: "statements of a cooperating witness—who is acting as a law enforcement agent—that are designed to inculpate, in the form of a recording offered to prove the truth of the cooperating witness's statements, are not admissible." *United States v. Carneglia*, 256 F.R.D. 384,

397 (E.D.N.Y. 2009). At the same time, however, the "recorded statements [of the cooperating witness] are admissible to provide the context for the [co-conspirator] declarant's admissions." *United States v. Stratton*, 779 F.2d 820, 830 (2d Cir.1985). Here, the Court has reviewed the transcripts of the audio recordings at issue and finds that the statements by cooperating witnesses on the audio recordings are admissible to prove the context of other co-conspirator statements on the recordings that are admissible under FRE 801(d)(2)(E). As the Court stated from the bench, the Court will issue a jury instruction as to such statements by cooperating witnesses. *See United States v. Murray*, 618 F.2d 892, 900 (2d Cir. 1980) (finding no error in district court's admission of cooperating witness's out-of-court statements, where the court "carefully instructed the jury that they were not to consider [the cooperator's] statements for their truth except to the extent that [a co-conspirator] adopted them.").

### D. The Court Overrules Marin's Specific Objections to Segments of the Audio Recordings

In addition to the general objections addressed above, Marin offers a number of objections to specific segments of the audio recordings. The Court addresses each of these objections in turn.

#### 1. Marin's Objections to "Past Events"

Marin argues that three of the recorded statements are nothing more "than a colloquy of past events" and should be excluded. (Dkt. 729 at 8). But coconspirator statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy. *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994) (internal quotations and citations omitted). *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (holding statements admissible that discuss "the identity and activities of his coconspirators."). For the reasons set forth below, the Court finds that each of the recordings are admissible because they serve a "current purpose" in the conspiracy:

### i. September 26, 2014 Recording Between José Hawilla and José Margulies (FIFAR081)

In this conversation, Hawilla, the owner of Traffic, and Margulies express concern that their business associates are "not feel[ing] good" about payments that were made, and are "scared to death that – that something could come up." (Transcripts of Recordings Subject to Objection, Dkt. 731, at ECF[1] 10.) Hawilla and Margulies discuss how many payments Margulies has made over the years, including what banks were used. (*Id.* at ECF 13-14.) Margulies references shredding all of his documents. (*Id.* at ECF 11.) Here, the Court finds that the two men are assessing how past payments should inform their future conduct, including Hawilla's potential sale of Traffic, which is a "current purpose" of the conspiracy.

### ii. May 1, 2014 Recording Between José Hawilla, Alejandro Burzaco, and Hugo and Mariano Jinkis (FIFAR090)

In this conversation, Burzaco, the Jinkises, and Hawilla discuss payments to CONMEBOL and CONCACAF, including outstanding debts to the latter. (*Id.* at ECF 20-21, 31-33.) They reference bribe payments owed to soccer officials in connection with the Copa América scheme. Hawilla mentions that he might be selling his company, Traffic. The group also discusses concealment of past bribe payments in the event a new company is formed. There is a mention of paying Marin and others bribes in specific amounts. (*Id.*) The future bribe payments and the reorganization of Traffic qualifies as a "current purpose" of the conspiracy, as does their concealment of past bribe payments, which inform the group's plans to continue their bribery scheme.

---

[1] Citations to "ECF" refer to the pagination generated by the CM/ECF system, and not the document's internal pagination.

### iii. March 24, 2014 Recording Between José Hawilla and Flavio Grecco Guimaraes (FIFAR131)

In this conversation, Hawilla and Guimares discuss past and future "payments." (*Id.* at ECF 85-91.) Guimares states one such "payout" needs to be made by the end of the coming November. (*Id.* at ECF 85.) The two men discuss exact payment amounts. (*Id.* at ECF 90.) Hawilla instructs Guimares to make additional payments and confirm via phone; Guimares agrees to do so. (*Id.*) The discussions here are by no means confined to "past events"—they relate directly to an ongoing conspiracy—and the references to past payments are inextricably intertwined with, and inform, the ongoing bribery scheme and future payments.

### 2. Marin's Objections to "Gratuitous" Comments by Cooperating Witnesses

Marin argues that the cooperating witnesses who recorded the conversations made "gratuitous" statements that, although not offered for their truth, will still prejudice the jury. However, such statements are regularly admitted to provide context for the co-conspirators' statements. *See United States v. Romano*, No. 12-cr-691, 2014 WL 69794, at *1 (E.D.N.Y. Jan. 8, 2014). The Court finds that this evidence is relevant and that the danger of unfair prejudice does not substantially outweigh the probative value of the proffered evidence. Further, many of these statements serve as more than just context and also should be permitted to show the effect on the listener, which is an appropriate, non-hearsay purpose. *See United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016). The Court will provide a curative instruction explaining that they are not to be considered for their truth. For the reasons set forth below, the Court finds the following recordings admissible:

### i. May 1, 2014 Recording Between Hawilla, Burzaco, and the Jinkises (FIFAR090)

In this conversation, Hawilla states: "Now, you need to, uh, uh, know that you cannot make long-term commitments with these folks, individually. Yesterday, you told me that Grondona,

Figueredo and Marin receive more than the others." (Dkt. 731 at ECF 22.) Even though the other participants on the call do not respond in any substantive way, the statement is important context for the conversation as a whole as being related to bribes, and thus provides context to the inculpatory statements made during the conversation. Any potential prejudice resulting from the unresponded-to reference by the cooperator to a payment to Marin can be cured through an instruction by the Court.

### ii. March 24, 2014 Recording Between Hawilla and Kleber Leite (FIFAR134)

In this conversation, Hawilla raises the concern of whether his company Traffic is "clean"; Leite responds that the phone is a "dangerous thing" and it is better to talk in person. (*Id.* at ECF 94.) Even though Hawilla is the one initiating the conversation about the bribes and making an allegedly "gratuitous" statement, his statement clearly provides important context for Leite's response, which reflects both Leite's knowledge (and lack of surprise) about the topic and concerns about its illegality and the need to conceal information touching on it. Hawilla's statements are admissible as context and also for their effect on Leite, the listener.

### iii. March 28, 2014 Recording Between Hawilla and Leite (FIFAR117)

In this recording, Hawilla and Leite have a panicked conversation about how dangerous their situation is. (*Id.* at ECF 77-82.) Hawilla mentions that the current arrangement is to pay "500" to Marin and to two others and that specific bribes were sent to "Kleber [Leite]" and "Flavio". (*Id.* at ECF 77-78.) Here, the two men are referring to bribes, including a specific bribe paid to Marin. The jury could find that Leite's reaction and responses are adoptions of Hawilla's

statements about Marin receiving bribe payments.[2]  Hawilla's statements, therefore, are not gratuitous.

### iv.  April 30, 2014 Recording Between Hawilla and the Jinkises (FIFAR091)

In this conversation, Hawilla refers to "bribes" and "payoffs" when talking about the money transfers that the Jinkises make.  (*Id.* at ECF 40.)  In response to Hawilla's questions about "payoffs," Hugo Jinkis states that he makes "payoffs for the qualifying games" and that he "need[s] to pay payoffs every day."  (*Id.* at ECF 41.)  Hawilla also inquires about payoffs that were associated with the company Full Play.  Hugo Jinkis responds that a company from Panama handles the payoffs.  (*Id.* at ECF 47.)  Here, Hawilla's statements prompt Hugo Jinkis to discuss bribe payments and are relevant to understanding Jinkis's responses.  Hawilla's statements, therefore, are not gratuitous.

### 3.  Marin's Objections to Statements Not In Furtherance of a Conspiracy of Which the Defendants Were Members

Marin asserts that the following statements are not in furtherance of any conspiracy in which he was a part.  However, because Marin is alleged to have been a member of the broad RICO conspiracy charged in Count One, the recorded conversations between other members of that  conspiracy are admissible against him, even if only to prove the existence of the conspiracy.  *See Coppola*, 671 F.3d at 246-47 (upholding admission of statements as in furtherance of "the broader racketeering conspiracy" even if not part of the "narrower [predicate] extortion conspiracy").  For the reasons set forth below, the Court finds the following recordings admissible:

---

[2] Consistent with the government's proffer in its motion *in limine*, the government introduced other evidence at trial to show that Leite was responsible for making bribe payments to Marco Polo Del Nero, Marin, and Ricardo Teixera.  (Tr. 2825:9-2826:2.)

### i. September 2, 2015 Recording Between Fabio Tordin and Rafael Salguero (FIFAR031)

In this conversation, Tordin and Salguero discuss being paid by an individual named Miguel through a Panamanian account. (Dkt. 731 at ECF 3-6.) Miguel is allegedly the middle man between the company Full Play and the two men. Salguero ponders what will happen if the FBI looks into the Panama accounts. (*Id.* at ECF 5.) The conversation is evidence of the existence of the broader RICO conspiracy in which Marin is charged.

### ii. March 16, 2014 Recording Between José Hawilla and Aaron Davidson (FIFAR137)

In this conversation, Hawilla tells Davidson that an investigation is underway and that Hawilla's lawyer has instructed him not to lie. (*Id.* at ECF 98.) Hawilla asks about the payments to "Jeff" and seeks reassurance from Davidson that they will be made. (*Id.* at ECF 99.) Davidson states that he has started telling people that Traffic is no longer making "payoffs." Davidson said that Jeff "was pissed because he wanted more" after he "found out that CONMEBOL was going to get more." (*Id.* at ECF 99.) The dialogue suggests that both men have been involved with paying bribes and also covering them up, including a current bribe to CONMEBOL. This is again evidence of the existence of the broader RICO conspiracy in which Marin is charged.

### 4. Marin's Objections to "Idle Chatter"

Marin asserts that statements made during the course and in furtherance of the conspiracy "must be such as to prompt the listener ... to respond in a way that promotes or facilitates the carrying out of a criminal activity." *United States v. Maldonando-Rivera*, 922 F.2d 934, 958-59 (2d Cir. 1990) (citation omitted). Marin argues that, under these principles, "idle chatter" will not satisfy 801(d)(2)(E). *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986). However, these statements are admissible under Rule 801(d)(2)(E) because they provide information about the

"activities of [alleged] coconspirators". *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989).

For the reasons set forth below, the Court finds the following recordings admissible:

### i. April 30, 2014 Recording Between Hawilla and the Jinkises (FIFAR091)

In this conversation, Hawilla and the Jinkises are talking about the number of votes needed for candidates to win elections in certain soccer organizations. (Dkt. 731 at ECF 35-60.) Hugo Jinkis mentions that he was able to curry favor with people by supporting their candidacies. Hugo Jinkis also mentions Marin in the context of support for certain candidates. (*Id.* at ECF 42.) Given that the primary purpose of the bribery schemes alleged in this case is for media companies to gain influence over soccer officials, this conversation between media executives from Torneos, Full Play, and Traffic about efforts to curry favor with these soccer officials is clearly not "idle chatter" and is admissible because it is intended to "inform[] coconspirators as to the progress or status of the conspiracy." *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013).

### ii. April 30, 2014 Recording Between Zorana Danis and Eugenio Figueredo (FIFA094)

In this conversation, Danis and Figuerado talk about the different contracts CONMEBOL had with companies, including Bridgestone. (Dkt. 731 at ECF 62-63.) Figuerado mentions a payment to Nicolas Leoz of "$5,000,000." (*Id.* at ECF 63.) Danis and Figuerado also discuss "betrayal," "corruption," and other lawsuits that are floating around, including one in front of a "[female] judge." (*Id.* at ECF 63.) Because this conversation is intended to inform co-conspirators of the status of the conspiracy, it is not "idle chatter" and is admissible.

### iii. April 15 and 16, 2014 Recordings between Jose Hawilla and Hugo Jinkis (FIFAR104 and FIFAR105)

During the April 15 conversation, Hawilla and Hugo Jinkis talk about wanting to get together in Miami. They also talk about who else might join them, including Mariano Jinkis. (Dkt.

731 at ECF 68-70.)  In the April 16 conversation, Hawilla and Jinkis are coordinating going to breakfast.  Even though these statements only relate to scheduling, they are admissible as non-hearsay evidence of the "activities" of the coconspirators.  This conversation is also admissible to corroborate Hawilla's testimony about his relationship and dealings with alleged co-conspirator Hugo Jinkis.

### 5.  Marin's Objection to "Irrelevant" Material

Marin asserts that certain portions of one conversation are "irrelevant."  But evidence corroborating other witness testimony about the actions of coconspirators is admissible. *See United States v. Carmona*, 873 F.2d 569, 571-72 (2d Cir. 1989) (explaining that evidence that "corroborated" an informant's testimony "satisfies the test of relevance in Rule 401").  During these conversations, the coconspirators inform each other about, and make plans relating to, the actions of other coconspirators.  Thus, the Court finds that the following recording is admissible:

#### i.  May 1, 2014 Recordings between Zorana Danis, Mariano Jinkis, and Hugo Jinkis FIFAR088

This discussion concerns an individual named Lucho Chiriboga flying to Las Vegas to watch a boxing match between Floyd Mayweather and Marcos Maidana.  (Dkt. 731 at ECF 17.) While this exchange does not concern the payment of bribes, it does relate to, and corroborate the testimony of cooperating witnesses about, the relationship between the alleged members of the conspiracy.  It is, therefore, relevant and admissible.

## II.  Defendants Must Identify All Non-Impeachment Trial Exhibits

Before trial, the government moved the Court to compel each Defendant "to provide a list of exhibits he intend[ed] to introduce during the government's case (*i.e.*, not those documents to be used for impeachment purposes only) or any defense case."  (Dkt. 718 at 22.)  The government made this request pursuant to Federal Rule of Criminal Procedure 16 ("Rule 16"), which provides,

in relevant part, that if a criminal defendant requests disclosure from the government under Rule 16(a)(1)(E), the defendant must also permit the government to inspect any document or record that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).

As an initial matter, the Court notes that Rule 16 unambiguously requires Defendants to identify the exhibits they intend to introduce at trial through any witnesses they call after the closure of the government's case in chief.  Fed. R. Crim. P. 16(b)(1)(A).  The more difficult question, which the parties dispute, is whether Rule 16 also requires Defendants to identify non-impeachment exhibits they intend to introduce during their cross-examination of witnesses called by the government during its case in chief.  The government argues that Rule 16 requires Defendants to identify such exhibits, and Defendants argue that it does not.[3]

The parties' dispute turns on the scope of the "defendant's case in chief" within the meaning of Rule 16.  In pressing for a broad definition of that phrase, the government argues that the phrase "case-in-chief," as used in Rule 16, refers to "the part of a trial in which a party presents evidence to support its claim or defense."  (Dkt. 718 at 21 (quoting *United States v. Hsai*, No. 98-cr-57, 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000) (quoting Black's Law Dictionary 207 (7th ed. 1999))).)  In opposition, Defendants argue that the phrase "case-in-chief" refers only to "the part of a trial in which a party calls its first witness until it rests."  (Dkt. 729 at 16-17.)[4]

As the Court ruled from the bench on November 8, 2017, it finds that the government's interpretation of Rule 16 is the correct one:  Rule 16 requires Defendants to identify all non-

---

[3] The government acknowledges that documents used solely for impeachment need not be disclosed under Rule 16.  (Dkt. 718 at 20-21.)

[4] Defendants Napout and Burga joined Defendant Marin's arguments with respect to their disclosure obligations under Rule 16.  (*See* Dkt. 736 at 2 (Burga); Dkt. 748 at 1 (Napout).)

impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant.  As the district court explained in *Hsai*, where a defendant cross-examines a government witness to "buttress[] her theory of the case," rather than to impeach the testimony given by the witness on direct examination, "[t]he cross-examination . . . is properly seen as part of the defendant's case-in-chief."  2000 WL 195067, at *2.  Indeed, this interpretation of Rule 16 has been adopted by almost every district court to consider the issue.  *See Hsai*, 2000 WL 195067, at *2; *United States v. Swenson*, 298 F.R.D. 474, 478 (D. Idaho 2014); *United States v. Holden*, No. 13-cr-444, 2015 WL 1514569, at *5 (D. Or. Mar. 19, 2015); *United States v. Larkin*, No. 12-cr-319, 2015 WL 4415506, at *6 (D. Nev. July 20, 2015); *United States v. Aiyaswamy*, No. 15-cr-568, 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017).  *But see United States v. Harry*, No. 10-cr-1915, 2014 WL 6065705, at *10 (D.N.M. Oct. 14, 2014).

Defendants cite a single district court decision, *United States v. Harry*, No. 10-cr-1915, 2014 WL 6065705 (D.N.M. Oct. 14, 2014), to support their narrow interpretation of Rule 16. (Dkt. 729 at 16-17.)  On closer examination, however, the *Harry* decision actually supports the government's position.  In that case, the district court explained that, although the "case-in-chief" should *generally* be limited to "the part of a trial in which a party calls its first witness until it rests, . . . [t]here could be cases where everyone agrees that, to avoid recalling witnesses, everyone will just ask all of their questions while the witness is present; and the cross-examination is really a direct examination with non-leading questions; and in such cases the defendant's case-in-chief should include that direct examination."  *Id.* at *10.  This is the same reasoning that underpinned

the decisions on which the government relies.[5]  In short, contrary to Defendants' arguments, there is general consensus among courts that if a defendant seeks to present affirmative (non-impeachment) evidence through a government witness during the government's case in chief, the defendant's presentation of evidence during such an examination should be treated as part of the defendant's "case-in-chief" for purposes of the defendant's disclosure obligations under Rule 16. *See Larkin*, 2015 WL 4415506, at *5 (collecting cases).

Notwithstanding this ruling, there remains a practical question of when exactly Defendants must identify the exhibits they intend to introduce through a government witness.  The government asked the Court to order Defendants to identify their exhibits on the first day of jury selection. (Dkt. 718 at 22.)  In response, Defendants argued that they could not "fairly be expected to know what their case-in-chief will be, or whether there will even be one, before the government calls a single witness."  (Dkt. 729 at 17-18.)

To address this practical challenge, the Court adopted the approach used by many courts[6], and advised Defendants that if they sought to introduce an exhibit as affirmative evidence at trial— *i.e.*, for a purpose other than impeachment—the Court, on the government's motion, would consider whether the defense had failed to timely disclose that exhibit under Rule 16.  Defendants were cautioned that if the Court determined that a Defendant could have made timely disclosure, but failed to timely do so, the defendant ran the risk that the exhibit would be excluded.  Thus, during the November 8, 2017 hearing, the Court advised counsel:

---

[5] As the court in *Holden* observed, "the *Harry* court's acknowledgment that some evidence a defendant intends to use in examination of government witnesses may be evidence the defendant intends to use in his 'case-in-chief' undermines the court's bright-line temporal interpretation of 'case-in-chief.'"  *Holden*, 2015 WL 1514569, at *3.

[6] *See, e.g.*, *Hsia*, 2000 WL 195067, at *2; *Swenson*, 298 F.R.D. at 478; *Holden*, 2015 WL 1514569, at *5; *Larkin*, 2015 WL 4415506, at *6; *Aiyaswamy*, 2017 WL 1365228, at *5.

Impeachment materials, you do not have to turn over, . . . but if you want to introduce [an exhibit] as an actual exhibit in your case in chief and, again, the boundaries of that are not defined by . . . who called the witness, then you should, out of caution, turn it over earlier.

(Tr. 59-60; *see also* Tr. 63 ("The distinction is impeachment.").)

## III. Evidence of Foreign Law

Before trial, the government sought an order precluding Defendants from presenting evidence or argument about foreign law, including the law concerning commercial bribery in the various countries where Defendants worked and resided during the time period of the indictment. The government argues that evidence concerning foreign law is not relevant under FRE 401. In the alternative, the government argues that evidence concerning foreign law is not admissible under the balancing test of FRE 403. The government also points out that Defendants did not give advanced notice of their intention to raise an issue of foreign law, as required by Fed. R. Crim. P. 26.1.[7]

On November 8, 2017, the Court ruled from the bench that evidence concerning foreign law would generally not be relevant in this case under FRE 401, except for the following narrow purpose: a defendant could "defend on [the element of] the intent to violate [his] fiduciary duty based on saying [he] never saw the [FIFA] rules, . . . no one told [him] about the [FIFA] rules, and . . . [he] assumed that [the FIFA rules] were somehow consistent with what [his] country allow[s] or doesn't allow and, therefore, [he] didn't have the intent or belief that [he] was violating [his] fiduciary duty

---

[7] The Court agrees that Defendants did not comply with Rule 26.1, which imposes a notice requirement on any party that intends to raise an issue of foreign law in a criminal trial. *See* Fed. R. Crim. P. 26.1 ("A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice."). Indeed, other than their legal memoranda in opposition to the *government's* motion *in limine* to preclude evidence of foreign law, Defendants did not provide any notice of their intention to present such evidence. (*See* Dkt. 767 at 25 n.17.) Nonetheless, the Court does not rest any of its rulings in this Order on Defendants' failure to comply with Fed. R. Crim. P. 26.1.

as defined by the FIFA code[.]" (Tr. 90:10-20.) Nonetheless, the Court ruled that evidence of foreign law was inadmissible under FRE 403 because the risk of confusing the jury and the risk of jury nullification substantially outweighed the probative value of any evidence of foreign law. (Tr. 90:21-91:16.)

On December 1, 2017, during the government's case in chief, the Court advised the parties that it was open to reconsidering one aspect of its November 8, 2017 ruling on the admissibility of foreign law. Specifically, the Court advised the parties that, based on the government's proposed jury instructions—which state that a defendant cannot be convicted of honest services fraud if he had a "good faith" belief that his conduct did not violate his duties to FIFA or any of the other relevant soccer organizations—the Court decided *sua sponte* to reconsider whether Defendants should be permitted to present evidence of foreign law for the narrow purpose of proving their subjective beliefs about their duties to FIFA and the other relevant soccer organizations. (Tr. 2620:2-2622:15.) The parties submitted written briefing on the issue. (Dkts. 835, 836, 837, 842, 843, 844.)

On December 8, 2017, still during the government's case in chief, the Court held a hearing to discuss the parties' briefing on the admissibility of evidence concerning foreign law. In the hearing, the Court amended its November 8, 2017 ruling on this issue, holding that no categorical rule of inadmissibility would apply to evidence of foreign law. The Court also held, however, that it would consider any evidence of foreign law proffered by a Defendant on an individualized, fact-specific basis. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008) ("Relevance and prejudice under [FRE] 401 and 403 are determined in the context of the facts and arguments in a particular case . . . ."). After giving Defendants an opportunity to make a proffer as to the evidence they would seek to present concerning foreign law, the Court ruled that the forms of

evidence Defendants proffered were all inadmissible, with one exception—namely, the Court ruled that a Defendant who takes the stand would be permitted to testify as to his beliefs about foreign law and how those beliefs influenced his understanding of the duties he owed to FIFA or another relevant soccer organization.

In reaching these rulings, as explained from the bench, the Court relied on the following legal authorities.

### A. Relevance under FRE 401.

As a threshold matter of relevance, Defendants bear the burden to show that foreign law (a) "has a[] tendency to make a fact more or less probable than it would be without [evidence of the foreign law]; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Whether a fact is "of consequence" is "framed by the elements of, and cognizable defenses to," the underlying charges. *Solis v. Cindy's Total Care, Inc.*, No. 10-cv-7242, 2011 WL 5170009, at *1 (S.D.N.Y. Oct. 31, 2011). Although a fact need not be directly probative of an "element" of the offense charged, *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997), the fact must be "logically related, either directly or indirectly through an inferential chain of proof, to at least one of the formal elements of the charges made or defenses raised in the case." *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 138 F. Supp. 2d 357, 366-67 (E.D.N.Y. 2001).

In their submissions and presentations to the Court, Defendants Napout and Marin have argued in various ways that evidence of foreign law would be probative of their "intent."[8]  The Court addresses Napout's and Marin's arguments in turn.

---

[8] Defendant Burga joined the arguments of Napout and Marin on the issue of foreign law.

### 1. The Evidence of Foreign Law Proffered by Napout Is Not Relevant

Napout argues that the Court should make a finding, after holding an evidentiary hearing outside the presence of the jury, that the kinds of secret payments alleged in this case, which Napout characterizes as "commercial bribery", are not prohibited under the laws of Argentina and Brazil. (Dkt. 844 at 2-3.) Napout would then have the Court instruct the jury that the personal payments at issue in this prosecution are not crimes in those foreign countries. (Dkt. 844 at 1-4.) Napout contends that this determination and jury instruction are necessary because, according to Napout, "[a]bsent such such a determination [and jury instruction], Mr. Napout could easily be convicted of the alleged conspiracy despite the complete legality of the payments that are at the heart of the government's case." (Dkt. 844 at 3.) Such a conviction would be improper, according to Napout, because "if a defendant is charged with conspiring to commit an act that the defendant believes is lawful, the government cannot prove the crime of conspiracy." (Dkt. 748 at 9.)

In support of this argument, Napout relies on the Second Circuit's decision in *United States v. Schultz*, 333 F.3d 393 (2d Cir. 2003). Napout argues that *Schultz* entitles Napout "to introduce evidence of foreign law on the question of his alleged intent to join an[] unlawful conspiracy." (Dkt. 748 at 9.) Contrary to Napout's arguments, however, the *Schultz* decision does not provide any basis on which to introduce foreign law or other witnesses' knowledge of foreign law in the manner Napout seeks to introduce it. In *Schultz*, the defendant was charged with conspiracy to receive antiquities stolen from the Egyptian government in violation of the National Stolen Property Act ("NSPA"), 18 U.S.C. § 2315. A material question in *Schultz* was whether the Egyptian antiquities at issue were "stolen" within the meaning of the NSPA, which in turn depended on whether the antiquities were "owned" by the Egyptian government by operation of an Egyptian law, Law 117, which vested ownership rights over certain antiquities in the Egyptian government. 333 F.3d at 398-

400. To resolve that embedded issue of foreign law, the district court in *Schultz* held an evidentiary hearing pursuant to Fed. R. Crim. P. 26.1 and determined that the antiquities at issue in that case were owned by the Egyptian government. *Id.* at 402. The Second Circuit affirmed this determination on appeal. *Id.* at 398-400, 402.

Contrary to Napout's arguments, the *Schultz* case is clearly distinguishable from this one. Whereas in *Schultz* the government was required to prove that the antiquities in question were "owned" by the Egyptian government under Egyptian law, the government in this case need not prove anything about foreign law in order to establish Defendants' guilt of the charges in the indictment. Similarly, whereas in *Schultz* the government was required to prove that the defendant knew the antiquities in question were "stolen," which in turn required the government to prove that the defendant knew the antiquities were "owned" under Egyptian law, the government in this case need not prove that any defendant or co-conspirator knew anything about any foreign law. Rather, with respect to Defendants' legal duties, the government need only prove that Defendants or their co-conspirators owed duties to FIFA or other relevant soccer organizations that prohibited Defendants and their co-conspirators from secretly accepting the personal payments underlying the charges in this case. Similarly, with respect to Defendants' "intent to defraud," the government need only prove that Defendants knowingly entered into a conspiracy to deprive FIFA and the other relevant soccer organizations of the fiduciary duties owed to those organizations, where it was reasonably foreseeable that the U.S. wires would be used in furtherance of that conspiracy. The requirements of foreign law and Defendants' knowledge thereof are simply not relevant facts in this case.

Furthermore, Napout's argument that the government must prove that Napout entered into a conspiracy knowing that the objectives of the conspiracy were "illegal" is simply incorrect. (Dkt.

748 at 9 (arguing that, "if a defendant is charged with conspiring to commit an act that the defendant believes is lawful, the government cannot prove the crime of conspiracy.").)  The government is not required to show "willfulness" for any of the charges against Defendants.  (Dkt. 767 at 22-26); *see also United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc) ("The only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services." (internal quotation marks and alterations omitted)); *United States v. Scotto*, 641 F.2d 47, 55-56 (2d Cir. 1980) ("The law at issue here does not demand willful violations of the RICO statute, nor does it require willful violations of the predicate offenses."), *overruled on other grounds by Reves v. Ernst & Young*, 507 U.S. 170 (1993); *United States v. Dupree*, 870 F.3d 62, 78 (2d Cir. 2017) (holding that, to prove a drug conspiracy, the government need not prove that defendant knew that the objectives of the conspiracy were illegal under United States law or any other law).

Accordingly, the Court denies Napout's request to hold an evidentiary hearing to determine whether the laws of Argentina, Brazil, or any other foreign country prohibit the payments underlying the charges in this case.  That proposed evidence is irrelevant and thus inadmissible under FRE 401.

### 2. Evidence of a Defendant's Belief about Foreign Law May Be Relevant to Show "Good Faith"

Defendant Marin took a less extreme position as to the relevance of foreign law.  According to Marin, although the government need not prove that a Defendant knew that his conduct or the reasonably foreseeable conduct of his co-conspirators was illegal, the government nonetheless must prove that a Defendant understood that the applicable FIFA, CONMEBOL, or other codes of conduct prohibited the secret payments that underlie the criminal charges in this case (Tr. 73:15-22)—a point the government does not dispute (Dkt. 767 at 26 (acknowledging that, to prove the requisite "intent to defraud," the government "must prove the absence of a defendant's good faith" belief that he was not "depriving the relevant soccer organization of its right to honest services")).  From this premise,

Marin argues that a Defendant's "state of mind as to the code of conduct, what it meant and what its contours or what its meaning is can be informed by life experience including where they grew up and what the law is where they grew up." (Tr. 75:22-25.) In other words, as the Court formulated the argument, Defendants seek to elicit or present evidence that they lacked the requisite "intent to defraud" because they believed, based on the laws of their own countries, that the FIFA, CONMEBOL, or other soccer organizations' codes of conduct did not prohibit the secret payments underlying the charges in this case. As one illustration of this point, a Defendant might testify that he did not think he was violating the applicable codes of conduct because he "expected them to be consistent with [the law of his] country." (Tr. 76:1-12; *see also* Tr. 90:10-20 (positing the possibility that a defendant could testify that "I never saw the rules, . . . no one told me about the rules, . . . [and] I assumed that they were somehow consistent with what my country allows or doesn't allow and, therefore, I didn't have the intent or belief that I was violating my fiduciary duty as defined by the FIFA code").)[9]

---

[9] As a fallback position, Napout joined Marin's argument that evidence of foreign law is admissible on this narrow ground. (Tr. 3598-3599 ("[T]he fact that [a defendant] didn't violate . . . Paraguayan and Argentinian law . . . has to be relevant to his state of mind in carrying out his duties to CONMEBOL.").) As part of this argument, Napout relies again on *Schultz*, in which the district court allowed the government to call witnesses who worked in the same field as the defendant to give testimony on their personal knowledge of Egyptian Law 117, as a means to prove that defendant also knew the significance of that law. 333 F.3d at 415. Napout argues that if the government was permitted to call such witnesses to prove the defendant's knowledge of foreign law in *Schultz*, Napout should likewise be permitted to to examine other witnesses (such as other co-conspirators) about *their* understanding of foreign laws as indirect proof of Napout's understanding of foreign law and therefore his intent. (Tr. 3595-3599.) The Court disagrees with this reading of *Schultz*. As explained above, the *Schultz* court allowed evidence and testimony concerning Egyptian Law 117 because the government was required to prove, as part of the crime charged under U.S. law, that the antiquities at issue were "owned" by the Egyptian government under Egyptian law, and that the defendant knew that the antiquities were owned by the Egyptian government under Egyptian law. No such proof is required in this case, which makes the existence of foreign law and other witnesses' knowledge of that foreign law—especially where that law is not necessarily the law of Defendant's country—of virtually no relevance, since the only potential relevance of foreign law is how that

As explained from the bench, the Court finds that foreign law is arguably relevant under FRE 401 for the extremely limited purpose that Marin has identified. Given that the government must establish each Defendant's fraudulent intent and consequent lack of a "good faith" belief that the secret payments at issue were permitted under the codes of conduct applicable to him, each Defendant's understanding of those codes of conduct is relevant to the charges against him. Thus, to the extent a Defendant in fact based his understanding of the relevant codes of conduct on his understanding of the laws of his home country (or any other country), that understanding is arguably relevant under FRE 401. (*See* Tr. 82-83.)

### B. Balancing under FRE 403.

Under FRE 403, a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Application of this Rule requires a balancing analysis, and the trial judge has broad discretion to weigh the probative value of the evidence against the negative factors." *Haynes v. Acquino*, 692 F. App'x 670, 671 (2d Cir. 2017) (quoting *Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1998)).

As noted above, the Court finds that a Defendant's belief about foreign law is relevant to the extent that he based his understanding of the fiduciary duties owed to FIFA or another relevant soccer organization on his belief about foreign law. Based on this ruling, during a hearing on December 8, 2017, Defendants proffered the evidence they would seek to introduce to prove Defendants' beliefs about foreign law for this limited purpose and how it informed Defendants'

---

knowledge of foreign law influenced a Defendant's belief about the fiduciary duties owed to a relevant soccer organization.

beliefs about their duties to FIFA or the relevant soccer organizations. Defendant Marin proffered that co-conspirators Jose Hawilla and Sergio Pena would testify that they did not believe the payments underlying the charges in this case were illegal under the laws of Argentina and [Brazil], respectively. Marin also proffered news articles and other "authoritative sources . . . that confirm the fact that the crime of commercial bribery does not exist in Brazil." (Dkt. 842.)

After considering the Defendants' proffers, the Court ruled that the proffered evidence is not admissible under FRE 403. On the probative side of the Rule 403 balancing, the evidence proffered by Defendants is highly attenuated from any question of material fact in the case. As explained above and during the hearings, neither the requirements of foreign law nor any Defendant's belief about foreign law is relevant to any element of any charge in this prosecution. In proffering evidence concerning whether commercial bribery is prohibited under foreign law, Defendants seek permission to ask the jury to make the following two inferences: first, that Defendants knew or believed that the payments underlying the charges against them were legal under the proffered foreign law, *i.e.*, Brazil and Argentina; and, second, that Defendants believed that their duties to FIFA and the other relevant soccer organizations were identical to their obligations under that foreign law. As the Court explained from the bench, the second inference that Defendants would have the jury make is so attenuated that it borders on speculation. Defendants have not articulated any reason to believe, let alone proffered any evidence, that they construed their duties to FIFA or any other relevant soccer organization based on their understanding of their own countries' criminal laws.[10] As the government has stressed during these arguments, and as the Court largely agrees, that line of reasoning is practically a non-sequitur.

_____

[10] Indeed, even the first inference, *i.e.*, that a Defendant knew or had beliefs about Brazilian or Argentine law, is highly speculative with respect to Napout and Burga, given that they are from Paraguay and Peru, respectively.

Accordingly, because the evidence that Defendants have proffered must rely on that almost entirely speculative inference, the Court assigns extremely low probative value to the proffered evidence.

On the other side of the Rule 403 balance, there is a compelling reason to preclude defense counsel from eliciting evidence or arguing about foreign law. To the extent defense counsel suggests to the jury that the secret payments underlying the charges against Defendants were not illegal in Defendants' home countries, there is an obvious risk of jury nullification. Notwithstanding any limiting instruction the Court may give, there is a substantial risk that the jury would improperly acquit Defendants if it believed that commercial bribery did not violate the laws of Defendants' home countries. This genuine risk of jury nullification weighs heavily against allowing defense counsel to elicit evidence or make argument about foreign law. *See United States v. Rivera*, No. 13-cr-149, 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (district court may consider "the risk of jury nullification" in determining admissibility of evidence under FRE 403) (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011)); *United States v. Levin*, No. 15-cr-101, 2016 WL 299031, at *10 (S.D.N.Y. Jan. 25, 2016) (same). Furthermore, to the extent defense counsel elicits testimony concerning whether foreign law prohibits the secret payments at issue here, the government claims that it would then present evidence of foreign law to rebut any suggestion that the secret payments were legal in any relevant jurisdiction. (Tr. 78:2-12.) This additional evidence, which could be voluminous, would only draw the jury's attention away from the relevant issues in the case, causing them instead to focus on the irrelevancies of foreign law. This potential for juror confusion further weighs against admission of evidence regarding foreign law under FRE 403.

During the November 8, 2017 hearing, Defendant Marin argued that he should be permitted to ask co-conspirators whether they believed that their home countries' laws prohibited the kind

of personal payments at issue in this case, "because [the government] want[s] to demonstrate and prove to the jury that [the] co-conspirator is part of the conspiracy." (Tr. 74.) However, as the Court held in the November 8 hearing, that line of inquiry suffers from the same relevance and prejudice problems as Defendants' proposed evidence concerning their own understanding of foreign law. (Tr. 74-75, 82-83.) And Defendants have not proffered any evidence or other reason to believe that any co-conspirator based his understanding of any relevant fiduciary duties on his beliefs about any country's laws. Moreover, notwithstanding the Court's November 8 order, Defendants had every opportunity to cross-examine cooperating witnesses on their understanding of the fiduciary duties owed to the relevant soccer organizations.

For these reasons, the Court finds that the risk of prejudice and juror confusion substantially outweighs any probative value there may be to permitting defense counsel to present the evidence it proffered during the December 8, 2017 hearing.

However, as the Court explained during the December 1, 2017 and December 8, 2017 hearings, there is one caveat to the Court's ruling under FRE 403. Namely, to the extent a Defendant wishes to testify that he, in fact, relied on his belief or understanding of his own country's laws to determine his obligations to FIFA or another relevant soccer organization, the Court would allow that testimony under FRE 403. That testimony would be permissible under FRE 403 because, unlike the other evidence of foreign law proffered by the Defendants, a Defendant's own testimony that he relied on foreign law to understand his relevant fiduciary duties would bridge the gap between the Defendant's belief about foreign law (which is not a material issue) and the Defendant's belief about his duties to FIFA or another soccer organization (which is a material issue). Thus, a Defendant's own testimony would not suffer from the same infirmity of attenuation, discussed above, that renders the other proffered evidence, *e.g.*, co-conspirators'

beliefs about their own countries' laws, inadmissible. Therefore, if a Defendant chooses to testify in this action, he will not be prohibited from testifying about how, if at all, his understanding of his own country's criminal laws informed his understanding of his obligations to FIFA or the FIFA confederation that he is accused of defrauding of honest services.[11]

Defendants contend that the Court's rulings, which disallow all forms of evidence of foreign law other than the Defendant's own testimony, violate the Defendant's Fifth Amendment right to remain silent. (Dkt. 835 at ECF 4-5.) On careful consideration, the Court disagrees. Defendants are correct that, as a result of the Court's rulings under FRE 401 and FRE 403, they must testify in their own defense in order to present evidence and argument concerning their understanding of foreign law and how it informed their beliefs about their duties to the relevant soccer organizations. But putting Defendants in the position to make that choice by incident of rulings under FRE 401 and 403 does not violate the Fifth Amendment. "The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow." *Corbitt v. New Jersey*, 439 U.S. 212, 220 (1978). "Although a defendant may

---

[11] The government contends that allowing a Defendant to present evidence of his understanding of foreign law violates "the rule that ignorance of law is no excuse." (Tr. 76:15-17.) The Court disagrees. Although wire fraud is not a "willfulness" or "specific intent" crime, the government's theory of "honest services" fraud in this case requires the government to prove that Defendants knew or believed that the secret payments they and other co-conspirators accepted were prohibited by the relevant soccer organizations. Because the government is relying on written codes of conduct to prove both the prohibition on such payments and Defendants' knowledge of that prohibition, the government has opened the door for Defendants to rebut the government's proof as to Defendants' knowledge of their duties under the relevant codes of conduct, including through testimony about how they interpreted or understood the requirements of the codes of conduct. That defense counsel can argue in closing that Defendants never received, saw, or read the codes of conduct, as the government maintains, does not mean that they should be precluded from offering other potentially relevant evidence about their beliefs or understanding of their fiduciary duties. If a Defendant wishes to testify that he believed the relevant codes of conduct did not prohibit him or other soccer officials from accepting the payments in question, either wholly or partly because of his belief about his own country's laws, the Court will allow him to do so.

have a right, even of constitutional dimension, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *Id.* Numerous appellate courts, including the Second Circuit, have affirmed district court evidentiary decisions that have the effect of requiring a criminal defendant to testify in order to present certain types of evidence or argument. *See, e.g.*, *United States v. Singh*, 811 F.2d 758, 762-63 (2d Cir. 1987); *United States v. Taylor*, 686 F.3d 182, 195-96 (3d Cir. 2012). Although Defendants are presented with a difficult choice of whether to testify, that choice is no different in any other case in which the defendant has unique knowledge known only to himself and must choose whether to testify in order to present that knowledge to the jury. The Court's rulings regarding the limited admissibility of evidence of foreign law, therefore, do not violate Defendants' Fifth Amendment rights to remain silent.

## CONCLUSION

For the reasons stated above, and as ruled from the bench on November 8, 2017 and December 8, 2017 (Tr. 55-127, 3600-3616), the Court has (1) granted the government's motion to admit the audiotapes listed in its motion (Dkt. 718) subject to appropriate limiting instructions at trial, (2) granted the government's motion to compel Defendants to identify all exhibits they intend to introduce at trial other than for impeachment, and (3) granted the government's motion to exclude evidence of foreign law at trial, with the limited exception stated herein.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: December 12, 2017
      Brooklyn, New York