UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

            **MEMORANDUM & ORDER**
   - against -        **REGARDING POST-TRIAL MOTIONS**
             **(Dkts. 887, 888, 889)**
JUAN ANGEL NAPOUT, *et al.,*      15-CR-252 (PKC)

       Defendants.
-------------------------------------------------------X
PAMELA K. CHEN, United States District Judge:

    Defendants Juan Angel Napout, Jose Maria Marin, and Manuel Burga ("Defendants") are among numerous individuals charged with racketeering conspiracy and other offenses allegedly undertaken to enrich themselves by leveraging their various positions in the Federation Internationale de Football Association ("FIFA"); its continental, regional, and national affiliates; and certain sports marketing companies. In the operative indictment (Dkt. 604): (1) Napout was charged with one count of racketeering conspiracy, two counts of wire fraud conspiracy, and two counts of money laundering conspiracy; (2) Marin was charged with one count of racketeering conspiracy, three counts of wire fraud conspiracy, and three counts of money laundering conspiracy; and (3) Burga was charged with one count of racketeering conspiracy. After a six-week trial: (1) Napout was convicted of three counts and acquitted of two counts; (2) Marin was convicted of six counts and acquitted of one count; and (3) Burga was acquitted of the sole count against him.

    Napout and Marin now move under Federal Rule of Criminal Procedure 29 for judgments of acquittal, or, alternatively, for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons stated herein, Napout's and Marin's motions are denied in their entirety.

# BACKGROUND

## A. The Indictments

On May 20, 2015, a grand jury in the Eastern District of New York returned a 47-count indictment charging 14 individuals, including Marin, with racketeering conspiracy, wire fraud, and money laundering offenses, among other crimes, in connection with alleged bribe payments made to FIFA officials in exchange for valuable broadcasting and marketing contracts. (Dkt. 1.) On November 25, 2015, the grand jury returned a 92-count superseding indictment ("S-1 indictment") charging sixteen additional defendants, including Napout and Burga, with the same racketeering conspiracy, among other crimes. (Dkt. 102.) On June 14, 2017, the grand jury returned a Second Superseding Indictment ("S-2 indictment") against Napout, Burga, and Marin, which was the operative indictment for their trial. (Dkt. 604.) The S-2 indictment contained seven counts.

Count 1 charged Napout, Marin, and Burga with conspiracy to engage in racketeering, in violation of 18 U.S.C. § 1962(c)&(d). The alleged enterprise consisted of FIFA, its six constituent continental confederations, affiliated regional federations, national member associations, and sports marketing companies. As predicate acts, the S-2 indictment alleged wire fraud in violation of 18 U.S.C. § 1343, money laundering and money laundering conspiracy in violation of 18 U.S.C. §§ 1956-57, interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. § 1952, and obstruction of justice and conspiracy to obstruct justice in violation of 18 U.S.C. § 1512. (Dkt. 604 ¶ 123.)

Counts 2 and 3 charged Napout and Marin with wire fraud conspiracy (Count 2) and money laundering conspiracy (Count 3) in connection with the Copa Libertadores soccer tournament, an annual club soccer tournament organized by FIFA's continental confederation for South America, the Confederacion Sudamerica de Futbol ("CONMEBOL"), of which Defendants were officers.

Counts 4 and 5 charged Marin with wire fraud conspiracy (Count 4) and money laundering conspiracy (Count 5) in connection with the Copa do Brasil soccer tournament, an annual soccer tournament organized by Brazil's soccer confederation, the Confederacao Brasileira de Futbol ("CBF"), of which Marin was the president between March 2012 and April 2015.

Counts 6 and 7 charged Napout and Marin with wire fraud conspiracy (Count 6) and money laundering conspiracy (Count 7) in connection with the Copa America soccer tournament, an annual international soccer tournament organized by CONMEBOL.

## B. Pre-Trial Rulings

The Court made several pre-trial rulings that bear on the present motions. By order dated February 17, 2017, the Court denied Napout's motion to dismiss the S-1 indictment as an impermissible extraterritorial application of the federal racketeering statute, the federal wire fraud statute, and the federal money laundering statute. *See United States v. Hawit*, No. 15-cr-252, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017). In denying Napout's motion, the Court held, *inter alia*, that the S-1 indictment alleged permissible domestic applications of the wire fraud statute and extraterritorial applications of the money laundering statute. *See id.* at *4-8. By extension, the Court also held that the S-1 indictment adequately alleged a RICO conspiracy based on domestic wire fraud predicate acts and extraterritorial money laundering predicate acts. *See id.* at *9-10. The Court advised the parties, however, that Second Circuit caselaw—most notably, *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), *rev'd on other grounds*, *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), and *Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2014) (summary order)—has left undetermined the "domestic" reach of the wire fraud statute, thus putting all parties on notice of the importance of

evidence concerning the "domestic" nature of the wire fraud charges against Defendants. *See Hawit*, 2017 WL 663542 at *5.

By order dated October 17, 2017, the Court ruled that the government, subject to specific objections at trial, would be permitted to present evidence that Napout and alleged co-conspirators engaged in obstruction of justice to conceal their criminal conduct. *See United States v. Napout*, No. 15-cr-252, 2017 WL 4685089 at *3-7 (E.D.N.Y. Oct. 17, 2017) ("*Napout I*"). Among other things, the Court ruled that the government could seek to introduce evidence concerning "the removal of electronic devices from Napout's CONMEBOL office, at Napout's direction, on the morning of Napout's December 3, 2015 arrest in Zurich, Switzerland and the subsequent recovery and search of those devices by U.S. law enforcement." *Id.* at *2-7. The Court ruled that evidence in this category was generally admissible, both as evidence of the existence of a RICO conspiracy, as well as evidence of Napout's "consciousness of guilt," except that, to the extent the government sought to introduce this evidence to prove the existence of a RICO conspiracy, the government would also need to submit evidence that at least one person involved in the obstruction, other than Napout, was a member of the charged conspiracy prior to the alleged obstruction. *Id.* at *5-7 & n.7. The Court also ruled that evidence in this category was not unduly prejudicial, because the "acts of obstruction are really no different than Defendants' alleged acts of bribery, wire fraud, and money laundering: they all involve non-violent acts of dishonesty, deceit, and concealment." *Id.* at *7.

Jury selection in Defendants' trial began on November 6, 2017. On November 8, 2017, before the end of jury selection, the Court ruled from the bench on an omnibus motion *in limine* by the government (Dkt. 718). Among other things, the Court ruled, over Defendants' objections, that certain covertly-recorded audiotapes proffered by the government would be admissible at trial,

so long as the government laid the proper evidentiary foundation. (Hr'g Tr. 55-127, Nov. 8, 2017.) The Court also ruled that evidence and argument about foreign law, *i.e.*, whether commercial bribery was illegal in Defendants' home countries, would be categorically excluded from the trial, holding that the evidence would generally not be relevant in this case under Federal Rule of Evidence ("FRE") 401, except for the following narrow purpose: for purposes of a charge of honest services wire fraud, a defendant could potentially "defend on [the element of] the intent to violate [his] fiduciary duty based on saying [he] never saw the [FIFA] rules, . . . no one told [him] about the [FIFA] rules, and . . . [he] assumed that [the FIFA rules] were somehow consistent with what [his] country allow[s] or doesn't allow and, therefore, [he] didn't have the intent or belief that [he] was violating [his] fiduciary duty as defined by the FIFA code[.]" (*Id.* at 90.) However, the Court further held that evidence of foreign law would be inadmissible at trial even for this limited purpose because, under FRE 403, the risk of confusing the jury and the risk of jury nullification substantially outweighed the probative value of any evidence of foreign law. (*Id.* at 90-91.)

On November 11, 2017, before the presentation of opening statements, the Court issued a written order addressing several remaining evidentiary matters. (Dkt. 796.) In relevant part, the order denied Marin's motion *in limine* to preclude a government expert, Dr. Stefan Szymanski, from offering any opinion testimony concerning the economic effects of corruption (Dkt. 732), and denied Napout's motion *in limine* to preclude the government from introducing at trial certain WhatsApp text messages between Napout and co-conspirator Alejandro Burzaco, as to which Napout's counsel had asserted work product protection (Dkt. 786; *see also* Dkt. 816 (Hr'g Tr., Nov. 9, 2017)). With respect to Dr. Szymanski, the Court ruled that Dr. Szymanski's proffered testimony satisfied the requirements of FRE 702 and *Daubert*, and held that Defendants would

suffer no prejudice from allowing Dr. Szymanski's testimony in any event. (Dkt. 786 at 4-5.) With respect to Napout's WhatsApp text messages with Burzaco, the Court ruled that the requirements of work product protection were not satisfied because the text messages themselves were written by two non-lawyers and not in anticipation of litigation or trial.[1] (*Id.* at 5-9.)

### C. Rulings During Trial

During the government's case in chief,[2] the Court made additional rulings that Napout and Marin now contest in their post-trial motions. With respect to the admission of evidence concerning foreign law, on December 1, 2017, the Court *sua sponte* advised the parties that it would reconsider its prior order excluding all evidence of foreign law, and invited Defendants to make proffers about the specific evidence of foreign law they sought to introduce. (Trial Tr. ("Tr.") 2620-2622.) On December 8, 2017—still during the government's case in chief—the Court held a hearing to discuss the evidence proffered by Defendants. At the hearing, the Court ruled that the specific foreign-law evidence proffered by Defendants was inadmissible under FRE 401 and FRE 403. (Tr. 3460-3617.) The Court also noted, however, that if any of the three Defendants chose to testify at trial, he would not be precluded from testifying as to his own beliefs about foreign law and how those beliefs informed his understanding of the duties he owed to FIFA or

---

[1] The Court rejected Napout's argument that because his attorneys had asked him to send them copies of the text messages—which the government obtained directly from an email service provider—these messages constituted protected work product. (Dkt. 796.)

[2] Over the course of the six-week trial, the government called 28 witnesses and introduced voluminous documents concerning international soccer, the organization of FIFA and related soccer organizations, Defendants' and their co-conspirators' roles in FIFA, related soccer organizations, and sports marketing companies, the codes of conduct and other ethical rules of FIFA and its related soccer organizations, and alleged bribe payments made by sports marketing companies to FIFA officials in exchange for lucrative broadcasting and marketing contracts, including detailed financial and wire transfer records. The Court presumes the parties' familiarity with the evidence presented at trial, and the Court will not restate that evidence except to the extent relevant to its resolution of the present motions.

another relevant soccer organization.[3] (*Id*. at 3603-3604, 3616.) No Defendant testified at trial, and none of the Defendants proffered any additional evidence of foreign law beyond the forms of evidence deemed inadmissible during the December 8, 2017 hearing.

During its case in chief, the government moved for the admission of certain documents seized by Brazilian law enforcement from a safe in the offices of a Brazilian sports media company, Klefer Producoes E Promocoes Ltda. ("Klefer"). (Dkt. 826.) Among the documents seized were notes allegedly handwritten by one of Marin's co-conspirators, documenting bribe payments made to Marin and another co-conspirator (Marco Polo Del Nero) in exchange for valuable media contracts related to the Copa America tournament and the Copa do Brasil tournament. (Govt. Exhibit ("GX") 307.) Marin objected to the admission of the handwritten Klefer documents (GX 307, GX 308) on the ground that the government had failed to properly authenticate them. (Dkt. 825.) The Court ruled, under FRE 901(a), that the government had authenticated the documents by a preponderance of the evidence, and that the evidentiary weight, if any, to be given to the documents was for the jury to decide. (Tr. 2652-2653.)

At the end of the government's case in chief, Special Agent Steven Berryman of the Internal Revenue Service ("IRS") gave testimony concerning the government's investigation of corruption within FIFA generally and Defendants' corrupt conduct specifically. During cross-examination, Marin's counsel sought to question Berryman about his understanding of the role of then-CBF president Marco Polo Del Nero, *i.e.*, whether Del Nero was still president. (Tr. 3760-3765.) Marin sought to elicit from Berryman the fact that, despite allegations and evidence (introduced at Defendants' trial) that Del Nero had received bribe payments by virtue of his

---

[3] The Court later published a written opinion detailing the legal authorities relied upon in reaching its December 8, 2017 ruling on the admissibility of foreign-law evidence. *United States v. Napout*, No. 15-cr-252, 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) ("*Napout II*").

position as the president of the CBF, FIFA had neither removed Del Nero from his position nor instituted disciplinary proceedings against him. (Tr. 3764, 3778-3779.) After hearing argument at sidebar, the Court sustained the government's objection to that line of questioning, both on the ground that the questions called for hearsay (Tr. 3766, 3775-3776), and because, under FRE 403, the prejudicial effect of any such testimony would substantially outweigh its minimal probative value (Tr. 3771-3772, 3777).

### D. The Verdict

On December 22, 2017, after five days of deliberation, the jury returned a verdict as to Napout and Marin.[4] The jury convicted Napout of RICO conspiracy (Count One), conspiracy to commit wire fraud in connection with the Copa Libertadores soccer tournament (Count Two), and conspiracy to commit wire fraud in connection with the Copa America soccer tournament (Count Six). The jury acquitted Napout of conspiracy to commit money laundering in connection with the Copa Libertadores soccer tournament (Count Three), and conspiracy to commit money laundering in connection with the Copa America soccer tournament (Count Seven). The jury convicted Marin of RICO conspiracy (Count One), conspiracy to commit wire fraud in connection with the Copa Libertadores soccer tournament (Count Two), conspiracy to commit money laundering in connection with the Copa Libertadores soccer tournament (Count Three), conspiracy to commit wire fraud in connection with the Copa do Brasil soccer tournament (Count Four), conspiracy to commit wire fraud in connection with the Copa America soccer tournament (Count Six), and conspiracy to commit money laundering in connection with the Copa America soccer tournament (Count Seven). The jury acquitted Marin of conspiracy to commit money laundering

---

[4] The jury asked to deliver a partial verdict, *i.e.*, as to some, but not all, Defendants, on December 22, 2017, which the Court allowed pursuant to Federal Rule of Criminal Procedure 31(b). (Tr. 4747-4748.)

in connection with the Copa do Brasil tournament (Count Five).  On December 26, 2017, the jury returned its verdict as to Burga, finding him not guilty of the sole count for which he was on trial. (Dkt. 874.)

### E.  Napout's and Marin's Post-Trial Motions

On January 22, 2018, Marin and Napout moved separately for judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29, or, alternatively, for a new trial pursuant to Federal Rule of Criminal Procedure 33.  (Dkts. 887 ("Marin Br.") (omnibus brief), 888 ("Napout R29 Br."), 889 ("Napout R33 Br.").)  The government filed an omnibus memorandum in opposition on February 21, 2018.  (Dkt. 898 ("Govt. Br.").)  Marin and Napout filed reply briefs on March 24, 2018.  (Dkts. 909 ("Marin Reply Br."), 910 ("Napout R29 Reply Br."), 911 ("Napout R33 Reply Br.").)

### LEGAL STANDARDS

### A.  Federal Rule of Criminal Procedure 29

Under Rule 29, "the court[,] on the defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged."  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quotation omitted).  The Court must make this determination with "the evidence against a particular defendant . . . viewed in a light that is most favorable to the government . . . and with all reasonable inferences . . . resolved in favor of the government."  *Id.* (quotation omitted).  In other words, a court should deny a defendant's motion for acquittal if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis

in *Jackson*). To view the evidence in "the light most favorable to the government," the court must "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006), and "resolve all issues of credibility in the government's favor," *United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997). To be sure, the court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that [each] element . . . is established beyond a reasonable doubt." *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008). However, "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). Furthermore, "[t]his 'traditional deference accorded to a jury's verdict is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Eppolito*, 543 F.3d at 46 (quoting *Jackson*, 335 F.3d at 180).

### B. Federal Rule of Criminal Procedure 33

Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In general, "a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998)). In making this determination, the court "is not required to view the evidence in the light most favorable to the government," *United States v. Lopac*, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006), but instead must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation[,]" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court

may "weigh the evidence" for itself, "and in so doing evaluate for itself the credibility of the witnesses," *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992), but the court "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury," *Ferguson*, 246 F.3d at 133 (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)). Ultimately, the court should order a new trial under Rule 33 if "it would be a manifest injustice to let the guilty verdict stand." *Sanchez*, 969 F.2d at 1414.

## DISCUSSION

Napout and Marin move separately for judgments of acquittal under Rule 29 or, alternatively, for a new trial pursuant to Rule 33. In their motions for acquittal, Napout and Marin both argue that the government failed to prove certain elements of the crime of conspiracy to commit honest services fraud. Accordingly, the Court begins with a recitation of the elements of that crime.

### A. Conspiracy to Commit Honest Services Fraud

As the Second Circuit recently explained, "[a] person commits wire fraud when, 'having devised or intending to devise any scheme or artifice to defraud,' he uses interstate wires 'for the purpose of executing such scheme or artifice.'" *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (quoting 18 U.S.C. § 1343). Further, the honest-services fraud statute, 18 U.S.C. § 1346, defines the term "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, "which the Supreme Court in turn has held to encompass 'only bribery and kickback schemes.'" *Halloran*, 821 F.3d at 337 (quoting *Skilling v. United States*, 561 U.S. 358, 368 (2010)).

In the post-*Skilling* era, to prove a crime of honest services fraud, the government must prove that a defendant (i) owed a fiduciary duty to not accept bribes or kickbacks in exchange for an official act, (ii) knowingly breached that duty by accepting a bribe or kickback in exchange for

an official act, (iii) knowingly made a material misrepresentation or omission to the person or entity to whom the duty was owed in furtherance of his receipt of the bribe or kickback, and (iv) made use of the wires in furtherance of his receipt of the bribe or kickback. *See Halloran*, 821 F.3d at 337 (confirming that "a violation of a fiduciary duty" is an element of honest-services fraud (citing *Skilling*, 561 U.S. at 368)); *United States v. Rybicki*, 354 F.3d 124, 146-47 (2d Cir. 2003) (holding that a "material" misrepresentation or omission is an element of honest-services fraud)[5]; *see also* Tr. 4600-4611 (Jury Instructions).

In the case of a conspiracy to commit honest services fraud, the government must prove that two or more persons entered into an unlawful agreement, the aims of which included the crime of honest services fraud (as defined above), and that the defendant knowingly and intentionally joined and participated in the conspiracy. *United States v. Valle*, 807 F.3d 508, 515-16 (2d Cir. 2015).

### B. Napout's Motion for Acquittal

Napout argues that he should be acquitted of all counts of which he was convicted— including his conviction for conspiracy to commit racketeering[6]—on two grounds. First, Napout argues that "the government failed to establish that Mr. Napout's receipt of any [personal] payments . . . resulted (or would have resulted) in any identifiable harm to FIFA or any

---

[5] Although *Rybicki* was decided before *Skilling*, 561 U.S. 358 (2010), the Supreme Court's decision in *Skilling* did not address the misrepresentation element of honest services fraud, and "the Second Circuit . . . continues to rely [on *Rybicki*] even in *Skilling*'s wake." *United States v. Smith*, 985 F. Supp. 2d 547, 593 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016).

[6] As discussed *supra*, Napout was acquitted of both money laundering counts in which he was named.

confederation within the FIFA umbrella."[7] (Napout R29 Br. at 1.) Second, Napout argues that "the government failed to present sufficient evidence to support [an] extraterritorial application" of the wire fraud statute or the racketeering statute. (*Id.* at 2.)

### 1. Napout's "Absence of Identifiable Harm" Argument

For purposes of his motion for acquittal, Napout does not challenge the sufficiency of the evidence on most of the elements of the crime of honest services fraud. Napout assumes that the government presented sufficient evidence to prove that Napout accepted or agreed to accept personal payments in exchange for official acts—namely, the awarding of valuable contract rights—in his position as a FIFA official. (*Id.* at 1, 12.) Napout further assumes that his acceptance or agreement to accept such personal payments was a violation of his fiduciary duty to FIFA, as embodied in the FIFA code of ethics. (*Id.* at 12.)[8] Napout argues, however, that he is nonetheless entitled to an acquittal because the evidence failed to establish that "the payment of alleged 'bribes' would have injured FIFA or CONMEBOL by depriving those organizations of monies that would otherwise have been paid in exchange for contract rights." (*Id.* at 12.) Thus, Napout contends, the government failed to establish an element of honest services fraud, which defeats both of Napout's honest services fraud convictions (Counts Two and Six).

The flaw in Napout's argument, however, is that the crime of honest services fraud does not require a showing of pecuniary harm to the victim. Indeed, as the Second Circuit stated in *Rybicki*, "actual or intended economic or pecuniary harm to the victim need not be established" to

---

[7] As discussed *infra*, despite Napout's suggestion that harm to the victim is an element of conspiracy to commit honest services fraud, it is not.

[8] In relevant part, the FIFA code of ethics prohibits the receipt of "personal or undue pecuniary or other advantage in order to obtain or retain business or any other improper advantage to or from anyone within or outside FIFA . . . that is related to their official activities and is contrary to their duties or falls within their discretion." (Napout R29 Br. at 5 (citing GX 1226:19).)

prove a crime of honest services fraud. *Rybicki*, 354 F.3d at 145. Rather, the crime of honest services fraud must involve, among other things, a misrepresentation or omission that is "material" to the person who is defrauded of an intangible right of honest services—that is, a misrepresentation or omission that would "naturally lead to or is capable of leading a reasonable employer to change its conduct." *Id.*[9] Accordingly, Napout's motion for a judgment of acquittal based on the government's failure to prove actual or intended pecuniary "harm" to FIFA is without merit.

Moreover, even if the government were required to prove that FIFA and its confederations suffered pecuniary harm as a result of Napout's and other FIFA officials' receipt of bribe payments, the Court would find that the government's evidence was sufficient. At trial, the government's expert, Dr. Szymanski, was qualified under FRE 702 and *Daubert* to testify as an expert in the business of sports with an emphasis on the sport of soccer. (Tr. 159-164, 195.)[10] Among other things, Dr. Szymanski testified about the sale of "broadcast rights" for international soccer competitions, including the Copa America and Copa Libertadores. (Tr. 172-177.) Based on his examination of the market for broadcasting rights in international soccer, Dr. Szymanski testified that, in recent years, broadcasting rights have become "by far the most important" asset that an

---

[9] Consistent with this definition of "materiality," the Court instructed the jury in this case that, for purposes of proving the materiality element of honest services fraud, the government "need not prove that the conspirator intended to cause economic or pecuniary harm or that any such harm actually resulted from the fraud." (Tr. 4607.) Napout did not object to the final jury instruction on materiality. Indeed, Defendants' own proposed jury instructions stated that, for purposes of evaluating the "materiality" element of wire fraud, "[a] statement, false pretense, or omission is 'material' if it is one that would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision." (Dkt. 809 at 25.)

[10] As discussed *infra*, Napout objected to Dr. Szymanski's testimony on the ground of relevance, but he did not challenge Dr. Szymanski's qualifications to give expert testimony concerning the business of sports with a focus on international soccer. (Tr. 164.)

international soccer organization owns.  (Tr. 175.)  Dr. Szymanski identified "two immediate effects" of personal payments made to officials who have authority over the sale of broadcasting rights on behalf of international soccer organizations.  (Tr. 191, 198.)  First, because sports marketing companies typically have a specified amount they are willing to spend on broadcasting rights, "if some of that budget is going in the form of bribes to officials and executives, then that's less money for the soccer organization."  (Tr. 191.)  When a sports media company pays a bribe to a soccer official in exchange for the award of broadcasting rights, the amount paid to the soccer official is "lost [by the soccer organization] . . . directly from the bribe."  (Tr. 192.)  Second, when a market for broadcasting rights is influenced by secret bribe payments, competitors in the market are "not likely to enter into competition to win the [media] right[s], so that the total amount paid is going to be less than you would get in a competitive environment."  (Tr. 191.)

Napout argues that Dr. Szymanski's testimony concerning the effects of bribe payments on media right contracts was insufficient to establish materiality because his testimony was "not about any of the facts of this case."  (Dkt. 910 at 6.)  While Napout is correct that Dr. Szymanski did not review any of the specific media-rights contracts at issue in this case, or CONMEBOL's historical financial data, to prepare, for example, a statistical analysis isolating the financial impact of the specific bribe payments at issue in this case on CONMEBOL (Tr. 197-204), that does not render his testimony insufficient to establish harm to the organization.  The economic principles that Dr. Szymanski explained based on his examination of the market for sports media rights—in particular, the principle that bribe payments made to a soccer official in exchange for the awarding of a valuable contract right directly translates into "less money for the soccer organization"—provided the jury with a sufficient basis on which to conclude that the specific bribe payments in this case resulted in lower contract prices for the relevant soccer organizations.  Indeed, although

Napout claims that a jury finding on that basis would be "mere speculation" (Dkt. 910 at 6-7), the jury was within its discretion to find materiality in this case based on the specific contracts presented and the economic principles set forth by Dr. Szymanski.

Accordingly, Napout is not entitled to acquittal on the basis of the government's alleged failure to prove "harm" or materiality.[11]

### 2. Napout's Extraterritoriality Argument

Napout moves for a judgment of acquittal on the ground that his convictions for wire fraud conspiracy (Counts Two and Six) and racketeering conspiracy (Count One) are invalid because they were based on an improper extraterritorial application of the relevant statutes. In large part, Napout's motion for acquittal on this ground reiterates the same arguments he made in connection with his motion to dismiss the indictment, which the Court denied by order dated February 7, 2017. *See Hawit*, 2017 WL 663542, at *4-5. Napout now argues, however, that even if the government adequately alleged a domestic application of the relevant statutes, the government did not present evidence sufficient to establish such a domestic application.

---

[11] In addition, with respect to the 2012 Copa Libertadores tournament, the government presented direct evidence from which the jury could have found economic harm to CONMEBOL. Alejandro Burzaco testified, based on extensive negotiations in South America for media contract rights, that he paid less than market value for the media rights contract he obtained from CONMEBOL for the 2012 Copa Libertadores tournament. (T. 374-377.) Napout argues that Burzaco's testimony concerning the adequacy of the payments made to CONMEBOL for the 2012 Copa Libertadores contract was inadmissible as "lay" opinion. (Napout R29 Reply Br. at 7.) The Court disagrees. In the course of three days of testimony, Burzaco testified at length about his personal experience negotiating media rights contracts on behalf of Torneos. Indeed, given Burzaco's personal understanding of contract prices at the time he negotiated the 2012 Copa Libertadores contract, his testimony about whether the payments made to CONMEBOL in exchange for the 2012 Copa Libertadores contract were lower than the price that would have been paid in an honest arm's-length negotiation did not constitute expert opinion, but rather were based on his direct personal knowledge of the situation. (Tr. 374-377.)

### a. Wire Fraud Conspiracy

As the Court explained in its February 7, 2017 order, the federal wire fraud statute, 18 U.S.C. § 1343, does not have extraterritorial application. *Id.* at *4 (citing *RJR Nabisco*, 764 F.3d at 140-41). Rather, the wire fraud statute applies "domestically" to schemes to defraud that have a sufficient connection to the United States, although the scheme may also involve foreign conduct. *Id.* (citing *RJR Nabisco*, 764 F.3d at 141-43, and *Petroleos Mexicanos*, 572 F. App'x at 61).

Neither the Supreme Court nor the Second Circuit has established a definitive test for the domestic reach of the federal wire fraud statute. Indeed, both courts have passed on the opportunity to propound such a test. *See RJR Nabisco*, 764 F.3d at 141 ("We need not now decide precisely how to draw the line between domestic and extraterritorial applications of the wire fraud statute . . . ."); *RJR Nabisco*, 136 S. Ct. at 2105 (reversing and remanding without providing guidance on the domestic reach of the wire fraud statute). Therefore, to determine the domestic reach of the wire fraud statute in the absence of a specific test, the Court must "look[] to the statute's focus," and "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 136 S. Ct. at 2101.

In the February 7, 2017 order, the Court observed that the Supreme Court's decision in *RJR Nabisco*, and the Second Circuit's decision in *Petroleos Mexicanos*, provide guideposts in determining the domestic reach of the wire fraud statute. Relying on the Supreme Court's decision in *RJR Nabisco*, the Court rejected Napout's argument that the wire fraud statute can be applied

"domestically" only if the relevant fraud scheme has its focus in the United States. *Hawit*, 2017 WL 663542, at *5. At the same time, relying on the Second Circuit's decision in *Petroleos Mexicanos*, which held that "three minimal contacts" with the United States were insufficient to establish a domestic application of the wire fraud statute, 572 F. App'x at 61, the Court expressed skepticism of the government's position that "nothing more" than a single transmission across U.S. wires is sufficient to establish a domestic application of the wire fraud statute. *Hawit*, 2017 WL 663542, at *5. Ultimately, without propounding a general test for the domestic reach of the wire fraud statute, the Court held that the government had adequately alleged domestic wire fraud as to Napout, "regardless of whether the correct test is the bright-line test proposed by the Government or the more holistic analysis implied by *Petroleos Mexicanos*." *Id.*

During the trial, the government presented extensive evidence of the domestic conduct involved in the wire fraud conspiracies alleged in the S-2 indictment. As summarized in the government's brief, the government presented evidence that Napout and/or his co-conspirators met in the United States in furtherance of the charged conspiracies, maintained bank accounts in the United States to pay and receive bribes in connection with the Copa Libertadores and the Copa America tournaments in particular,[12] maintained businesses in the United States that were used to further the charged conspiracies, and used the United States' financial system to clear U.S. dollar transactions involved in the charged conspiracies. (*See* Govt. Br. at 14-16.) In addition, with respect to the Copa Libertadores scheme (Count Two), the government presented evidence that Napout and his co-conspirators aimed to generate profits from the sale of broadcasting and other commercial rights in the United States specifically. (Tr. 180-183, 373-374, 481-483.) Further,

---

[12] As discussed, Napout was convicted of conspiracy to commit wire fraud in connection with the Copa Libertadores tournament (Count Two) and the Copa America tournament (Count Six).

with respect to the Copa America scheme (Count Six), the government presented evidence that Napout and his co-conspirators conspired to make and receive bribe payments in connection with a soccer tournament that would be played and broadcasted in the United States. (Tr. 2522-2525, 2539-40.)

Toward the end of the government's case in chief, the Court distributed to the parties proposed jury instructions. In describing the elements of wire fraud, the draft instructions addressed the extraterritoriality issue as follows:

> It is not necessary that all or most of the wire communications involved in the alleged scheme to defraud were sent to, from, or within the United States. However, for the wire-use element to be satisfied, the scheme to defraud must make substantial use of wire communications that pass between two or more states or it must pass between the United States and a foreign country.

(Dkt. 847 at 45.) Thereafter, in a charge conference, the Court revised this section of the proposed charges by replacing the phrase "substantial use" with the phrase "more than minimal use." (Tr. 4177.) Thus, the final instructions to the jury stated, in relevant part:

> It is not necessary that all or most of the wire communications involved in the alleged scheme to defraud were sent to, from, or within the United States. However, for the wire-use element to be satisfied, the scheme to defraud must make more than minimal use of wire communications that pass between two or more states or between the United States and a foreign country.

(Tr. 4611.)

At no time did Napout object to the Court's proposed instructions concerning the domestic contacts required to prove a domestic wire fraud conspiracy. (*See, e.g.*, Tr. 4177-4179.) Nor does Napout argue now that the evidence at trial failed to meet the domestic nexus requirement described in the instructions given to the jury. Instead, in his motion for a judgment of acquittal, Napout argues that a different legal standard than the one charged to the jury should be applied to determine whether the evidence was sufficient to sustain a domestic application of the wire fraud statute. Specifically, Napout asks, for the first time, that the Court apply the test for domestic wire

fraud adopted by the Honorable Nicolas G. Garaufis in *United States v. Gasperini*, No. 16-cr-441 (NGG), 2017 WL 2399693 (E.D.N.Y. June 1, 2017).[13] There, the court followed two district courts in holding that a "domestic" application of the wire fraud statute has three requirements: "(1) a defendant or coconspirator commits a substantial amount of conduct in the United States, (2) the conduct is integral to the commission of the scheme to defraud, and (3) at least some of the conduct involves the use of U.S. wires in furtherance of the scheme to defraud." *Id.* at *8 (citing *United States v. All Assets Held at Bank Julius*, No. 04-cv-798 (PLF), 2017 WL 1508608 (D.D.C. Apr. 17, 2017), and *United States v. Prevezon Holdings, Inc.*, 122 F. Supp. 3d 57, 71-72 (S.D.N.Y. 2015)). Napout argues that, under this test for the domestic scope of the wire fraud statute, the evidence introduced at trial was insufficient to support his wire fraud convictions.

The Court finds that Napout's arguments under *Gasperini* are without merit for two reasons. First, Napout's claim that the evidence at trial was insufficient to sustain a domestic application of the wire fraud statute is based on a legal standard that was neither articulated to the jury, nor asserted by Napout before or during his trial. Had Napout wanted to instruct the jury to apply the three-part *Gasperini* test for domestic wire fraud, he was required to object to the Court's instruction before the jury was charged and to notify the Court of the *Gasperini* decision—neither of which Napout did.[14] Napout cannot now launch a backdoor attack on the Court's jury instructions in the form of a Rule 29 motion challenging the sufficiency of evidence. Second, as the government demonstrated in its opposition brief, the evidence presented at trial was more than sufficient to satisfy the three-part test set forth in *Gasperini*. As summarized above and in the

---

[13] Notably, Judge Garaufis's *Gasperini* decision was issued more than five months before trial began in this case.

[14] The Court is compelled to note that Napout's counsel was not shy about litigating a myriad of issues before and during trial. (*See, e.g.*, Dkt. Nos. 227, 462, 490, 491, 626, 654, 694.)

government's brief (Govt. Br. at 14-18), in furtherance of the Copa Libertadores and Copa America schemes, Napout and his co-conspirators met in the United States, maintained bank accounts in the United States, maintained businesses in the United States, transmitted and received bribe payments through the United States, and targeted broadcasting audiences in the United States. Under the three-part test in *Gasperini*, these domestic contacts constituted (1) a substantial amount of conduct in the United States, which was (2) integral to the commission of the bribe conspiracies in question, and (3) involved more than a *de minimis* use of the U.S. wires. 2017 WL 2399693, at *8.

Accordingly, the Court rejects Napout's contention that the evidence was insufficient to sustain his wire fraud conviction.

### b. Racketeering Conspiracy (Count One)

Under the Supreme Court's decision in *RJR Nabisco*, the federal racketeering statute, 18 U.S.C. § 1962, "appl[ies] extraterritorially in tandem with the underlying predicates, without regard to the locus of the enterprise." *Hawit*, 2017 WL 663542, at *9 (quoting *RJR Nabisco*, 136 S. Ct. at 2105. In this case, the government alleged and argued that the racketeering conspiracy charged against Napout was based on predicate acts of wire fraud conspiracy (applied domestically) and money laundering conspiracy (applied extraterritorially). Given these predicate acts, Napout argues that the evidence was insufficient to sustain his conviction for racketeering conspiracy because (i) Napout was acquitted of all charges of money laundering conspiracy (Counts Three and Seven), and (ii) Napout's convictions for wire fraud conspiracy were based on an impermissible extraterritorial application of the wire fraud statute. (Napout R29 Br. at 15-16.) As discussed above, the Court has held that Napout's convictions for wire fraud conspiracy were based on a domestic application of the wire fraud statute, thereby undercutting an essential premise

of Napout's argument as to the extraterritorial reach of the racketeering statute. Accordingly, the Court also rejects Napout's argument about the extraterritorial application of RICO.[15]

For these reasons, the Court denies Napout's motion for a judgment of acquittal.

## C. Napout's Motion for a New Trial

Napout also moves for a new trial pursuant to Federal Rule of Criminal Procedure 33 based on (1) purported errors in the Court's evidentiary rulings before and during trial, and (2) alleged "newly discovered evidence." (Napout R33 Br.)

### 1. Purported Evidentiary Errors

Napout contends that the Court made four erroneous evidentiary rulings that, either individually or in combination, make it a manifest injustice to allow Napout's convictions to stand. The Court addresses each of these alleged errors in turn.

### a. Evidence of Foreign Law

In the more than one year of discovery in this case, neither Napout nor his co-Defendants gave notice under Federal Rule of Criminal Procedure 26.1 of an intention to raise an issue of foreign law at trial.[16] In pretrial motions, the government, although not required to do so, sought an *in limine* order precluding Defendants from presenting evidence or argument about foreign law,

---

[15] The government also argues that, even if the evidence was insufficient to prove a domestic application of the wire fraud statute, the Court should nonetheless deny Napout's motion for acquittal as to the conviction for racketeering conspiracy (Count One). According to the government, although the jury acquitted Napout of the two charges against him for conspiracy to commit money laundering, Napout's conviction for racketeering conspiracy may still be sustained based on the predicate acts of money laundering conspiracy. (Govt. Br. at 12-13.) Having ruled that the evidence was sufficient to establish a domestic application of the wire fraud statute, the Court declines to reach this additional argument by the government.

[16] Federal Rule of Criminal Procedure 26.1 states: "A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice. Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence."

including the law concerning commercial bribery in the various countries where Defendants worked and resided during the time period of the indictment. That motion prompted Defendants to argue, for the first time in the case—days before the start of trial—that they should be permitted to introduce evidence of foreign law at trial. As previously discussed, after initially precluding evidence and argument about foreign law under FRE 401 and FRE 403 (Hr'g Tr. 90-91, Nov. 8, 2017), the Court *sua sponte* revisited the issue while the government was still presenting its case in chief, and instructed Defendants to proffer the specific evidence concerning foreign law that they sought to introduce. (Tr. 2620-2622.) At a hearing held on December 8, 2017, the Court ruled that the specific foreign-law evidence proffered by Defendants was inadmissible under FRE 401 and FRE 403, but clarified that if any Defendant chose to testify at trial, he would not be precluded from testifying as to his beliefs about foreign law and how those beliefs informed his understanding of the duties he owed to FIFA or another relevant soccer organization. No Defendant testified during the trial or proffered any additional evidence of foreign law beyond the forms of evidence deemed inadmissible during the December 8, 2017 hearing.

In his motion for a new trial, Napout argues that the Court erred in precluding him from presenting evidence to prove that "commercial bribery" and "personal payments" are legal in both Paraguay and Argentina. (Napout R33 Br. at 4-6.)[17] Napout argues that the Court should have

---

[17] The Court notes a mischaracterization in Napout's arguments concerning the Court's exclusion of foreign-law evidence. In his motion, Napout claims that the Court ruled that "the only permissible means by which foreign law could be presented to the jury would be that a defendant who testified at trial 'would be permitted to testify as to his beliefs about foreign law and how those beliefs influenced his understanding of the duties he owed to FIFA or another relevant soccer organization.'" (Napout R33 Br. at 4 (quoting Dkt. 853 at 18).) That description of the Court's December 8, 2017 order is incorrect. Contrary to Napout's assertion, the Court did not rule that Napout's own testimony was the "only permissible means" by which to present evidence relating to foreign law. Rather, the Court considered each of the specific forms of foreign-law evidence that Napout and Marin proffered and determined that none were admissible.

made a judicial determination as to whether the laws of Paraguay and Argentina prohibited commercial bribery and personal payments, and the Court should have allowed Napout to "elicit from witnesses with whom Mr. Napout had business dealings whether they had conducted their business[] affairs as they did because they had believed that doing so was legal under Paraguayan or Argentinian law." (*Id.* at 6.) Had the Court allowed such a determination and inquiry, Napout argues, the jury could have concluded that Napout lacked the criminal intent to join any of the charged conspiracies because he believed that the personal payments underlying those conspiracies were legal under Paraguayan or Argentinian law. (*Id.*)

In making this argument, Napout relies once again on the Second Circuit's decision in *United States v. Schultz*, 333 F.3d 393 (2d Cir. 2003). Napout contends that the Court should have permitted Napout to use the "method" of proof permitted in *Schultz* to prove the contents of foreign law, and should have permitted Napout to elicit testimony from his associates to rebut the government's proof of Napout's criminal intent. (Napout R33 Br. at 6.) As the Court has previously explained, however, the *Schultz* court's treatment of foreign law does not extend to the specific facts and charges at issue in this case. *Napout II*, 2017 WL 6375729, at *10-11 (summarizing the relevant holdings of *Schultz* and addressing the same arguments that Napout now makes under *Schultz*); *see Schultz*, 333 F.3d 393 (finding foreign law relevant because defendant's knowledge of foreign law was a required element of the charged crime). Accordingly, for the reasons stated in the December 12, 2017 order, the Court finds no error in its decision not to hold an evidentiary hearing to determine the contents of Paraguayan, Argentinian, or any other

---

Then, to eliminate any doubt about the scope of the Court's order concerning foreign law, the Court clarified that, if a Defendant chose to testify in the case, the Court would not preclude him from testifying about his beliefs about foreign law and how those beliefs informed his understanding of his duties to FIFA.

foreign country's laws, and also finds no error in its exclusion of the specific foreign-law evidence that Napout proffered for admission at trial.

### b. Purported Work Product

During its investigation of this case, the government executed a search warrant for, and obtained electronic records from, a Hotmail account used by Napout. (Hr'g Tr., Nov. 9, 2017.) Among the records the government obtained from that Hotmail account were two electronic files containing a written record of "WhatsApp" text message communications between Napout and Burzaco, from June and July 2014. At trial, Napout moved to exclude the WhatsApp text messages on the ground that they were protected by the work product doctrine. (Dkt. 786.) Napout asserted that the WhatsApp text messages were protected from disclosure because the copies of those messages that were obtained by the government were preserved in Napout's Hotmail account only because he had sent a copy of the messages to his attorneys, at their request and in anticipation of litigation. (*Id.*)

After holding a sealed hearing with Napout, his attorneys, and the government's privilege team, the Court issued an order, dated November 11, 2017, denying Napout's motion to exclude the messages. (Dkt. 796.) In brief, the Court ruled that work product protection did not extend to the WhatsApp messages because the original messages themselves were not created at the behest of an attorney or in anticipation of litigation, and Napout's transmission of those messages to his attorneys did not render the documents privileged or work product. (*Id.* at 8-11 (citing *United States v. Walker*, 243 F. App'x 621, 623 (2d Cir. 2007) ("[P]utting otherwise non-privileged . . . records . . . in the hands of an attorney—or printing out such records for an attorney to review— does not render the documents privileged or work product.")).)

In his motion for a new trial, Napout argues that the Court erred in allowing the government to introduce a copy of the WhatsApp text messages over his assertion of work product protection. (Napout R33 Br. at 7; GX 976 (WhatsApp messages).) Napout further argues that the government, in its closing argument to the jury, unfairly "exploited" those WhatsApp text messages by arguing that they demonstrated a "trusting" relationship between Burzaco and Napout, which bolstered the government's theory that Burzaco and Napout were co-conspirators. (Napout R33 Br. at 7.)

In support of this argument, Napout merely incorporates by reference the arguments he made in his letter briefing during trial (Dkt. 786), which the Court examined in detail and rejected in its November 11, 2017 order (Dkt. 796). Napout does not offer any additional argumentation on this front, and the Court finds no error in its holding that the WhatsApp messages were not protected by the work product doctrine. Accordingly, for the reasons stated more fully in its November 11, 2017 order (Dkt. 796), the Court finds no error in allowing the government to present the WhatsApp messages to the jury and argue that they, *inter alia*, showed a relationship of trust between Burzaco and Napout.

### c. The "Obstruction" Evidence

As previously discussed, by order dated October 17, 2017, the Court ruled that the government, subject to specific objections at trial, would be permitted to present evidence that Napout and alleged co-conspirators engaged in obstruction of justice to conceal their criminal conduct. *See Napout I*, 2017 WL 4685089, at *3-7. Among other things, the Court ruled that the government could introduce evidence concerning "the removal of electronic devices from Napout's CONMEBOL office, at Napout's direction, on the morning of Napout's December 3, 2015 arrest in Zurich, Switzerland and the subsequent recovery and search of those devices by U.S. law enforcement." *Id.* at *2-7. The Court ruled that evidence in this category was generally

admissible, both as evidence of the existence of a RICO conspiracy, as well as evidence of Napout's "consciousness of guilt," except that, to the extent the government sought to introduce this evidence to prove the existence of a RICO conspiracy, the government would also need to submit evidence that at least one person involved in the obstruction, other than Napout, was a member of the charged conspiracy prior to the alleged obstruction. *Id.* at *5-7 & n.7. The Court also ruled that evidence in this category was not unduly prejudicial, because the "acts of obstruction are really no different than Defendants' alleged acts of bribery, wire fraud, and money laundering: they all involve non-violent acts of dishonesty, deceit, and concealment." *Id.* at *7.

In his motion for a new trial, Napout contends that the government unfairly exploited the Court's pre-trial order permitting the introduction of evidence concerning the removal of Napout's computer from his CONMEBOL office. Specifically, Napout claims he was prejudiced by the government's repeated reference, during its summation, to the computer that was "stolen" from Napout's office. (Napout R33 Br. at 8-9; Napout R33 Reply Br. at 4-5.) According to Napout, the government's use of the phrase "stolen computer" to describe the computer removed from Napout's office was unfair because, although the government had obtained the Court's conditional approval to introduce evidence of obstruction, the government "utterly failed to prove that which it had proffered to the Court" before trial. (Napout R33 Br. at 8.) Thus, Napout argues, "[t]he government . . . obtained the benefit of selling alleged wrongdoing [to the jury] without any actual basis to link Mr. Napout to any wrongdoing." (Napout R33 Reply Br. at 5.)

Before addressing the merits of Napout's argument, the Court notes several limitations on the "obstruction" evidence that were observed by the government at trial. First, consistent with the Court's pre-trial order concerning obstruction evidence, the government did not argue that the removal of Napout's computer from his CONMEBOL office was evidence of the racketeering

conspiracy, Napout's involvement in the racketeering conspiracy, or the commission of a predicate act of racketeering conspiracy. Rather, in summation, and in keeping with the Court's pre-trial order, the government argued to the jury that the removal of Napout's computer—which contained photographs of Napout with central members of the alleged racketeering conspiracy—reflected "a consciousness of guilt, that is to say, somebody who may want to argue[:] I don't really know the [alleged co-conspirators], those are business people, . . . how would I get cash from the [alleged co-conspirators], these are not people I'm close to." (Tr. 4531-4532.) In other words, despite the Court's grant of conditional permission to introduce the obstruction evidence for several purposes, the government ultimately used the obstruction evidence solely as "other acts" evidence pursuant to FRE 404(b) to show Napout's consciousness of guilt.

With this as background, the Court considers Napout's objection to the government's use of the obstruction evidence to argue Napout's "consciousness of guilt." In essence, Napout argues that the evidence introduced at trial was insufficient to show that Napout "had a role" in the removal of his computer from the CONMEBOL office. According to Napout, in the absence of evidence linking Napout to the removal of the computer, the government should not have been permitted to argue "consciousness of guilt" in summation, and the Court should not have given a consciousness-of-guilt instruction to the jury. (Napout R33 Reply Br. at 4-5.)

Having reviewed the obstruction evidence introduced at trial, the Court finds no error or unfair prejudice stemming from the government's summation or the Court's instruction to the jury concerning Napout's consciousness of guilt. The evidence at trial was more than sufficient to conclude, by a preponderance of evidence, that Napout was involved in the removal of his computer from his CONMEBOL office. Nelson Sanabria, one of Napout's executive assistants at CONMEBOL, testified that, a month or two before Napout was arrested in Zurich, Switzerland,

Napout's senior assistant informed Sanabria of a plan to remove Napout's computer from his CONMEBOL office in the event Napout was arrested. (Tr. 3121-3124.) Sanabria explained that, "in case Mr. Napout was arrested, [a CONMEBOL attorney] would go get [Napout's] computer at the office," and that Sanabria was "to give [the attorney] access [to the office] if that happened." (Tr. 3122-23.) On December 3, 2015, no more than a few hours after Napout was arrested, Sanabria received a phone call from a CONMEBOL attorney instructing him to go immediately to the CONMEBOL office. (Tr. 3124.) Two CONMEBOL attorneys joined Sanabria at the office, and one of them asked Sanabria to unlock the door to Napout's office, so that Napout's computer could be removed. (Tr. 3124-3125.) To avoid detection by an office security camera, one of the attorneys covered Napout's computer with his jacket and removed it from the office. (Tr. 3126-3127.) As the attorneys left the CONMEBOL office with the computer, one of them told Sanabria that the computer was being removed because Napout was afraid that photographs on the computer of his family "might be leaked" if the computer was not removed. (Tr. 3127.) The next day, a different computer was placed on Napout's desk, seemingly to conceal the removal of Napout's work computer. (*Id.*) Eventually the government came into possession of the computer that was removed and found, among other things, numerous photographs of Napout with his alleged co-conspirators, including two co-conspirators, Hugo and Marian Jinkis, who, according to the government's trial witnesses, were responsible for delivering cash bribe payments to Napout. (Tr. 3205-3212.) Given this timeline of events, there was more than a preponderance of evidence to find that Napout had a role in the removal of his computer from his CONMEBOL office.

Moreover, even if the Court erred in allowing the government to argue Napout's consciousness of guilt based on the removal of his computer from the CONMEBOL office, any such error would not constitute the kind of "manifest injustice" required to warrant a new trial. In

general, "a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Smith*, 316 F.3d at 183 (quoting *Atkins*, 143 F.3d at 102). Viewed in context of the other inculpating evidence introduced against Napout—including testimony about Napout's agreement to receive bribes and about the delivery of bribe money to him, as well as ledgers maintained by co-conspirators documenting the bribes paid to Napout—the evidence concerning the removal of Napout's computer from his CONMEBOL office carried minimal threat of unfair prejudice. Most importantly, Napout was free to argue, as he did, that there was no direct evidence that he had ordered the removal of his computer, and that, even if Napout had expressed a concern about the government obtaining his computer (as Sanabria testified), he did so only because he wanted to protect his family photographs from being leaked. (Tr. 4364.) Indeed, Napout's counsel offered into evidence photographs of Napout's family that were stored in the computer, including a photograph of his daughter in a bathing suit. (Tr. 3178-3182.) Thus, the jury was aware of, and well equipped to evaluate, the government's argument that Napout was involved in the removal of his computer and the motives for having the computer removed. Furthermore, in the Court's assessment, the fact that Napout's computer was removed from his CONMEBOL office was far less significant, in terms of evidence of Napout's guilt, than the contents of the computer itself. As noted above, the computer contained, among other things, numerous photographs of Napout and alleged co-conspirators who were at the heart of the bribery conspiracy described by other government witnesses throughout the trial. Napout did not claim, and does not claim now, that those photographs and the other contents of his computer were inadmissible. Thus, even if the circumstances surrounding the removal of the computer should not have been admitted, the computer's contents would nonetheless have been admitted to bolster the government's argument

about Napout's close association with the alleged co-conspirators in the bribery scheme. For these additional reasons, even if there was error in allowing the government to present evidence concerning the removal of Napout's computer as "consciousness of guilt," that error would not warrant a new trial.[18]

### 2. "Newly Discovered Evidence"

Napout also moves for a new trial on the ground that he has discovered new evidence that entitles him to a new trial pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), or, alternatively, because the newly discovered evidence "would likely [have] result[ed] in an acquittal," *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007).

### a. Napout's "Newly Discovered" Evidence

Napout's argument about "newly discovered" evidence relates to testimony given by cooperating witness Alejandro Burzaco, one of the government's key witnesses against Napout. On November 15, 2017, the third day of the government's case in chief, Burzaco testified that he attended a CONMEBOL board meeting in October 2014 in Asuncion, Paraguay, where, among other things, he spoke with Napout about bribe payments in exchange for media contracts. (Tr. 568-576.) In the course of giving that testimony, Burzaco also mentioned that he had traveled to Asuncion at that time with Luis Segura, the president of the Argentinian soccer federation. (Tr. 566.)

---

[18] As a final ground for seeking a new trial, Napout contends that the Court erred in "allowing the government to introduce 'expert' testimony on the purported impact of the alleged offenses on FIFA and CONMEBOL, without any evidentiary link between the witness's opinion and the facts of the case." (Napout R33 Br. at 1-2.) For this part of his motion, Napout merely "adopts the argument set forth in Marin's Rule 33 motion." (*Id.* at 2 n.2.) The Court addresses this common ground of Napout's and Marin's motions below.

According to Napout, before Burzaco testified in trial, Napout had no way of knowing that Burzaco would tell the jury that he had traveled to the October 2014 CONMEBOL meeting with Luis Segura.[19]  Napout contends that when Burzaco testified that he had traveled to Asuncion with Segura for the October 2014 CONMEBOL meeting, Napout's counsel "undertook an investigation" as to the veracity of Mr. Burzaco's assertion that he spoke with Napout about bribe payments in Asuncion, Paraguay around the time of the October 2014 CONMEBOL meeting.  (Napout R33 Br. at 10.)  Napout does not provide details on the "investigation" his counsel conducted, but his post-trial submission shows that, on December 5, 2017 (three weeks after Burzaco testified about his trip to Asuncion), Napout submitted a request to a Paraguayan immigration authority for all immigration records associated with Alejandro Burzaco's entries into Paraguay during 2014.  (Napout R33 Br., Ex. A.)  One day later, on December 6, 2017, Napout received a written response from the Paraguayan immigration authority, which indicated that Burzaco entered into Paraguay on December 3, 2014, but that "no [other] immigration data was recorded" for Burzaco in 2014.  (*Id.*)  Thereafter, "an exhaustive and painstaking search of Paraguayan airport records" was conducted, which ultimately revealed flight manifests showing private flights taken by Luis Segura on October 24, 2014, into and out of Asuncion, Paraguay.  (Napout R33 Br. at 10.)  Burzaco is not listed on those flight manifests.  (Napout R33 Br., Ex. B.)

---

[19] In his opening brief in support of his motion for a new trial, Napout claimed that the government's Section 3500 disclosures did not adequately disclose that Burzaco might testify that he attended the CONMEBOL meeting in Asuncion in October 2014.  (Napout R33 Br. at 10 ("Mr. Burzaco's trial testimony was the first time that Mr. Napout or his counsel learned that Mr. Burzaco would testify as to the date, time, or place of the alleged meeting [with Napout] . . . .").)  However, Napout walked back that argument after the government demonstrated in its responsive briefing that its Section 3500 materials disclosed, among other things, that Burzaco spoke about bribe payments with Napout and another co-conspirator, Marco Polo Del Nero, around the time of the October 2014 CONMEBOL meeting in Asuncion.  (Dkt. 919 (Napout Letter Brief) at 3-4.)

According to Napout, the absence of Burzaco's name on the flight manifests shows that Burzaco was lying when he told the jury that he had traveled to the October 2014 CONMEBOL meeting with Segura. (Napout R33 Br. at 10-11.) Napout argues that, had the jury seen the immigration records and flight manifests showing that Burzaco lied about his trip to Asuncion, the jury would have discredited Burzaco's testimony that he spoke with Napout in Asuncion about the bribery schemes. Napout further contends that Napout would not have been convicted if Burzaco had been impeached with the immigration records and flight manifests during trial. (*Id.* at 14.)

### b. The Government Did Not Commit a *Brady* Violation

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)) (internal quotation marks omitted). To establish prejudice, the defendant must show materiality. *Id.* "The touchstone of materiality is a reasonable probability of a different result. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (alterations, emphasis, and internal quotation marks omitted)).

Napout asserts that the government violated its *Brady* obligations in two ways. Napout first suggests that the government violated *Brady* by failing to disclose records, such as immigration or flight records, related to Burzaco's travel to Asuncion, Paraguay in October 2014. (Napout R33 Br. at 12 n.10.) The Court finds this argument to be without merit. Other than Napout's supposition that the government may have been in possession of records concerning

Burzaco's travel to and from Asuncion (*id.*), there is no evidence that the government possessed any such records. Indeed, the government represents that it "did not know of, much less possess, the [newly discovered evidence] or the information contained therein until the government received Napout's post-trial brief." (Govt. Br. 57.)

Napout next argues that the government violated its *Brady* obligations by failing to disclose to Napout that Burzaco, in a pretrial interview with the government, told the government that he traveled to Asuncion, Paraguay with Luis Segura in October 2014 and, during that trip, he talked to Napout about the bribe schemes. (*Id.* at 11.) Napout's argument is flawed for at least two reasons. First, the information that Napout claims was suppressed—*i.e.*, Burzaco's statements to the government about his travel to Asuncion and his conversation with Napout—is not information that is "favorable" to Napout. Indeed, Burzaco's statements on this point were highly inculpatory and, therefore, did not trigger the government's *Brady* obligations. Second, contrary to Napout's assertions, the information in question was not suppressed by the government. Several weeks before trial began, the government disclosed 3500 materials to Napout that included, among other things, notes from various interviews between the government and Burzaco. In relevant part, those notes indicated that (i) Burzaco traveled on a private plane to Asuncion in October 2014, (ii) in October 2014, Burzaco attended a CONMEBOL meeting in Asuncion, Paraguay, which was his first CONMEBOL meeting since the death of co-conspirator Julio Grondona, and (iii) at the first CONMEBOL meeting he attended since the death of Grondona, Burzaco met with Napout and Del Nero, and the subject of bribe payments was discussed. (GX-3500-AB-7(a) at 8; GX-3500-AB-11(a) at 3; GX-3500-AB-13(a) at 10.)

When these disclosures were brought to Napout's attention in the post-trial briefing, Napout then modified his *Brady* argument, claiming that, although the government may have

disclosed "that [Burzaco] had a meeting with Mr. Napout at a CONMEBOL meeting[,] . . . nothing put Mr. Napout on notice that Mr. Burzaco would testify that he flew to Asuncion *with Mr. Segura* for the October 2014 CONMEBOL meeting."  (Dkt. 919 (Napout Letter Brief) at 3 (emphasis in original).)   But, even assuming *arguendo* that this information was "suppressed," as Napout contends, the information nonetheless was not "favorable" to Napout.  The mere fact that Burzaco traveled to Asuncion with Segura—which is the only undisclosed information that Napout even suggests was in the government's possession prior to trial—has no direct bearing on Napout's guilt or innocence and, *absent contradicting documents or information* (which Napout does not suggest was in the government's possession)[20], held no impeachment value either.  Napout has thus failed to establish a *Brady* violation based on the government's supposed failure to disclose that Burzaco traveled to Asuncion in October 2014 by private jet in the company of Luis Segura.

For these reasons, the Court finds that Napout has failed to establish a *Brady* violation by the government.

### c.  Napout's "Newly Discovered Evidence" Does Not Warrant a New Trial

In the alternative, Napout argues that, even if the government did not violate its *Brady* obligations, the newly discovered immigration records and flight manifests constitute "newly discovered evidence" that warrants a new trial.

A district court may grant a new trial based on the discovery of new evidence if "(1) the evidence is newly discovered after trial; (2) facts are alleged from which the court can infer due

---

[20] Herein lies the problem with Napout's argument:  he confuses *inculpatory* evidence, *i.e.*, Burzaco's statement that he flew to Asuncion in a private jet with Segura in October 2014 to attend the CONMEBOL meeting—which the government was not required to, but largely did, disclose— with *exculpatory* evidence, *i.e.*, the immigration and flight records that did not show Burzaco entering Paraguay or flying on Segura's private plane in October 2014—which only Napout, and not the government, possessed at any point during the trial.

diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Vernace*, 811 F.3d 609, 620 (2d Cir. 2016) (quoting *Owen*, 500 F.3d at 88 (brackets omitted)).

For the sake of argument, the Court accepts Napout's identification of the "newly discovered" evidence as the combination of the immigration records and the flight manifests, the latter of which Napout did not obtain until after the close of trial. The Court further assumes that the immigration records and flight manifests are "material" and "not merely cumulative or impeaching." Nonetheless, the Court denies Napout's motion for a new trial based on this evidence, for two reasons.

First, the Court finds that Napout failed to demonstrate "due diligence . . . to obtain the evidence" before the close of trial. As discussed above, more than six weeks before trial, the government's 3500 materials disclosed that Burzaco traveled on a private plane to Asuncion in October 2014 to attend a CONMEBOL meeting at which Burzaco met with Napout and another co-conspirator, and the subject of bribe payments was discussed. (GX-3500-AB-7(a) at 8; GX-3500-AB-11(a) at 3; GX-3500-AB-13(a) at 10.) Had Napout's counsel sought to prove that Burzaco was not in fact in Asuncion, Paraguay for the October 2014 CONMEBOL meeting, they could have sought the immigration records and flight manifests submitted with their post-trial motions long before the close of the government's case in chief.

Moreover, even assuming that Napout did not have sufficient "actionable" information to obtain the immigration records and flight manifests until Burzaco testified at trial, the Court still finds a lack of due diligence. Burzaco testified on November 15, 2017 that he had traveled to Asuncion, Paraguay in October 2014 with Luis Segura. (Tr. 568-576.) The record shows that

Napout's counsel then waited until nearly three weeks later, on December 5, 2017, to seek the immigration records attached to Napout's motion. Had Napout's counsel sought those records sooner, they would have been able to obtain not only the immigration records, but also the flight manifests, before the close of the government's case in chief. Napout could then have called Burzaco during the defense case and impeached him with the records at that time.[21]

Second, and in any event, the Court finds that the immigration records and flight manifests in question are not likely to have resulted in an acquittal. The immigration records indicate that Burzaco did not pass through an immigration checkpoint in Paraguay in October 2014. The flight manifests further suggest that Burzaco did not travel with Luis Segura on October 24, 2014, in the private jet, to Asuncion, Paraguay, and also that Burzaco did not leave Asuncion, Paraguay with Segura that same day. Nonetheless, the Court cannot conclude, based on these documents alone, that the jury would have discredited Burzaco's testimony about speaking with Napout and Del Nero about the bribery schemes around the time of the October 2014 CONMEBOL meeting. As the government argues, had Napout impeached Burzaco with the documents in question during trial, it is unlikely that Burzaco or the government would have simply conceded that Burzaco was lying about his conversation with Del Nero and Napout.[22] Just as the government has done in its

---

[21] Furthermore, even assuming that Napout was unable to obtain the immigration records in question until December 6, 2017, the Court rejects the notion that Napout exercised due diligence to obtain the flight manifests before the close of trial. At no time did Napout notify the Court that Burzaco's testimony during trial raised a new avenue for impeachment that could not have been known until trial. Had Napout's counsel raised the present issue during trial, the Court would have had an opportunity to consider other remedies, short of a new trial, to allow Napout's counsel additional time to complete its investigation into the flight records associated with Segura's and Burzaco's alleged travel to Asuncion, Paraguay in October 2014.

[22] Burzaco testified for nearly four trial days, during which he was subjected to extensive and aggressive cross-examination by all three Defendants' counsel. (Tr. 226-953.) The jury consequently had ample opportunity to assess his credibility.

post-trial briefing, the government would presumably have challenged the reliability of the documents in question and argued, among other things, that it was common for delegations from Brazil and Argentina to enter Paraguay for CONMEBOL meetings without passing through immigration. (Govt. Br. at 62-63 (citing Tr. 289).) Given the inconclusiveness of the immigration records and flight manifests, as well as the other evidence of Napout's guilt, which the government has summarized in its opposition brief (*id.* at 64-65), the Court cannot conclude that the "newly discovered" evidence would "likely" have resulted in an acquittal.

For these reasons, the Court denies Napout's motion for a new trial on the ground of newly discovered evidence.

### D. Marin's Motion for Acquittal

Marin moves for a judgment of acquittal as to each of his convictions on a single ground: Marin argues that each of his wire fraud conspiracy and money laundering conspiracy convictions must be vacated based on the government's failure to present sufficient evidence of a *quid pro quo* exchange of money for an official act by him.

### 1. Wire Fraud Conspiracy (Counts Two, Four, and Six)

Marin was convicted of conspiracy to commit honest services wire fraud with respect to the Copa Libertadores tournament (Count Two), the Copa do Brasil tournament (Count Four), and the Copa America tournament (Count Six).

Among other elements, the crime of conspiracy to commit honest services fraud requires a showing that the defendant accepted, or agreed to accept, a secret payment in exchange for an "official act." *United States v. Silver*, 864 F.3d 102, 118-19 (2d Cir. 2017). As the Second Circuit recently held, an "official act," within the meaning of the honest services fraud statute, means a formal exercise of authority on a matter that is pending, or which may be pending, before the

institution on whose behalf the defendant is authorized to act. *Id.* (citing *McDonnell v. United States*, 136 S. Ct. 2355, 2365-66 (2016)). Further, the "matter" in question must be "specific and focused," akin to a hearing, lawsuit, or other concrete matter that comes before the institution in question. *Id.* at 119.

In this case, the jury was instructed that, in order to find that Marin breached his fiduciary duty to a soccer organization, it must find the existence of an actual or agreed-upon *quid pro quo* exchange of things of value for "official action". (Tr. 4603.) The jury was further instructed on the definition of an "official act":

> The term official act includes the decision or action on a matter involving the formal exercise of the organization's power akin to awarding a contract or instituting a lawsuit. The term official act also includes using one's official position to exert pressure on another official to perform an official act. The term also includes using one's official position to advise to another official, knowing or intending that such advice . . . will form the basis for an official act by another official. Standing alone, setting up a meeting and calling another official or hosting an event is not an official act. This is not to say that setting up a meeting, calling another official or hosting the event is irrelevant. If an official sets up an act, a meeting, hosts an event or makes a phone call on a question or matter that is or could be pending before another official, that can serve as evidence of an agreement to take an official act. Whether or not an official took an official act or agreed to do so is a question of fact for . . . you [to] determine like any other fact question.

(Tr. 4603-4604.)

Marin concedes that the above instruction was "[c]onsistent with" the standards articulated in *McDonnell*. (Marin Br., Dkt. 887-1, at 5.) However, Marin contends that "the government's proof at trial failed because it never showed that Mr. Marin participated or agreed to participate in a *quid pro quo* arrangement in connection with the three soccer tournaments at issue: the Copa Libertadores, the Copa do Brasil[,] and the Copa America." (*Id.*)

### a. Copa Libertadores

Marin argues that, although the government presented evidence that Marin agreed to receive personal payments in connection with the Copa Libertadores, the government failed to

prove the requisite *quid pro quo* because there was "scant testimony about what Mr. Marin was to provide in exchange for these payments." (*Id.* at 6.) Further, Marin argues, the only evidence that Marin provided anything in return for these payments are the minutes of a CONMEBOL Executive Committee meeting on October 24, 2012, during which Marin expressed support for the extension of a media-rights contract with Burzaco's media company, Torneos, for the Copa Libertadores. (*Id.* at 6-7 (citing GX No. 1352-T).) According to Marin, this "mere expression of support . . . does not qualify as an official act under *McDonnell*." (*Id.* at 7.)

Viewing the record as a whole, however, the Court finds that the evidence presented at trial was more than sufficient for a rational jury to find the requisite *quid pro quo* agreement involving an official act in connection with the Copa Libertadores tournament. At trial, Burzaco testified that, when he became an active manager of Torneos in 2006, the company was making annual bribe payments to various CONMEBOL officials in exchange for media rights in connection with the Copa Libertadores tournament, including the president of the Argentine Football Association, Julio Grondona. (Tr. 295.) Burzaco testified that Torneos made these annual "bribe" payments to Grondona "[i]n exchange for his support; in exchange for a continuous extension of such contracts; in support for, in some cases, keeping away certain competitors." (Tr. 290.) Burzaco further testified that he made similar bribe payments, in connection with the Copa Libertadores, to other CONMEBOL officials, including the president of the CBF, Riccardo Teixiera. (Tr. 299.) As of 2006, Torneos was paying Teixiera $600,000 in bribes for each annual edition of the Copa Libertadores. (*Id.*) Torneos continued to make annual bribe payments to Teixiera, among others, throughout the time Teixiera was the president of the CBF. (Tr. 354.)

Burzaco then explained how Torneos came to expand its bribe payments to other CONMEBOL officials to secure its continued media rights in connection with the Copa

Libertadores. The impetus for these payments, Burzaco testified, was a conversation with Grondona, during which Grondona informed Burzaco that certain CONMEBOL officials were considering whether to terminate the existing media-rights contract with Torneos for the Copa Libertadores. (Tr. 331.) Grondona informed Burzaco that if Torneos wished to ensure that CONMEBOL would not terminate its contract for the Copa Libertadores, Torneos would need to make bribe payments to additional CONMEBOL officials who had not been receiving the kind of annual bribes that Grondona, Teixiera, and other soccer officials had been receiving. (Tr. 332.) In the end, Burzaco agreed that "this group of six presidents . . . [would] be included in the bribe payments" going forward. (Tr. 334.)

Finally, Burzaco explained how Marin came to accept bribes in connection with the Copa Libertadores. According to Burzaco, when Teixiera resigned from his position as the president of the CBF in March or April 2012, Torneos began to make the same annual bribe payment of $600,000 to Teixiera's successors, Del Nero and Marin. (Tr. 354.) Burzaco testified that, according to Teixiera, Del Nero and Marin were to have "the same empowerment and decision-making together with [respect to] Argentina and CONMEBOL's decision[s] . . . regarding the Copa . . . Libertadores." (Tr. 355.) Burzaco explained that this arrangement was agreed upon at a meeting in CONMEBOL's branch office in Buenos Aires in or around April 2012, which was attended by Burzaco, Grondona, Del Nero, Marin, and two other men. (Tr. 355-356.) During the meeting, "[t]he agreement was reached . . . that Marco Polo Del Nero and Jose Maria Marin were going to collect starting from that year $600,000 per year, a total amount for Copa Libertadores and [Copa] Sudamericana . . . ." (Tr. 356.) Two or three months later, Burzaco met again with Del Nero and Marin in Buenos Aires, and the men confirmed that Del Nero and Marin "must help [Burzaco] and Torneos and confirm[ed] that they were starting to collect the $600,000" for the

Copa Libertadores and Copa Sudamericana tournaments. (Tr. 357.) Following this meeting, Burzaco in fact paid annual bribes to Marin in connection with the Copa Libertadores. (Tr. 359.)

Viewing the foregoing evidence in the light most favorable to the government, a rational trier of fact could have found, beyond a reasonable doubt, that Marin entered into an agreement to receive bribe payments in exchange for official action, namely, approving the ongoing contractual relationship between Torneos and CONMEBOL in connection with the Copa Libertadores. Although Marin focuses on the government's failure to connect the bribe payments made to Marin with a specific media contract, the full record, construed in the government's favor, shows that Torneos entered into agreements with each of the bribe recipients (including Marin) to make annual bribe payments in exchange for the assurance that CONMEBOL would not prematurely terminate Torneos's media rights in connection with the Copa Libertadores and would continue to extend Torneos's contracts as the opportunity arose. Importantly, because Marin was charged with conspiracy, the government was not required to show that Marin took any official action in exchange for the bribe, simply that he agreed to take an official action in exchange for the bribe. The jury was entitled to view Marin's "expression of support" for the extension of Torneos's Copa Libertadores media-rights contract, even if not an "official act" in itself, as evidence of Marin's agreement and intent to participate in the bribery conspiracy. In sum, the evidence was more than sufficient for the jury to find a *quid pro quo* agreement involving an official action—*i.e.*, the awarding and maintaining of media contracts—in connection with the Copa Libertadores.

### b. Copa do Brasil

At trial, cooperating witness Jose Hawilla testified concerning the CBF's award of media rights for the Copa do Brasil tournaments to be played each year from 2009 through 2022. Hawilla testified that his company, Traffic, paid bribes in or around 2009 to the president of the CBF,

Riccardo Teixiera, in exchange for certain broadcasting rights for the 2009, 2010, 2011, 2012, 2013, and 2014 editions of the Copa do Brasil. (Tr. 2794.) Thereafter, when Traffic stopped making bribe payments to Teixiera, Teixiera sold the media rights for future editions of the Copa do Brasil, starting with the 2015 edition, to a competing media company, Klefer, which was owned by Mr. Kleber Leite. (Tr. 2797.)

Hawilla began working as a government cooperator in or around May 2013. (Tr. 2758.) While cooperating with the government, Hawilla recorded several phone conversations and in-person meetings with members of the conspiracy alleged in the indictment, including Leite. (Tr. 2760, 2824-2825.) On one of the audiotapes, Leite told Hawilla that there was an agreement to pay bribes in connection with Klefer obtaining media rights for the Copa do Brasil for 2015 through 2022.[23] (Tr. 2822.) Leite confirmed to Hawilla that Teixiera, Del Nero, and Marin had each received $500,000 in exchange for the award of media rights to Klefer for the Copa do Brasil from 2015 to 2022. (Tr. 2824.) Leite also told Hawilla that he (Leite) had written down the bribe commitments ($1.5 million split among Teixiera, Del Nero, and Marin) on a handwritten note and placed the note in a safe in his offices at Klefer. (Tr. 2826.)

On April 30, 2014, while still cooperating with the government, Hawilla recorded an in-person conversation with Marin. (GX 1709-T.)[24] During the conversation, Marin confirmed that he had agreed to receive bribe payments in connection with upcoming editions of the Copa do Brasil and the Copa America. (*Id*.) Marin complained to Hawilla that he had not received a large

---

[23] Leite shared this information with Hawilla because Leite and Hawilla had an agreement to cooperate together in broadcasting the Copa do Brasil and share the profits equally. (Tr. 2820-2822.)

[24] The suffix "-T" in GX 1709-T denotes that the exhibit is a certified English-language translation of the audio recording in question.

bribe payment owed to him in connection with the Copa do Brasil.[25]  (*Id.*)  Hawilla said that he would look into the issue, and Marin replied that, if the payments were made as agreed, Marin would call Hawilla to confirm by saying "Yes, Cup in Brazil, all well, everything is fine."  (*Id.*) By contrast, if Marin were to "say nothing," then Hawilla would "already know that [everything] is not [fine]."  (*Id.*)

Notwithstanding this evidence, Marin argues that "neither Hawilla nor any other witness provided any testimony with respect to a *quid pro quo* agreement between Traffic or Klefer and Mr. Marin, nor that Marin had any understanding of what he or others in the alleged conspiracy were to do in exchange for any benefit."  (Marin Br. at 8.)  Therefore, Marin argues, there was insufficient evidence from which a jury could infer the requisite *quid pro quo* agreement.  (*Id.*)

The Court finds, however, that Marin takes too narrow a view of the evidence presented against him.  Viewing this evidence in the light most favorable to the government, the Court finds that a rational jury could have concluded, beyond a reasonable doubt, that when Marin became the president of the CBF, he continued Teixiera's practice of requiring bribe payments to award media contracts to, or maintain them with, Klefer or Traffic for the Copa do Brasil tournament.  In particular, Marin's knowledge that he was owed certain payments in connection with the Copa do Brasil, and his statement to Hawilla that he would double-check the transmission of the payments, strongly corroborates Hawilla's testimony that in order for Traffic or Klefer to obtain and maintain the media rights for the Copa do Brasil, Hawilla would need to ensure that Marin received the bribe payment he was promised.  That the government did not offer direct proof of the mechanism that Marin might use to enforce that promise—such as by terminating the contract with Klefer, or

---

[25] Although Leite told Hawilla in another recorded conversation that Teixiera, Del Nero, and Marin each were to receive $500,000, Marin told Hawilla during the April 30, 2014 recorded conversation that he was owed $900,000 at that time.

by ensuring that neither Klefer nor Traffic received media rights for future editions of the Copa do Brasil—does not negate the reasonable inference that an agreement existed between Traffic, Klefer, and Marin that media rights to the Copa do Brasil were premised on the payment of secret bribes to Teixiera, Del Nero, and Marin.

### c. Copa America

During the trial, Burzaco testified at length about the secret bribe payments made in connection with CONMEBOL's award of media rights for the 2015, 2019, and 2023 Copa America tournament, as well as the 2016 Copa America "Centenario" tournament, which was to be played in the United States. In broad overview, the principals of media companies Full Play (Hugo and Mariano Jinkis), Traffic (Jose Hawilla), and Torneos (Alejandro Burzaco) formed a joint venture, Datisa, with the understanding that they would pay $15 million in bribes to decision-makers at CONMEBOL, including Marin, in order to cause CONMEBOL to grant certain media rights to Datisa for the 2015, 2019, and 2023 editions of the Copa America. (Tr. 388-392.) There was also an additional commitment of the same bribe amounts, to the same soccer officials, to secure media rights for the 2016 Copa America Centenario. (Tr. 461.)

Among the bribe commitments made, Datisa agreed to pay $3 million to be divided between Del Nero and Marin. (Tr. 421.) In May 2013, Burzaco was in London and met with both Del Nero and Marin to discuss various bribe commitments, both in connection with the Copa Libertadores and the Copa America. (Tr. 498-500.) During that meeting, Del Nero and Marin complained to Burzaco that the bribe payments they were owed for the Copa Libertadores had not been paid on time, and they also clarified to Burzaco that the bribe payments they would receive for the Centenario tournament—$3 million split between them—would be separate, and in addition to, the bribe payments they were to receive in connection with the Datisa contract for the 2015,

2019, and 2023 Copa America tournaments. (Tr. 500.) Burzaco confirmed that they would receive separate bribe payments for each of those editions of the Copa America. (*Id.*) Burzaco in fact made those bribe payments through Torneos, as documented in detailed ledgers maintained by his administrative manager, Eladio Rodriguez. (Tr. 500-501, 577.)

In exchange for these bribe commitments and payments, an agreement was reached between Datisa and CONMEBOL granting media rights to Datisa for the 2015, 2019, and 2023 Copa America tournaments, as well as rights of first refusal on subsequent Copa America tournaments after 2023. (Tr. 496.) Marin signed the agreement on behalf of CONMEBOL. (*Id.*)

Marin argues that the government failed to prove the requisite *quid pro quo* agreement in connection with the Copa America because, "[w]hile Mr. Marin plainly signed the contract" granting media rights to Datisa, "there was nothing in the record to demonstrate that he said or did anything indicating his participation in a *quid pro quo* agreement with Datisa or its owners in exchange for that signature." (Marin Br. at 8-9.) However, this argument simply ignores the evidence, summarized above, indicating that Marin, Del Nero, and the other CONMEBOL decision-makers caused CONMEBOL to enter into the agreement with Datisa for the 2015, 2019, and 2023 Copa America tournaments with the understanding that they would receive their respective shares of $15 million in bribe payments for those rights. This evidence was more than sufficient for a rational jury to find the requisite *quid pro quo*.

## 2. Money Laundering Conspiracy (Counts Three and Seven)

Marin also seeks a judgment of acquittal on the two counts of money laundering conspiracy for which he was convicted. (*Id.* at 9.) This prong of Marin's motion is premised on the argument that there was insufficient evidence to convict Marin of wire fraud conspiracy. As Marin explains, because "the only predicate 'specified unlawful activity' that was alleged to support the money

laundering conspiracy charge was 'honest services wire fraud,'" a judgment of acquittal on the wire fraud counts would require a corresponding judgment of acquittal on the two counts for money laundering conspiracy. (*Id.*) However, as discussed, the Court denies Marin's motion for a judgment of acquittal on the counts for wire fraud conspiracy, thereby negating the sole basis for Marin's motion for judgment of acquittal on the money laundering counts. Accordingly, the Court denies Marin's motion for judgment of acquittal on Counts Three and Seven.

### 3. RICO Conspiracy (Count One)

Finally, Marin seeks a judgment of acquittal on his conviction for racketeering conspiracy (Count One). Like his motion for acquittal on the money laundering counts, this prong of Marin's motion is predicated on a finding that there was insufficient evidence to support his convictions for wire fraud conspiracy. Again, having rejected that premise by finding a sufficient evidentiary basis for Marin's convictions for wire fraud conspiracy, the Court denies this prong of Marin's motion as well.

### E. Marin's Motion for a New Trial

Marin moves for a new trial pursuant to Rule 33 on the grounds that (1) the Court erred in certain evidentiary rulings, and (2) the verdict was against the weight of the evidence.

### 1. Evidentiary Rulings

Marin contends that the Court erred in five evidentiary rulings, such that allowing the verdict to stand would be a manifest injustice. The Court addresses each of these supposed errors in turn.

### a. Foreign Law

Marin argues that the Court's rulings on the admissibility of foreign law, discussed in detail above, were erroneous on three grounds. The Court addresses each of these arguments in turn.

First, Marin contends that the Court's initial ruling on November 8, 2017—*i.e.*, that evidence of foreign law was categorically inadmissible—"foreclosed entirely a theory of defense" that Marin might have chosen if the Court had issued its December 8, 2017 ruling from the outset. (Marin Br. at 13.)  Marin claims that, once his lawyers presented an opening statement and conducted cross-examination with the theory that Marin did not have any role in the schemes charged in the indictment, he could not "change course midway through trial and present evidence of a good faith basis for soliciting and receiving payments."  (*Id.*)

The Court does not find this argument to make out a credible claim of unfair prejudice. Contrary to Marin's contention, the Court's November 8 ruling did not foreclose Marin from arguing to the jury that he had a good faith belief that the solicitation and receipt of the kinds of payments at issue in this case were permissible.  Indeed, in summations, in addition to arguing that the government had failed to prove that Marin was involved in any bribery scheme, Marin's counsel argued that the government had failed to prove that Marin read any of the FIFA rules that proscribed bribe payments.  (Tr. 4460-4461.)  Had Marin been able to offer additional evidence concerning Marin's knowledge of the FIFA rules on bribery that satisfied the balancing test under Rule 403—including, potentially, evidence that touched on issues of foreign law—his counsel could have drawn on that evidence to bolster his closing argument that the government had failed to prove that Marin knew that bribe payments were prohibited by the FIFA rules.

Second, Marin contends that the Court's December 8, 2017 ruling created unfair prejudice because it was issued after some of the government's witnesses had already completed their testimony in the government's case in chief.  According to Marin, "[i]t would . . . be unfair and prejudicial to expect that, following the December 8 Ruling, Mr. Marin would—even if possible— recall the government's cooperating witnesses just to inquire about the issue of foreign law."

(Marin Br. at 14.)  The Court finds this argument to be without merit.  Marin does not identify any government witnesses from whom he would have elicited any evidence concerning foreign law that satisfied the Court's December 8 ruling, let alone explain how recalling such a witness to answer additional questions during Marin's defense case would have been "unfair and prejudicial."  Had any such potential testimony been known or anticipated by Marin, he could have proffered as much to the Court during trial and recalled that witness for a further examination.[26]

Third, Marin contends that the Court's December 8 ruling was itself erroneous because, Marin argues, it placed Marin in "an impossible Catch-22 situation:  He either had to give up his constitutional right not to testify (and subject himself to cross-examination) or forgo evidence of his good-faith state of mind."  (*Id*.)  In particular, Marin argues, as he argued in prior letter briefing to the Court (Dkt. 842), that the Court should have (i) allowed Marin to cross-examine cooperating witness Jose Hawilla concerning Hawilla's beliefs about whether bribe payments of the kind at issue in this case are illegal under Brazilian law, (ii) allowed Marin to introduce "authoritative [documentary] sources" that would "confirm the fact that the crime of commercial bribery does not exist in Brazil,"[27] and (iii) allowed evidence of the widespread knowledge in Brazil that commercial bribery is not a crime in Brazil.  (Marin Br. at 15 n.7 (citing Dkt. 842; Tr. 3581).)

---

[26] The Court also notes that Marin's argument that the timing of the Court's rulings on the foreign-law issue hindered his defense is belied by the fact that this issue was not part of Marin's defense before trial, as demonstrated by his failure to notify the government and the Court of his intent to introduce foreign-law evidence, as required by Federal Rule of Criminal Procedure 26.1.  *See supra*.  Rather, as the record makes clear, Defendants collectively stumbled upon this entire line of argument only after the government, just weeks before trial, sought to preclude them from making arguments, or introducing evidence, on foreign law because of the potential for jury confusion and nullification.  (Dkt. 718.)  Given these circumstances, Marin's claims that evidence of foreign law was critical to his defense and that the Court prevented him from adequately defending himself ring hollow.

[27] Again, such evidence is plainly of the type Marin would have had to provide notice of before trial, *see* Fed. R. Crim. P. 26.1, which he did not do.

The Court does not agree that its December 8 ruling caused any unfair prejudice to Marin or encroached on his Fifth Amendment right to remain silent. Contrary to Marin's argument, the December 8 ruling did not categorically exclude all evidence of foreign law other than Marin's own testimony. Rather, as the Court stated from the bench and reiterated in a subsequently issued opinion, the Court merely held that the specific evidence concerning foreign law proffered by Marin was insufficiently probative and unduly prejudicial, such that it was inadmissible under the balancing test of FRE 403. As the Court previously explained, the only potential relevance of foreign law was to provide a basis on which Marin could argue that he believed that the bribe payments at issue were not unlawful under Brazilian law, and, therefore, he also believed that the bribe payments were not prohibited by governing FIFA rules. *Napout II*, 2017 WL 6375729, at *12-13. However, the specific foreign-law evidence proffered by Marin was not directly probative of Marin's own beliefs about the FIFA rules; rather, the proffered evidence only related to what the law in Brazil purportedly was or what *other* people believed it to be. Furthermore, even assuming *arguendo* that it would have been reasonable for the jury to infer that Marin believed what other Brazilians believed about the supposed legality of commercial bribery in their country, Marin's proffered evidence still would not have allowed the jury to infer that Marin further believed that his duties to FIFA, CONMEBOL, or the CBF were identical to his obligations under Brazilian law, or that Marin construed those duties based on his understanding of Brazilian law. *See id.* In short, the two inferential leaps necessary to make Marin's proffered foreign law evidence relevant—neither of which would have been reasonable—doom his argument. Thus, the foreign-law evidence proffered by Marin carried virtually no probative value, and any such probative value

was substantially outweighed by the risk of juror confusion or nullification that would arise from suggesting or proving that Marin's conduct was lawful in his home country. *See id.*[28]

### b. References to Marco Polo Del Nero

During the cross-examination of IRS Special Agent Berryman, defense counsel sought to elicit testimony concerning Berryman's knowledge of Marco Polo Del Nero and, in particular, whether he was aware that Del Nero, at that time, continued to hold the position of president of CBF, despite the allegations that he, like Marin, accepted bribes in connection with various international soccer tournaments. (Tr. 3760.) Marin sought to argue based on this testimony that, contrary to the government's theory of prosecution against Marin, FIFA did not in fact have a zero-tolerance policy against bribery. (*Id.*) The Court ruled that Marin was not permitted to elicit the testimony in question, both because it would constitute hearsay and because any probative value of such testimony from Berryman—an agent of the federal government, not an agent of FIFA—would be substantially outweighed by the risk that the jury would speculate about the seriousness with which FIFA enforces its prohibition on bribery. (Tr. 3771-3772, 3775, 3777.) The Court's ruling focused on the incompetence of the evidence and the improper inference the jury might draw from it over the relevance of the issue for which it was being offered.

---

[28] Marin suggests that the Court's decision to exclude the foreign-law evidence he proffered is inconsistent with allowing the government to argue that Marin knew that personal payments were prohibited by the FIFA rules based on FIFA's distribution of its code of ethics. (Marin Br. at 15-16.) There is no such inconsistency. The government's argument that Marin knew the requirements of the FIFA code of ethics is based on the logical inference that Marin was aware of and/or read the rules that were provided to him—as testified to by FIFA's inside counsel (Tr. 138-144)—and that governed his conduct as a FIFA official. By contrast, Marin's argument is based on the unnatural, almost far-fetched, notion that Marin formed a belief about one set of rules, *i.e.*, the FIFA code, based on an entirely different and unrelated set of rules, *i.e.*, Brazilian law—a notion that was thoroughly contradicted by the evidence regarding the measures that Marin and his co-conspirators took to conceal their bribery scheme.

In his motion for a new trial, Marin argues that the Court should have admitted the proposed hearsay evidence pursuant to the Second Circuit's decision in *United States v. Rea*, in which the Second Circuit examined the bounds of "lay opinion" testimony under FRE 701. 958 F.2d 1206, 1215 (2d Cir. 1992). In making this argument, Marin relies on the *Rea* court's recitation of general background principles of lay testimony under FRE 701, including the proposition that a witness giving lay opinion testimony may draw on "a number of objective factual bases from which it is possible to infer with some confidence that a person knows a given fact." (Marin Reply Br., Dkt. 909, at 6 (citing *Rea*, 958 F.2d at 1216).) But the testimony that Marin sought to elicit from Berryman was not opinion testimony; rather, the testimony that Marin sought was merely the objective fact of whether Marco Polo Del Nero continued to serve as the president of the CBF. Accordingly, the principles set forth in *Rea*, which were directed narrowly at the evaluation of opinion testimony under FRE 701, do not apply.

Even assuming the testimony Marin sought to elicit from Special Agent Berryman about Del Nero was not barred as hearsay, it was properly excluded under the balancing test of Rule 403. As the Court explained, the mere fact that FIFA had not yet removed Del Nero from his official position carried minimal probative weight concerning FIFA's zero-tolerance policy for bribery, especially where Berryman was not competent to testify about FIFA's or CBF's disciplinary processes, what information or evidence FIFA or CBF had regarding Del Nero's taking of bribes, or the reasons why Del Nero had not been removed.[29] (Tr. 3764, 3778.) Moreover, even if the Court erred in excluding the testimony in question, any such error would not rise to the level of a

---

[29] Indeed, it is entirely plausible that FIFA, CONMEBOL, or CBF were and are waiting for the government's prosecution of Marin or others to conclude before they proceed against Del Nero. It is equally plausible that the evidence that these organizations need to do so is solely in the government's possession at this time, including the testimony of its cooperating witnesses.

manifest injustice warranting a new trial, given the overwhelming evidence of the lengths to which Marin and his co-conspirators went to conceal the bribery and the absence of any evidence that FIFA condoned bribery.

### c. Dr. Szymanski's Testimony

Like Napout, Marin argues that the Court erred in permitting government expert Stefan Szymanski to testify about the economic impact of the bribe payments on the various soccer organizations at issue. (Marin Br. at 17-18.)  Marin similarly contends that Dr. Szymanski should not have been permitted to testify that bribe payments made to soccer officials in exchange for the award of media-rights contracts result in less money being paid to the soccer organization for its valuable rights because Dr. Szymanski did not review the specific media rights and contracts at issue in this case. (*Id.* at 17.)  For the reasons stated above in denying Napout's identical argument, the Court finds no error, and denies Marin's motion for a new trial based on Dr. Szymanski's testimony.

### d. Undercover Audio Recordings

Marin argues that the Court erred in admitting certain portions of the undercover audio recordings presented at trial. (*Id.* at 18.)  To make this argument, Marin "incorporates" by reference the arguments he made in his memorandum of law in opposition to the government's omnibus *motion in limine*. (Dkts. 718 (Govt. Mot.), 766 (Marin Opp'n).)  In response, the government similarly "refers" the Court to the government's motion to admit the audio recordings in question. (Dkt. 718.)  Given that Marin has not identified a specific error in the Court's prior ruling or offered any new argumentation on this point, the Court denies his motion for a new trial on this ground, for the reasons stated in the Court's prior opinion on this issue. *See Napout II*, 2017 WL 6375729, at *3-8.

### e. Documents Seized at Klefer Offices

Marin argues that the Court erred in permitting the government to introduce certain handwritten and typed notes found in the offices of Klefer, on the ground that the government failed to properly authenticate them. (Marin Br. at 19.) Under FRE 901(a), the government was required to "produce sufficient evidence to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). This standard is met when "sufficient proof has been introduced so that a reasonable jury could find in favor of authenticity or identification." *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) (internal quotation marks omitted).

At trial, the government called Jose Schettino, a federal prosecutor from Brazil, to authenticate the documents in question. Schettino testified that, on the day after the unsealing of the first indictment in this case, his colleague received a request from the U.S. government to conduct a search of Klefer's offices. (Tr. 2572-2573.) Schettino obtained a warrant to search Klefer's offices and assisted a colleague in overseeing a team of Brazilian federal police who executed the warrant. (Tr. 2573.) Schettino did not review every document that was seized, but he had a recollection of certain documents that were seized. (Tr. 2576.) Among other things, the search team found a cache of documents stored in a safe inside the office of Klefer's owner, Kleber Leite, one of Defendants' alleged co-conspirators. (Tr. 2575.) Schettino testified that the search team placed the documents into evidence bags and sealed them, after which the documents were stored as evidence before being transported to a Brazilian court, until they could be transported to the United States. (Tr. 2579.) Schettino could not say with certainty that the documents proffered by the government were the same documents that had been removed from the offices of Kleber Leite because he did not read each document during the search. (Tr. 2579-2580.) But Schettino testified that the folders in which the documents were stored—which bore Klefer's name and

logo—were consistent with the folders used by Brazilian law enforcement and that the documents in question were "consistent with the type of documents that were seized" from Leite. (Tr. 2606.) Schettino also remembered certain documents with specificity. (Tr. 2581.) The government did not produce a chain-of-custody record for the documents in question. (Tr. 2593-2594.)

Based on Schettino's testimony and the contents of the documents themselves, the Court finds no error in its ruling at trial that the authentication requirements of FRE 901(a) were satisfied. To be sure, and as the Court acknowledged when ruling from the bench, the authentication would be stronger if the government had produced, for example, a full record of the chain of custody. (Tr. 2616-2617.) But this fact went to the weight, and not the admissibility, of the documents, and Marin was free to argue to the jury about the documents' uncertain provenance. Nonetheless, Schettino's testimony, combined with the self-authenticating nature and contents of the documents themselves—some of which contained reference to the soccer tournaments at issue in this case[30]— were sufficient to satisfy the requirements of FRE 901(a).

### 2. Weight of the Evidence

Finally, Marin moves for a new trial on the ground that the jury's verdict was against the weight of the evidence. A court may grant a new trial upon a finding that the jury's verdict was contrary to the weight of the evidence. *See Sanchez*, 969 F.2d at 1413. However, the standard for granting a new trial on this ground is a stringent one: generally, a court will not grant a new trial based on the weight of the evidence unless the Court concludes "that an innocent person may have been convicted." *Id.* at 1414.

---

[30] As previously discussed, Leite told Hawilla that he had made handwritten notes of the bribe commitments to Marin, Teixeira, and Del Nero, and had stored the notes inside a safe in his office at Klefer, where the notes were, in fact, found.

In support of this prong of his motion for a new trial, Marin incorporates by reference the insufficiency-of-evidence arguments he made in support of his motion for acquittal. (Marin Br. at 20.) Other than those arguments, Marin does not offer any additional reasons to believe that the jury's verdict was contrary to the substantial evidence. In denying Marin's motion for a judgment of acquittal, the Court has considered and, ultimately, rejected those arguments. Thus, for the same reasons stated in that section of this opinion, the Court denies Marin's motion for a new trial based on the weight of the evidence.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant Napout's and Marin's motions for judgment of acquittal and for a new trial.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: June 22, 2018
      Brooklyn, New York