WRITER'S DIRECT DIAL NO.
**(202) 538-8151**

WRITER'S EMAIL ADDRESS
**benoneil@quinnemanuel.com**

August 6, 2018

The Honorable Pamela K. Chen
U.S. District Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. José María Marín* – Docket No. 15-cr-252 (PKC)

Dear Judge Chen:

We write on behalf of the *Confederación Sudamericana de Fútbol* ("CONMEBOL") in support of its request for restitution from the convicted defendant José María Marín in connection with his upcoming sentencing.[1]

Defendant Marín previously served on CONMEBOL's Executive Committee, and he grossly abused his position of trust to personally enrich himself and his co-conspirators, while causing significant direct and proximate harm to the South American soccer confederation. After a lengthy jury trial in the U.S. District Court for the Eastern District of New York, Marín was found guilty on December 22, 2017 of six criminal counts:  RICO conspiracy (Count One); conspiracy to commit wire fraud in connection with CONMEBOL's *Copa Libertadores* tournament (Count Two); conspiracy to commit money laundering in connection with the *Copa Libertadores* tournament (Count Three); conspiracy to commit wire fraud in connection with the *Copa do Brasil* tournament (Count Four); conspiracy to commit wire fraud in connection with

---

[1]     The actions attributed to Marín in this victim impact statement are based upon (1) the Indictment filed in *United States v. Webb et al.*, 15-cr-252, Dkt. No. 1 (E.D.N.Y. May 27, 2015) (the "Original Indictment"); (2) the Superseding Indictment filed in that case, Dkt. No. 102 (Nov. 25, 2015) (the "Superseding Indictment"); (3) the Second Superseding Indictment filed in that case, Dkt. No. 604 (June 14, 2017) (the "Second Superseding Indictment" or "S-2 Indictment"); (4) the transcript of Marín's criminal trial presided over by the Honorable Judge Pamela K. Chen of the U.S. District Court for the Eastern District of New York ("Marín Trial Transcript"); (5) CONMEBOL's internal investigation directed by Quinn Emanuel with the assistance of forensic accountants from Ernst & Young; and (6) public media.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON
LONDON | TOKYO | MANNHEIM | STUTTGART | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

07052-00001/10325994.2

CONMEBOL's *Copa América* tournament (Count Six); and conspiracy to commit money laundering in connection with the *Copa América* tournament (Count Seven).[2]

CONMEBOL has suffered considerable financial harm, including, but not limited to: (1) more than $6.5 million dollars in unlawful bribes paid directly to Marín when those financial sums should have instead accrued to CONMEBOL in the form of legal payments corresponding with higher contract prices for soccer tournament marketing and media rights; (2) losses for salaries and benefits paid to Marín during the period he was breaching his ethical duties to CONMEBOL; (3) attorney fees and accountant fees incurred in connection with CONMEBOL's internal investigation and substantial cooperation with the criminal investigations into the illegal actions of Marín and his co-conspirators; as well as (4) possibly hundreds of millions of dollars in lost revenues that would have accrued to CONMEBOL if Marín and his co-conspirators had created a legitimate tender process to ensure the soccer confederation would obtain the actual fair market value of the marketing and media rights for numerous editions of *Copa América*, *Copa Libertadores*, and other soccer competitions to which CONMEBOL owns the exclusive legal rights.

Through their self-serving misconduct, Marín and his co-conspirators have impaired CONMEBOL's ability to use its resources for positive action throughout South America, and to meet its mission of developing the game of soccer. As the primary victim of the financial fraud crimes committed by Marín and his co-conspirators, CONMEBOL is entitled to recover restitution under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A *et seq.*[3] We understand that, to date, the United States Government has ensured the forfeiture of more than $300 million in assets and has identified, recovered, or frozen more than $100 million in the United States and abroad relating to the defendants' unlawful schemes.[4] These funds should be used to compensate all of the victims of Marín's crimes, especially the primary victim CONMEBOL, so that new leaders can repair the damage that the old guard has done to the South American and international soccer communities.

## I.   CONMEBOL BACKGROUND

To appreciate the importance of restitution in this matter, it is necessary to understand the history and international reach of CONMEBOL. For more than a century, committed leaders of South American soccer have worked tirelessly to promote both excellence in sports and shared values throughout a diverse continent. By contrast, convicted defendant Marín and his co-conspirators have personally enriched themselves at the expense of soccer players, soccer fans, and communities throughout South America. In the years to come, CONMEBOL will reinvest any restitution funds that may be granted in the present cases to build more soccer fields, expand educational and sporting opportunities for the region's youth, and, hopefully, to once again host

---

[2]      *See* Jury Verdict Sheet, Dkt. 873.

[3]      Funds seized from and forfeited in these actions should be used first to compensate victims, either as restitution under the MVRA or through remission or restoration under 28 C.F.R. Part 9.

[4]      *See* Press Release, U.S. Dep't of Justice, *Sixteen Additional FIFA Officials Indicted For Racketeering Conspiracy And Corruption* (Dec. 3, 2015), *available at* https://www.justice.gov/usao-edny/pr/sixteen-additional-fifa-officials-indicted-racketeering-conspiracy-and-corruption.

a World Cup tournament in 2030 on the same continent where that storied competition was first celebrated one hundred years earlier.

### A. CONMEBOL Has Been a Global Force for Good, Inspiring People Throughout South America and Beyond to "*Cree[r] en Grande.*"[5]

CONMEBOL is a not-for-profit organization with the goal of "[p]romot[ing] soccer in South America with a spirit of peace, understanding and fair play, [and] without discrimination based on politics or gender, religion, race or any other reason."[6]  Founded in 1916, CONMEBOL's historical and cultural roots in South America reach almost as far back as the sport's existence on the continent.  Over the past hundred years, soccer has flourished in South America largely due to CONMEBOL's efforts to promote the sport, which has become one defining feature of popular culture that unifies communities from the Andes mountains to the Amazon jungle to some of the largest and most modern cities in the world.

The first ever FIFA World Cup tournament was hosted by Uruguay in 1930, thus beginning an impressive history of CONMEBOL member nations hosting and winning World Cup championships.  Brazil hosted the World Cup in 1950, Chile hosted in 1962, Argentina hosted in 1978, and Brazil hosted for a second time in 2014.  In terms of world championships, no country anywhere can match the record of Brazil, which has won the World Cup on five separate occasions.  Argentina and Uruguay have won the World Cup championship twice each.

South America's well-known history of producing some of the world's best teams and individual soccer players – from *Pelé* and *Diego Maradona* during the past century to *Lionel Messi* this century – has made the CONMEBOL-sponsored tournaments easily adaptable to international television audiences in every corner of the globe.  Having built a highly successful foundation in South America, CONMEBOL began inviting teams from North America, Central America, and Asia to compete against South American national teams in the *Copa América* in the 1990s.  By opening up its oldest and most popular CONMEBOL tournament to unify the entire Western Hemisphere, and spread its camaraderie and competition to Asian nations, CONMEBOL has continued its legacy as a trailblazer for international soccer.  Indeed, by the 2000s, CONMEBOL's *Copa América* had become one of the world's most watched sporting events – the 2011 tournament garnered a cumulative audience of over five billion people across the world.[7]

The market in the United States has been no exception to CONMEBOL's tremendous success.  As the U.S. television audience for soccer is increasingly comprised of a fast growing Hispanic immigrant fan base, the demand for television broadcasts of  CONMEBOL's *Copa América* and other CONMEBOL events has surged to record levels.  Recognizing this trend,

---

[5]     *See* CONMEBOL.com video, "*Cree en Grande*" (May 17, 2017), *available at* https://www.youtube.com/watch?v=KiWea-_ZtH4 (close translation is "Believe in Big Things").

[6]     CONMEBOL Governing Statute, quote *available at* http://www.conmebol.com/en/content/fifas-technical-conference-dr-manuel-burga-exposes-conmebols-plans-development-football.

[7]     Paul Sargeant, *Football corruption: Who bought the Copa America?*, BBC News (June 11, 2015), http://www.bbc.com/news/world-latin-america-33087370.

CONMEBOL hosted a special tournament in 2016 called *Copa América Centenario* – commemorating the 100 year anniversary of the *Copa América* – and the games were played in ten cities across the United States. A record crowd of more than 80,000 soccer fans packed the MetLife Stadium in New Jersey to watch the final between Chile and Argentina.[8] Moreover, television viewership in the United States alone surpassed more than 100 million people who watched a *Centenario* tournament game on either the Univision or Fox Sports networks,[9] demonstrating clearly the appeal of CONMEBOL's competitions in the United States.

Although CONMEBOL's soccer tournaments have become a global phenomenon with worldwide television viewership, the confederation re-invests 91 percent of its revenues at home through a combination of CONMEBOL programs to develop soccer and support communities in South America and prize money for local teams that win CONMEBOL tournaments.[10] In that regard, defendant Marín and his co-conspirators have stolen directly from the people of South America. The following are simply a few recent examples of CONMEBOL's contributions to strengthening South American communities, all of which could have been funded in even larger amounts if defendant Marín had not diverted funds to enrich himself and his co-conspirators:

- CONMEBOL partnered with UNICEF and the Vatican's education and sports charity – "*Scholas Occurrentes*" – to launch an initiative to increase impoverished children's access to education, with an emphasis on teaching values through soccer. The partnership received a blessing from the Holy Father, Pope Francis (a lifelong fan of Argentine soccer), as well as significant financial backing from CONMEBOL. The confederation donated $10,000.00 for every goal and penalty score during the entire 2015 *Copa América* tournament – 59 goals translated to a $590,000.00 donation – and will continue this "Goals for Hope" pledge in future editions of the CONMEBOL tournament.[11]

- CONMEBOL has sponsored thousands of women's soccer matches over many decades as part of the Confederation's efforts to expand the sport and create opportunities for women to excel as athletes and leaders. For example, since 1991, CONMEBOL has organized the *Copa América Femenina* as South America's qualifier for the Women's World Cup. Because CONMEBOL recognizes that more investment is needed to create equal opportunities for future generations of women leaders, CONMEBOL has also regularly hosted two women's youth tournaments – the "*Campeonato Sudamericano Femenino Sub-17*" and "*Femenino Sub-20*" – allowing young women to compete on behalf of their national soccer teams for the South American championship that qualifies for additional international tournaments. Moreover, CONMEBOL recognizes that women have an important role in organizing

---

[8]     Andrew Keh, *Lionel Messi and Argentina Miss Again as Chile Wins Copa América*, N.Y. Times, June 27, 2016, at D1.

[9]     Sergei Klebnikov, *Successful Copa America 2016 Smashes Records*, Forbes, June 26, 2016, *available at* https://www.forbes.com/sites/sergeiklebnikov/2016/06/26/successful-copa-america-2016-smashes-records/#5c3daf077640.

[10]     *Copa América, la fuente de riqueza de la Conmebol*, La Opinion (Apr. 6, 2016), http://www.laopinion.com/2016/06/04/copa-america-la-fuente-de-riqueza-de-la-conmebol/.

[11]     *Goals for Hope*, CONMEBOL (Apr. 21, 2015), http://www.conmebol.com/en/04212015-1239/goals-hope.

men's soccer as well, and the confederation was proud to celebrate a historic first for women referees when Claudia Umpierrez, a lawyer in her primary profession, became the first woman to referee a men's professional soccer match in Uruguay.[12]

- CONMEBOL donated more than $100,000.00 U.S. dollars to help repair and rebuild soccer fields in the immediate aftermath of the 8.8 magnitude earthquake that devastated Chile in 2010. However, even more important than the initial donation, CONMEBOL demonstrated important symbolic and financial solidarity with Chile by granting the nation's request to move the 2015 *Copa América* from its originally scheduled location in Brazil and instead award Chile the prestigious hosting rights. In the end, Chile not only hosted a successful tournament, it also won that year's *Copa América* on its home fields, thus providing an entire nation with a greatly needed boost in morale after surviving several very difficult rebuilding years.[13]

Finally, CONMEBOL member nations have recently launched an impressive joint bid to host the 2030 World Cup in Argentina, Paraguay, and Uruguay, which hosted the very first edition of soccer's most important competition exactly 100 years before.[14] CONMEBOL is confident in its member associations' ability to organize a successful World Cup, and indeed, a significant restitution order in the present cases would allow CONMEBOL to invest in the soccer infrastructure that will for many years host the highest caliber soccer matches in the world. With these big and ambitious plans for the future, CONMEBOL's new leadership has publicly pledged to "*Creer en Grande*."

### B. Marín Abused His Position of Authority at CONMEBOL, and the Confederation's New Leadership Has Cooperated with Government Investigators and Implemented Reforms to Prevent Future Fraud and Abuse.

During his career in international soccer, Marín held positions of trust and responsibility with a number of organizations, including: (1) a vice president of the Confederação Brasileira de Futebol ("CBF," a CONMEBOL member association) from 2008 to 2012; (2) president of the CBF from 2012 to 2015; and (3) a member of CONMEBOL's Executive Committee from 2012 to 2015. Marín also served on multiple CONMEBOL and FIFA standing committees throughout his career, including the 2014 FIFA World Cup Committee. Per the FIFA Code of Ethics, which applied to Marín in his capacity as a CONMEBOL official, Marín owed a fiduciary duty to the institutions of international soccer.[15]

---

[12] *CONMEBOL and a New Precedent in Women's Refereeing*, CONMEBOL (Mar. 18, 2016), http://www.conmebol.com/en/03182016-1023/conmebol-and-new-precedent-womens-refereeing.

[13] *CONMEBOL Backs Venue Swap for 2015 Copa America*, FoxSports (Aug. 18, 2010), https://www.foxsports.com/soccer/story/conmebol-backs-venue-swap-for-2015-copa-america-65607325-081810

[14] Bobby McMahon, *Uruguay, Argentina And Paraguay Bid For 2030 FIFA World Cup Finals Will Be Hard To Beat*, Forbes (Oct. 4, 2017), https://www.forbes.com/sites/bobbymcmahon/2017/10/04/uruguay-argentina-and-paraguay-bid-for-2030-fifa-world-cup-finals-will-be-hard-to-beat/#22150bc12b2d.

[15] *See* FIFA Code of Ethics § 15 (2012) ("Persons bound by this Code shall have a fiduciary duty to FIFA, the confederations [such as CONMEBOL], associations, leagues and clubs.").

Defendant Marín was arrested in Switzerland on May 27, 2015, on the same day that the Department of Justice unsealed the original indictment charging Marín and several other FIFA conspirators with racketeering conspiracy, among other crimes.[16] On June 14, 2017, the grand jury returned a Second Superseding Indictment ("S-2 Indictment") against Defendant Marín and two of his co-conspirators, which was the operative indictment for the EDNY trial.[17]

During that trial, the Government presented overwhelming evidence of Defendant Marín's guilt, including voice recordings, witness testimony, and bank records, all showing that Marín agreed to receive bribes and kickbacks in connection with CONMEBOL tournaments.[18] For example, jurors heard evidence that within the first months of becoming CBF President, Marín had meetings with co-conspirators to ensure that he would begin receiving the bribe payments related to CONMEBOL's *Copa Libertadores* that his Brazilian predecessor had previously received.[19] However, Marín was not satisfied with the amounts of his initial bribe payments – $300,000.00 per year corresponding to *Copa Libertadores* alone – and approximately six months after becoming CBF President, Marín again met with his co-conspirators in order to demand that his personal bribe payments increase to $450,000.00 per year.[20] Defendant Marín also demanded millions of dollars in bribes related to CONMEBOL's *Copa América*.[21] Once that bribe money arrived in Marín's accounts, he would make withdrawals for expensive purchases at luxury stores, including $20,000 at once in an *Hermès* boutique in Paris, $50,000 at *Bulgari* in Las Vegas, and over $20,000 at *Chanel* in New York and Florida.[22] On December 22, 2017, Marín was found guilty of six criminal counts including conspiracy to commit racketeering, as well as conspiracy to commit wire fraud in corruption of two of CONMEBOL's tournaments, the *Copa América* and *Copa Libertadores*.[23]

The conclusion of the EDNY trial and the upcoming sentencing hearings for dozens of culpable individuals have created the opportunity for a new chapter in CONMEBOL's history. Indeed, upon taking office after much of the confederation's prior leadership was arrested, CONMEBOL's new and current president, Alejandro Domínguez, remarked that the organization had devolved into a "personal fiefdom" and "was managed at the discretion of certain people and which was never held to account."[24] Recognizing the scope of the problems created by his predecessors, President Domínguez and the new leadership team have launched expansive reforms to CONMEBOL's management. To begin, Domínguez hired the attorneys from Quinn Emanuel and forensic accountants from Ernst & Young to uncover the fraud and corruption from the confederation's prior officials, and the results of that internal investigation

---

[16]     *See* Press Release, U.S. Dep't of Justice, *Nine FIFA Officials and Five Corporate Executives Indicted for Racketeering Conspiracy and Corruption* (May 27, 2015), https://www.justice.gov/opa/pr/nine-fifa-officials-and-five-corporate-executives-indicted-racketeering-conspiracy-and.

[17]     S-2 Indictment, Dkt. 604.

[18]     *See* Gov. Exhibit 623, the Eladio Rodriguez bribe ledger.

[19]     *See* Alejandro Burzaco testimony, Marín Trial Transcript at 254-358.

[20]     *Id.*

[21]     *See* Alejandro Burzaco testimony, Marín Trial Transcript at Tr. 500.

[22]     *See* Government Exhibit 511C.

[23]     *See* Jury Verdict Sheet, Dkt. 873.

[24]     Press Conference, Remarks of Alejandro Dominguez, Buenos Aires, Argentina (Aug. 24, 2016), http://www.efe.com/efe/english/sports/dominguez-conmebol-had-been-run-as-personal-fiefdom/50000266-3022046.

were shared in exhaustive detail with the U.S. Attorney's Office for the Eastern District of New York to facilitate the convictions or guilty pleas of many defendants like Marín. Moreover, in September 2016, CONMEBOL's new Executive Committee unanimously passed amendments to its governing statutes adding new measures to increase transparency and prevent corruption. For example, CONMEBOL's budgets are now fully available to the public.[25]

In addition, CONMEBOL's new leadership has addressed the previous lack of free market competition in the sale of marketing and media rights for its soccer tournaments. CONMEBOL has recently launched a new tender process to re-bid the marketing and media rights associated with the 2019 and 2023 editions of the *Copa América*, and these new tenders will be audited by outside accountants at Ernst & Young to ensure they reflect a fair market price obtained through a transparent process. All of these accountability reforms help better ensure that any restitution order from the Eastern District of New York in the present cases will be invested effectively in South America in advance of the true purpose of CONMEBOL: to promote soccer with a spirit of peace, understanding and fair play.

## II.    MARÍN'S UNLAWFUL CONDUCT HARMED SOUTH AMERICAN SOCCER, AND RESTITUTION WOULD RESTORE THE VICTIM CONMEBOL TO ITS PRIOR STATE OF WELL-BEING

From the first day the original Indictment was unsealed through the last day of Marín's trial, representatives of the U.S. Department of Justice have repeatedly referred to CONMEBOL as the "victim" of the crimes committed by Marín and his co-conspirators. Indeed, former U.S. Attorney General Loretta Lynch recognized that CONMEBOL itself suffered harm when she told reporters at a press conference that "this corruption essentially hurts. . .the organization itself."[26] Another Justice Department official at the same press conference added:

> "certainly. . . CONMEBOL" along with other confederations "whose officials are [or] have engaged in bribery are the victims in this case. . . If there comes a point in time that victims such as those . . . can come before the court and apply for restitution, we're certainly hopeful that those types of true victims . . . can get some of these forfeitures money that have been collected."[27]

Later in the proceedings of this case, when U.S. Magistrate Judge Robert Levy heard arguments on matters related to defendant Juan Ángel Napout's unfounded and unethical claim of a common interest privilege with CONMEBOL, the U.S. Attorney's Office for the E.D.N.Y. submitted a brief noting that this failed argument "provides a window into the extent to which defendant Napout continued to victimize CONMEBOL by inserting his personal interests into

---

[25]    Eoin Connolly, *Alejandro Dominguez on Making Conmebol a 21st Century Organisation*, Sports Pro Media (Mar. 23, 2017), http://www.sportspromedia.com/quick_fire_questions/i-saw-the-opportunity-alejandro-dominguez-on-making-conmebol-a-21st-century.

[26]    Press Conference, Attorney General Lynch on FIFA Arrests, U.S. Dep't of Justice (Dec. 3, 2015), https://www.c-span.org/video/?401555-1/attorney-general-loretta-lynch-fifa-arrests.

[27]    *Id.*

the affairs of an entity he no longer represented."[28]  Finally, during closing arguments, the Government said of CONMEBOL and other soccer organizations, "The enterprise is perfectly legal and, in fact, it's the victim of the crimes here."[29]  As described below, Marín victimized CONMEBOL in a manner that created at least four types of harm that should each be taken into account in the restitution order.

### A.  Marín Obtained More Than Six and a Half Million Dollars in Illegal Bribes That Diverted Money That Should Have Legally Transferred from the Sports Marketing Companies to CONMEBOL in the Form of Higher Contract Prices.

The Original Indictment explains that, "By conspiring to enrich themselves through bribery and kickback schemes relating to media and marketing rights, among other schemes, the defendants deprived FIFA, the confederations, and their constituent organizations . . . of the full value of those rights."[30]  Indeed, the Government proved exactly that at trial, demonstrating that defendant Marín received $6,550,000.00 in bribes between 2012 and 2016 alone.[31]  The trial included testimony and evidence that Marín received his bribes in many forms, including wire transfers to foreign bank accounts [32]  At the very least, CONMEBOL's order of restitution from defendant Marín should include this **$6,550,000.00** dollars in bribes.[33]

However, CONMEBOL was victimized by Marín acting in concert with dozens of guilty individuals from sports marketing companies as well as other corrupt former officials from the South American soccer confederation, and the Court should utilize its discretion to impose joint and several liability for the entire **$85,400,000.00** in bribes for the time period between 2010 and 2016 that was demonstrated at trial.[34]  *See, e.g.*, *U.S. v. Donaghy*, 570 F.Supp.2d 411, 423 (E.D.N.Y. 2008) ("Because the three defendants pled guilty to conspiring with one another, they are liable to pay restitution for acts of their co-conspirators committed in furtherance of the conspiracy."), *aff'd sub nom*, *United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) (affirming restitution order in which the appealing defendant was properly held jointly and severally liable for the act of his co-conspirators in victimizing the National Basketball Association).[35]  In the

---

[28]  Government's Post-Hearing Brief Concerning the Existence and Scope of Certain Privileges Claimed by defendant Napout, Nov. 16, 2016, at n.19.

[29]  Marín Trial Tr. at 4203:17-19.

[30]  Original Indictment ¶ 73.

[31]  Marín Trial Tr. at 4302.

[32]  *See* Gov. Exhibit 623, the Eladio Rodriguez bribe ledger.

[33]  This figure seems to include some bribes corresponding to *Copa do Brasil*, and the media rights for those soccer matches were owned by the CBF, which is CONMEBOL's Brazilian member association.  CONMEBOL agrees with Judge Chen's ruling that a continental confederation should not collect restitution awards that correspond directly to one of its member associations.  *See* Restitution Order in *U.S. v. Trujillo* (Jan. 4, 2018, Dkt #877) (rejecting CONCACAF's attempt to collect restitution for the Guatemalan Member Association).  Thus, CONMEBOL has written to the CBF on three separate occasions to inform its leadership of its legal right to seek restitution from the E.D.N.Y., and CONMEBOL would not object if the Court were to subtract the relevant amount from Marín's total bribes and set the amount aside for CBF to collect.  However, the evidence from trial suggests the majority of the $6.55 million in bribes paid to defendant Marín corresponded to CONMEBOL-owned media rights.

[34]  Marín Trial Tr. at 4302.

[35]  *See also United States v. Klein*, 476 F.3d 111, 114 (2d Cir. 2007) (vacating a restitution order where district court's "error in precluding joint and several liability" stemmed from the "view that the Probation Department cannot administer varying restitution amounts that are joint and several is 'mistaken'"); *United States v. Boyd*, 222

present CONMEBOL-related cases, three of the other guilty defendants alone – all from South American sports marketing companies – have forfeited more than **$250,000,000.00** combined in unlawfully acquired profits,[36] which is more than enough to cover CONMEBOL's full losses from unlawful bribes and kickbacks. Thus, CONMEBOL respectfully requests a restitution order holding defendant Marín jointly and severally liable with all of the defendants who were convicted or pleaded guilty to the *Copa América* and *Copa Libertadores* conspiracies.

### B. Marín Obtained Salaries – called "*Gastos de Representación*" – and Other Financial Benefits of Half a Million Dollars From CONMEBOL Under False Pretenses.

The Original Indictment explains that "the schemes deprived FIFA, the confederations, and their constituent organizations of their right to the honest and loyal services of the soccer officials involved."[37] Indeed, Marín has served on various FIFA committees and was bound by FIFA's Code of Ethics throughout his entire career in international soccer, but his conduct flagrantly violated numerous provisions of FIFA's Code of Ethics.[38] Similarly, every member of the CONMEBOL Executive Committee is bound by a duty of loyalty to CONMEBOL and duty not to receive personal financial gain in carrying out their duties. The bribe payments for defendant Marín and his CONMEBOL co-conspirators described in the Superseding Indictment, and proven at trial, clearly and uncontrovertibly violate these ethics provisions.

By depriving CONMEBOL of his honest services, Marín unfairly obtained money from CONMEBOL in the form of salaries, benefits, and other compensation. Marín was not entitled to those payments and benefits because he did not give CONMEBOL the full value of his honest services in return. CONMEBOL is entitled to restitution for those amounts. *See, e.g.*, *United States v. Bahel*, 662 F.3d 610, 649 (2d Cir. 2011) (affirming restitution order for part of convicted UN employee's salary because "[t]here is no question that a portion of an individual's salary can be subject to forfeiture where, as here, an employer pays for honest services but receives something less"); *see also United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011) (shifting the burden of the defendant employee to "offset" the salary portion of the restitution award to the employer by the amount of legitimate services he rendered, and when he could not do so, awarding 100% of salary as restitution); *United States v. Crawley*, 533 F.3d 349, 359 (5th Cir. 2008) (awarding victim employer restitution in the amount of 100 percent of the salary and

---

F.3d 47, 50–51 (2d Cir. 2000) (per curiam) (affirming a restitution award imposing joint and several liability "payable by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions").

[36] José Hawilla's forfeiture order totals $151.7 million, Alejandro Burzaco has forfeited $21.7 million, and the sports marketing company Torneos y Competencias has forfeited $89.1 million.

[37] Original Indictment ¶ 73.

[38] *See, e.g.*, FIFA Code of Ethics § 13.3 (2012) ("Persons bound by this Code shall . . . act with complete credibility and integrity."); *Id.* at § 13.4 ("Persons bound by this Code may not abuse their position in any way, especially to take advantage of their position for private aims or gains."). At a minimum, Marín repeatedly and grossly violated the Code of Ethics' provisions on bribery and corruption, which states that FIFA officials must not "offer, promise, give or accept any personal or undue pecuniary or other advantage in order to obtain or retain business or any other improper advantage to or from anyone within or outside FIFA. Such acts are prohibited, regardless of whether carried out directly or indirectly through, or in conjunction with, intermediaries or related parties as defined in this Code." *Id.* § 21.1 (2012).

benefits paid to the defendant because "the MVRA requires the defendant to return any ill-gotten property which has been acquired by, *inter alia,* fraud on the victim").

In the present case, defendant Marín's total salary – called "*Gastos de Representación*" – for the period of time he served on the CONMEBOL Executive Committee from March 2012 to May 2015 was **$590,000.00**[39] in official CONMEBOL payments. When Marín joined the Executive Committee, he began receiving a monthly payment of $10,000.00 from CONMEBOL, which increased to $20,000.00 per month beginning in August 2013. Thus, during Marín's final years in CONMEBOL's leadership, he was receiving $240,000.00 per year.[40] However, Marín and his co-conspirators mismanaged CONMEBOL's finances by operating a cash-based accounting and expenses system that allowed them to obfuscate their personal financial gains.[41] For example, Ernst & Young's internal audit uncovered evidence that numerous months of Marín's 2013 payments were withdrawn in cash by co-conspirator Napout rather than paying Marín through an official CONMEBOL check. As a result of this prior management of CONMEBOL's accounting system, the Ernst & Young internal audit could only document official CONMEBOL checks to Marín in the total amount $380,000.00. In addition, CONMEBOL "*contabilidad,*" or book records, account for $505,000.00 of the **$590,000.00** in total compensation owed for Marín's time period of service. The remainder is believed to have been paid to Marín in cash.[42]

Thus, CONMEBOL respectfully requests restitution corresponding to the full amount of **$590,000.00** that was likely paid by CONMEBOL – including in cash – to defendant Marín from 2012 to 2015.

---

[39]     Defendant Marín's *Gastos de Representación*:

2012 salary:  $100,000 (10 months from March to December);
2013 salary:  $170,000 (7 months at $10,000 rate and 5 months at $20,000 rate);
2014 salary:  $240,000 (12 months at $20,000 monthly rate);
2015 salary:  $80,000 (4 months from January to April given that Marín was arrested in May 2015).

[40]     CONMEBOL director Luis Bedoya testified at trial in the E.D.N.Y. that during the most recent several years of his employment, his CONMEBOL salary was $20,000.000 per month. *See* Marín Trial Tr. 1680-1681.

[41]     As part of CONMEBOL's internal investigation, the confederation obtained the forensic accounting services of Ernst & Young's South American affiliate – Pistrelli, Henry Martin y Asociados – to review CONMEBOL's historical financial statements and conduct investigations of alleged financial misconduct. (*See* Ernst & Young, *Reporte Final, Análisis Forense*, Feb. 21, 2017.) These forensic accountants discovered and documented that CONMEBOL's prior leadership had administered an unusually informal and predominantly cash-based system for payments and expense reimbursements, all of which seems designed to maximize graft and allow CONMEBOL's former leaders to siphon confederation funds for their own personal benefit. Even then, some defendants took greater advantage of the cash-based system than others. For example, by comparison: Defendant Marín received approximately 65 percent of his payments through verifiable means such as official checks; and defendant Sergio Jadue received more than 95 percent of his CONMEBOL payments through wire transfers and checks. (*See id*. at p. 38, Table 13). This disparity means that more culpable defendants – such as Marín– may pay a much smaller amount of restitution related to their official salary than a defendant like Jadue, who held less influence in the confederation and took smaller amounts in bribes, but who accepted his CONMEBOL salary and reimbursements through the documentable means of wire transfers and official checks. These facts create a risk that even at post-conviction sentencing, defendant Marín would yet again benefit from the cash-based accounting system at CONMEBOL.

[42]     CONMEBOL anticipates submitting affidavits from employees with personal knowledge that defendant Marín sometimes received his *Gastos de Representación* in <u>cash</u>.

### C. Marín and His Co-Conspirators Caused CONMEBOL to Incur More Than Eight Million Dollars in Attorney Fees And Accountant Fees as Part of the Confederation's Internal Investigation.

In response to Marín's and his co-conspirators' criminal conduct and the Government's prosecution of them, CONMEBOL has had to incur substantial costs to investigate their misconduct and assist in the investigation and prosecution of Marín and his co-conspirators in the U.S. District Court for the Eastern District of New York. CONMEBOL is entitled to restitution for its attorney fees and accounting and legal costs that directly flowed from the indictments and ongoing investigations. Indeed, the MVRA states that fraud victims like CONMEBOL are entitled to restitution from the defendant for "***expenses incurred during participation in the investigation or prosecution of the offense***." *See* 18 U.S. Code § 3663A(b)(4) (emphasis added). The Second Circuit has definitively concluded that the "expenses" referenced in the statute include attorney fees and legal costs incurred by the victim during an internal investigation of the defendant's fraud, where the internal investigation is conducted at the Government's request or invitation alongside the Government's own criminal investigation. *See, e.g.*, *United States v. Amato*, 540 F.3d 153, 159–60 (2d Cir. 2008) (under Section 3663A(b)(4), "'other expenses' incurred during the victim's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense may include attorney fees and accounting costs").[43]

CONMEBOL's damages in the form of attorney fees are substantial, and they include the cost of: (1) experienced attorneys from Quinn Emanuel to investigate the defendants' conduct and represent CONMEBOL before the relevant authorities and in related litigation, at a cost of **$3,110,906.50**; and (2) forensic accountants from Ernst & Young's South American affiliate, Pistrelli, Henry Martin y Asociados, to review CONMEBOL's historical financial statements and conduct investigations of alleged financial misconduct, at a cost of **$474,148.00**. These costs would be appropriately allocated pursuant to joint and several liability to all co-defendants who participated in the *Copa América* and *Copa Libertadores* conspiracies. Prior to Quinn Emanuel's representation of CONMEBOL, the confederation had already spent considerable resources on FIFA-related corruption matters in the form of: (1) legal fees from the Paraguayan attorney Esteban Burt of the law firm Peroni Sosa Tellechea Burt & Narvaja at a cost of **$255,700.00**;[44] and (2) legal fees from the American law firm McDermott Will & Emery, which billed CONMEBOL at a cost of **$4,391,104.89**.

---

[43] CONMEBOL's restitution petition for attorney and accounting fees is in no way precluded by the recent ruling in *Lagos v. United States*, 584 U.S. __ , 138 S. Ct. 1684 (May 29, 2018), in which the U.S. Supreme Court held that the terms "investigation" and "proceedings" found in the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A(b)(4), refer only to investigations connected to criminal proceedings, and not to civil or bankruptcy proceedings. Unlike the facts in *Lagos*, where the company's internal investigation began before the criminal investigation and without a request from the Government, here, CONMEBOL's internal investigation was conducted at the specific request of the Government after the U.S. Department of Justice unsealed the Original FIFA Indictment. Thus, the MVRA's restitution provision clearly applies to CONMEBOL's internal investigation, which was undertaken "*during* participation in the investigation or prosecution of the offense". 18 U.S.C. §3663A(b)(4) (emphasis added).

[44] *See* Government Exhibit 29 and CONMEBOL Exhibit 6 presented at the October 25, 2016 hearing before U.S. Magistrate Judge Levy regarding defendant Napout's failed claim of common interest privilege with CONMEBOL.

In total, CONMEBOL's legal and accounting fees stemming from Marín and his co-conspirators' criminal conduct have reached at least **$8,231,859.39**.

### D. Marín Caused CONMEBOL to Suffer Enormous Amounts in Lost Revenues, Possibly Reaching Hundreds of Millions of U.S. Dollars, Related to Artificially Deflated Contract Prices for Marketing and Media Rights to Numerous Editions of *Copa América* and *Copa Libertadores*.

The Superseding Indictment explains that Marín and his co-conspirators "distort[ed] the market for the commercial rights associated with soccer and undermin[ed] the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders [referring to CONMEBOL]."[45]   Significant trial testimony supported this economic theory.  In particular, the Government presented the expert testimony of Dr. Stefan Szymanski, a Ph.D. Economist and Professor of Sports Management at the University of Michigan.  The Honorable U.S. District Court Judge Pamela Chen ruled that Professor Szymanski was qualified as an expert in the economics of the business of sports, with a particular focus on soccer. Professor Szymanski testified that a confederation like CONMEBOL can only ensure the highest value for selling its marketing and media rights when it holds a competitive tender process, explaining that a "**successful competitive process will enhance the final value that the soccer organization receives because the bidders for their services will be enticed to paying the highest amount possible.**"[46]

Defendant Marín and his co-conspirators created no such competitive tender process when selling CONMEBOL's media rights to competitions such as *Copa América* and *Copa Libertadores*.  At trial, the witness and former CONMEBOL director Luis Bedoya of Colombia testified that CONMEBOL's leadership never did any sort of market analysis before selling its marketing and media rights to better understand their actual commercial value.[47]  Bedoya also testified that the CONMEBOL co-conspirators never tried to obtain any competing bids from additional sports marketing companies to raise the final price obtained by the South American soccer confederation.[48]   Moreover, Alejandro Burzaco testified that, based on extensive negotiations in South America for media contract rights, he paid less than market value for the media rights contract he obtained from CONMEBOL for the 2012 *Copa Libertadores* tournament.[49]  Similarly, the jury heard evidence from José Hawilla's audio recordings of his co-conspirator Marino Jinkis, who boasted "each cup will yield a profit of 100 million for the company, more or less."[50]  These windfall profits of $400 million over four editions mean that the corrupt and unnecessary middlemen from the sports marketing companies were profiteering in amounts that actually exceeded the contract price of $317.5 million scheduled to be obtained by the legitimate owner of the rights at CONMEBOL.  Indeed, even if the exact same sports marketing companies – Datisa, Traffic, Torneos, and Full Play – had eventually won all of the

---

[45]     Superseding Indictment ¶ 97.

[46]     Marín Trial Tr. at 188:16-21.

[47]     Marín Trial Tr. 1586:12-18.

[48]     Marín Trial Tr. 1586:12-18.

[49]     Marín Trial Tr. 374-377.

[50]     Marín Trial Tr. at 2777-2779; *see also* Gov. Exhibits 1709-1710.

exact same CONMEBOL contracts, a tender process with additional competitors would have pushed up the contracts' prices to CONMEBOL's advantage.

At trial, Expert witness Professor Szymanski addressed the following example to further illustrate this lost-revenue harm inflicted upon an organization such as CONMEBOL. He explained that when a sports marketing company bribes the confederation's officials with, for example, a $1 million personal payment in order to secure a $10 million dollar contract, the harm to the victim soccer confederation could be significantly greater than simply the amount of the bribe:

> [I]n addition, if it was known that there was bribery involved, competition may have been discouraged in the market and that may mean that, in fact, it's not just $10 million that would have been paid, you may have lost more money. Maybe somebody would have paid $50 million if they hadn't known that there was bribery and corruption. So, the soccer organization may actually lose more than the 1 million.[51]

Applying this concept to the facts in the present case, Professor Szymanski's expert testimony demonstrates how the co-conspirators harmed CONMEBOL by bundling the rights to numerous years' editions of the soccer tournaments into one multi-edition contract with the final tournament being sold exceedingly far in advance – sometimes a decade early – from the actual dates of play. For example, the bribery-induced CONMEBOL contract with Datisa was signed in 2013 and sold the marketing and media rights for four tournament editions of the *Copa América*: **$75 million** for the 2015 edition, **$77.5 million** for the 2016 edition, **$80 million** for the 2019 edition, and **$85 million** for the 2023 edition.[52] At trial, the Government adduced the following expert testimony about the harm to CONMEBOL created by such a contract:

> **Q:** Professor Szymanski, what if a contract from one edition to the next, what if the value of the contract goes up even thought there's a bribe, does the organization still do better?
>
> **A:** Not necessarily. So, in a world in which the value of these rights are escalating very rapidly, the soccer organization may actually be losing up. Even though on the face of it the value of the contract went up, maybe the value of the contract would have gone many times more if there had been an open competitive process.[53]

Indeed, the value of CONMEBOL's marketing and media rights have been escalating very rapidly due to increasing viewership in Latin America, the United States, and throughout the world, and the bribe-paying co-conspirators from Datisa captured the value of that escalation by

---

[51]     Marín Trial Tr. 193:15-25.

[52]     *See* Gov. Rebuttal Summation, Trial Tr. at 4505 ("There's been a suggestion that because the contracts got better for CONMEBOL couldn't have been anything wrong with it, but this is in a market where the rights values are soaring, so the fact it is somewhat better says nothing about whether it's good enough about whether you should have tapped into the market for competition. When you have people on tape saying, we sold a hundred million dollars to the United States alone, we're going to make a hundred million dollars in profit.").

[53]     Marín Trial Tr. at 194:1-9.

purchasing *Copa América* rights a decade in advance and at artificially depressed prices. As mentioned previously, CONMEBOL is now in the process of re-tendering the marketing and media rights to the 2019 edition of this tournament, and CONMEBOL expects that free market competition will yield a price far above the **$80 million** for which Datisa purchased the rights through unlawful means five years ago.

It is admittedly challenging – though certainly possible – to quantify the amount of harm suffered by CONMEBOL because of the co-conspirators' intentional failure to sell its marketing and media rights through a proper tender process. However, if the Probation Department for the E.D.N.Y. or the Honorable Judge Chen were to inform CONMEBOL of their interest in receiving additional information for calculating lost-revenue damages for the purposes of the restitution awards in the present cases, CONMEBOL would commit to providing two additional forms of data to the E.D.N.Y. in the months to come: (1) CONMEBOL would bear the expense to now obtain an expert witness to analyze all relevant CONMEBOL contracts for prior editions of *Copa América* and *Copa Libertadores* and other soccer events in order to provide additional data and analysis of the true market value for those rights which were previously sold at artificially deflated prices; (2) CONMEBOL would provide the results from the upcoming re-tender of the marketing and media rights for the 2019 edition of the *Copa América*, which would provide some concrete evidence of the percentage difference between the fair market value and bribery-induced contract price that resulted from Datisa's bribery and the co-conspirators unlawful acts in 2013.

This additional data may help the Court make a more precisely calculated determination regarding the percentage difference that CONMEBOL suffered in lost-revenue from prior editions of its numerous soccer tournaments held throughout the time period of the unlawful conspiracy. For example, an expert obtained by CONMEBOL could compare the obscenely high profits obtained by Datisa – $100 million per edition of *Copa América* – to standard profits in the sports marketing industry. Such an expert might also opine on the rarity of sports marketing companies obtaining profit levels that are actually larger, and by a significant amount, than the contract revenue received by the original owner of the rights.

However, with or without any such additional expert testimony or new market data, CONMEBOL urges the E.D.N.Y. Probation Department and the Court to apply the sound legal principle that, "**Uncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole.**" *U.S. v. Donaghy*, 570 F.Supp.2d 411, 423 (E.D.N.Y. 2008) (*citing United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006) ("[R]estitution attempts to compensate for loss by restoring the victim to a position he occupied before the injurious event.") and *United States v. Coriaty*, 300 F.3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's losses and upon making victims whole")).

III.  **CONCLUSION**

As the owner of the marketing and media rights for *Copa América*, *Copa Libertadores*, and other CONMEBOL competitions, and therefore the primary victim of José María Marín's criminal conduct, CONMEBOL respectfully requests restitution in the full amount of its

damages. Further information and supporting documentation is available upon request, and we are available to further discuss any of the above-raised issues. Restitution is appropriate and should be awarded for:

(a)  Illegal bribes paid directly to Marín in the amount of $6,550,000.00, with joint and several liability shared by all co-conspirators to cover the entire **$85,400,000.00** in bribes paid between to CONMEBOL-related defendants between 2010 and 2016 alone;

(b)  Salaries, benefits, and other compensation that CONMEBOL paid to Marín in the amount of at least **$590,000.00**;

(c)  CONMEBOL's costs, including attorney fees and accountant fees, incurred during its internal investigation and substantial cooperation in the prosecution of the crimes committed by Marín and his co-conspirators, totaling at least **$8,231,859.39**;

(d)  Lost revenues from numerous editions of CONMEBOL tournaments, which resulted from the defendants' failure to create a legitimate tender process to ensure that CONMEBOL would secure the actual fair market value of the marketing and media rights for those events, totaling possibly **hundreds of millions of U.S. dollars**.

In total, CONMEBOL seeks **at least $94,221,859.39** in restitution from defendant Marín, with some of that amount apportioned individually to Marín and other portions of that amount granted through joint and several liability with Marín's co-conspirators. A substantial restitution order in this matter would provide a new generation of CONMEBOL leadership the expanded ability to continue recent management reforms, improve soccer infrastructure and educational opportunities throughout the continent, and hopefully, to successfully host another World Cup on South American soil exactly one hundred years after the storied soccer tournament was born there.

Very truly yours,
Quinn Emanuel Urquhart & Sullivan LLP

Ben O'Neil
Tico Almeida

*Attorneys for the Confederación Sudamericana de Fútbol*

CC: All counsel of record (via ECF)