NS:SPN/MKM/KDE
F.#2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

           - against -                Docket No. <u>15-CR-252 (S-2) (PKC)</u>

JOSÉ MARIA MARIN,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S SENTENCING SUBMISSION
## <u>AS TO DEFENDANT JOSÉ MARIA MARIN</u>

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Samuel P. Nitze
M. Kristin Mace
Keith D. Edelman
Assistant U.S. Attorneys
     (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this sentencing memorandum in anticipation of the defendant José Maria Marin's sentencing for his conspiratorial racketeering, wire fraud, and money laundering counts of conviction following the six-week jury trial in November and December 2017, and to respond to Marin's sentencing memorandum dated August 10, 2018. See ECF Dkt. No. 978 ("JMM Br.").

In his sentencing memorandum, Marin challenges the description of the offense conduct and various aspects of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") calculation detailed in the Presentence Investigation Report ("PSR"), which results in an applicable Guidelines range of 235 to 293 months' imprisonment, including the application of offense level enhancements based on the total bribe amounts intended by the defendant and his coconspirators in the jointly undertaken schemes, and on the use of sophisticated means to carry out the offenses and offense conduct outside of the United States. Marin seeks a drastically below-Guidelines sentence of time served on the ground that, among other things, the applicable Guidelines range, even without the challenged enhancements, overstates his culpability, and that his age and health warrant extreme leniency. Marin also challenges the PSR's recommendations with respect to forfeiture and restitution.

For the reasons set forth below, the government respectfully submits that the defendant's challenges to the PSR are meritless and the Court should adopt its Guidelines calculation and recitation of the relevant facts, except as noted in the government's letter to the Probation Department dated August 3, 2018. Although the government agrees that a sentence below the applicable Guidelines range is appropriate in Marin's particular circumstances, the defendant dramatically understates the seriousness of his crimes and the need for general deterrence and to promote respect for the law, which together warrant a term of imprisonment of

1

no less than 120 months.  The Court should also order payment of forfeiture, restitution, and a substantial fine.

FACTUAL BACKGROUND

The Court is intimately familiar with the offense conduct in this case, having presided over the six-week trial of Marin and his codefendants Juan Ángel Napout and Manuel Burga.  The Court has already detailed some of the trial evidence and made related factual findings in denying defendants Marin and Napout's post-trial motions for acquittal or for a new trial.  In addition, the PSR provides a detailed summary of the relevant offense conduct based on the evidence presented at trial.  The following factual summary is intended to provide an overview sufficient to situate the government's arguments with respect to sentencing in the relevant factual context, but not to provide a comprehensive recitation of the full procedural history or all aspects of the offense conduct proven at trial.

I.     The Investigation and Indictments

Since approximately 2010, the government has been investigating bribery and corruption in the world of international soccer.  See PSR ¶ 18.  That investigation resulted in an indictment unsealed on May 27, 2015 (the "First Indictment"), charging Marin and 13 other soccer officials and/or sports marketing executives with racketeering conspiracy, including predicate acts of honest services wire fraud and money laundering, among other offenses.  The First Indictment detailed multiple bribery and kickback schemes relating to, among other things, the purchase and sale of media and marketing rights to various soccer tournaments organized by FIFA, the international organizing body of soccer, as well as CONCACAF and CONMEBOL, the continental confederations responsible for soccer in North and South America, respectively.  See First Ind., ECF Dkt. No. 1.  As to Marin, the First Indictment alleged his participation in bribery schemes relating to the sale of rights for the Copa América, a tournament organized by

2

CONMEBOL involving the national teams in South America, and the Copa do Brasil, in which local, or club, teams from Brazil participate.  See id. ¶¶ 156-64, 241-62.

Marin was arrested on May 27, 2015, in Switzerland pursuant to a provisional arrest request by U.S. authorities.  See PSR ¶ 70.  At that time, Marin was the president of the Confederação Brasileira de Futebol (the "CBF") and was in Switzerland to attend FIFA and CONMEBOL meetings.  See id.  Marin was incarcerated in Switzerland fighting extradition until November 3, 2015, when he arrived in the United States and was released on bond.  See id.  On December 3, 2015, the government unsealed a superseding indictment (the "First Superseding Indictment") that charged an additional 16 soccer officials, detailed more bribery and kickback schemes, and resulted in the arrest of, among others, Marin's codefendants at trial Juan Ángel Napout of Paraguay and Manuel Burga of Peru.  The First Superseding Indictment also added charges against Marin relating to a bribery scheme involving the sale of the media and marketing rights for the Copa Libertadores, a tournament organized by CONMEBOL that includes the best club teams across South America.  See First Superseding Ind., ECF Dkt. No. 102, ¶¶ 174-85.

Following pretrial litigation, in June 2017, Marin, Napout, and Burga were together charged in an indictment (the "Second Superseding Indictment") that alleged their participation in the Copa América, Copa Libertadores, and, as to Marin only, the Copa do Brasil bribery schemes.  Marin was charged in the Second Superseding Indictment with seven counts: racketeering conspiracy (with predicate acts of wire fraud, money laundering, and money laundering conspiracy), three counts of wire fraud conspiracy, and three counts of money laundering conspiracy.  See 2d Superseding Ind., ECF Dkt. No. 604.

Marin, Napout, and Burga were tried on the Second Superseding Indictment in November and December 2017.  Following a six-week trial, which included testimony from 28 witnesses, the admission of thousands of pages of documents, and multiple consensual

recordings, Marin was convicted of racketeering conspiracy, three counts of wire fraud conspiracy (relating to each of the three charged bribery schemes), and two counts of money laundering conspiracy (relating to the Copa América and the Copa Libertadores Schemes). Following the guilty verdict, Marin was remanded on December 22, 2017.

II.    The Offense Conduct Proven at Trial

    A.    Background

        The evidence presented at trial revealed that for over twenty years, soccer officials including Marin had violated the fiduciary duties they owed to FIFA, CONMEBOL, and other soccer organizations by receiving bribes and kickbacks in connection with, among other things, the sale of media and marketing rights for a variety of soccer tournaments.  See PSR ¶ 47.  Frequently relying on the United States financial system and growing market for soccer events, the coconspirators corrupted the game they were supposed to protect, defrauding the institutions of hundreds of millions of dollars that should have gone to those organizations to be spent on things such as development and women's and youth leagues.  See id.

    B.    The Copa América, Copa Libertadores, and Copa do Brasil Schemes

        Among the tournaments corrupted by Marin and his coconspirators were the Copa América, the Copa Libertadores, and the Copa do Brasil.  The government sets forth below a brief synopsis of those bribery schemes and then details Marin's personal involvement in the racketeering conspiracy.

        1.    Copa América

        Beginning with the 1987 edition of the Copa América tournament, CONMEBOL officials solicited and received millions of dollars in bribes from the Traffic Group ("Traffic"), a sports marketing company owned by José Hawilla, in exchange for awarding the media and marketing rights to that tournament.  Traffic paid bribes when the various contracts were signed

4

and when the tournaments were played to, among others, Nicolás Leoz, the president of

CONMEBOL, Julio Grondona, the long-time president of the Argentine soccer federation

("AFA"), and Ricardo Teixeira, the long-time president of the CBF.  See PSR ¶ 49.

   In 2010, CONMEBOL terminated its relationship with Traffic and sold the rights

to the 2015, 2019, and 2023 editions of the Copa América (among other tournaments) to sports

marketing company Full Play Group ("Full Play"), which was owned by coconspirators Hugo

and Mariano Jinkis (the "2010 Contract").  See PSR ¶ 50.  Full Play, which had entered the

market for soccer events by acquiring the rights to other matches played by some of the

traditionally less powerful nations, was able to secure the 2010 Contract in part due to the

promise of $1 million bribe payments to a group of federation presidents known as the "Group of

Six," which included Napout and Burga.  See, e.g., Trial Tr. at 1581-86 (testimony of L. Bedoya,

the former president of the Colombian soccer federation).  This contract caused Traffic to file a

lawsuit in Miami, Florida in 2011.  See Trial Tr. at 412.

   To resolve the lawsuit, Traffic, Full Play, and a third sports marketing company,

Torneos y Competencias (together with its affiliates, "Torneos"), which was operated by

Alejandro Burzaco, formed a new company called Datisa that, in May 2013, signed a new

contract with CONMEBOL to acquire the rights to the 2015, 2019, and 2023 editions, as well as

the special 2016 Copa América Centenario tournament, which was to be played in the United

States (the "Datisa Contract").  See Trial Tr. at 412-18; PSR ¶¶ 51-52.  Unlike the 2010 Contract,

which paid Full Play a percentage of income from the sale of the rights to the tournaments,

leaving CONMEBOL with 75% of the income, less certain expenses, the Datisa Contract paid

CONMEBOL a fixed amount of $80 million per edition with no profit sharing over that amount,

even if the value of the rights increased over time.  See id.  Neither the 2010 Contract nor the

Datisa Contract were put out to bid.

To sign the Datisa Contract, nearly all CONMEBOL officials agreed to receive bribes.  As detailed in the chart set forth in paragraph 52 of the PSR, all of the presidents of CONMEBOL's members (except for Uruguay) agreed to receive at least $1 million for the signature of the Datisa Contract as well as each edition of the tournament.  Marin and fellow Brazilian soccer official Marco Polo Del Nero were to split $3 million in bribe payments for the signature and for each future edition.  See PSR ¶ 52.  In total, the various CONMEBOL officials, along with certain CONCACAF officials who were also bribed in connection with the 2016 Copa América Centenario, agreed to receive a total of $79,300,000 in bribes, which is attributable to criminal activity jointly undertaken by Marin and his coconspirators.  See id.

        2.     Copa Libertadores

Like the Copa América, the Copa Libertadores tournament was corrupted by bribery for decades.  In 2005, Alejandro Burzaco began to manage the day-to-day operations of Torneos and learned of the company's practice of making annual bribe payments to CONMEBOL officials in exchange for their support of Torneos as holder of the broadcasting rights to the Copa Libertadores.  See PSR ¶ 55.  That practice expanded over time such that nearly every CONMEBOL official, including federation presidents as well as CONMEBOL's president and treasurer, received between $600,000 and $1.2 million in annual bribe payments, as set forth in the chart in paragraph 56 of the PSR.  As a result of these annual bribe payments, in 2012, the CONMEBOL officials voted to extend Torneos's contract rights through 2022 in exchange for annual bribe payments.  This extension was not put out to bid and the contract committed CONMEBOL to a set price under a long-term contract, despite the fact that the value of rights was expected to rise over time.  See PSR ¶ 55.  In total, for the 2011 to 2022 editions, the various CONMEBOL officials agreed to receive a total of $73,600,000 in bribes as part of

the Copa Libertadores Scheme, of which $66,800,000 is attributable to criminal activity jointly undertaken by Marin with his coconspirators.  See PSR ¶ 56.

       3.     Copa do Brasil

Between approximately 1990 and 2009, Traffic acquired the media and marketing rights to the Copa do Brasil from the CBF, the Brazilian soccer federation.  In exchange for those rights, Traffic paid bribes to Teixeira, the president of the CBF.  In 2011, another sports marketing company, Klefer Producoes e Promocoes Ltda. ("Klefer"), entered into a contract with the CBF to purchase the commercial rights for all editions of the tournament between 2015 and 2022.  See PSR ¶ 58.  In 2012, to resolve a dispute between Traffic and Klefer over which company should hold the rights in the long term, the two companies agreed to pool their rights for the 2013 to 2022 editions and share in the profits and costs.  As part of their joint venture, Traffic and Klefer agreed to pay, and did pay, annual bribe payments of 1 million Brazilian Reias (approximately $450,000) to Teixeira and 500,000 Brazilian Reias each to Marin and Del Nero.  See PSR ¶¶ 57-61.  In total, Teixeira, Marin, and Del Nero agreed to receive a total of $8,474,580 in bribes in this part of the Copa do Brasil Scheme, which is criminal activity jointly undertaken by Marin and his coconspirators.  See id. ¶ 61.

       C.     Marin's Participation in the Bribery Schemes

Marin is an attorney and former politician who served as the governor of the state of Sao Paulo and was a vice president of the CBF from 2010 to April 2012.  See PSR ¶¶ 127-29.  In approximately April 2012, Ricardo Teixeira – the long-time president of the CBF, member of the FIFA executive committee, and powerful soccer official – resigned from all of his positions.  See Trial Tr. at 352-53.  Teixeira had been receiving bribe payments for years and resigned because he was under criminal investigation in Switzerland and Brazil.  See Trial Tr. at 352-53.  According to the CBF by-laws, Marin, as the eldest CBF vice-president, took over as president;

fellow Brazilian and coconspirator Marco Polo Del Nero took Teixeira's place on the FIFA

Executive Committee.  See Trial Tr. at 353.

Immediately after taking over Brazilian soccer, Marin sought to enrich himself

personally by soliciting the bribes that had been paid to Teixeira.  The same month Marin

became president of the CBF, he flew to Buenos Aires to meet with Grondona and Burzaco.  See

Trial Tr. at 354-55.  During the meeting, and at Teixeira's request and with Grondona's blessing,

it was agreed that Marin and Del Nero would begin receiving the $600,000 yearly bribe

payments for the Copa Libertadores that previously had been paid to Teixeira.  See Trial Tr. at

355-56.

Marin also quickly ensured that he would receive the millions of dollars of bribe

payments relating to the Copa América.  Prior to Teixeira's departure, Burzaco (on behalf of

Torneos), along with the principals of Full Play, Hugo and Mariano Jinkis, had agreed to pay

Teixeira a $3 million bribe payment relating to the media and marketing rights for the 2015 Copa

América, but only $1 million had been paid by that time.  In approximately June 2012, Marin,

Del Nero, Grondona, Burzaco and others again met in Buenos Aires, where they agreed that the

$2 million owed to Teixeira for the 2015 edition would be paid to Marin and Del Nero.  See Trial

Tr. at 356-58.

After these initial meetings, Marin and his coconspirators met repeatedly to

discuss the bribe payments.  For instance, in December 2012, Marin and others met with Burzaco

and Grondona in Paraguay, where it was decided that the annual bribe payments relating to the

Copa Libertadores for Marin and Del Nero would increase to $900,000.  See Trial Tr. at 360.  In

May 2013, Marin and Del Nero met with Burzaco in London to complain that their Copa

Libertadores bribe payments were late and again insist that, in addition to the $3 million they

8

were to receive for the signing of the Datisa Contract, they should collect the $2 million that was

still owed to Teixeira for the 2015 edition of the Copa América.  See Trial Tr. at 498-500.

Marin did more than just agree to receive the payments; he in fact received

millions of dollars in illicit bribes.  Many of these bribes he received in a bank account at

Morgan Stanley in New York held in the name of Firelli International Limited, a shell company

that conducted no business and had no employees.  At trial, IRS-CID Special Agent Steven

Berryman explained how in July 2013, the $3 million bribe for the signature of the Datisa

Contract was sent from the Swiss account of FPT Sports (a Torneos-controlled shell company

used to pay bribes) to an account in Andorra held in the name of Support Travel, which was

controlled by Wagner Abrahao, a Brazilian associate of Marin's.  See Trial Tr. at 3430-33; see

also GX 1709-T at 21-22 (recording of Marin praising Abrahao).  From there, $1.5 million was

sent in installments from another of Abrahao's Andorran accounts in the name of Expertise

Travel to Marin's Firelli account.  See Trial Tr. at 3434-39.  The same occurred with respect to

$900,000 in bribes relating to the 2013 Copa Libertadores that was paid from the Swiss account

of Arco Business and Development (another Torneos-controlled shell company used to pay

bribes), through Abrahao's Andorran accounts, with a portion flowing into Marin's Firelli

account.  See Trial Tr. at 3483-86.

Marin did not hesitate to spend his ill-gotten gains.  The debit card statements for

his Firelli account alone reflect hundreds of thousands of dollars in lavish purchases.  See GX

511-C.  For instance, in March and April 2014, Marin spent over $150,000 from his Firelli

account, including over $20,000 at Hermès in Paris, $50,000 at Bulgari in Las Vegas, and over

$10,000 at Chanel in New York.  See Trial Tr. at 3444-46.

In all, Marin received approximately $3,335,593 in bribes, including $2.7 million

from Torneos or its partners relating to the Copa América and the Copa Libertadores, see Trial

Tr. at 600, plus an additional $635,593 from Traffic and Klefer as part of the Copa do Brasil

Scheme, see PSR ¶¶ 61, 74.  He agreed to receive a total of approximately $10,318,644,

including $8.65 million from Torneos and its partners, and $1,668,644 more from Traffic and

Klefer.  See id.

SENTENCING

I.    Legal Framework

      Sentencing courts have the authority to fashion a reasonable and appropriate

sentence in each case, and must consider the Guidelines in so doing.  United States v. Booker,

543 U.S. 220, 259-62 (2005).

The "Guidelines should be the starting point and the initial benchmark."  Gall v. United States,

552 U.S. 38, 49 (2007).  Next, a sentencing judge should consider all of the factors in 18 U.S.C.

§ 3553(a) to determine the appropriate sentence in each case.  Id. at 49-50.  Those factors

include, among other things, the nature and circumstances of the offenses; the history and

characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness

of the offense, afford adequate deterrence to criminal conduct, protect the public from further

crimes of the defendant, and avoid unwarranted disparities between similarly situated

defendants.  In considering the relevant factors, the sentencing court may not presume that the

Guidelines range is reasonable.  Rather, the court "must make an individualized assessment

based on the facts presented."  Id. (citation and footnote omitted).

II.    The Applicable Guidelines Range

      The Guidelines calculation detailed in the PSR is accurate and, based on a total

offense level of 38 and criminal history category of I, results in an applicable Guidelines range of

235 to 293 months' imprisonment.  The government agrees with the offense level calculation in

the PSR, as set forth below:

10

| | | |
|---|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2B1.1(a)(2)) | | 6 |
| Plus: | Loss Greater Than $150 Million (§§ 2B1.1(b)(1)(N)) | +26 |
| Plus: | Outside the U.S. / Sophisticated Means (§ 2B1.1(b)(10)) | +2 |
| Plus: | Conviction under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)) | +2 |
| Plus: | Abuse of Position of Trust (§ 3B1.3) | +2 |
| Total Offense Level: | | 38 |

Marin objects to the calculation of the intended loss amount and to offense level-enhancements related to offense conduct committed abroad and the use of sophisticated means to carry out the offenses.  He does not challenge the offense-level enhancements tied to his convictions of money laundering offenses pursuant to U.S.S.G. § 2S1.1(b)(2)(B) or for abuse of position of trust under U.S.S.G. § 3B1.3.[1]

A.    The Loss Amount Exceeds $150 Million

Marin challenges the PSR's calculation of an overall intended loss amount of $154,574,580 and the resulting 26-point offense-level enhancement on the ground that the specified intended bribe amounts are not properly attributed to him for purposes of sentencing. Specifically, Marin argues that the evidence is insufficient to sustain a finding that bribes paid or promised to be paid to other soccer officials were part of criminal activity jointly undertaken by Marin.  JMM  Br. at 11-15.  Marin is wrong.

The Guidelines provide that the loss amount for fraud offenses is the greater of the actual loss or intended loss.  U.S.S.G. § 2B1.1, app. note 3(A).  Actual loss is defined as "the

---

[1] Marin and the government objected to certain aspects of the PSR in letters to the Probation Department dated July 25 and August 3, 2018, respectively.  To date, the Probation Department has not issued an addendum to the PSR.  Most of the substantive objections raised in Marin's objections to the PSR are repeated in his sentencing memorandum, which the government addresses here.  The government will be prepared to address other objections to the PSR at sentencing.

reasonably foreseeable pecuniary harm that resulted from the offense," while intended loss is the pecuniary harm the defendant intended to cause.  Id.  The Guidelines provide further that relevant conduct for determining the offense level and applicable enhancements includes both the defendant's conduct and, in the case of jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of that activity.  See U.S.S.G. § 1B1.3(a)(1)(B).  Thus, the loss amount attributable to a particular defendant includes not only the loss caused or intended by the defendant's own acts and omissions, but also losses caused or intended through the reasonably foreseeable acts of coconspirators in the furtherance of jointly undertaken criminal activity.  Id.; see also United States v. Certified Envtl. Servs., Inc., 753 F.3d 72, 103 (2d Cir. 2014) (Guidelines loss calculations include defendant's conduct as well as reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity); United States v. Elfgeeh, 515 F.3d 100, 138 (2d Cir. 2008) (in sentencing defendant convicted of operating and conspiring to operate an unlicensed money-transmitting business, the district court properly calculated defendant's offense level with reference to losses caused by the other defendant involved in the business).

The sentencing court need only "make a reasonable estimate of the loss, given the available information."  United States v. Reifler, 446 F.3d 65, 107 (2d Cir. 2006) (internal quotation marks omitted); see U.S.S.G. § 2B1.1, app. note 3(C) ("The court need only make a reasonable estimate of the loss . . . based on available information . . . .").  A district court's factual findings on loss amount are reviewed for clear error.  See United States v. Carboni, 204 F.3d 39, 46 (2d Cir. 2000); see also U.S.S.G. § 2B1.1, app. note 3(C) ("The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.  For this reason, the court's loss determination is entitled to appropriate deference.") (citing 18 U.S.C. § 3742(e) and (f)).

In determining whether a defendant is liable for jointly undertaken criminal activity, a district court must first determine the "scope of the criminal activity agreed upon by the defendant." United States v. Mulder, 273 F.3d 91, 118 (2d Cir. 2001) (internal quotation marks omitted).  Second, if it finds that the scope of the activity to which the defendant agreed includes the conduct in question, "the court must make a particularized finding as to whether the activity was foreseeable to the defendant." Id. (internal quotation marks omitted); see also United States v. Getto, 729 F.3d 221, 234 (2d Cir. 2013).  In determining the scope of the criminal activity the particular defendant agreed to jointly undertake, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."  U.S.S.G. § 1B1.3, app. note 3(B).

Here, the evidence at trial established that Marin jointly undertook with fellow soccer officials and certain sports marketing executives to carry out schemes through which the soccer officials together awarded lucrative contracts to companies controlled by the sports marketing executives in exchange for annual six-, and sometimes seven-, figure bribe payments. The $154,574,580 intended loss attributed to Marin in the PSR comprises losses intended by Marin and his coconspirators in connection with three tournaments – the Copa America ($79,300,000), Copa Libertadores ($66,800,000), and Copa do Brasil ($8,474,580) – and excludes the intended losses from aspects of these schemes not jointly undertaken by Marin and which occurred before Marin joined the conspiracy, as well as other schemes within the racketeering conspiracy.  See PSR ¶ 73; cf. JMM Br. at 11 (incorrectly claiming that "[t]he PSR's loss amount is derived from a tally of *every bribe* purportedly promised to *every soccer official* in connection with the Copa América, Copa Libertadores and Copa do Brasil schemes") (emphasis in original); id. at 14 (incorrectly claiming that the PSR includes the "entirety of the losses attribute[d] to the Copa América, Copa Libertadores and Copa do Brasil schemes").  The

13

intended loss amount reflects bribes paid or intended to be paid to Marin and other soccer officials who had the authority to approve or administer lucrative media and marketing contracts relating to the specified tournaments.  All of these losses were intended in furtherance of jointly undertaken criminal activity involving Marin.

In determining the scope of the jointly undertaken criminal activity properly attributable to Marin, it is important to consider the trial proof as a whole as it relates to the schemes at issue.  With respect to the Copa América and Copa Libertadores Schemes, the evidence established that Marin, as president of the CBF, along with other national federation presidents responsible for approving contracts at CONMEBOL, collected millions of dollars in bribe payments from, variously, Torneos, Full Play, and Traffic executives in exchange for the officials' support of the bribing entities as they sought the rights to the tournaments at issue. See, e.g., PSR ¶¶ 49-56.  The evidence revealed that none of the presidents who received bribes in connection with the 2013 Datisa Contract, which awarded rights to four editions of the tournament to Datisa, or in connection with contracts for the Copa Libertadores, including the renewal and extension of rights for Torneos in 2012, took steps to put the contracts out to bid or to meaningfully test the commercial value of the rights in hopes of securing the true market value for the confederation.  See, e.g., Trial Tr. at 310-13 (testimony of A. Burzaco relating to the 2012 Copa Libertadores extension); Trial Tr. at 1932-33 (testimony of L. Bedoya concerning increases in contract prices and failure of the conspirators to determine the market value of the rights or obtain any competing bids); GX 183-T (Marin's signature on the Datisa Contract approved without bids or market valuation); GX 1352-T at 4 (executive committee meeting minutes reflecting that Marin and Grondona spoke in favor of Torneos receiving the Copa Libertadores renewal and that a competitor was barred from presenting competing bid).  From these facts alone, it is clear that Marin was one of a group of conspirators who had agreed, collectively, to

14

receive bribes at the expense of the institutions they were trusted to serve in connection with particular contracts and tournaments.

This conclusion is reinforced by other evidence, including evidence that the conspirators spoke to one another about the bribes, albeit in sub-groups, see Trial Tr. at 292-93 (testimony of A. Burzaco that the soccer officials spoke about the bribes in clusters, with only a few having full information across the confederation); photographic evidence of the personal closeness of the conspirators to each other and to the people who were paying the bribes, see, e.g., GX 1016 (Marin, Del Nero, and Napout flashing victory signs), GX 1046 (A. Burzaco, S. Jadue, L. Bedoya, and Napout at a FIFA event), GX 1020 (Marin, Del Nero, Napout, and L. Bedoya laughing near a private jet), GX 1069 (Napout, M. Jinkis, and H. Jinkis with arms around each other, flashing thumbs-up signs)[2]; evidence of Marin's closeness with coconspirator Del Nero, see, e.g., Trial Tr. at 939 (testimony of A. Burzaco); evidence that Marin became increasingly close with Napout as Napout moved toward the presidency, see, e.g., Trial Tr. at 556-57 (testimony of A. Burzaco); and evidence of Marin's knowledge that Mariano and Hugo Jinkis, who were not responsible for delivering bribe payments to Marin, but who were close with the Group of Six, were involved in the conspiracy, see GX 1709-T at 3-4 (statement of M. Jinkis that "nowadays, the presidents know that we [i.e., Datisa] will have $100 million of profit. The presidents have Internet, they are not Nicolas Leoz; they have Internet, they talk on Facebook, uh, they talk to the clients in every country . . . I don't want to earn too much in one deal" because otherwise the officials would demand more bribes).

_____

[2] The government recognizes, of course, that soccer officials brought together through professional circumstances can be expected to attend soccer events and socialize together as colleagues do the world over, and that photographs showing such associations do not, standing alone, establish criminal conduct.  But the photographs in evidence reveal particular closeness among the conspirators, including between Marin and members of the Group of Six, and between coconspirator soccer officials and the bribe-paying sports marketing executives.

Indeed, during a recorded conversation with Hawilla at the Copa América Centenario announcement in Miami in 2014, Marin indicated that he had been in discussions with the Jinkises and Burzaco about the broader conspiracy, beyond his own involvement:

HAWILLA:   Have you settled with them?  Copa América and all that?

MARIN:   Yeah, uh, *we are talking about everything, yes, with them*.  The conversation with them has been going well.  It's been very good.

HAWILLA:   With– uh– Jinkis?

MARIN:   Yeah. . . with– with the father and the son.

HAWILLA:   Yeah, uh . . .

MARIN:   And the big one there, who is–

HAWILLA:   Alejandro!

MARIN:   –Alejandro!

GX 1709-T at 18-19 (emphasis supplied).

Viewed in context, the evidence shows that each of the three schemes at issue is properly viewed as a single, jointly undertaken criminal activity rather than as a set of separate criminal activities, each corresponding to a different soccer official.  Cf. U.S.S.G. § 1B1.3, app. note 4(C)(viii) (providing an analogous example of multiple conspirators involved in drug trafficking and noting that "the scope of the jointly undertaken criminal activity may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities").  The law is clear, for example, that, among other factors, jointly pooled resources and sharing of profits are a sign of jointly undertaken criminal activity.  See United States v. Iannuzzi, 372 F. App'x 98, 100 (2d Cir. 2010) (summary order).

Here, the media rights contracts, the key economic resource of the confederation, were a shared resource, and the overall amount of bribes that could be sustained by the sports marketing companies – Torneos in the case of the Copa Libertadores; the Datisa partners in the case of the Copa America – was divided among the conspirators through the controlling influence of Julio Grondona and, later, Napout and Del Nero.  See, e.g., Trial Tr. at 353-60 (testimony that Marin learned of the bribes he would receive from Burzaco and Grondona during a series of meetings following the resignation of Teixeira amid a corruption scandal); Trial Tr. at 191-92 (testimony of expert S. Szymanski that the bribe payor "will typically have in mind a budget as to how much they're prepared to spend to acquire the rights," which is split between the contract price and bribe amounts); Trial Tr. at 461-63 (testimony of A. Burzaco referring to a total amount of bribes for the signature of the Datisa Contract (as well as other amounts for each edition of the tournament) that was to be distributed to various CONMEBOL officials); Trial Tr. at 2093-99 (testimony of E. Rodriguez regarding block of $2.4 million in bribes being sent from Torneos to Full Play to pay bribes to the Group of Six for the Copa Libertadores); GX 413-T (e-mail from E. Rodriguez to himself referring to total amount of bribes owed for 2015, 2016, 2019, and 2023 editions of the Copa América); GX 1710-T at 1, 6 (statements of A. Burzaco that the Datisa partners "set 40 million aside" in bribes for the 2015 Copa América and for the signature of the Datisa Contract, as well as "Twenty [million] for 2019 and 20 [million] for 2023"); GX 1709-T at 5-6 (statement of M. Jinkis that the total bribes for the 2015 to 2023 editions of the Copa América, including the signature of the Datisa Contract and bribe payments to CONCACAF officials, is "more – than 100 million . . . That's 110 [million]"); GX 1709-T at 10 (statement of M. Jinkis that "I want to coexist with and make all the presidents rich . . . Not three only.  This is my philosophy and my way of thinking").

Another relevant factor is whether the defendant assisted in designing and executing the illegal scheme.  See Iannuzzi, 372, F. App'x at 100.  Here, Marin participated in the execution of the schemes by signing contracts along with his coconspirators, joining his coconspirators in refusing to put the rights out to bid, supporting contract renewals for the bribe-paying entities (and even expressly advocating in an executive committee meeting for Torneos to keep the Copa Libertadores rights), and maintaining secrecy, including in the face of a requirement under CONMEBOL's Code of Ethics that the officials report any knowledge of bribe offers.  See GX 1310-T, at 9 (2013 CONMEBOL Code of Ethics, Art. 21(1)); GX 1362-T (minutes of the December 12, 2013 CONMEBOL Executive Committee meeting, in which Marin participated and the Code of Ethics was adopted).  That Marin jointly undertook to receive bribes along with his coconspirators is, at a minimum, "fairly inferred from the conduct of the defendant" and his coconspirators.  U.S.S.G § 1B1.3, app. note 3(B).

As to the Copa do Brasil, the trial evidence, including recorded conversations between Marin and Hawilla and Hawilla and Leite, make plain that Marin was a participant in criminal activity jointly undertaken with Teixeira, Del Nero, and Leite to receive annual bribe payments in connection with the Copa do Brasil.  See, e.g., GX 1712-T at 4 (when asked by J. Hawilla if "Marin and Marco Polo . . . do they know you're paying Ricardo [Teixeira] more," K. Leite replied, "Of course they know!"); id. (when asked by J. Hawilla, "Marin, he shares it with Marco Polo, does he not?," K. Leite replied, "He does share – how they do it, I have not the slightest idea . . . they are aware that the other is participating.  Nothing else."); id. at 6-7 (when J. Hawilla stated that Marin and Del Nero might not receive the same amount as Teixeira, K. Leite replied, "that's their problem. . . . That is their internal problem . . . . Now, what they do, when they share, or how, that is not my problem. . . . That is their problem."); GX 307-T (ledger

18

recovered from K. Leite's safe detailing, among others, Copa América and Copa do Brasil bribes

for "MPM," i.e., Marco Polo and Marin, as well as "Miami," i.e., Teixeira).

In arguing that the evidence is insufficient to support a finding that he jointly

undertook with his coconspirators to take bribes in connection with the specified tournaments in

specified years, Marin relies heavily on United States v. Studley, 47 F.3d 569 (2d Cir. 1995), and

United States v. Rigo, 649 F. App'x 107 (2d Cir. 2016) (summary order).  Both cases are readily

distinguishable from this one.  In Studley, the Second Circuit held that a salesman who was

defrauding customers was not responsible for the frauds of his coworkers because the defendant

did not contribute resources to the scheme, "had no interest in the success of the operation as a

whole, and took no steps to further the operation beyond executing his sales."  47 F.3d at 576.

There was no evidence in that case that the defendant "assisted other sales representatives with

their sales, shared in the profits, or participated in any way in the management of the operation."

Id. at 572.  Here, as argued above, Marin had a strong interest in the success of the operation as a

whole because he only stood to receive his own bribes if the other officials also agreed to sign

the contracts in exchange for bribes.  He therefore took steps to further the broader operation and

participated in the management of the key resource at issue, the contracts.  See, e.g., GX 1352-T

at 1, 4 (CONMEBOL Executive Committee meeting minutes dated October 24, 2012, during

which Marin spoke in favor of the contract with Torneos for the Copa Libertadores rights, which

were obtained through bribes); GX 1357-T at 1, 11 (CONMEBOL Executive Committee

meeting minutes dated May 29, 2013, during which Marin voted with the other officials who

were receiving bribes to approve the contract with Datisa for the Copa América rights); GX

1709-T at 8-9 (after J. Hawilla asked if he should talk to, among others, Marin about the various

bribe payments, H. Jinkis said no, and instructed Hawilla to talk to him and A. Burzaco instead,

indicating that Marin had already spoken with Jinkis or Burzaco about the bribes); see also GX

19

1712-T; GX 307-T.  Put simply, here, the schemes' existence and viability required that they be jointly undertaken.

In Rigo, the Circuit vacated a finding that the defendant was liable for certain losses documented in a ledger because the district court had failed to make the requisite factual findings relating to jointly undertaken activity and had instead improperly applied the broader concepts of coconspirator liability.  649 F. App'x at 108.  But the Circuit took no position on whether the losses were, in fact, properly attributed to the defendant.  See id. at 109.  Marin fails to note in his brief that on remand, the district court in Rigo imposed the very same sentence, based on the very same loss amount, after making the requisite findings.  See United States v. Rigo, 13-CR-897 (RWS), 2017 WL 213064, at *7 (S.D.N.Y. Jan. 17, 2017).  It bears emphasizing that here, the PSR does not seek to hold Marin accountable for all losses associated with the racketeering conspiracy he was convicted of joining, or even all of the bribes associated with the schemes in which he participated.  Cf. JMM Br. at 11, 14.  Rather, the PSR only relies on losses intended through jointly undertaken criminal activity, as discussed herein.

In sum, the trial evidence established by at least a preponderance of the evidence that Marin and his coconspirators jointly undertook to receive bribes in exchange for their official support of the bribe-paying entities in the granting of the rights to certain editions of the Copa América, Copa Libertadores, and the Copa do Brasil tournaments.  Accordingly, the loss amount set forth in the PSR is accurate and should be adopted by the Court.

B.   The Enhancement For Use of Sophisticated Means and Conduct Overseas is Warranted

Marin challenges the PSR's application of a two-point enhancement under U.S.S.G. § 2B1.1(b)(10) because he used "sophisticated means" and a "substantial part" of the schemes were "committed from outside the United States," either one of which requires that the

enhancement be applied.  Marin argues that (1) he did not use sophisticated means to conceal his conduct; and (2) because there is jurisdiction relating to the use of the U.S. wires even though, according to Marin, "[v]irtually all of the conduct . . . took place on foreign soil," it is "unfair" to punish Marin for committing a substantial portion of the crimes outside the United States.  JMM Br. at 15-17.  He is wrong as to each prong of the enhancement.

Under U.S.S.G. § 2B1.1(b)(10)(C), a two-point enhancement is warranted if the defendant "intentionally engaged in or caused" there to be "sophisticated means," that is, "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1, app. note 9(b).  The Guidelines instruct that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Id.; see also United States v. Persaud, 411 F. App'x 431, 436 (2d Cir. 2011) (summary order) (upholding application of enhancement where the defendant used, among other things, "corporate shells, and offshore financial accounts . . . in perpetrating this fraud").  The two-point enhancement is also required under § 2B1.1(b)(10)(B) if "a substantial part of a fraudulent scheme was committed from outside the United States."

Marin's conduct, as well as that of his coconspirators, easily satisfies both the "sophisticated means" and the "outside the United States" prongs of the § 2B1.1(b)(10) enhancement.  As to the former, Burzaco testified that he and other Torneos employees received the wiring instructions for the bribe payments for Marin from an intermediary named "Alexandre" who worked at the CBF.  See Trial Tr. at 267, 385.  Marin himself used a shell company, Firelli International Limited, to receive many of his bribe payments, which money laundering expert Richard Adams explained helps conceal illegal activity as it "adds another layer" that must be removed to uncover the true beneficial owners.  Trial Tr. at 3297-98

21

(testimony of R. Adams); see also, e.g., Trial Tr. at 3435-40 (testimony of IRS Special Agent S. Berryman tracing $1.5 million in bribe payments as part of the Copa América Scheme into Marin's Firelli account); Trial Tr. at 3483-86 (testimony of S. Berryman tracing $500,000 in bribe payments as part of the Copa Libertadores Scheme into the Firelli account).  Marin also used a "hold mail service" for the Firelli account (see GX 511C), which Adams explained was a technique used by money launderers to help them remain "anonymous."  Trial Tr. at 3300.  Most significantly, Marin received these illicit funds through an intermediary, Wagner Abrahao, who received the funds from the bribe payors' bank account (often in Switzerland), used a complicated off-setting process involving two Andorran bank accounts (held in the name of Support and Expertise Travel), and then sent the funds in staggered payments to Marin's Firelli account in New York.  See, e.g., Trial Tr. at 3434-40, 3483-87.  As the commentary to the Guidelines instruct, this type of conduct, including use of "corporate shells, or offshore financial accounts," "ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1, app. note 9(B).  The proof at trial clearly established, well beyond a preponderance of the evidence, that a two-point enhancement is required under U.S.S.G. § 2B1.1(b)(10)(C).

In urging otherwise, Marin argues that because he identified himself and his wife as owners of Firelli and banked in the United States, he did not attempt to conceal his crimes through sophisticated means.  JMM Br. at 16-17.  This enhancement is not limited to efforts to conceal, however, but also applies if the offense "involved sophisticated means," § 2B1.1(b)(10)(C), that is, "pertaining to the execution or concealment of an offense," id., app. note 9(B) (emphasis supplied).  Marin's use of Firelli, as well as the use of an intermediary with multiple accounts in Andorra, certainly related to the "execution" of the crimes, and Marin listed himself as Firelli's beneficial owner so he could access the bribe money, which he did.  See, e.g., Trial Tr. at 3333-34 (testimony of R. Adams).  More importantly, the use of a complicated

transfer scheme through Andorran accounts, and the use of a shell company with no other

economic purpose, as well as the "hold mail" service, only served to help conceal the crimes.

That this concealment was not ultimately successful, and the government, through a years-long

investigation, traced the bribe money to Marin's Firelli account, does not mean that he did not

use sophisticated means.  If it did, the enhancement could never apply to crimes uncovered by

the government.

The two-point enhancement is also warranted under § 2B1.1(b)(10)(B).  The trial

record is replete with evidence that "a substantial part of a fraudulent scheme was committed

outside the United States," and Marin does not argue otherwise.  See JMM Br. at 17 (asserting

that "[v]irtually all of the conduct that the jury heard about at trial took place on foreign soil").[3]

Marin instead asserts that the "crux of the government's exercise of jurisdiction as to Marin was

a novel honest services fraud charge, grounded on the alleged breach of a fiduciary duty found in

codes of conduct that related to South America and its constituent soccer federations – not the

_____

[3] Although Marin does not contest this factual point, it is worth noting that the evidence established substantial international conduct by Marin, including conduct well beyond Marin's home country of Brazil, including: (1) shortly after his elevation to president of the CBF in April 2012, Marin and others flew to Buenos Aires and met with Burzaco and Grondona and discussed Marin and Del Nero receiving the annual $600,000 Copa Libertadores bribe payments that previously had been paid to Teixeira (see Trial Tr. at 354-56); (2) in June 2012, Marin and others again flew to Buenos Aires and met, among others, Burzaco and Grondona and they discussed both the Copa Libertadores and the Copa América bribe payments (see Trial Tr. at 356-58); (3) in December 2012, Marin and others met with Burzaco and Grondona in Paraguay and they discussed an increase in the Copa Libertadores bribe payments (see Trial Tr. at 360-61); and (4) in May 2013, Marin and Del Nero met with Burzaco in London, where they discussed the lateness of the promised Copa Libertadores bribe payments and demanded a portion of the Copa América bribe payment that had been promised, but not yet paid, to Teixeira (see Trial Tr. at 498-501).  In addition, Marin received his bribe payments from Abrahao's accounts in Andorra (as noted above); spent the proceeds of his crimes in, among other places, Paris (see GX 511C; Trial Tr. at 3444-45); signed the 2013 Datisa contracts in London (see GX 183, 184); and attended numerous FIFA and CONMEBOL events around the world (see, e.g., GX 1351-1374).  And this relates only to Marin's own misconduct, not that of his coconspirators for which he is also accountable.

United States."  JMM Br. at 17.  Punishing Marin for committing the crimes outside the U.S.,
according to Marin, would "permit the government to have its cake and eat it too."  Id.  The
argument is unavailing.

      As an initial matter, the government disagrees with Marin's characterization of
the government's theory of jurisdiction as "novel," particularly where, as here, Marin made
direct use of the United States banking system to receive his illicit proceeds, met with
coconspirators and discussed the schemes in the United States, and was part of a bribery scheme
involving a tournament to be played in the United States, among other domestic aspects of the
charged offenses.  Moreover, where a Guidelines provision is unambiguous, its plain language
controls.  See United States v. Parnell, 524 F.3d 166, 171 (2d Cir. 2008) ("Because the
Guidelines are clear, the District Court did not err . . . .") (citing United States v. Sloley, 464
F.3d 355, 359 (2d Cir. 2006) ("We [give] the Guidelines language its plain meaning and force . .
. .") (alterations in Parnell); see also United States v. Reed, 629 F. App'x 19, 21 (2d Cir. 2015)
(summary order) (rejecting arguments against application of a certain Guidelines provision as
"inconsistent with the plain text"); see also United States v. Okagbue-Ojekwe, 38 F. App'x 646,
648 (2d Cir. 2002) (summary order) (upholding application of enhancement under the
predecessor to § 2B1.1(b)(10)(C) where documents containing false statements were sent from a
foreign country).  Section 2B1.1(b)(10)(B) applies, without qualification, where a "substantial
portion" of the offense occurred "outside the United States."  Because that plainly occurred here,
the enhancement is appropriate.[4]

---

[4] The rationale behind the enhancement also powerfully supports its application here.
See U.S.S.G. § 2B1.1, bkgd. commentary ("Offenses that involve the use of financial
transactions or financial accounts outside the United States in an effort to conceal illicit profits
and criminal conduct involve a particularly high level of sophistication and complexity.  These
offenses are difficult to detect and require costly investigations and prosecutions.  Diplomatic

III.     Financial Penalties and Restitution

    A.     Forfeiture

        Marin acknowledges that an order of forfeiture is appropriate, but disputes the

forfeiture amount recommended in the PSR on the ground that the trial evidence was insufficient

to establish that he received $3,335,593 in bribes.  See PSR ¶ 149; JMM Br. at 18-19 (urging

order of forfeiture "no greater than $2 million").  The argument fails.

        In challenging the proposed forfeiture amount, Marin cites portions of the trial

evidence out of context and urges unsupported inferences while ignoring important aspects of the

record that support the recommended amount.  For example, Marin suggests that because

Torneos employee Eladio Rodriguez could not confirm that Marin actually received the bribe

payments that Rodriguez facilitated in connection with the Copa América and Copa

Libertadores, and because the ledgers maintained by Rodriguez only accounted for $2.4 million

in payments, the $2.7 million identified by the PSR in connection with those tournaments was

unfounded.  JMM Br. at 18-19.  The argument disregards the fact that Rodriguez made the

payments for the benefit of Marin as directed by others and was unable to confirm receipt only

because he did not personally witness the receipt of funds.  More importantly, the argument

ignores Burzaco's direct testimony that Marin was paid $2.7 million dollars in bribes – an

amount corresponding to $1.5 million for the Copa América (Marin's share of the $3 million sent

for the signature on the 2013 contract), and $1.2 million for the Copa Libertadores (comprising

$300,000 paid in 2012 and $450,000 in each of 2013 and 2014).  See, e.g., Trial Tr. at 461, 500

(regarding the $3 million due to be shared by Marin and Del Nero for the Datisa Contract

signature), 356-61 (regarding bribe money due to Marin for the Copa Libertadores), 600

---

processes often must be used to secure testimony and evidence beyond the jurisdiction of United
States courts.").

(referencing $2.7 million paid to Marin for the two tournaments).  The argument also fails to acknowledge that the Rodriguez ledgers only referenced $900,000 for Marin in connection with the Copa Libertadores – $450,000 in 2013 and $450,000 in 2014 – because the ledgers only covered 2013 and part of 2014.  That is, the evidence did not include a ledger for 2012.  But Burzaco testified that Marin and Del Nero were paid $600,000 together for 2012.  Trial Tr. at 356-61.

As for the Copa do Brazil, José Hawilla testified that he and Kleber Leite agreed to make bribe payments to Marin, as well as to Marco Polo Del Nero and Ricardo Teixeira, every year in connection with the tournament.  Trial Tr. at 2822.  In a recorded conversation, Leite, referring to the Copa do Brasil payments, stated, "I know that we have already paid . . . We've already paid – I'm absolutely sure."  GX 1704-T at 2.  In addition, one of the ledgers recovered from Leite's safe on May 27, 2015, show that the bribe payments for Copa do Brasil for "MPM" (which refer to Del Nero ("MP") and Marin ("M")) were "R$1M per year" for the years 2013-2022.  GX 307-T at 3, 5.  The evidence thus amply supports the conclusion that Marin was paid for each of the three years Marin was president, as required under his agreement with Hawilla and Leite.[5]

---

[5] Contrary to Marin's argument, see JMM Br. at 19, the transcript of his conversation with Hawilla at the Copa América Centenario announcement dinner in Miami (GX 1709-T) does not indicate that Marin was not paid – rather, it reflects Marin's general confusion about how much he was paid and when.   Indeed, the $900,000 figure – expressed in dollars, not Reais – seems more likely a reference to the $900,000 due to him and Del Nero for the 2014 Copa Libertadores than to the amount due for the Copa do Brasil.  As discussed further below, it appears that there was so much money coming in for the various tournaments that Marin simply lost track.

The trial proof established that Marin received at least $3,335,593 in bribe payments in connection with the crimes of conviction, as set forth in the PSR.[6]  He should be ordered to forfeit those ill-gotten gains.[7]

B.     Restitution

Under the Mandatory Victim Restitution Act of 1996 ("MVRA"), restitution is mandatory for certain crimes, including "any offense committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii).  Because the MVRA applies to the offenses at issue here, the Court must order restitution where "an identifiable victim or victims has suffered a . . . pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B).  The MVRA defines a victim as a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," including "any person [who is] directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).  Congress has authorized restitution for "the full amount of each victim's loss," 18 U.S.C. § 3664(f)(1)(A), which encompasses only the "actual loss," United States v. Marino, 654 F.3d 310, 320 (2d Cir. 2011) (quoting United States v. Germosen, 139 F.3d 120, 130 (2d Cir. 1998)), that was "directly caused

---

[6] Given the appearance of Marin's initial on notes recovered from Leite's safe that reference bribes paid in connection with additional tournaments, see GX 307-T, the number is an understatement of Marin's ill-gotten gains.

[7] The government does not seek to establish that Marin acquired or maintained his salaries and honoraria through his criminal conduct and thus withdraws its opposition to Marin's objection to inclusion of these amounts in the forfeiture judgment.  The Court should, however, order Marin to compensate his victims for salaries and honoraria to the extent such outlays are recoverable through restitution.  See, e.g., United States v. Bahel, 662 F.3d 610, 649 (2d Cir. 2011) ("There is no question that a portion of an individual's salary can be subject to forfeiture [under the Mandatory Victims Restitution Act] where, as here, an employer pays for honest services but receives something less.").

27

by the conduct composing the offense of conviction," id. (quoting United States v. Silkowski, 32 F.3d 682, 689 (2d Cir. 1994)).

   Marin raises a number of arguments in opposition to the PSR's recommendation that the Court order restitution in the full amount of the victims' losses in connection with the bribery schemes at issue, including that (1) the Court should first determine what amounts, if any, the victims have already received in compensation for purported losses; (2) that in assessing requests for restitution, the Court should focus on losses suffered by the victims, not on gains to the defendant; (3) that there is no evidence of harm to the purported victim entities, and therefore restitution should be limited to a percentage of Marin's salary; and (4) that FIFA and its constituent organizations should not receive restitution because they were complicit in the charged offenses.  See JMM Br. at 20-26.  The government agrees with Marin insofar as he urges a process that focuses on the amount of actual losses suffered by victims as a result of the defendant's criminal conduct.  See, e.g., United States v. Zangari, 677 F.3d 86, 91 (2d Cir. 2012) ("Because the purpose of restitution is essentially compensatory, and because the MVRA itself limits restitution to 'the full amount of each victim's loss,' 18 U.S.C. § 3664(f)(1)(A), a restitution order must be tied to the victim's actual, provable, loss.") (internal quotation marks and citation omitted).  The government rejects the argument – as it and the Court have previously – that there was no evidence presented at trial of harm to the victims in connection with the contracts procured through bribery, or that FIFA and its constituent entities are not properly viewed as victims.  See, e.g., Mem. & Order dated June 22, 2018 Regarding Post-Trial Mots., ECF Dkt. No. 952, at 14 ("[E]ven if the government were required to prove that FIFA and its

28

confederations suffered pecuniary harm as a result of Napout's and other FIFA officials' receipt of bribe payments, the Court would find that the government's evidence was sufficient.").

        In addition, that other coconspirators have agreed to forfeit their ill-gotten gains does not impact Marin's restitution obligations. See United States v. Bodouva, 853 F.3d 76, 78-79 (2d Cir. 2017) (explaining the "distinct purposes of forfeiture and restitution"). Although the government has agreed in certain contexts to request permission to apply forfeiture payments to a judgment of restitution, the decision "lies within the sole and exclusive discretion of the Attorney General or his or her designee." See, e.g., GX 3500-AB-3. Because restitution is a victim-centered approach, Marin's restitution obligations should not be conditioned on the Department of Justice's decision with regard to other coconspirators made at some point in the future. See United States v. Torres, 703 F.3d 194, 203 (2d Cir. 2012) (stating that the "purpose of restitution in criminal cases is to compensate victims for harm suffered as result of criminal activity") (citing Restatement (3d) of Restitution and Unjust Enrichment § 1 cmt. e (2011)).

        The government notes that several entities and individuals, including FIFA and CONMEBOL, have submitted filings seeking to be designated as victims of Marin's offenses and to be compensated for losses through the restitution process. See ECF Dkt. Nos. 965 (former employees of Traffic Sports USA), 966 (FIFA), 967 (CONCACAF), and 968 (CONMEBOL). Others have inquired about the possibility of submitting filings related to restitution. These filings, and Marin's arguments in response, raise a number of complex issues to be resolved by the Court in determining a just order of restitution. Pursuant to 18 U.S.C. § 3664(d)(5), "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." In light of the multiple submissions by potential victims, which have

been contested by defendant Marin,[8] the government respectfully submits that the Court should set a date for the final determination of the victims' losses within 90 days following defendant Marin's sentencing to allow for full briefing by all interested parties.

      C.    Fine

          Marin objects to the Probation Department's recommendation that he be ordered to pay a fine.  Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his or her dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a).  The Guidelines provide, in turn, that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," and employs a similar eight-factor test to determine the amount of any such fine.  U.S.S.G. §§ 5E1.2(a), 5E1.2(d).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  Id.  The defendant bears the burden of demonstrating an inability to pay a fine.  See United States v. Camargo, 393 F. App'x 796, 798 (2d Cir. 2010) (summary order); United States v. Salameh, 261 F.3d 271, 276 (2d Cir. 2001).

          Here, the PSR states that the statutory maximum fine for Counts One, Two and Six is $250,000 on each count.  See PSR ¶ 143.  As noted in the government's July 25, 2018

---

[8] Marin challenged the victim submissions in sentencing memorandum and indicated that he also "intends to respond separately" to those submissions.  JMM Br. at 21 n.4.

30

letter objecting to the PSR, however, 18 U.S.C. § 3571(d) provides, in relevant part, that "[i]f

any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a

person other than the defendant, the defendant may be fined not more than the greater of twice

the gross gain or twice the gross loss."  Here, Marin's gross gain is $3,335,593, see PSR ¶ 74,

and so the maximum fine is at least $6,671,186.[9]

      The Guidelines fine range for the offenses of conviction is $25,000 to $250,000.

PSR ¶ 145 (citing U.S.S.G. § 5E1.2(c)(3)); see also United States v. Gushlak, 495 F. App'x 132,

136 (2d Cir. 2012) (summary order).  Marin has an individual net worth of more than $14

million and it is not in dispute that he has the ability to pay a fine, nor has he demonstrated that

the payment of a fine would be a burden.  See PSR ¶¶ 132, 136.  For the reasons detailed at

length below, there is a strong need for a substantial financial penalty in light of the seriousness

of Marin's crimes, his disregard for the law, and the need for deterrence.

IV.    3553(a) Factors

      In fashioning the appropriate sentence, the Court must consult the Guidelines and

balance all of the factors set forth in 18 U.S.C. § 3553(a).  The government respectfully submits

that this analysis should result in a sentence of no less than 120 months' imprisonment.[10]

A.    Nature and Circumstances of the Offenses and the Need to Provide Just
        Punishment

      The nature and circumstances of Marin's criminal conduct, including his

sustained and flagrant disregard for his obligations as a FIFA official, for the interests of the

---

[9] As set forth above, the government respectfully submits that the calculation of the total loss (which affects restitution) should be resolved after sentencing.  For purposes of sentencing, therefore, the maximum possible fine is no less than twice the gross gain, i.e., $6,671,186.

[10] The Bureau of Prisons ("BOP") will likely credit Marin for the approximately five months he spent in Swiss custody pending extradition against any sentence imposed by the Court.  Accordingly, the government requests that the Court impose a sentence recognizing he

sport he was meant to serve, and for the integrity of the U.S. financial system, support the imposition of a significant incarceratory sentence.  See 18 U.S.C. § 3553(a)(1), (2)(A).  Almost from the moment he became the president of the CBF in April 2012, Marin began to abuse his position in the upper ranks of international soccer, contributing to the corruption of the game that he now professes to love.  See JMM Br. at 39.  Marin exploited his position to line his own pockets with millions of dollars in bribes that should have gone to the organizations he was supposed to serve.  In doing so, he abused the trust placed in him by those organizations and the sport as a whole, effectively stealing money that could have been used to better the game through development, promotion of youth and women's leagues, and other initiatives.  His crimes spanned more than three years, from the time of his elevation to the top of the CBF to the moment of his arrest in May 2015.

Marin seeks to minimize the seriousness of his crimes, arguing that his conduct falls "well outside the 'heartland' of the typical case" because "one cannot overstate the degree to which the conduct on trial in this case is engrained into the fabric of FIFA."  JMM Br. at 34.  That corruption in soccer was endemic does not render Marin any less culpable.  To the contrary, that Marin joined others in widespread criminality only underscores the special dangers posed by the conspiratorial and racketeering conduct at issue in this case and the need for punishment beyond that warranted by isolated offenses.  See Jury Instructions, ECF Dkt. No. 872, at 19 ("The United States Congress has deemed it appropriate to make conspiracy a separate crime. That is because collective criminal activity poses a greater threat to the public's safety and

---

will receive such credit (as well as the approximately eight months spent in U.S. custody).  To the extent Marin is not appropriately credited with time already served, as occurred with codefendant Costas Takkas, the government will not oppose a motion to amend the judgment to include the facts necessary for the BOP to credit him for the five months.  See ECF Dkt. No. 839 (motion by Takkas to amend the judgment with the consent of the government).

welfare than individual conduct, and increases the likelihood of success of a particular criminal venture."); RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2096-97 (2016) (a pattern of racketeering activity "demonstrate[s] the existence or threat of continued criminal activity") (citing H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)).

Marin also claims that his position in soccer was "largely a perfunctory one" and that his role in the overall conspiracy was therefore "extremely limited."  JMM Br. at 36.  It is true that Marin is significantly less culpable than Napout, who sought to rise through the ranks of international soccer to become the president of CONMEBOL and aspiring to be president of FIFA itself, all the while collecting millions of dollars in bribes, supervising other coconspirators, and ultimately obstructing the government's investigation.  But Marin's role was significant and essential to the success of the criminal schemes in that he continued his predecessor's use of Brazil's outsized influence and prestige in the world of soccer to further the corruption of the sport, support the exchange of influence for bribes, and seek personal enrichment.  It was Marin, not Del Nero, who signed the Datisa Contract that was the product of hundreds of millions of dollars in bribes.  And although Marin may not have actively pursued the CBF presidency, he immediately took advantage of the position, holding his hand out for bribes relating to multiple editions of at least three tournaments in meetings with Del Nero, Grondona, Burzaco, and others.  See, e.g., GX 1709-T at 23-24.

In short, Marin abused the trust placed in him for his entire tenure as president of the CBF, receiving in excess of $3 million in bribes and agreeing to receive nearly $7 million

more.  The nature and circumstances of the offenses therefore support a substantial term of imprisonment.

      B.     <u>The Need to Adequately Deter Criminal Conduct and Promote Respect For the Law</u>

      The Court also must consider the need for the sentence to "afford adequate deterrence to criminal conduct" and to promote respect for the law.  18 U.S.C. § 3553(a)(2). Simply put, a significant term of incarceration is warranted to deter others who would abuse their positions in sports governance to enrich themselves, and to assure the public here and abroad that when corrupt sports officials abuse the U.S. wire facilities and the broader financial system to carry out fraudulent schemes, they will be appropriately punished.

      As the Court is aware, this case has unearthed a decades-long criminal conspiracy in which dozens of soccer officials violated their duties by soliciting and receiving millions of dollars in bribes and kickbacks, and thus depriving the sport of millions of dollars for their own personal benefit.  Marin acknowledges the pervasiveness of the criminal conduct, which, until now, has remained unchecked.  <u>See</u> Marin Br. at 2 (describing the corruption in international soccer as "long accepted as a way of life"); 25 (commenting that FIFA should receive "condemnation[] for its wanton disregard for the decades-long pattern of corruption that permeated the highest levels of those organizations"); 34 (describing the bribery conduct at issue in the case as "engrained into the fabric of FIFA"); and 40 (noting that the "offense conduct," namely bribery, was "rampant in the sport").  This Court already referenced the need for general deterrence in imposing sentence on codefendant Héctor Trujillo, the former General Secretary of the Guatemalan soccer federation who agreed to receive bribes totaling $415,000 and who pleaded guilty to wire fraud and wire fraud conspiracy.  <u>See</u> Trujillo Sentencing Tr. at 64 (statement of the Court that general deterrence is "another compelling interest here").

The need for deterrence is even stronger here.  Marin was the president of the federation in Brazil, a country in which soccer holds a special place in the national culture and which wields special influence in the sport owing to the success of Brazilian soccer players and the size of the Brazilian economy.  See Trial Tr. at 285 (testimony of A. Burzaco that the CBF was "most important soccer federation in South America in terms of economic power and sports background or sports performance").  Marin continued the corruption of one of the most important soccer organizations in the world, out of greed, and to date has expressed no remorse for his conduct.  It is therefore imperative that the sentence imposed by the Court clearly demonstrate that such egregious conduct at the very highest levels of the sport will be met with significant punishment.  Only a significant term of imprisonment can effectively deter the many other officials who govern soccer, and other sports, from similarly harming the organizations whose interests they are supposed to represent.  A significant term of imprisonment also would assure the broader public, from "clean" sports officials who do not violate their duties of loyalty, to soccer fans of modest means, to players on the field, that the law will hold even those in the highest positions to account for criminal violations of their duties.

Marin asserts that a sentence of time served (approximately 13 months' incarceration, including the five months he spent in Swiss jail) "completely satisfies general deterrence interests" because his arrest, indictment, and conviction have been "well-publicized." JMM Br. at 40.  But the publicity surrounding the case is insufficient to deter others who might commit similar crimes.  Rather, the world will be watching to see what sentence the Court imposes on Marin, the first convicted trial defendant to be sentenced in the case.  The extreme and unwarranted leniency Marin seeks in a sentence of time served would undermine the deterrent effects of this case.  Such a sentence would suggest that a soccer official can brazenly corrupt the sport he is supposed to protect, enrich himself for years with millions of dollars in ill-

gotten gains, abuse the stability and availability of the U.S. financial system in the process, and spend just eight months in U.S. custody.[11]

　　　　　For far too long, officials responsible for administering the sport of soccer have enriched themselves with impunity.  The sheer number of soccer officials who have been indicted or otherwise convicted in this Court demonstrates just how pervasive a problem this has been for decades in the world of soccer, and how necessary it is for the Court to emphasize general deterrence in its sentence.

C.　　The History and Characteristics of the Defendant

　　　　　Marin's sentencing memorandum argues for a sentence of time served based in large part on his history and characteristics, including his history of public service, age and health problems, and status as a non-English speaker.  See JMM Br. at 27-34.  Although the government agrees that Marin's particular circumstances, including his age and health, warrant a substantial downward variance from the Guidelines range of 235 to 293 months' to 120 months' imprisonment,[12] the government respectfully submits that consideration of these factors does not

---

[11] Although the government recognizes that specific deterrence is less of a concern here given Marin's age, his failure to express remorse for his years-long criminal activity is relevant to the need to protect the public from further crimes of the defendant.  See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); accord United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order).  Marin's lack of remorse, when coupled with his significant criminal conduct, also bears on the need to promote respect for the law.

[12] In his discussion of the § 3553(a) factors, Marin cites to provisions of the Guidelines that permit a formal downward departure within the Guidelines system rather than a variance below the Guidelines under § 3553(a).  See, e.g., JMM Br. at 29-31 (citing U.S.S.G. §§ 5H1.1 and 5H1.4, which permit a departure based on age and physical health).  The government does not understand the defendant to be seeking a departure from his Guidelines range of a certain number of points, but rather a variance to a below-Guidelines sentence.

warrant a sentence of time served – at 13 months, a sentence less than one eighteenth as long as a sentence at the bottom of the applicable Guidelines range.

First, Marin's background as an attorney and former politician only highlights the gravity of his offenses.  He clearly knew the difference between right and wrong and between service and self-interest, and his only possible motivation to commit these crimes was greed, despite his claims to be "selfless."  JMM Br. at 1.  As detailed in the PSR and his sentencing submission, Marin has been an attorney in Brazil since 1955.  He served as a Sao Paulo city councilman, president of the city council, state assemblyman, lieutenant governor of the state of Sao Paulo, and later the governor of the state.  See PSR ¶¶ 126-28.  He also ran a radio company, which his family owned, earned money and property upon the passing of his parents, and owned numerous income properties as well as his apartment at Trump Tower.  See PSR ¶ 130-31.  In these ways, Marin amassed a substantial fortune in excess of $14 million.  See PSR ¶ 132.  When he became president of the CBF in 2012, then, Marin had no need to exploit his position for personal gain.

As the Court explained at the sentencing of Trujillo, the former general secretary of the Guatemalan soccer federation and an attorney and former judge on his country's Constitutional Court, a life of public service, and in the law, reflects an opportunity and an obligation to avoid inflicting the harms that flow from corruption:

> So unfortunately, as much good as he's done through his education and training and background, it also says to me that he's someone who knew better and should have done better, and that when he concealed these acts, as I said before, he knew exactly what he was doing, that rather than fulfilling his duty of loyalty and honesty at [the Guatemalan federation], he stole from them and he knew what he was doing and in some way, he betrayed his country because the sport of soccer is, of course, a national love and a patriotic endeavor.

37

> So in that regard, he really wounded not only the institution of
> soccer, but the pride of his country.

See Trujillo Sentencing Tr. at 68; see also id. at 62 (statement of the Court that "what is true is
that [attorneys] know better – better than anyone else – that they shouldn't be doing these things.
They are the people who are entrusted to impose and enforce the rule of law").

Notwithstanding his trial defense, as an attorney, long-time soccer fan, and
president of the CBF, Marin knew very well that as a soccer official, he was not permitted to
accept bribes. Yet he did so year after year, tournament after tournament – an egregious course
of conduct that requires a significant term of imprisonment.

Second, the government appreciates that Marin is 86 years old and suffers from
various health conditions and that therefore a term of imprisonment is a significant punishment
for him. But it bears emphasizing that Marin lived an active lifestyle seemingly unimpeded by
his advanced age. For instance, in the three years preceding his arrest in May 2015, Marin flew
all around the world (for soccer-related events and otherwise), including trips to Brazil, New
York, London, Miami, Switzerland, Argentina, Las Vegas, Paris, Budapest, Sweden, Tokyo, and
Paraguay. See, e.g., GX 700K (American Airlines flight records for Marin); Trial Tr. at 3442-46
(testimony of S. Berryman detailing how some of the bribe proceeds were spent around the
world). He was also able to commit the crimes of conviction despite his advanced age as he
entered the racketeering conspiracy in April 2012 at age 79. Although the Court should consider
Marin's age and health problems in fashioning an appropriate sentence, the government submits
they do not support a sentence of time served. The goals of sentencing would not be served by

allowing a criminal to enjoy the fruits of his crimes until he deems himself too old to pay the consequences.

Third, though perhaps relevant, the fact that Marin is not a U.S. citizen and is not proficient in English do not warrant the degree of leniency sought. As Marin concedes in a footnote, the Second Circuit has held that "the unavailability of preferred conditions of confinement" is generally not a basis for any downward departure under the Guidelines. United States v. Restrepo, 999 F.2d 640, 644 (2d Cir. 1993); accord United States v. Duque, 256 F. App'x 436, 437 (2d Cir. 2007) (summary order) (affirming decision not to downwardly vary from the Guidelines range because the "collateral effects at issue here [from his status as a deportable alien] are run of the mill"); see also United States v. Volynskiy, 431 F. App'x 8, 11 (2d Cir. 2011) (summary order) (observing that the district court found the defendant's "collateral consequences common among aliens in criminal cases" and affirming decision not to downwardly vary from the Guidelines on that basis).

D.    The Need to Avoid Unwarranted Sentencing Disparities

In imposing sentence, the Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Although this factor is difficult to apply as comparisons are often imperfect, the government submits that it also weighs in favor of a significant incarceratory sentence.

The Court has already imposed sentence on two defendants charged in this case, both of whom expressed remorse for their crimes. On October 31, 2017, the Court sentenced Costas Takkas, an attaché to former CONCACAF president Jeffrey Webb who helped Webb launder a $3 million bribe paid in exchange for one contract. Takkas did not receive any financial benefit for facilitating the bribe, had never before been involved in illegal activity, and

39

spent 10 months in Swiss prison prior to extradition and received a sentence of 15 months' imprisonment.

On October 25, 2017, the Court sentenced Trujillo, who agreed to receive two bribes totaling $415,000, and ultimately received less than $200,000, to eight months in prison. The Court found that Trujillo had significant health problems, including "declining mobility and other health issues that would make prison and incarceration considerably harder on him than other defendants who are younger and more fit," and had committed many "good works" and "public service."  Trujillo Sentencing Tr. at 66-67.

Here, every sentencing factor (apart from age and health) weighs in favor of a substantially lengthier sentence than that imposed on Takkas or Trujillo.  Marin was the president of his national soccer federation and received vastly more bribe money over a longer period of time in connection with more tournaments.  The need for deterrence is even stronger as he has not expressed any remorse for his actions, exhibited a cavalier attitude towards receiving millions of dollars in bribes, and did so during his entire tenure as CBF president.  Accordingly, the need to avoid unwarranted sentencing disparities requires the Court impose a significant incarceratory sentence.

In urging that the Court impose a sentence of time served, Marin also argues that (1) the "rare" facts of the case justify a downward variance; and (2) the Court should consider the fact that the average fraud sentence in the Second Circuit is 30 months' imprisonment.  See JMM Br. at 42.  Neither of these contentions has merit.

As set forth above, Marin exploited his position as president of the CBF to receive millions of dollars in bribes with the promise of millions more.  He abused the trust placed in him by the organizations for whom he worked and the sport as a whole.  He committed these

crimes not out of economic need, but from greed.  To the extent these facts are "rare," they counsel in favor of a more severe sentence, not a more lenient one.

Marin's reliance on the mean sentence imposed by the Second Circuit in certain cases is misplaced as well.  The mean sentence cited by Marin is irrelevant as it is no more than a mathematic calculation of all "fraud" sentences imposed in the Circuit.  It is not even clear whether Marin's crimes would qualify as "fraud" as there are separate categories for "racketeering/extortion" offenses (which had a mean sentence of 96 months) and "money laundering" crimes (which had a mean sentence of 34 months).  In any event, this statistic does not indicate whether those defendants were found guilty of "similar conduct," 18 U.S.C. § 3553(a)(6), or how many of them received sentencing reductions for acceptance of responsibility, and therefore does not bear on the Court's analysis.

E.    Marin's Other § 3553(a) Arguments

In support of his request for a sentence of time served, Marin also argues that (1) even if the PSR's calculation of loss is correct, the enhancement "grossly overstate[s] Mr. Marin's culpability"; and (2) the various enhancements recommended by the PSR (loss amount, sophisticated means/outside the United States, money laundering conviction, and abuse of trust) are "substantially overlapping" and warrant a "departure or variance."  JMM Br. at 36-39.  Neither of these arguments warrants the relief he seeks.

1.    Loss Calculation

Marin claims that applying the monetary loss enhancement would "grossly overstate" his culpability, but the Guidelines instruct "that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes."  U.S.S.G. § 2B1.1, bkgd. commentary.  And with respect to a downward departure on the ground that the loss amount overstates the seriousness of the

41

offense, the example offered by the Guidelines is that a "securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims." Id. § 2B1.1, app. note 20(C).  In such a case, the Guidelines note that the loss-amount enhancement plus the number-of-victims enhancement (§ 2B1.1(b)(2)) "may combine to produce an offense level that substantially overstates the seriousness of the offense."  Id.

Here, by contrast, the loss-amount enhancement is driven by the amount of bribes Marin (and his coconspirators in the jointly undertaken schemes) themselves agreed to receive. The figure is not driven by any factor outside of their control, but rather is a direct reflection on their culpability and attempts to enrich themselves at the expense of their victims.  For those reasons, the loss amount accurately reflects "the nature and magnitude of the loss caused or intended" and therefore a downward variance on that basis is unwarranted.  U.S.S.G. § 2B1.1, bkgd. commentary.

Marin's cited authority is not to the contrary.  Indeed, in those cases, the district judges lamented the Guidelines' reliance on loss amount where the harm caused was accidental and dependent on factors other than the defendant's own actions.  See Gov't Sent. Memo., United States v. Lumiere, 16-CR-483 (JSR) (S.D.N.Y. May 16, 2017), ECF Dkt. No. 98, at 2-5 (lying on financial documents to overstate a fund's health, resulting in over $9 million in losses to investors who invested in the fund after the fraud began and lost their investment); United States v. Faibish, 12-CR-265 (ENV), 2014 WL 4273299 (E.D.N.Y. Aug. 28, 2014), at *1-2, and id., 2015 WL 4637013, at *1-3 (E.D.N.Y. Aug. 3, 2015) (check kiting scheme that overstated the health of companies, resulting in at least $21 million in losses to over 250 investors); United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) ("pump and dump" scheme where the court criticized the Guidelines in white collar cases, focusing on the enhancements for loss

amount, number of victims, and being a director of a publicly traded company, and contrasting a case where the defendant caused a "$2.2 billion loss to hundreds of thousands of investors"); United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (executing fraudulent trades on behalf of his employer with himself, resulting in a scenario where "the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence of the victim's security procedures as on [the defendant's] cupidity," and observing that "the Guidelines already consider the potential for a large-scale loss to some extent by providing an enhancement [of four points] for a securities fraud by a person associated with a broker-dealer").[13]

2.      Purported "Cumulative Effects" of Enhancements

Finally, Marin asserts that time served sentence is warranted because of the purported overlap between the enhancements for: (1) loss amount, (2) sophisticated means and

---

[13] In United States v. Corsey, 723 F.3d 366 (2d Cir. 2013), Judge Underhill, a United States District Judge for District of Connecticut sitting on the Second Circuit by designation, concurred in the majority's opinion that the defendants' sentences had to be vacated for procedural error but wrote only for himself in asserting that the sentences were substantively unreasonable in large part because of his views of the loss amount enhancement. In that case, the defendants committed a "clumsy, almost comical, conspiracy to defraud a non-existent investor of three billion dollars . . . [that] never came close to fruition." 723 F.3d at 378 (Underhill, J., concurring). Although Judge Underhill criticized the nature of the loss enhancement, he did so in the context of arguing that the sentences of 20 years' imprisonment for a failed and impossible scheme to defraud were substantively unreasonable. See, e.g., id. at 379 ("Because the plan was farcical, the use of intended loss as a proxy for seriousness of the crime was wholly arbitrary: the seriousness of this conduct did not turn on the amount of intended loss any more than would the seriousness of a scheme to sell the Brooklyn Bridge turn on whether the sale price was set at three thousand dollars, three million dollars, or three billion dollars."). By contrast, Marin's conduct was sophisticated, calculated and successful for many years.

conduct outside the United States, (3) money laundering conviction, and (4) abuse of trust.  JMM Br. at 38-39.  This too is without merit.

Marin readily admits that he cites no authority for the proposition that application of these four enhancements results in substantial overlap requiring a departure under United States v. Jackson, 346 F.3d 22 (2d Cir. 2003), or United States v. Lauersen, 348 F.3d 329[14] (2d Cir. 2003).  In Lauersen, the Court vacated a sentence for failing to apply an enhancement but stated that, on remand, the district court "may exercise discretion" to downwardly depart because, under an earlier version of the Guidelines, the court had to impose enhancements (1) for an intended loss of $4.9 million, see U.S.S.G. § 2F1.1(b)(1)(N) (2000), and (2) because the crime affected a financial institution and the defendant derived more than $1 million in gross receipts from the offense, see U.S.S.G. § 2F1.1(b)(8)(B) (2000).  348 F.3d at 332, 343-44.

In Jackson, the defendant stipulated to a two-point aggravating role enhancement under § 3B1.1(c), but the district court imposed a four-point enhancement under § 3B1.1(a) because he was a leader of criminal activity that was "otherwise extensive."  346 F.3d at 24.  The Court upheld the application of the enhancement but remanded for the district court to consider, "in its discretion," whether to downwardly depart because the enhancements for loss amount, sophisticated means, and involvement of more than minimal planning substantially overlapped with the extra two-point enhancement because the defendant was a leader of "otherwise extensive" criminal activity.  Id. at 26.

Here, the Court should not exercise its discretion to downwardly depart because there is no similar overlap between the challenged enhancements.  The amount of money lost (or

---

[14] The Laursen opinion at 362 F.3d at 1651, cited in Jackson and Marin's sentencing memorandum, was withdrawn and replaced with the decision at 348 F.3d 329.

intended to be lost) is quite different from the use of sophisticated means, the abuse of trust[15] or the fact that Marin was convicted of a money laundering offense.  Unlike in <u>Laurensen</u> (where both enhancements dealt with the amount of loss) or <u>Jackson</u> (where all the enhancements dealt with the scope of the misconduct), the enhancements here all serve specific and different purposes.  For those reasons, a downward departure for "substantially overlapping" enhancements is not warranted.

---

[15] Marin also argues in a footnote that the abuse of trust enhancement "seems to be duplicative" because the government was required to prove as an element of the honest services wire fraud predicate that he owed a duty of loyalty.  <u>See</u> JMM Br. at 39 n.8.  This is entirely beside the point.  The base offense level prescribed in § 2B1.1 applies to all sorts of frauds, not just honest services wire fraud that requires proof of a fiduciary duty.  For instance, a wire fraud in which one stranger defrauds another by selling him a car and lying about its physical condition carries the same base offense level as an honest services fraud scheme in which a director who agreed to operate in the best interests of his company accepts an unlawful bribe.  The Guidelines, however, recognize that the latter offense is more culpable than the former and therefore call for a two-point enhancement where the defendant abused a position of trust to facilitate the offense.  That reveals that Marin's misconduct is more culpable than the average fraud scheme and therefore warrants a higher sentence; it in no way reveals an improper overlap or "double counting" warranting a downward departure.

CONCLUSION

For the reasons set forth above, the government respectfully submits that a sentence of 120 months is sufficient but not greater than necessary to achieve the goals of sentencing.

Dated:          August 14, 2018
                Brooklyn, New York

                                    Respectfully submitted,

                                    RICHARD P. DONOGHUE
                                    United States Attorney,
                                    Eastern District of New York

                        By:         _____/s/_____
                                    Samuel P. Nitze
                                    M. Kristin Mace
                                    Keith D. Edelman
                                    Assistant United States Attorneys
                                    (718) 254-7000