

SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
+1 212 839 5300
+1 212 839 5599 FAX

AMERICA ● ASIA PACIFIC ● EUROPE

MLEVY@SIDLEY.COM
+1 212 839 7341

September 7, 2018

**By ECF**

The Honorable Pamela K. Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re: *United States v. Juan Ángel Napout & Jose Maria Marin,*
> 15 Cr. 252 (S-2) (PKC) (RML)

Dear Judge Chen:

<u>Introduction</u>

The Confederation of North, Central America and Caribbean Association Football ("CONCACAF") respectfully submits this statement of the losses that it suffered as a result of the offenses for which Juan Ángel Napout and Jose Maria Marin were convicted and recently sentenced. As detailed below, those losses include (i) at least $27.7 million to $32.7 million that CONCACAF lost as a result of the corrupt sale of its commercial rights to the Copa América Centenario (the "Centenario"), and (ii) at least $15,216,634 in attorney fees and related expenses incurred during CONCACAF's participation in the investigation and prosecution of the offenses and attendance at proceedings related to the offenses. Accordingly, CONCACAF respectfully submits that it is entitled to restitution in an amount no less than $42,916,634 to $47,916,634.

<u>Discussion</u>

I.    Centenario-Related Losses

In 2013 and 2014, the principals of several sports marketing companies promised more than $100 million in bribes to Napout, Marin, CONCACAF President Jeffrey Webb, and others in order to *terminate* the governing contract for the commercialization of media and sponsorship rights for upcoming Copa América editions and *replace* that contract with a deal that was far more favorable to the sports marketing companies. This corrupt new contract applied to four upcoming editions of the Copa América, including the special Centenario edition to be held in 2016—the only one of the four editions in which CONCACAF had an interest. As described

# SIDLEY

below, when compared to the contract that had been in place, and based on the sports marketing companies' own reasonable projections of the revenue that the Centenario would have brought in absent the taint caused by subsequent revelation of their corruption, CONCACAF collected between $27.7 and $32.7 million less than it would have absent the conspirators' crimes.[1]

A.     The Preexisting 75/25 Revenue-Split for Commercial Rights

Prior to 2010, CONMEBOL's media and sponsorship rights to the quadrennial Copa América were marketed by the Traffic Group ("Traffic"). In 2010, however, Traffic's competitor, Full Play Group ("Full Play"), wrested away Traffic's incumbency and secured a three-edition contract with CONMEBOL to act as sales agent for CONMEBOL's commercial rights to the 2015, 2019, and 2023 editions of the Copa América. (*See* GX 178-T (the "2010 Full Play Contract"), Ex. A, hereto.) Under the 2010 Full Play Contract, CONMEBOL and Full Play agreed on a 75/25 revenue-split pursuant to which Full Play, as sales agent, would receive 25% of any revenue that it procured through the sale of CONMEBOL's commercial rights, and the remaining 75% of the revenue would go to CONMEBOL. (*Id.* at ¶ 5.1.)

Because Full Play procured this contract corruptly through millions of dollars in bribes, it may be that this revenue-split was overly generous to Full Play. Nonetheless, it sets a benchmark from which to measure the pecuniary harm that CONMEBOL and CONCACAF suffered when officials of those organizations (including Napout and Marin) subsequently accepted even more generous bribes in order to terminate this otherwise operative agreement and replace it with one that was far less favorable to their organizations.

B.     Replacement with a Corrupt Flat-Fee Arrangement

Following execution of the 2010 Full Play Contract, Traffic sued CONMEBOL and Full Play in Florida. Thereafter, in 2013, Traffic and Full Play resolved that lawsuit by joining together with a third competitor, Torneos y Competencias ("Torneos"), and forming a joint venture called Datisa. Datisa then agreed to pay massive bribes to various CONMEBOL officials—and subsequently to Webb at CONCACAF—for their acquiescence in terminating the 2010 Full Play Contract and replacing it with a new and more corrupt contract that was self-evidently a worse deal for Copa América rights-owners (the "2013 Datisa Contract").

Under the terms of the 2013 Datisa Contract—which covered the same 2015, 2019, and 2023 editions of the Copa América, plus the special 2016 Centenario edition—CONMEBOL

---

[1] This Court has already found for Sentencing Guidelines purposes that the bribe to Webb, and thus the harm to CONCACAF, was reasonably foreseeable to the defendants and that they are appropriately held accountable for it.

# SIDLEY

voluntarily gave up its right to 75% of all revenue received from the commercialization of its rights by a sales agent. Instead, CONMEBOL simply sold all of its right, title, and interest in the media and sponsorship rights to Datisa for the flat fee of $80 million per edition of the tournament, including the Centenario. (Tr. 417-18.) Datisa subsequently entered into a separate contract with CONCACAF following the same structure, paying CONCACAF a flat fee of $35 million for its share of the media and sponsorship rights relating to the Centenario. (Trial Tr. 487.)

As one of Datisa's principals, Alejandro Burzaco, testified at trial, this flat-fee arrangement "was worse" for the rights-owners than the sales-agency agreement that it replaced because now CONMEBOL "was getting paid a fixed price of $80 million per edition with no upside" when the revenue from Datisa's sale of the rights predictably outstripped that meager amount. (Trial Tr. 417-18.) Similarly, CONCACAF would receive only $35 million, with no further opportunity to share in the upside of the enormous media and sponsorship revenues expected from the Centenario.

Nor was it lost on CONMEBOL's and CONCACAF's corrupt leadership that this deal was worse than what the market would bear—indeed, worse than the structure that CONMEBOL already had *in place* with Full Play for commercialization of the rights to various upcoming editions of the Copa América. As Burzaco testified, Datisa recognized that it "need[ed] to pay *additional* bribes" to the officials that Full Play had *already* bribed in order to get this new and even worse deal approved. (Trial Tr. 417 (emphasis added).) In total, although not all of the bribes were paid, Datisa budgeted to pay $100 million in bribes to CONMEBOL officials in order "to get the contract signed as a purchase of rights, instead of an agency" agreement—$20 million for execution of the contract and another $20 million per edition of the Copa América; effectively, $25 million for each of the four editions. (Trial Tr. 462.) Datisa also agreed to pay another $10 million to Webb in order to obtain CONCACAF's rights to the Centenario. (Trial Tr. 487.) Thus, Datisa budgeted to pay a total of $35 million in bribes to buy all of the Centenario rights outright, rather than simply act as a sales agent with a 25% share of the revenue.

C.     Expected Revenue from the Centenario

Nearly a year after the 2013 Datisa Contract was signed, and with at least one large contract with a broadcaster already in hand, Datisa's internal estimate was that its resale of the media and sponsorship rights for the Centenario would bring in between $250 and $270 million in revenue. Specifically, in recorded conversations on April 30 and May 1, 2014 (GX 1709-T & 1710-T, Exs. B and C, hereto; *see also* Tr. 2778-80, 2786-88), *all* of the principals of the entities that formed Datisa—Burzaco (Torneos), Hugo and Mariano Jinkis (Full Play), and Jose Hawilla (Traffic)—met and discussed the fact that Univision had already committed to pay a

"spectacular" $71 million for Spanish-language broadcasting rights in the United States, Fox was likely to pay $30 million more for English-language broadcasting rights in the United States, and thus, because of the amounts that Datisa stood to bring in "only from the United States," it was apparent that the Centenario would at least "yield a profit of 100 million for the company, more or less," and likely "100, 110, [or] 120" million. (GX 1709-T at 1-2; GX 1710-T at 4.) Indeed, the Datisa principals were sufficiently certain of this profit that they began strategizing how to deal with potential demands by soccer officials for more bribes, explaining that "the presidents know that we will have $100 million of profit" (GX 1709-T at 3) and that "when they see that we earn 100, 110, 120, we are at risk that they will come to ask us for more." (GX 1710-T at 4; *see also* Trial Tr. 4505 (Govt. observation in rebuttal that Datisa's principals were "on tape saying, '[W]e sold a hundred million dollars to the United States alone, we're going to make a hundred million in profit. . . . [W]e're going to be making so much money [that soccer officials will] want more.'").)

Because Datisa's committed expenditures to obtain the rights to the Centenario were at least $150 million—$115 million in fees and $35 million in bribes—Datisa's projected profit of $100 to $120 million necessarily meant that Datisa projected bringing in at least $250 to $270 million in revenue.[2] And as the Government explained in its rebuttal summation, there is "no reason to doubt" the accuracy of Datisa's projections about how much money it would make. (Trial Tr. 4506.) This is true for a variety of reasons.

First, as the Government noted, the projection was not made in a vacuum. It was made after the $71 million Univision agreement had already been reached, and another $30 million from Fox appeared certain. Thus, the projection was based on actual data.

Second, the individuals doing the projection were the principals of three of the most experienced sports marketing companies in the relevant segment of the industry. More than anyone, they had the experience and expertise to project from the revenue already in hand how

---

[2] To the extent there is any uncertainty about whether Datisa agreed to pay CONMEBOL officials something less than $100 million in bribes to go along with the $10 million to Webb (*see* Govt. Sentencing Submission re: Napout, Docket No. 997, at 6 (suggesting only $79.3 million total in bribes)), any such uncertainty would not alter this analysis. During the conversations in which Datisa's principals estimated that they would earn $100 to $120 million in profit on the Centenario, they made clear that their calculation was based on the assumption that they would be paying $110 million in bribes for the 2013 Datisa Contract. (*See, e.g.*, GX 1709-T at 5-6 (discussing that bribes would be "more [] than [the] 100" to CONMEBOL because "[t]here are ten more for CONCACAF . . . For Jeff [Webb] . . . That's 110 . . . So, it is 110; it is not 100.").)

# SIDLEY

much revenue would be obtained in total from selling the media and sponsorship rights to the Centenario.

Third, CONMEBOL and CONCACAF's actual data from the Centenario supports the estimate. After the May 2015 indictment in this case revealed the corruption underlying the 2013 Datisa Contract, CONMEBOL and CONCACAF unwound the agreement and—taking over Datisa's sales efforts despite a severely shortened sales window before the event, and the reality of a badly tarnished product—managed to complete the sales process and produce total media and sponsorship revenue of approximately $220 million. That figure makes clear that, in the absence of the negative effects of the crime, revenue would, indeed, have been at least in the $250 to $270 million range that Datisa predicted.

Finally, to the extent the Court would be assisted by it, CONCACAF is prepared to present at the scheduled hearing in this matter the testimony of Professor Victor Matheson of the College of the Holy Cross, an expert sports economist, to further establish that Datisa's revenue estimate was a reasonable one.[3]

## D.     CONCACAF's Losses

Given the foregoing, it is not difficult to generate a reasonable estimate of the pecuniary harm that CONCACAF and CONMEBOL suffered as a result of the defendants' Centenario fraud scheme. *See*, *e.g.*, *United States v. Gushlak*, 728 F.3d 184, 195-96 (2d Cir. 2013) ("[O]ur case law reflects the settled understanding among courts of appeals that a reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable.") (internal quotation marks omitted). Absent the corrupt 2013 Datisa Contract and the fallout that attended its public disclosure, a legitimately marketed Centenario would have generated between $250 and $270 million in revenue from the sale of media and sponsorship rights. Under the sales agency framework in place for the Copa América before the conspirators terminated it and replaced it with the corrupt 2013 Datisa Contract, CONMEBOL and CONCACAF would collectively have retained 75% of that revenue. In other words, instead of the $115 million that the defendants and other corrupt CONMEBOL and CONCACAF officials agreed to accept from Datisa for the Centenario rights (while lining their own pockets to the tune of $35 million), CONMEBOL and CONCACAF would collectively have earned between $187.5 and $202.5 million from the sale of the rights.

---

[3] To the extent necessary, Professor Matheson would also testify about the soundness of CONCACAF's reasoning and loss calculation more broadly.

# SIDLEY

Under terms legitimately negotiated between CONMEBOL and CONCACAF when the two organizations unwound the 2013 Datisa Contract and renegotiated their revenue sharing contract in October 2015, CONCACAF is entitled to one-third of the revenue from the sale of the media and sponsorship rights for the Centenario.[4] Accordingly, CONCACAF would have earned between $62.5 and $67.5 million from a non-corrupt sale of its Centenario rights. As reported in CONCACAF's publicly released, audited financial statements for 2015 and 2016, however, CONCACAF in reality only earned approximately $34.8 million from the sale of its Centenario rights. (Ex. D, hereto, at 13.)[5] <u>Accordingly, the Centenario scheme caused CONCACAF to lose between at least $27.7 and $32.7 million on the sale of its rights</u>.

D.     Alternative, Minimum Measure of Loss

Although the above-described estimate is reasonable and should be adopted, at a bare minimum CONCACAF lost the amount of the $10 million bribe promised to Webb. As Government expert Stefan Szymanski testified at trial, money that a sports marketing company like Datisa spends on bribes in connection with bidding on commercial rights is money that the company would, in a competitive environment, have been willing to include in its bid. (Trial Tr. 192.) Thus, the amount of the bribe is the minimum amount by which a victim could have been harmed.

But limiting loss to such a theory instead of using the carefully calculated measure of harm described above would blink reality because it would incorrectly assume that Datisa gained nothing from the bribery scheme; *i.e.*, that $150 million was a fair price for the Centenario rights and that Datisa was indifferent to whether it paid that amount legitimately, or broke it up into

---

[4] Under the 2013 and 2014 agreements with Datisa, CONCACAF's share was slightly lower—$35 million to CONMEBOL's $80 million, or 30.4%. But that artificially low percentage was the product of corrupt arrangements among criminals, reflecting not a fair apportionment based on the merits but, rather, the share that Webb was prepared to accept so long as he personally received an outsized, $10 million bribe. There is no reason to adopt that apportionment over the one-third/two-thirds apportionment legitimately negotiated by CONCACAF and CONMEBOL after the corrupt Datisa arrangement was discovered and jettisoned.

[5] It is essentially coincidence that this number nearly matches the $35 million figure that Datisa agreed to pay for the rights. In actuality, Datisa only paid CONCACAF $14 million before that agreement was unwound. CONCACAF obtained the remaining $20.8 million as its share of revenues collected under the legitimate agreements put in place by CONMEBOL and CONCACAF after the corrupt Datisa arrangement was voided.

# SIDLEY

$115 million in fees and $35 million in bribes.  This was clearly not the case.  As shown above, Datisa was well aware that $150 million was a preposterously low price to pay for the rights, regardless of whom it paid the money to.  The rights were worth $250 to $270 million in revenue, and CONMEBOL already had a sales agency deal in place with Full Play pursuant to which the sports marketing company (Full Play) would capture only 25% of that revenue.  The whole point of the bribery scheme in question was that Datisa wanted to replace that deal with one where the sports marketing company would instead capture approximately 40 to 45% of the revenue.  As Burzaco explained, in order to get soccer officials to terminate the existing deal and permit it to be replaced with an obviously "worse" one, those officials had to be bribed.  (Trial Tr. 417-18.)  Indeed, the Datisa principals discussed after the fact whether they had obtained such an unfairly advantageous deal at CONCACAF and CONMEBOL's expense that they might be pressured into increasing the amount of the bribes.  Under these circumstances, limiting CONCACAF's loss to the amount of the bribe is plainly insufficient to account for the harm caused.  Doing so would ignore the very reason the soccer officials demanded bribes and, correspondingly, the very reason Datisa agreed to pay them.

II.    Attorney Fees and Other Expenses Incurred During Participation in the Investigation or Prosecution of the Offense

The Mandatory Victims Restitution Act provides that a defendant must be ordered to reimburse a victim for "necessary . . . expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  Such expenses include attorney fees and related costs incurred cooperating with the Government, including by performing an internal investigation invited or encouraged by the Government during the period of the Government's investigation and prosecution.  *See*, *e.g.*, *United States v. Amato*, 540 F.3d 153, 159 (2d Cir. 2008).[6]

Under Section 3663A(b)(4), <u>CONCACAF is entitled to restitution for $15,216,634 in attorney fees and related costs</u> incurred in the following three categories:

- <u>Attorney fees and expenses incurred assisting the Government and Court</u>:  The United States Attorney's Office first contacted CONCACAF in October 2012.  Since that time, CONCACAF has incurred $1,927,123 in attorney fees and

---

[6] In *Lagos v. United States*, 138 S. Ct. 1684 (2018), the Supreme Court recently made clear that the statute's use of the phrase "'*during* participation in the investigation or prosecution'" means there may be no restitution for expenses incurred for an internal investigation conducted "*before* the . . . government's investigation began."  *Id*. at 1690 (quoting MVRA; emphasis in original).

related expenses as a result of its attorneys' participation in the investigation and prosecution of the offenses through activities such as communicating and meeting with the Government, collecting and producing evidence to the Government, preparing and making factual presentations to the Government, making witnesses available to the Government, and supplying information to the Court to assist with the Court's statutory obligation to calculate restitution.

- <u>Attorney fees and expenses incurred performing an internal investigation</u>: CONCACAF has conducted two internal investigations. The first was commenced in 2012 and completed in 2013. It was begun on CONCACAF's own initiative, before CONCACAF was aware of any federal investigation. Under *Lagos*, CONCACAF is not entitled to restitution for attorney fees and expenses associated with this first internal investigation. CONCACAF is, however, entitled to restitution for the attorney fees and expenses incurred in connection with its second internal investigation. That second investigation was initiated in June 2015, shortly after the unsealing of the first indictment, with the encouragement of the United States Attorney's Office. Information and evidence collected during the investigation was shared with the Government as part of CONCACAF's participation in the investigation and prosecution of this case. In total, CONCACAF incurred $13,027,981 in attorney fees and related expenses conducting this second internal investigation, consisting of: (i) $9,086,972 in fees and expenses for legal services; (ii) $2,446,976 in fees for forensic consultants to collect, process, and host relevant data; and (iii) $1,494,033 in fees for forensic auditing services.

- <u>Attorney fees and expenses incurred assisting in FIFA's internal investigation</u>: FIFA reports in its restitution submission that it participated in the investigation and prosecution of the offenses by conducting an internal investigation in consultation with the Government. CONCACAF directly assisted FIFA in its efforts by responding to FIFA's requests to CONCACAF for documents and information in connection with that internal investigation. In doing so, CONCACAF incurred $261,530 in attorney fees and related expenses.

**SIDLEY**

<u>Conclusion</u>

For the foregoing reasons, CONCACAF respectfully submits that the defendants should be ordered jointly and severally to make restitution to CONCACAF in an amount not less than $42,916,634 to $47,916,634.

Respectfully submitted,

Michael A. Levy

cc: All counsel of record (by ECF)

# Exhibit A

GOVERNMENT
EXHIBIT
**178-T**
15 CR 252 (PKC)

<u>TRANSLATION</u>

**AGENCY AGREEMENT**

Between:

**CONFEDERACIÓN SUDAMERICANA DE FÚTBOL** (SOUTH AMERICAN FOOTBALL CONFEDERATION), having permanent headquarters at Autopista Internacional Km. 12, Luque (Greater Asunción), in the Republic of Paraguay (hereinafter referred to as "Conmebol"), represented at this proceeding by Dr. Nicolás Leoz, Paraguayan, of legal age, in his capacity as President, and by Mr. Eduardo Deluca, Argentinian, of legal age, in his capacity as General Secretary, the party of the first part,

and

**FULL PLAY GROUP S.A.,** a corporation established under the laws of the Oriental Republic of Uruguay, having legal domicile at Calle Treinta y Tres No. 1374, Apartment No. 307, in the city of Montevideo, Oriental Republic of Uruguay (hereinafter referred to as "FP" and/or the "Agent"), represented at this proceeding by Mr. Mariano Alejo Jinkis, Argentinian, of legal age, in his capacity as attorney-in-fact, the party of the second part (each party hereinafter individually referred to as the "Party" and, collectively, as the "Parties"),

and

**WHEREAS**

I.  Conmebol is a non-profit civil association under private law founded on July 9, 1916, consisting of the National Associations of South America, which are members of the Fédération International[e] de Football Association (hereinafter referred to as "FIFA"):


II.  Conmebol is the sole worldwide owner of all commercial available rights or rigths likely to be marketed now and in the future with respect to everything relating to sports events involving professional male junior and adult football national teams which are members and non-members of Conmebol associations, currently known as "Sudamericano Sub-17 (South American Under-17)," "Sudamericano Sub-20 (South American Under-20)" and "Copa América."

III.  Based on the commercial and economic experience of the past years regarding the manner and contents of marketing the commercial rights to the above-mentioned events, and seeking to optimize the resources granted by those rights, therefore, in order to achieve an adequate, optimum and effective organization of those events and to maximize profits towards a greater improvement regarding purpose and social function, both for Conmebol as well as the member associations, Conmebol, through its Executive Committee, has decided to directly market all rights to the above-mentioned events. To that end, and on the factual basis that Conmebol does not have the necessary resources to do so, Conmebol has decided to engage an exclusive commercial agent to market all rights pertaining to those events, to whom it shall grant a power of attorney with representative powers for a better and greater promotion, sale and marketing of the aforementioned rights to the events mentioned in II.

IV.  FP, its affiliates, associates, controlled and controlling companies constitute a long-established entrepreneurial group in the market specializing in marketing, agency and distribution of universal broadcasting rights and the production and marketing of advertising, marketing and intellectual property rights regarding sporting events in general and football events in particular, and thus it is fully qualified to take on the role of commercial agent.


In consideration of the foregoing recitals, the Parties agree to enter into this Agency Agreement (hereinafter referred to as the "Agreement") which shall be governed according to the following

**CLAUSES AND CONDITIONS**

**FIRST. PURPOSE.**                                                                FIFA00176776

DISCLOSED PURSUANT TO PROTECTIVE ORDER

1.1. Under the terms and conditions of this Agreement, Conmebol designates FP as exclusive commercial agent for negotiation and marketing, for the account of and by order of Conmebol and throughout the world, of all Rights (as they shall be defined in clause 1.2.) in connection with the Events (as they shall be defined in clause 1.3.) up to and including the year 2023.

Furthermore, and for purposes of achieving efficient and adequate agency service, Conmebol, in its capacity as principal, entrusts FP, which, in its capacity as agent, accepts the commercial representation and management of the business specified in this clause and under the terms of this Agreement. In order to perform all these commissions and assignments, simultaneously with the execution hereof, Conmebol grants and confers a general, broad and sufficient power of attorney in favor of FP, which includes, *inter alia*, the power so that FP may be able to sign and execute agreements and collect monies relating to the purpose hereof, in representation of (on behalf and for the account of) Conmebol, pursuant to the terms of Annex II. Notwithstanding this, in any event, FP may request Conmebol to directly sign agreements with the purchasers of rights marketed by FP.

1.2. FP's activities, in its role as exclusive commercial agent, shall comprise the business of Conmebol related to the Events and shall include, but not be limited to, *inter alia*:

a) marketing and exploiting all rights to broadcast, rebroadcast, disseminate and reproduce, without limit as to number of broadcasts, either live and/or delayed and/or abridged broadcasts, by any system created and/or to be created, including, but not limited to, AM and FM radio, open TV, closed TV, cable TV, MMDS, UHF, closed-circuit TV, closed circuit TV, satellite TV, basic or premium cable, digital and/or analogue TV, High Definition (HD), Three Dimensional (3D), Internet, WAV technology, News Access, Intranet and cellular telephony, SMS, Direct to Home (DTH), Direct Broadcast Satellite (DBS), wire, optic fiber or physical cable, Multichannel Microwave Distribution System (MMDS), Hertzian way, Pay per View (PPV), Near Video on Demand (VOD), of all activities relating to the Events, including training and related activities, on an exclusive and worldwide basis (the "Broadcasting Rights");

b) exploiting the rights relating to advertising, marketing, intellectual property, industrial property, image, brand names, trade names, licenses, in any manner relating thereto created and/or to be created, including, but not limited to, the designation of companies as "Official Partner," "Sponsor," "Patron," "Sponsor [*sic*]," "Official Product," "Supplier," "Licensees," "Commercial Partners," or other names deemed appropriate;

c) exploiting all brand names, words, names, logos, emblems, symbols, devices, mascots and/or any other intellectual property developed or to be developed by Conmebol or on its behalf by third parties or which are owned by Conmebol in connection with the Events, including the identity associated with brand names, graphics, the trophy and any other symbol or identifier approved by Conmebol to identify the Events;

d) marketing of sponsorship, virtual advertising, advertising by static, dynamic, aerial, inflatable billboards and LEDS in all stadiums; promotion, hospitality and any other commercial opportunity relating to the Events to exploit any product in the official venues;

e) granting licenses, concessions, franchises, display, sampling, demonstration and sales rights at the official venues; merchandising (including, but not limited to, electronic games and CD-ROMs in any format, either interactive or otherwise) in relation to the Events;

f) marketing of any conventional or electronic printed material produced in relation to the Events, such as posters, guides, programs, magazines, maps, books, electronic publications, CD-I and CD-ROM; producing and exploiting any musical composition for the Events and any film for the Events; selling advertising in any printed, official material relating to the Events, including, but not limited to, accreditations, tickets, invitations, posters, guides, programs, maps, notebooks and books, and

g) any other right to the commercial exploitation of the Events, which is not mentioned above, on an exclusive basis in the territory and in all possible categories and areas.

FIFA00176777

DISCLOSED PURSUANT TO PROTECTIVE ORDER

Henceforth, all rights included in subparagraphs a) to g) shall be designated as the "Rights."

1.3.    For purposes of this Agreement, the term "Events" comprises the following football sports events organized by Conmebol, in which professional male adult and junior national football teams participate:

(a)    "South American Under-17" is the football tournament currently held every two (2) years in which national junior football teams participate (players under l7 years of age and players who turn l7 in the year of the competition) with all their football figures from all Conmebol member Associations, which are currently ten (10), the minimum of official football matches to be held being twenty-six (26) [and] other qualifying tournaments of similar format for the World Championship organized by FIFA and/or the International Olympic Committee, plus related training and events;

(b)    "South American Under-20" is the football tournament currently held every two (2) years in which national junior football teams participate (players under 20 years of age and players who turn 20 in the year of the competition) with all their football figures from all Conmebol member Associations, which are currently ten (10), the minimum of official football matches to be held being thirty-five (35) and other qualifying tournaments of similar format for the World Championship organized by FIFA and/or the International Olympic Committee, plus related training and events, and

(c)    "Copa América" is the football tournament currently held every four (4) years in which the national adult football teams participate with all their football figures from all Conmebol member Associations, which are currently ten (10), plus two (2) additional guest national teams which are not members of Conmebol, one of which is Mexico's National Football Team, in such way that there are twelve (12) participating teams in each tournament, the minimum number of official football matches to be held being twenty-five (25), plus related training and events.-

1.4.    Marketing of any Rights to the 2011 Copa América edition, to be held in the Argentine Republic, is expressly excluded herefrom.

**SECOND. TERM.**

2.1.    This Agreement shall become effective as of this date and shall expire on December 31, 2023 (hereinafter referred to as the "Term"). The Parties expressly clarify the following points in connection with the Term: i) The Agent may market, at any time, all those Rights referring to Events held by December 31, 2023 at the latest, and ii) The Agent shall be entitled to market, even after December 31, 2023, all those Rights relating to the Events the scheduling of which under the current format would have been contemplated to end prior to December 31, 2023, even though after the signature of this Agreement it was decided to defer their execution to a date subsequent to that date.

2.2.    For purposes hereof, the Term shall be subdivided into the following three time periods: (i) From the signature hereof until December 31, 2015, during which time period and under the current format at least three (3) "South American Under-17" championships, three (3) "South American Under-20" championships shall be held, and one (1) "Copa América" championship, to be held in 2015; (ii) From January 1, 2016, until December 31, 2019, during which time period and under the current format at least two (2) "South American Under-17" championships, two (2) "South American Under-20" championships shall be held, and one (1) "Copa América," to be held in 2019, and; (iii) From January 1, 2020, until December 31, 2023, during which time period and under the current format at least two (2) "South American Under-17" championships, two (2) "South American Under-20" championships shall be held, and one (1) "Copa América," to be held in 2023. The time periods shall also include any other Event taking place during those time periods, provided they are related to these Events.

**THIRD. EXCLUSIVE RIGHTS. TERRITORY.**

3.1.    As of this date and until December 31, 2023, under the terms of the previous clause, FP shall be Conmebol's sole and exclusive agent for marketing the Rights-----------------------------------------------------------------

FIFA00176778

DISCLOSED PURSUANT TO PROTECTIVE ORDER

to all Events. Consequently, Conmebol undertakes to refrain from engaging in sales and/or profiting in any way from marketing the Rights to the Events, either by itself, or by acting either directly or indirectly. This means that Conmebol may not, during the aforementioned term, sell or allow the marketing of Rights to the Events by itself or by other individuals, but only through the Agent, it being understood that this is the main function and intangible asset of it.

3.2.     The territorial scope of this Agency Agreement is the whole world. Any limitation to this global and exclusive scope of the Rights must be expressly agreed upon in writing by the Parties.

**FOURTH. CHARACTERISTICS OF THE AGENCY - RIGHTS AND OBLIGATIONS OF THE AGENT AND CONMEBOL.**

4.1.     The Agent shall act in good faith and shall cooperate and collaborate with Conmebol to achieve the commercial and economic success of the Events. To that end, it shall provide all necessary human resources for marketing the Rights in an effective manner.

4.2.     The Agent shall promote and negotiate the implementation of any activity related to the Events.

4.3.     The Agent, as of the execution hereof, may market at any time all Rights pertaining to any Events to be held within the Term.

4.4.     The Agent, either by itself or through a designated third party for such purpose, shall be in charge, albeit at Conmebol's expense, of the television production of all Events.

4.5.     Conmebol shall be in charge of the required sports and logistical organization to carry out all Events in such a way as to allow FP to effectively market all Rights and, consequently, to maximize revenue.  For this purpose, Conmebol undertakes:

(i)      to cause all Conmebol's affiliates and/or associates to participate in the Events and to strictly comply with the Requirements Handbook, to be adopted by the Committee (as defined in Annex I);

(ii)     to cause all Conmebol's affiliates and/or associates to cooperate with FP to ensure its success in the Rights Agency;

(iii)    to  cause all National Teams to play with their main professional teams;

(iv)     to make all payments related to (a) the participation of all National Teams, including the fee and other agreed upon sums; (b) the insurance policies which are usually underwritten for this type of participation, and (c) the transportation, accommodation and meals of the National Teams at each location where an Event takes place, if so agreed upon with the National Teams;

(v)      to turn over to FP all stadiums where the Events matches are to be held, which are to be turned over to the purchasers of the respective Rights, clear of all advertising, sufficiently in advance for the successful exploitation of those Rights. Furthermore, it shall deliver to FP, for it to hand it over to the purchasers of Rights, a sufficient number of tickets, which shall never be less than 100 tickets per secured sponsor and the right to purchase an additional 100 tickets per secured sponsor to any of the Events matches. Seating locations shall be in the upper pitch side seats (*platea superior*), and/or boxes and/or any other designation given to the Stadium's preferential seating. Each stadium shall have adequate and available space to accommodate hospitality areas for VIPs and for individuals so deemed to be by FP, particularly in order that FP and the purchasers of Rights may properly take care of the sponsors, business partners, etc.;

(vi)     to provide PF and/or whomever the latter indicates, in all stadiums where Events matches are to be held, all technical and operational facilities which are essential and necessary for a production according to international criteria and/or standards;

FIFA00176779

DISCLOSED PURSUANT TO PROTECTIVE ORDER

(vii) to provide, at PF's request, broadcasting booths in the stadiums, and also deliver the necessary credentials for the access of journalists and technicians to the sports arena;

(viii) to prevent, in its capacity as Events organizer, the access to the stadiums of any television channel which has not been expressly authorized by FP to capture the images of the matches. National and international journalists accredited before the host country's Association are excluded from this limitation, with the sole proviso that they do not carry image transmission cameras of any kind,

(ix) to act in good faith, cooperate and collaborate with the Agent in all matters relating to the purpose of this Agreement; and it shall arbitrate all solutions which may be necessary and may arise from the implementation hereof.

4.6. Conmebol shall be responsible vis-a-vis FP, for purposes of guaranteeing the free agency of the Rights to the Events and vis-a-vis the prospective purchasers of Rights, for controlling and/or causing to control and preventing any unauthorized use thereof.

4.7. Conmebol undertakes to sign all documentation which may turn out to be necessary for FP to best discharge its activity as Agent and, simultaneously with the signature hereof, it shall deliver certified letters to FP certifying that FP is Conmebol's exclusive commercial agent for marketing all Rights to the Events;

## FIFTH. FEE. EXPENSES.

5.1. As consideration for the activity to be carried out by the Agent hereunder, FP shall be entitled to receive a fee equal to twenty-five per cent (25%) on all income obtained by the Agent from the sales and/or marketing of all Rights (the "Fee").

The Agent shall receive all sums for marketing the Rights, and 30 days prior to the beginning of each Copa América organized during the Term, it shall settle with Conmebol the sums indicated as follows. From the total income the Agent would have received for the sales and/or marketing of all Rights, the Agent shall deduct the Fee, the television production expenses of all Events and all expenses the Agent would have incurred for the exploitation of the Rights and which were paid in advance by the Agent. The balance shall belong to Conmebol in full.

Furthermore, on the same date, the Agent shall deliver to Conmebol, as a sworn statement, an itemized report in which all amounts, marketed items and incurred expenses shall be indicated, with theapplicable vouchers.

5.2. Notwithstanding the provisions of the preceding clauses[,] and given the exclusive basis conferred by Conmebol to the Agent and the commitment the Agent assumes vis-a-vis Conmebol, FP undertakes to make an advance to Conmebol of US ten million dollars (US$ 10,000,000) (the "Advance"), which shall be paid as follows: (i) US five million dollars (US$ 5,000,000) within forty-five (45) days from the date of signature hereof, and ii) US five million dollars (US$ 5,000,000) prior to December 31, 2010. The Advance shall be taken on account from the amounts which must settled by the Agent to Conmebol.

5.3. The Parties expressly state for the record that all obligations, liabilities and expenses for producing and organizing the Events shall be at the exclusive cost and expense of Conmebol.

## SIXTH. COMMITTEE TO CONTROL AND MONITOR THE AGREEMENT.

6.1. For purposes of performing the reciprocal duties to cooperate, collaborate, monitor, and to better carry out the purpose hereof, the Parties establish at this proceeding, within Conmebol, a Committee to Monitor and Control regarding this Agreement (hereinafter referred to as the "Committee"), which shall consist of two full members and two alternate members designated by FP, and by two full members and two alternate members designated by Conmebol. Conmebol-------------------------------------------------------------------------------------------------------------

FIFA00176780

DISCLOSED PURSUANT TO PROTECTIVE ORDER

expressly declares that the composition of the Committee has been approved by the Executive Committee at its meeting on April 28, 2010. The decisions taken by the Committee shall be of an advisory nature for the Parties in all matters relating to the purpose hereof. All issues relating to the Committee's operational performance, as well as issues resulting from its terms of reference, shall be in principle set forth in ANNEX I hereto. The provisions of Annex I are without prejudice to all other issues the members of the Committee decide to add to it.

**SEVENTH. RIGHT OF FIRST REFUSAL.**

7.1.     The Parties agree that Conmebol must duly notify FP within the first five working days when the former has an offer from a third party to be engaged as an Agent for marketing the Rights related to Events subsequent to December 31, 2023. On the basis of this, FP shall have the right rather than the obligation to exercise, within 30 working days of having been notified, its intention as to the right of first refusal regarding the aforementioned third party and, consequently, to match the marketing conditions offered by it.

**EIGHTH. CONMEBOL REPRESENTATIONS AND WARRANTIES.**

8.1.     Conmebol represents and warrants by itself, on behalf of its associates and/or its affiliates: i) that the signatories have sufficient powers for purposes of signing this Agency Agreement; ii) that this Agreement constitutes a binding, valid, lawful and enforceable agreement, under the terms and with the scope contemplated herein; iii) that this Agreement does not violate any law, regulation or rule to which Conmebol might be subject, nor does it constitute a breach of any contractual obligation; iv) that the Rights to the Events are exclusively owned by Conmebol, and it does not acknowledge any charge or encumbrance, and (v) that it has not received any sum for the Rights to the Events, either on account or as an advance, or in any other way, and it undertakes not to do so as of this date.

**NINTH. FP'S REPRESENTATIONS AND WARRANTIES.**

**9.1.**     FP represents and warrants: (i) that the signatory has sufficient powers for purposes of signing this Agency Agreement; (ii) that FP has broad right, power, legal capacity and authority to market the Rights to the Events, free from legal, contractual or any other type of limitations, and to enter into and fulfill its obligations arising from this Agreement; (iv) [*sic*] that no consent or approval by any individual or body is required with respect to this Agreement; (v) that this Agreement constitutes a valid and legally binding obligation for the Agent, enforceable by Conmebol in accordance with its terms, and (vi) that it has full operational and commercial capacity to successfully develop the purpose hereof.

**TENTH. TERMINATION. DEFAULT.**

10.1.     The Parties agree that in the event of default of any of the obligations assumed hereunder, the Party in compliance shall duly notify the Party in default in order for it to remedy the default within ten (10) business days. In the event of failing to do so, the Party in compliance shall be entitled: a) to demand compliance with the Agreement, plus a claim for applicable damages, or b) to terminate the Agreement and to make a claim for any damages suffered, without prejudice to the fines established herein.

10.2.     In the event of default by Conmebol regarding the provisions of clause 3.1., Conmebol shall hand over to the Agent the total sums the Agent would have delivered as advances, plus a fine of US fifteen million dollars (US$ 15,000,000) for each time period (pursuant to clause 2.2.). This is without prejudice to the provisions of 10.1.

**ELEVENTH. INDEMNITY.**

11.1.     Conmebol, as holder of the Rights to the Events, undertakes to indemnify and hold harmless FP, its directors, managers, officers, representatives, agents, employees, and controlled, controlling and related companies, in its capacity as marketing agent, with regard to any damage, cost, loss, liability, expenditure (including, but not limited to, attorneys',------------------------------------------------------------------------------------------------------------

FIFA00176781

DISCLOSED PURSUANT TO PROTECTIVE ORDER

experts' and court fees) arising from third-party purchasers of any right or on any grounds relating hereto.

11.2.    Furthermore, the Parties undertake to indemnify and hold harmless the other Party with regard to any damage, cost, loss, liability, expenditure (including, but not limited to, attorneys', experts' and court fees) stemming from court and/or out-of-court claims arising from and/or related to any: (i) default by each Party of the obligations assumed hereunder, and/or (ii) falsehood or inaccuracy with respect to the statements made by each Party in the foregoing clauses, and/or (iii) labor claim, occupational accidents or diseases or similar made by employees, clerks, officers and/or personnel who have or have had an employment or contractor relationship with Conmebol or FP.

## TWELFTH. CONFIDENTIALITY.

12.1.    The Parties undertake to protect as confidential and not to disclose to any third party any confidential information received from Conmebol or FP, their related companies or in any other way found out by any of the Parties in connection with or by reason of the implementation hereof. Furthermore, the Parties shall not disclose by any means, including, but not limited to, mass media, the existence of this Agreement and/or the agreements reached between the Parties in relation to this Agreement, without the prior consent in writing of both Parties. Failure to comply with this obligation of confidentiality shall authorize the party in compliance to exercise its rights pursuant to the Tenth clause hereof.

## THIRTEENTH. MISCELLANEOUS.

13.1.    No conduct, custom or use shall modify the terms of this Agreement. Should any clause hereof be deemed invalid or otherwise unenforceable or not legally due, this shall not affect the validity, implementation and enforceability of all other provisions thereof. In such a case, the Parties shall enter into such supplementary agreements as may be necessary to replace the affected clause by another which, by satisfying the requirements of legality, validity and enforceability, endeavors to achieve the outcome the Parties have originally agreed upon herein.

13.2.    Nothing in this Agreement may be construed as though it creates an associative, corporate, labor, joint venture or transient union relationship of companies between the Parties or between the dependents or partners of one of the Parties with the other Party. The Parties are independent traders, with no commercial relationship in common beyond that arising from entering into and executing this Agreement. At no time shall any of the Parties mislead any individual as to its capacity as a contractual party independent of the other. Failure to comply with this obligation shall authorize the affected party to terminate the contractual relationship binding them, by operation of law.

13.3.    FP may assign this Agreement, in whole or in part, only to its affiliates, controlled and controlling companies. Any assignment of the status of Agent shall be provided that the assignee abides by all terms and conditions hereof.

13.4.    No omission by anyone of the Parties, at any time, to enforce a right or judicial remedy available to it hereunder shall be deemed to be a waiver by such Party to the right to enforce any of the provisions hereof in the future.

13.5.    The Parties agree to take all necessary measures to cooperate with each other on any issue relating to this Agreement.

## FOURTEENTH. NOTIFICATIONS. LEGISLATION. JURISDICTION.

14.1.    The Parties establish special domiciles for all purposes in:

a)    Conmebol
Autopista Internacional Km. 12- Luque
Gran (Greater) Asunción[,] Paraguay

b)    Full Play Group S.A.
Tucumán 633 piso 5° (fifth floor)
City of Buenos Aires, Argentine Republic

FIFA00176782

DISCLOSED PURSUANT TO PROTECTIVE ORDER

14.2.    All notifications regarding this Agreement must be made in writing and shall be forwarded by letter certified by a notary public and/or courier (Federal Express, DHL or TNT).

14.3.    The parties expressly agree that both the terms of this Agreement as well as any dispute arising therefrom shall be construed under the laws of Switzerland and shall be referred to the Court of Arbitration for Sport (Ordinary Arbitration Division) (TAS - Tribunal Arbitral du Sport / CAS - Court of Arbitration for Sport) in Lausanne, Switzerland. To that end, the Court shall consist of three arbitrators. Each Party shall choose an arbitrator who must be one of those included in the TAS/CAS list, and those two arbitrators shall agree, within the 30 next days, to choose the president. If there is no agreement within the aforementioned time period as to the president, the President of the Division shall designate the president of the [arbitration] panel. In the event that one of the Parties fails to choose its arbitrator, the President of the Division shall be responsible for doing so.

In witness whereof and acknowledging acceptance, two counterparts, each having the same force and effect of an original, are signed in the city of Johannesburg, South Africa, on the eighth day of June, two thousand and ten.


(Illegible Signature)                            (Illegible Signature)
FULL PLAY GROUP S.A.                    CONFEDERACIÓN SUDAMERICA DE FUTBOL
NAME: Mariano Jinkis                       NAME: Dr. Nicolás Leoz
TITLE: Attorney-in-Fact                     TITLE: President

(Illegible Signature)                            (Illegible Signature)
NAME: Luis Chiriboga                        NAME: Rafael Esquivel
TITLE: F.E.F. President                       TITLE: F.V.F. President

(Illegible Signature)                            (Illegible Signature)
NAME: Carlos A. Chávez L.                NAME: Luis Bedoya G.
TITLE: F.B.(illegible) President          TITLE: F.C.F. President


(Illegible Signature)                            (Illegible Signature)
NAME: Juan Angel Napout                 NAME: Manuel Burga
TITLE: A.P.F President                        TITLE: F.P.F. President

(Illegible Signature)
NAME: Sebastián Baeza                      NAME:
TITLE: A.U.F. President                      TITLE:

(Illegible Signature)                            (Illegible Signature)
NAME: Julio Grondona                       NAME: Ricardo Texeira
TITLE: A.F.A.                                      TITLE: CBF


NAME:                                               NAME:
TITLE:                                               TITLE:

(Illegible Signature)
NAME: Eduardo Deluca
TITLE: General Sec.

Translator's Note: The preceding Bates pages hereof
bear various affixed, illegible signatures and/or initials
at the bottom of each the page or on the margins.

FIFA00176783

DISCLOSED PURSUANT TO PROTECTIVE ORDER

# ANNEX I

## COMMITTEE TO MONITOR AND CONTROL THE AGENCY AGREEMENT

**FIRST.** The name of the Committee shall be "Committee to Monitor and Control the Agency Agreement" (for this agreement and as set forth in clause 6.1., the "Committee"), and it shall consist of two full members and two alternate members to be designated by Conmebol, and by two full members and two alternate members to be designated by FP.

**SECOND.** The purpose of the Committee shall include, but not be limited to, dealing with and deciding on all issues related to the management and operation of the organization of the Events and everything which best serves the performance of this Agreement.

Within the Committee the Parties, through their representatives, shall adopt a "Requirements Handbook" within the next nine (9) months, which shall contain essential operational details for purposes of properly organizing and marketing all the Events editions. The Requirements Handbook shall include, but not be limited to, definitions on the following topics: a) Listing of requirements: it shall note for the record, among other general conditions, roles, responsibilities, format of the tournaments, organizational format, liabilities, cooperation with the host association, obligation to participate with line-up and/or starting players; b) Intellectual property and protection: intellectual property records, marketing, guerrilla, customs, tickets, committee for the protection of rights, immigration, visa, work permits, employment law, volunteers, currency exchange, etc.; c) Stadium and other main facilities for the Events: basic stadium requirements, space requirements such as VIP tribune, hospitality, skyboxes, administrative offices, etc.; d) Media requirements: media tribune, TV requirements (camera positions, regular TV studios, panoramic [studios], working areas for journalists, photographers, press conference rooms, generators, power support etc.; (e) Security requirements; f) Main facilities for Events: Events final draw; international broadcasting center; training facilities, etc.; g) Accommodation: capacity, proximity to the stadium, variety of accommodation, price levels, etc.; h) Taxes and Insurance: taking out all kinds of insurances; tax status of the host country, tax system, tax exemptions, expedited processes, etc.; i) Copyright: agreements on rights, rights of the host Association, promotion of Events, free place principle, outdoor advertising space, official Internet site for the Events, fan areas, etc.

**THIRD.** Generally, the adoption of agreements and decision-making by the Committee shall require the favorable vote of all its members. The members of the Committee shall meet every three months and/or when required by any of the members to discuss the topics for which the meeting is or has been convened. The Committee's deliberations and decisions shall be drawn up in a book, and the members' attendance shall be recorded. The Committee may meet when all four full members are present, or in the absence thereof, their alternates.

**FOURTH**. Any situation not contemplated in this Annex shall be governed by and shall be resolved by the provisions of this Agreement.

Translator's Note: Various affixed, illegible signatures and/or initials appear at the end of the typewritten text.

FIFA00176784

## ANNEX II
## CONMEBOL'S GENERAL POWER OF ATTORNEY IN FAVOR OF
## FULL PLAY GROUP S.A. FOR THE EXECUTION OF AGREEMENTS
## AND THE COLLECTION OF MONIES.

On the eighth day of June, two thousand ten, in the city of Johannesburg, South Africa, the Executive Committee of the South American Football Confederation ("Conmebol") and the Presidents of the Associations and/or Federations which are members thereof, appear and execute **GENERAL POWER OF ATTORNEY** to Full Play Group S.A. to engage in the following proceedings on its behalf and representation thereof: **a) NEGOTIATION AND EXECUTION OF AGREEMENTS**: Conmebol authorizes Full Play Group S.A. to negotiate, execute and sign any type of agreements related to the worldwide marketing and/or sale of the available rights or rights likely to be marketed now and in the future with respect to everything relating to professional sports events involving male junior and adult football national teams which are members and non-members of Conmebol associations, which are currently known as "South American Under-17," "South American Under-20" and "Copa América" (regarding this last event, the power of attorney shall be valid from the first day subsequent to the conclusion of the 2011 edition to be played in Argentine Republic); **b) COLLECTION OF MONIES**: Conmebol authorizes Full Play Group S.A. to collect any sum of money related to marketing the rights to the events and the implementation of the agreements mentioned in the preceding subparagraph, and **c)** Conmebol authorizes Full Play Group S.A. to carry out any acts, steps and proceedings suited for the best performance of the Agency Agreement signed between the parties and any proceedings suited to best discharge this mandate, which may be replaced in whole or in part.

Translator's Note: Various affixed, illegible signatures and/or initials appear at the end of the typewritten text. The following page, FIFA00176786, is an English translation of this Annex, which appears as part of the original document FIFA A00176785 and, hence, has not been translated.

FIFA00176785

DISCLOSED PURSUANT TO PROTECTIVE ORDER

Exhibit B

Date of Recording:        April 30, 2014

Recording Time:        5:13 p.m.

Source Language (s):        Spanish and Portuguese

Target Language:        English


<u>Participants:</u>

| Jose Hawilla | HAWILLA |
| aka Jota | |
| Hugo Jinkis | H JINKIS |
| Mariano Jinkis | M JINKIS |
| Jose Maria Marin | MARIN |

<u>Abbreviations:</u>

| Phonetic Spelling | [PH] |
| Inaudible | [IA] |
| Unintelligible | [UI] |
| Overlapping Voices | [OV] |
| Recorded Message | [RC] |
| Words spoken in English | *In Italics* |
| Spanish | Standard |
| <u>Words spoken in Portuguese</u> | <u>Underlined</u> |
| Recording Clipped | *    *    * |

[00:32:52]

M JINKIS:        [OV] Jota, the business is going very well. The sale we had with Univision
                 was spectacular, you must have learned--

H JINKIS:        [OV] [UI] you must have learned.

HAWILLA:         <u>I know about it, because it seems</u> that there were two <u>sales</u> here, right? One
                 we did and one you did.

M JINKIS:        No, no, no, no, no, no, no.

HAWILLA:         [OV] Then we would have to make some arrangements, right? [clears
                 throat]

M JINKIS:        That has been arrang-- that was-- for 2015.

HAWILLA:         Yes.

M JINKIS:        The price was 32 million.

HAWILLA:         [clears throat]

M JINKIS:        In 2016--

H JINKIS:        [OV] Because we are now with Copa Centenario, we will do the launching.

M JINKIS:        [OV]-- we sold to Univision for 71 million.

HAWILLA:         You sold it to Univision?

H JINKIS:        Just--

M JINKIS:        [OV] Just in Spanish.

H JINKIS:        -- just in Spanish.

HAWILLA:        Uh--

M JINKIS:       Now, we are asking 30 more million from Fox. I mean, it will be 100 million only from the United States.

H JINKIS:       From the United States only! Do you remember when--

HAWILLA:        [OV] Yes, yes, yes.

H JINKIS:       --how much this has grown?

HAWILLA:        Yes.

H JINKIS:       That's what I am saying. We are very happy. The business is going well, you will be more than happy--

[00:33:44]

*        *        *

[00:53:28]

M JINKIS:       Jota, Jota, this is how things are: it is 100 million. [pause] There are four Cups.

HAWILLA:        Umh.

M JINKIS:       There are four Cups--

HAWILLA:        [OV] Yes.

M JINKIS:       --2015, 2019, 2023--

HAWILLA:        [OV] And 2016.

M JINKIS:       -- and 2016. With the 100 million, each Cup will yield a profit of 100 million for the company, more or less.

HAWILLA:        [coughs]

M JINKIS:        Between 80 and 100 million of profit from each of the Cups.

HAWILLA:         [OV] On average.

M JINKIS:        On average. Divided by three. The way the 100 million were paid was as follows: we had already paid 20 when we signed an agency contract, which was what we agreed on when we signed it.

HAWILLA:         Hm, you are-- But I don't know about that.

M JINKIS:        When-- when we made the agreement with you.

H JINKIS:        No, no, but then you went [UI]. You- you paid to us the part--

M JINKIS:        [OV] You paid to us 33% of those 20.

HAWILLA:         [OV] No, I paid 33% of 40.

M JINKIS:        Of 40, because-- but it was 20 plus 20 more at the signing of the new contract--

HAWILLA:         Uh--

M JINKIS:        -- To go to a fixed price-- Jota, nowadays, the presidents know that we will have $100 million of profit. The presidents have Internet, they are not Nicolas Leoz; they have Internet, they talk on Facebook, uh, they talk to the clients in every country, uh, there isn't anymore--

HAWILLA:         No, no, it was you who did that. I'm sorry. And it is not wrong. I am not criticizing. Because when you've got that, through an agency, through the work of an agency-- 20, 30, 25%-- you had to send the contracts to them. And once the contract is on their hands, they can do the math!

M JINKIS:        [OV] No, because I have a-- I disagree.

HAWILLA:         How?

M JINKIS:        [OV] I don't want to earn--

H JINKIS:          [OV] When [UI]--

M JINKIS:          I don't want to earn 200%. I want to earn whatever my share is. Earning 100 is a lot and we'd invoice 300. [noise] We are three partners, it is a business that handles large volumes, but the only reason why <u>you</u> said that they are loyal to me is because this is how I think. Because I don't want to earn too much in one deal.

[00:55:37]

*       *       *

[00:57:46]

M JINKIS:          I need to protect the presidents, because I am doing the part--

H JINKIS:          [OV] You will--you will see--

M JINKIS:          -- when I talked to you, Jota--

H JINKIS:          [OV] What I--

M JINKIS:          [OV]-- but no, the thing is--

H JINKIS:          --there were two things that [UI].

M JINKIS:          --when I talked to you, you said, "I don't want to know anything about that."

HAWILLA:           <u>I said</u>--

M JINKIS:          [OV] "I don't want to get involved in that."

HAWILLA:           Yes.

H JINKIS:          [OV] Traffic doesn't want to.

HAWILLA:          Yeah, uh-- <u>Traffic doesn't want to get</u> involved in that. <u>But-- What I want to say-- I cannot write a check for 13 million</u>--

M JINKIS:         It is more, it is more-- than 100.

HAWILLA:          Why?

M JINKIS:         Because there is some for CONCACAF. That is for CONMEBOL only. There are ten more for CONCACAF.0000

HAWILLA:          For Jeff?

M JINKIS:         Yes.

HAWILLA:          For Jeff.

M JINKIS:         That's 110.

H JINKIS:         [OV] Did Aaron make the arrangement?

HAWILLA:          No, no. Alejandro arranged it.

M JINKIS:         [OV] When [UI]--

HAWILLA:          In Zurich.

M JINKIS:         With Enrique-- no, no, no, no, no--

HAWILLA:          [OV] <u>No, no, he</u> arranged <u>it in Zurich</u>--

M JINKIS:         [OV] No, no, no, no, no. No, because I was there, too. At the table were Enrique, Alejandro, Aaron and me.

HAWILLA:          <u>Where was this</u>?

M JINKIS:         In Zurich.

HAWILLA:          But no--

M JINKIS:        [OV] Enrique Sanz, Alejandro Burzaco, Aaron and I sat down.

HAWILLA:        [coughs and clears throat] And Jeff wasn't there?

M JINKIS:        No. We talked to Jeff afterwards.

HAWILLA:        [coughs and clears throat]

M JINKIS:        And Jeff saw what was there, the numbers we talked about with Enrique.

HAWILLA:        So--

M JINKIS:        [OV] So, it is 110; it is not 100.


[00:59:06]

*    *    *

[01:00:10]

HAWILLA:        <u>Who pays that? Is it you? Mariano? It is not. It's your Finance Department</u>.

H JINKIS:        No, no, no, no, no, no. No, no, no, no, I sign the transfers, only I sign them. We had to open a company only for this business.

HAWILLA:        <u>That- uh- from Spain?</u>

H JINKIS:        No, no, another one, another- another company of-- I don't know where from, and with an account just to pay--

HAWILLA:        <u>Bribes</u>.

H JINKIS:        Payoffs.

HAWILLA:        <u>Payoffs</u>. [laughs]

H JINKIS:        Just to pay payoffs .

HAWILLA:      <u>Where is that account</u>?

H JINKIS:      I don't pay-- I don't pay payoffs for this. I pay payoffs for the qualifying games, all this--

HAWILLA:      <u>Of course</u>.

H JINKIS:      So, I need to pay payoffs every day.

HAWILLA:      <u>Of course</u>.

H JINKIS:      So, it is more and more difficult every day when I pay them [PH]. But two things bother me. I also want to tell you what bothers me. Because it draws my attention when you say that you were not aware, and that we were selling the TV, and that you were not aware that the 20 million had to be paid. Because at that meeting, he was there, Alejandro was there, I was there and you were there. And the only person who was not aware was you!

[01:01:20]

*       *       *

[01:14:51]

H JINKIS:      If someone has-- five votes--

HAWILLA:      <u>But there isn't</u>. There will not be, not against Julio. <u>That time, it was against the three of them. That time, it was against those three. It wasn't against Julio. Do you understand</u>?

               [noise]

H JINKIS:      [OV] But when Julio has--

HAWILLA:      [OV] <u>What happened</u>.

H JINKIS:      -- when Julio sees that someone has six votes--

| | |
|---|---|
| M JINKIS: | [OV] [SC] Hello? [pause] Hello? |
| H JINKIS: | -- he will go to the other side [PH]-- |
| HAWILLA: | [chuckles] |
| H JINKIS: | -- immediately. |
| HAWILLA: | Yes. |
| H JINKIS: | He told me that. |
| HAWILLA: | <u>No, it is not necessary</u>-- |
| H JINKIS: | [OV] He said to me, "Hugo, I want to tell you that it is a lie that you have six votes." |
| M JINKIS: | [OV] [SC] It was at a meeting that [UI] like that. [speaking in the background] |
| H JINKIS: | "You have eight. Because I am the first one who supported you." And he told me, "And Ricardo sides with me." |
| HAWILLA: | Hm. |
| M JINKIS: | [SC] I will call you-- I will call you in a little while, in half an hour. |
| H JINKIS: | [SC] And he told me--told me, "I-- from now on, I am your biggest supporter." But it was because he had six. He never wants to lose an election. |
| HAWILLA: | <u>Is he going to be there? Julio</u>? |
| H JINKIS: | Julio is not here. |
| HAWILLA: | <u>Uh, neither Julio nor Marco Polo are here, right</u>? |
| H JINKIS: | But Marin is here. |

HAWILLA:        <u>Well, what do I do</u>? Should I talk to <u>any of them about that</u>?

H JINKIS:       No. Talk to Alejandro.

M JINKIS:       [OV] Let's discuss this with Alejandro tomorrow and the [UI].

H JINKIS:       [OV] Alejandro will be there.

[01:16:12]

*      *      *

[01:18:33]


M JINKIS:       [OV] You cannot sell your participation in We Match, because-- do you know-- do you know why? In 2019, they will come to us to renegotiate the price.

H JINKIS:       For sure.

M JINKIS:       And- and I will want to extend it through 2027. I will need to pay and generate this again. And to go and talk to the-- to the new shareholders will be very complicated.

HAWILLA:        <u>I think that you don't have to give in. You have to do the same way I've done all my life</u>.

M JINKIS:       [OV] Well, but they, in the TV--

HAWILLA:        [OV] <u>You need to toughen up, dear friend, you have to toughen up, because the</u>--

M JINKIS:       Jota, but--

HAWILLA:        [OV] <u>What do they already have</u>?

M JINKIS:       [OV] --there is a-- there is a conceptual difference that we have as entrepreneurs--

HAWILLA:        [clears throat]

M JINKIS:       -- and both- both ways of thinking are correct. I want to coexist with and
                make all the presidents rich, because my goal--

H JINKIS:       [OV] Not- not only three, but everyone.

M JINKIS:       Not three only. This is my philosophy and my way of thinking. <u>You</u> think
                differently--

HAWILLA:        [OV] <u>I don't think</u> differently, <u>no. I was forced to it</u>.

M JINKIS:       [OV] Well, it doesn't matter, but--

HAWILLA:        [OV] Because the three- the three cornered me and <u>became</u>-- the owners.
                My owners.

H JINKIS:       [OV] Okay, but it changed now.

M JINKIS:       [OV] So--

H JINKIS:       [OV] It's different now.

HAWILLA:        <u>I should have</u> changed... [clears throat]

M JINKIS:       [OV] If I need to fight for five years with someone I don't know, and who
                will have to sell-- and who will have to-- and who will be unable to, uh--
                how do you call this?

HAWILLA:        Mariano, you...

M JINKIS:       --who'll be unable to, uh, uh, come up with this money?

HAWILLA:        Mariano--

M JINKIS:       [OV] Why don't you give us back that part of the business?

HAWILLA:        -- you will get to know [them] very well <u>in five years. You can be sure of it.</u>
                <u>Whoever they are, you will have dinner,</u> have dinner, <u>play golf-- A couple</u>
                <u>of games of golf and you'll become close friends</u>. This is how it works. No,
                no, no--

M JINKIS:       So, you are not willing to sell Traffic's participation in We Match before
                selling Traffic?

HAWILLA:        <u>I think that-- I- I already thought of that</u>, but <u>my feeling is that-- you won't</u>
                <u>pay what it is worth. And that will make Traffic very weak, do you</u>
                <u>understand</u>?

[01:20:27]

*       *       *

[01:28:21]

M JINKIS:       -- my fear is to have a partner who says "I can't pay payoffs-- we don't pay
                payoffs here," and not being able to talk. So, I don't-- I don't want to be
                caught up in that situation. So, why did we accept make a deal with you?
                Because we could talk about paying a payoff.

H JINKIS:       [OV] Uh, uh--

M JINKIS:       You are a South American, you are a friend--

H JINKIS:       [OV] totally, you are used to it.

M JINKIS:       -- you are used to it, [UI]. So, as much as-- but my fear is that I get stuck
                with a partner who can't pay payoffs. And then, I will have my hands tied, I
                need to pay it myself. So, I won't have the 33% anymore. I will have 15%.

H JINKIS:       We are not going to work [UI] either.

M JINKIS:       Well--

HAWILLA:        [OV] <u>What</u>?

11

H JINKIS:        We will work for management [PH].

M JINKIS:        No, no, no, no. We need to be realistic about that. This will not change. There will always be payoffs. There will be payoffs forever.

HAWILLA:        <u>Of course</u>.

M JINKIS:        So, if we have a partner with 33% who can't pay payoffs in four years, I will be worried.

H JINKIS:        There is payoffs in Central America, too. The difference is that the numbers are smaller.

HAWILLA:        <u>Of course</u>. [coughs]

                [pause]

M JINKIS:        That's why I think that the most viable option is either-- either not selling it--

HAWILLA:        [OV] Huh?

M JINKIS:        -- that you don't sell this part, or- or us buying this part from you. We are comfortable with 33%, and with your--

HAWILLA:        [OV] We-- we too. Let's--

H JINKIS:        [OV] No, but it makes sense for him. He-- will sell, uh, Traffic-- and to have this for the person who is buying will say, "You are keeping precisely what is most valuable." [chuckles]

HAWILLA:        <u>The best of the best. Yeah</u>. Look. <u>Let's decide on this, then</u>--

H JINKIS:        [laughs] Uh--

M JINKIS:        [OV] But we can leave the commercial management to Traffic-- [pause] but not the- the participation in the business administration. So, these people will say, "Okay, we have the advertising sale of Copa America, but we

                                        12

don't administer the business." So, we can generate the payoff there.-- I don't know, there- there- there are ways to--

H JINKIS:     [OV]When you come--

HAWILLA:     [OV] <u>Ah, but that is</u>--

H JINKIS:     When the moment comes--

HAWILLA:     <u>Tha- that's already- already</u>...

H JINKIS:     --he hasn't sold it yet. You haven't sold it yet. Let me make you a proposal.

[01:30:47]

*     *     *

[01:33:04]

H JINKIS:     We have one office in Chile, one office in Ecuador, one office in Peru, one office in Uruguay, and we will open one in London. All these companies-- and Argentina. All these companies depend on Full Play Spain. And Full Play Spain is from Full Play Group Uruguay.

HAWILLA:     And-- <u>and what is the company that only</u> handles the <u>payoffs</u>?

H JINKIS:     It is another one.

HAWILLA:     <u>But where is it from</u>?

H JINKIS:     The company-- the company is, uh-- I think it is from Panama, I don't know where it is from.

HAWILLA:     Ah--

H JINKIS:     The company.

HAWILLA:     <u>But is it a</u> company?

13

| | |
|---|---|
| H JINKIS: | It is a company. |
| HAWILLA: | With no activity? |
| H JINKIS: | Only-- |
| HAWILLA: | [OV] <u>Payoffs</u>. |
| H JINKIS: | Only that. |
| HAWILLA: | [OV] <u>And no-- can't</u>-- |
| H JINKIS: | [OV] I mean, it cannot go out from my account, no, from Full Play's account. |
| HAWILLA: | <u>No, I know</u>, but-- |
| H JINKIS: | [OV] That's why-- |
| HAWILLA: | -- the name is also Full Play? |
| H JINKIS: | No! |
| HAWILLA: | No? |
| H JINKIS: | No, no. |
| HAWILLA: | Can you handle <u>any</u>-- rights from that <u>company</u>? |
| H JINKIS: | We use it only to pay <u>payoffs</u>. But we can work around that; for what you are saying, we need to work around that. Because how did we get out from the middle of things with We Match to pay that? With a contract, we would do contracts. How did we get the money out the last time? |
| HAWILLA: | <u>That is the big question</u>. |
| H JINKIS: | [OV] Nothing. |
| HAWILLA: | No one knows. |

| | |
|---|---|
| H JINKIS: | [OV] Hold on. The last time we were able to get the money out from We Match or from Datisa, for--for-- for any contract with Traffic. |
| M JINKIS: | [OV] To Cross Trading. |
| H JINKIS: | Uh, to Cross Trading? |
| M JINKIS: | With Cross Trading, and from Cross Trading we sent it to another company-- |
| H JINKIS: | [OV] It's [UI] same as Cross Trading. It is another company-- |
| M JINKIS: | [OV] No, no, we have-- |
| H JINKIS: | [UI] forward, the company-- |
| M JINKIS: | It is called-- |
| H JINKIS: | Bayan [PH]. Bayan. |
| HAWILLA: | Excuse me? |
| M JINKIS: | Bayan. |
| H JINKIS: | We sent it from-- |
| HAWILLA: | [OV] Dashan [PH]? |
| H JINKIS: | Baya, Bayan. |
| M JINKIS: | Bayan. Bayan. |
| HAWILLA: | Bayan? Bayan. |
| M JINKIS: | That we don't-- that we don't have a record. |
| HAWILLA: | [OV] Is it from Panama? |

M JINKIS:        We're not affiliated.

HAWILLA:         <u>Is it from Panama</u>?

M JINKIS:        There is no record of us in it, and there is no record of it in our offices. It is managed--

HAWILLA:         [OV] <u>Right there, in Panama</u>?

M JINKIS:        -- from the house of one of our finance guys. There is nothing in the office, there is nothing.

HAWILLA:         Uh-huh.

M JINKIS:        So, we use three- three different companies to pay-- Massa.

H JINKIS::       [UI].

HAWILLA:         <u>Which are they? That Cross, uh</u>--

M JINKIS:        Cross.

HAWILLA:         <u>That PFT</u>...

M JINKIS:        Cross Trade [PH]..

HAWILLA:         [OV] <u>There is- there is one more, FTP</u>.

M JINKIS:        FTP belongs to-- belongs to--

H JINKIS:        [OV] It belongs to--

HAWILLA:         Alejandro?

H JINKIS:        Alejandro. That--

HAWILLA:         [OV] Can't this company, Bajan, <u>handle</u> any rights?

M JINKIS:        [OV] No, nothing.

[01:35:49]

\*       \*       \*

[01:42:44]

M JINKIS:       I would like to have this conversation with Alejandro, because this is a reality. But the truth is that all this thing about the-- about payoffs, we manage it with Alejandro. And-- and I am afraid about the long-term future, because I need to be honest.

HAWILLA:       <u>Er- Forget about it. When the king-- once the king's horse is dead, then you resolve that. Who pays that payoff? It is- uh-- what's his name</u>?

H JINKIS:       We pay it.

HAWILLA:       <u>You pay it</u>?

H JINKIS:       We pay through Bayan.

M JINKIS:       And Alejandro pays through [UI]. The two [UI].

H JINKIS:       [OV] Alejandro-- Alejandro-- Alejandro pays-- to a friend of yours [PH].

HAWILLA:       [OV] And we-- and we pay you?

M JINKIS:       No, each of us pays half.

H JINKIS:       [OV] No.

M JINKIS:       We settle among ourselves later.

[01:43:28]

\*       \*       \*

[01:58:36]

HAWILLA:        [OV]-- you, are you going to pay Jeff alone?

M JINKIS:       No, no, no, no.

H JINKIS:       [OV] No, no.

M JINKIS:       We Match must do-- pay Jeff.

H JINKIS:       How are we going to pay that?

M JINKIS:       We Match needs to pay someone in order to pay to Jeff.

HAWILLA:        Yes. Whom?

M JINKIS:       But it can't--

HAWILLA:        [OV] Who in-- in We Match make the payments?

M JINKIS:       No--

HAWILLA:        Isn't it you?

M JINKIS:       No, We Match can pay us, but an agreement has to be signed for advisory services about commissions-- not Full Play, but with Cross Trading. We Match has to sign a contract with the one who pays, get the money from We Match to pay Jeff.

[01:59:14]

*       *       *

[(2) 00:11:08]

HAWILLA:        Have you settled with them? Copa America and all that?

MARIN:          Yeah, uh, we are talking about everything, yes, with them. The conversation with them has been going well. It's been very good.

HAWILLA:        With-- uh-- Jinkis?

18

MARIN:          <u>Huh</u>?

HAWILLA:        <u>With Jinkis</u>?

MARIN:          <u>Yeah... with- with the father and the son</u>.

HAWILLA:        <u>Yeah, uh</u>...

MARIN:          <u>And the big one there, who is</u>--

HAWILLA:        <u>Alejandro</u>!

MARIN:          -- <u>Alejandro</u>!

HAWILLA:        <u>Hmm. But it's a done deal, right</u>?

MARIN:          <u>Uh, it se- we have settled everything</u>.

                [pause]

HAWILLA:        <u>I will tell you something in confidence</u>...

MARIN:          <u>Tell me</u>.

HAWILLA:        <u>You have settled something, with Kleber, regarding the Cup in Brazil,</u>
                <u>right</u>?

MARIN:          <u>Correct. I did, we did, right</u>.

HAWILLA:        <u>Don't-- don't mention it, but I'm going to sell Traffic</u>.

MARIN:          [OV] <u>It doesn't</u>--

HAWILLA:        <u>I am selling Traffic</u>.

MARIN:          <u>Fuck</u>!

HAWILLA:        <u>I am selling it</u>.

MARIN:          Uh--

HAWILLA:        [OV] Thirty-four years working on this.

MARIN:          [OV] You made the right decision, man--

HAWILLA:        I can't stand it anymore!

MARIN:          I think you're doing the right thing, man.

HAWILLA:        My kids don't like this thing, you know? Nothing else I can do, man, I have
                to sell--

MARIN:          Yeah.

HAWILLA:        So I am looking to settle, my part, on this deal, in advance.

MARIN:          Uh--

HAWILLA:        You see?

MARIN:          Ah, okay, I get it. I understand.

HAWILLA:        Because I cannot--

MARIN:          [OV] It's about security [IA] you're doing the right thing.

HAWILLA:        I cannot sell the company--

MARIN:          Hmm.

HAWILLA:        -- with-- all those loose ends, because nobody would buy it!

MARIN:          I get it.

HAWILLA:        You see? Because the buyer will have to be a big company, not a--

MARIN:          [UI] I've got it!

[00:12:34]

*       *       *

[00:22:39]

MARIN:          Ah-- pay attention.

HAWILLA:        Hm--

MARIN:          I face-- I faced FIFA. Alone! [knocks] To defend Wagner--

HAWILLA:        [OV] Wagner.

MARIN:          [OV, UI]

HAWILLA:        Wagner!

MARIN:          But I faced FIFA on my own. I told them: Just send me a guy who can
                speak English well and that knows about aviation.

[00:23:00]

*       *       *

[00:27:30]

MARIN:          But Wagner--

HAWILLA:        [OV] He's a fucking great pal.

MARIN:          -- has been very honest with us.

HAWILLA:        Yes, he is.

MARIN:          With me, with me, he has been super honest. [UI] I need-- a favor from him,
                [UI] to you. Fuck, you're coming to Rio just for that? No way! [IA]. You're

coming to Rio just to talk with me? No, I'm coming to Sao Paulo. No, Wagner-- I'm coming to you. Fuck!

HAWILLA:        Yeah.

MARIN:          He is--

HAWILLA:        [OV] He is fucking great!

MARIN:          -- he deserves it. He deserves it. He deserves it. Because now-- now, there will be-- [IA]

HAWILLA:        Zé, you know that I'm not in good terms with Ricardo, don't you?

MARIN:          I, yeah, uh- this is a fucked up subject, you know?


[00:28:27]

*       *       *

[00:59:55]

MARIN:          Now, I ask you just one favor-- just one favor I ask of you. Keep me well informed about--

HAWILLA:        Huh?

MARIN:          -- those fuck-- I ask you just one favor.

HAWILLA:        Ahn.

MARIN:          [UI] will ask you a favor, see if you help me. You just have to inform me exactly what we have received, that's all.

HAWILLA:        Which one? Income related to the Cup in Brazil?

MARIN:          Related to all this shit, everything, all that!

HAWILLA:     Cup in Brazil?

MARIN:     Cup in Brazil and-- and this Cup here.

HAWILLA:     And Copa America, right?

MARIN:     Yeah, it was treated very, mind you, very--

HAWILLA:     Oh yeah? Cup-- Copa America.

MARIN:     That one, right.

HAWILLA:     Who did you deal with?

MARIN:     Huh?

HAWILLA:     Hugo or Mariano?

MARIN:     Mariano. Mariano.

HAWILLA:     With you and Marco?

MARIN:     Right. What-- the two of them-- you understand?

HAWILLA:     [OV] Now, the Cup in Brazil--

MARIN:     What-- Say it, say it.

HAWILLA:     Is it really necessary to give Ricardo one million? Tell me.

MARIN:     I think, pay close attention, pay close attention, that-- er, what we have already done and what we are still doing, fuck, it's about time to-- to have it coming our way. True or not?

HAWILLA:     Of course, of course. Of course. That money had to be given to you.

MARIN:     That's it, that's it.

HAWILLA:     Not to him, shit--

MARIN:          Do you underst-- because now-- Fuck! We, mind you, wore ourselves out
                on the contracts that are in progress.

[01:01:07]

*       *       *

[01:01:47]

HAWILLA:        It s not that I am--

MARIN:          Hmm.

HAWILLA:        -- against it. But, wait a minute, that's not right. The man is not delivering.

MARIN:          Look-- the thing is—Kle—Kle-- Kleber-- look, Kleber is too much talking,
                too little doing [UI], you understand? Fuck, I already told them. [pause] Too
                much talking-- [pause] He's like, I don't remember, you know? Or I forgot,
                I don't remember-- It's been a long time that he [UI] to help.

HAWILLA:        Kleber?

MARIN:          Yes.

HAWILLA:        What about?

MARIN:          And if he owes something, like, I don't know, it seems it was 900,000
                dollars, right?

HAWILLA:        Ah, then it is the Cup in Brazil.

MARIN:          It could be.

HAWILLA:        He hasn't paid?

MARIN:          Not that I know.

HAWILLA:     He told me he has paid. [pause] He told me he had paid it. Do you want me to look into it?

MARIN:       Please look into it. And I will also check with Marco Polo. [UI] was 900,000 dollars. Please look into it. [UI].

HAWILLA:     He told me that everything was okay. We've paid our share.

MARIN:       I see. [pause] I will talk--

HAWILLA:     Hmm.

MARIN:       -- with Marco Polo, it has to be in person, and then I'll call you on your cell--

HAWILLA:     Hmm.

MARIN:        -- and say: Yes, Cup in Brazil, all well, everything is fine.

HAWILLA:     Okay.

MARIN:       If I say nothing, you already know that is not.

HAWILLA:     Okay.

MARIN:       Okay?

HAWILLA:     And try to find out also how much--

MARIN:       [OV] And-- uh--

HAWILLA:     -- for Copa America.

MARIN:       [OV] Huh? Right.

HAWILLA:     How much is it?

MARIN:       Yeah, that's what I want, that's all I ask you, man. Keep-- that you give me the in-- information about that. Marin, it goes like this.

HAWILLA:        But do tell me how much it is.

MARIN:          Okay. Right. Okay. Good.

HAWILLA:        You haven't received anything until now?

MARIN:          Until now-- [pause] And this-- this Centenario will be a-- big competition,
                right?

HAWILLA:        It will be.

MARIN:          Fuck!

HAWILLA:        It's also part of the package.

MARIN:          All that-- that is all that I would like you to check for me.

HAWILLA:        Okay.

[01:04:56]

*       *       *

Exhibit C

| | |
|---|---|
| Date of Recording: | May 1, 2014 |
| Recording Time: | 11:15 a.m. |
| Source Language(s): | Spanish, Portuguese |
| Target Language: | English |

Participants:

| | |
|---|---|
| Jose Hawilla | HAWILLA |
| Hugo Jinkis | H JINKIS |
| Mariano Jinkis | M JINKIS |
| Alejandro Burzaco | BURZACO |
| aka Ale | |

Abbreviations:

| | |
|---|---|
| Phonetic | [PH] |
| Unintelligible | [UI] |
| Inaudible | [IA] |
| Overlapping Voices | [OV] |
| Spoken in English | *In Italics* |
| Spoken in Spanish | Underlined |
| Spoken in Portuguese | Standard |
| Recording Clipped | *      *      * |

[Words between square brackets are translator's notes or exegesis.]

[TN: UMs and UFs are not numbered]

BURZACO:     <u>When we did the *closing*</u>, <u>we set some money aside, to—to-- to pay the 20 million, to set aside what the two of us had already paid, 20 million for 2015.  We made a contract to cover 2019 and we made a contract to cover 2023</u>.

HAWILLA:     [OV] Aaron, pay attention here.

BURZACO:     <u>We set 40 million aside</u>.

DAVIDSON     [UI]

HAWILLA:     Because, otherwise...

BURZACO:     <u>We set 40 million aside-- legally, the company has a contract with [UI]</u>--

M JINKIS:     [OV] <u>Ay, my contract</u>.

BURZACO:     <u>-- we have to pay a fee, I mean, to-- to a third party, blah-blah, for 40 million. We had not-- we had not included the ten we negotiated with CONCACAF nor did we include-- legally speaking-- we did not include the 20-- the 20 that we need to pay for 2016.  We included the contract with CONMEBOL, when we had to pay to CONMEBOL, etc. Now, we, uh, 2015 and 2016, when-- when the Copa Centenario will be held, we need to pay the 20. But, also, now we need to pay the ten already. We need to start paying the ten for CONCACAF, because CONCACAF asked for-- the-- the money before</u>.

M JINKIS:     [UI]

BURZACO:     <u>Uh-- before you sell the company, we need to prepare a document that will include a payment obligation to justify this cash outflow. I also need the--  the payment justification. I have an auditor, I have DirecTV, I cannot explain either to</u>--

M JINKIS:     [OV] <u>Because if you sell it, we'll need to go talk to a third party and he will tell us</u>--

HAWILLA:        [OV] Wh- where?

BURZACO:        No, and it can be your contingency.

HAWILLA:        What was that? What did you say?

BURZACO:        No, you will have--

M JINKIS:       [OV] If you sell the company now, we cannot go to talk to a third party about an obligation that is not signed-- [noise] We don't know who the president is. It is very--

HAWILLA:        [OV] But that is why I am here. I want to fix that.

BURZACO:        [OV] To fix, eliminate that problem--

HAWILLA:        I want to get rid of this problem and sell the company clean, without any obligations. That is... [clears throat] is my goal, you understand? [clears throat]

BURZACO:        Um-hum. Now--

HAWILLA:        [OV] Now, you need to, uh, uh, know that you cannot make long-term commitments with these folks, individually. Yesterday, you told me that Grondona, Figueredo and Marin receive more than the others.

BURZACO:        [UI]

HAWILLA:        This guy is leaving next year.

BURZACO:        Yes, but there will be a-- some president will come, and we will not give him the money.

M JINKIS:       [OV] No, no, no, no, but the new ones who will come, they will receive all their--  because they ask me for it. They are--

BURZACO:        [OV] [UI]--

HAWILLA:        [OV] Who is asking for it-- who is asking for it-- who is asking for it?

BURZACO:           [OV] We will see, we will see, we will see. We will see about that.

M JINKIS:          [OV] We will see. We will see later, Jota. Jota, we will not fix anything.

BURZACO:           [OV] But, today, today, Jota, our-- our math is very simple. Jota, our math is very easy. We give-- three to Brazil, three to Argentina, three to the president. Three to the president-- moreover, he replaced Nicolas and he let us know about it on the first day--

M JINKIS:          [OV] And we-- eleven--

BURZACO:           [OV]-- 500,000 to the secretary--

HAWILLA:           [OV] Not eleven.

M JINKIS:          [OV] -- well, and in 2020, and in two thousand--

BURZACO:           [OV] -- to the general secretary, and 1.5 million to seven presidents.

HAWILLA:           To the seven?

BURZACO:           Seven presidents-- it is 1.5 million because--

H JINKIS:          [OV] Yes, because some of them--

BURZACO:           [OV] --because-- because now there is a-- there is a-- there is a country that we do not give anything to.

                   [pause]

HAWILLA:           Why?

BURZACO:           Because he is honest-- They just-- just expelled him--

H JINKIS:          They just expelled him because it is [UI].

BURZACO:           So, we never gave him anything. We saved ourselves that. This is how things happened, it is not that we talked to everyone. We went, you called [UI]--

HAWILLA:        [OV] <u>But someone will get in Uruguay.</u>

BURZACO:        <u>Yes, well, but--</u>

H JINKIS:       [OV] <u>Uh, good-- good evening</u>.

M JINKIS:       <u>It will become our problem in the future.</u>

H JINKIS:       [OV] <u>No, no, it will not be a problem.</u>

BURZACO:        [OV] <u>It doesn't matter. Today-- today—today—today-- today</u>--

HAWILLA:        [OV] <u>Yes, now-- with Figueredo out</u>, who is going to receive <u>these three million</u>?

H JINKIS:       <u>Someone will come, because everyone</u>--

HAWILLA:        [OV] <u>But it will be one of those! It is not going to be someone new,</u> falling from the skies and--

H JINKIS:       [OV] <u>Yes, and the agreement</u>--

BURZACO:        [OV] <u>Yes, but, but one of them will come and one of them will- will come, from the Chilean Federation, or from the Colombian Federation-- best case scenario</u>--

M JINKIS:       [OV] <u>We will end up owing them money [PH]</u>.

BURZACO:        [OV] -- <u>for-- for-- Jota, the best case scenario is for us to continue paying 20 million, because when they see that we earn 100, 110, 120, we are at risk that they will come to ask us for more. It is not like</u>--

[00:05:31]

*        *        *

[00:08:36]

BURZACO:        <u>It remains-- the-the most urgent thing we need to fix is the ten that we need to pay to--to</u>--

4

H JINKIS:        [OV] <u>Oh, aright.</u> <u>Let's discuss everything</u>.

BURZACO:        -- <u>to the person from CONCACAF</u>--

M JINKIS:        [OV] <u>No, no, no, 20 to the</u>--

BURZACO:        [OV] -- <u>20 to the... and- and 20 between 2015 and 2016</u>.

H JINKIS:        [OV] <u>We have to figure out... Yes. I am not talking about what</u>--

M JINKIS:        [OV] <u>We have to figure this out now</u>.

H JINKIS:        [OV] -- <u>we have to pay now. What we have to figure out now</u>--

BURZACO:        [OV] <u>Yes</u>.

H JINKIS:        -- <u>is the 30 million</u>.

BURZACO:        <u>Yes, that's right</u>.

H JINKIS:        <u>Because-- he has the problem now, and not two years from now. We have to see how we solve the issue of the 30 now, although we only need to pay it in the future</u>.

M JINKIS:        <u>Your new partners-- the new partners will see that contract that already exists for 40</u>.

HAWILLA:        What contract is that? He already said--

BURZACO:        [OV] <u>There is a contract for the [UI], yes</u>.

H JINKIS:        [OV] <u>There is a contract between the *Holding* company of the three</u>--

HAWILLA:        [OV] Say-- say the <u>names</u>, what company is that?

M JINKIS:        [OV] We Match.

BURZACO:        [OV] Between We Match--

M JINKIS:          [OV] <u>There is a contract with</u>--

BURZACO:          [OV] -- <u>Datisa. So, then</u>--

M JINKIS:          [OV]-- <u>of Datisa with Cross-- Cross Trading and with FTP</u>--

HAWILLA:          [OV] Uh-huh.

M JINKIS:          [OV]-- <u>for $40 million, which your buyers will see</u>.

H JINKIS:          <u>To pay for 2019 and 2023. And it is covered</u>.

HAWILLA:          [OV] <u>Uh, who pays whom?</u>

H JINKIS:          <u>The *holding* that is</u>--

HAWILLA:          [OV] <u>Does Datisa pay to these two</u>?

H JINKIS:          <u>Yes.</u>

BURZACO:          <u>Yes</u>.

HAWILLA:          <u>Datisa pays to these two</u>?

BURZACO:          <u>For advisory services that-- for--for *advisory*</u>.

HAWILLA:          <u>Of how much? 40 million?</u>

BURZACO:          <u>Twenty plus 20. Twenty for 2019 and 20 for 2023</u>.

H JINKIS:          <u>It will not stand any analysis. If you are thinking about that, it will not stand</u>--

M JINKIS:          [OV] <u>It will not stand [UI]</u>--

H JINKIS:          [OV] -- <u>any analysis</u>.

M JINKIS:          [OV] -- <u>they will ask you questions</u>--

HAWILLA:          Of course.

M JINKIS:        [OV] -- <u>and you will not have any justification</u>.

H JINKIS:        [OV] <u>Because who is not going to realize what this is about? Do you</u>
                 <u>understand</u>?

HAWILLA:         [OV] It cannot be for <u>advisory services. It must be</u>-- you know? <u>The</u>
                 <u>rights.  Selling rights, something stronger, more</u>--

H JINKIS:        <u>The rights for 40 million</u>?

BURZACO:         <u>No, now for- for- for</u>--

HAWILLA:         [OV] Wait a minute. But isn't that the contract that we are paying <u>now</u>, 13
                 each of us?

BURZACO:         <u>Yes</u>.

HAWILLA:         Isn't that it?

M JINKIS:        <u>No, there is another one</u>--

H JINKIS:        <u>No, no</u>--

M JINKIS:        <u>That is for 2015, for the signature of the contract</u>.

BURZACO:         <u>That was already paid. It was already paid. It was already paid out and it</u>
                 <u>was settled</u>.

HAWILLA:         <u>There is another one</u>?

BURZACO:         <u>There is another one that covers</u>--

H JINKIS:        [OV] <u>2019 and 2023</u>.

BURZACO:         -- <u>what will come out as an obligation when Copa America is held</u>.

HAWILLA:         And Traffic signed that?

M JINKIS:        <u>Yes, yes</u>.

BURZACO:        <u>Yes</u>.

HAWILLA:        <u>It signed that</u>?

M JINKIS:       <u>Yes. It signed it at-- at-- when--</u>

BURZACO:        [OV] <u>At the</u> *closing,* <u>at the</u> *closing*.

M JINKIS:       [OV] <u>Yes, at the</u> *closing*.

[00:10:42]

*       *       *

[00:40:40]

BURZACO:        <u>[OV] -- in my opinion, the more solid the contract, the better for you--</u>
                [UI]--

HAWILLA:        Of course.

H JINKIS:       <u>For all of us.  No, that's why, I am telling you, it is not a-- it is an issue</u>
                <u>that must be solved now. We cannot wait until the sale happens.</u>

HAWILLA:        Think about this: <u>who could get hurt by this thing</u>?

                [pause]

BURZACO:        <u>You mean, with this contract, with this matter? All of us. [chuckles] If--</u>

HAWILLA:        [OV] Hurt by it. Who could get hurt because of this thing? <u>Anybody? Can</u>
                <u>CONMEBOL suffer any</u> loss?

BURZACO:        <u>Yes</u>.

HAWILLA:        <u>It can?</u>

BURZACO:        <u>All can get hurt</u>.

8

HAWILLA:        <u>How</u>?

H JINKIS:       [OV] <u>No. Not CONMEBOL.</u>

HAWILLA:        [OV] Tell me how. What do you mean everybody?

H JINKIS:       <u>Not CONMEBOL, but We Match can.</u>

BURZACO:        <u>All can get hurt because of this subject. Everyone. Tomorrow it could come the money laundering agency of Buenos Aires to investigate, just to name one. Or the one in Brazil, or the DEA, or any-- and they will say, "what are all these payments? No, this is inconsistent," everyone is-- they'll start tracking-- We Match and this [UI] where did it come from? All of us go to prison. All of us, he, you--</u>

HAWILLA:        So, let's-- let's--

BURZACO:        <u>Isn't that true or not? All can</u> [UI]--

HAWILLA:        [coughs]

BURZACO:        [UI] <u>business.</u>

HAWILLA:        Huh?

H JINKIS:       <u>This is part of our business. We always live with-- There isn't-- the reality is that this is how things are: we want to make a 'black' payment, but we want to make it look 'white.' And this is how things are.</u>

M JINKIS:       <u>At some point, the 'black' thing will be received and we will need to do</u> [UI].

HAWILLA:        [OV] Ale, tell me something-- [clears throat] That story you told me in Buenos Aires-- about Teixeira's, uh-- going from 5 to 50 million dollars-- That thing Julio found out, that it wasn't 5, it was 50-- <u>Do you remember that</u>? Were you able to confirm that?

BURZACO:        <u>No. I was never able to confirm that.</u>

HAWILLA:        You never confirmed that?

BURZACO:        No. About Qatar?

HAWILLA:        Yes, yes.

BURZACO:        No, I was never able to confirm that. I have my suspicions.

HAWILLA:        But he did tell you that...

BURZACO:        Julio?

HAWILLA:        Yes.

BURZACO:        He suspects that it was more--

M JINKIS:       [OV] This can be checked.

HAWILLA:        Huh?

M JINKIS:       I can check all that.

HAWILLA:        Yeah?

BURZACO:        [UI] has suspicions.

HAWILLA:        What? Yes. Right.

BURZACO:        And that Ricardo cha- charged much more.

HAWILLA:        Yes.

BURZACO:        Much more.

HAWILLA:        Yes. You told me--

BURZACO:        [OV] He- he- he was given a budget-- he kept most of the budget.

HAWILLA:        You told me fif- fifty and that he distributed five... among Julio, Leoz and him. Himself.

BURZACO:        This is what they told Julio.

HAWILLA:        Because Ricardo became very rich.

BURZACO:        Very?

HAWILLA:        Very rich.

BURZACO:        Yes.

HAWILLA:        Very, very, very rich.

[00:43:45]

*       *       *

[00:59:38]

HAWILLA:        Ah-- because Marin says that he didn't receive anything, right?

BURZACO:        Marin?

HAWILLA:        He says he didn't--

BURZACO:        [OV] [UI]. Marin received for the signature-- he received for the signature.

HAWILLA:        For?

M JINKIS:       He received for the signature.

BURZACO:        But [UI]-- Marin did receive.

M JINKIS:       He did receive?

BURZACO:        He didn't receive in 2015, because Ricardo got it. And he knew about it already-- if Marco Polo knows about it--

H JINKIS:       [OV] Yes, yes, yes.

M JINKIS:        Obviously.

HAWILLA:        Why did you pay Ricardo?

BURZACO:        Because Ricardo [UI]--

HAWILLA:        [OV] Why did you pay Ricardo? No, Ricardo wasn't there.

H JINKIS:        [OV] Ricardo was there.

BURZACO:        [OV]  Ricardo was already there.

H JINKIS:        Ricardo was already there. When we signed the agency contract, Ricardo was there.

HAWILLA:        I told you over the phone-- I don't know if it was you or Mariano:  Let's sign this contract with the new management of CON-- CONMEBOL.

BURZACO:        Yes, but the--

HAWILLA:        [OV] Because if you sign with Leoz, you would have problems, right? Remember?

H JINKIS:        [OV] No, but, we already-- we already analyzed that and--

HAWILLA:        [OV] You said: Good idea-- uh, let's sign it, let's do it--

BURZACO:        [OV] Yes, but- but, uh--

H JINKIS:        [OV] That was the contract for the sale of rights.

BURZACO:        [OV] You are-- you are mixing two different concepts.

H JINKIS:        [OV] Yes, yes.

BURZACO:        [OV] When you signed with us, what we had to pay to them was for the signature of the new contract, which Marin received money for. But when you came in, in some cases and through me, he-- they had already paid for Copa America 2015. They had already paid a year prior, before La Paz was signed.

HAWILLA:        Paid to whom? Ricardo?

BURZACO:        [OV] Arturo, to Ricardo, Nicolas, uh--

H JINKIS:       [OV] To all of them that were there!

HAWILLA:        [OV] Huh?

BURZACO:        -- uh, Julio--.

M JINKIS:       [OV] Before Copa America in Argentina.

H JINKIS:       Nicolas also got a share.

BURZACO:        All of them!

HAWILLA:        Who? Nicolas, too?

BURZACO:        Yes.

HAWILLA:        How much did Nicolas get?

BURZACO:        Three.

HAWILLA:        Fuck! [pause] And Ricardo, too?

BURZACO:        Three-- three. Three for Julio, 1.5 for seven and-- the same, the same.
                What happens is that the participants changed. Ricardo [UI].

H JINKIS:       Ricardo is trying now to get paid this way. [laughs]

HAWILLA:        For God's sake!

BURZACO:        No, no!

H JINKIS:       [OV] No, no, no! No!

BURZACO:        Nicolas also died--

[01:01:43]

*       *       *

Exhibit D

# The Confederation of North, Central America and Caribbean Association Football (CONCACAF)

## Consolidated Financial Statements
Years Ended December 31, 2016 and 2015

The report accompanying these financial statements was issued by BDO USA, LLP, a Delaware limited liability partnership and the U.S. member of BDO International Limited, a UK company limited by guarantee.



# The Confederation of North, Central America and Caribbean Association Football (CONCACAF)

Consolidated Financial Statements
Years Ended December 31, 2016 and 2015

# The Confederation of North, Central America and Caribbean Association Football (CONCACAF)

## Contents

Independent Auditor's Report                                           3

**Consolidated Financial Statements:**

Consolidated Statements of Financial Position                         5

Consolidated Statements of Activities                                 6

Consolidated Statements of Functional Expenses                        7

Consolidated Statements of Cash Flows                                 9

Notes to Consolidated Financial Statements                           10



Tel: 305-381-8000
Fax: 305-374-1135
**www.bdo.com**

1111 Brickell Avenue, Suite 2801
Miami, FL 33131

## Independent Auditor's Report

The Members of
The Confederation of North, Central America and
  Caribbean Association Football (CONCACAF)
Miami, Florida

We have audited the accompanying consolidated statements of financial position of The Confederation of North, Central America and Caribbean Association Football ("CONCACAF") as of December 31, 2016 and 2015, and the related consolidated statements of activities, functional expenses, and cash flows for the years then ended, and the related notes to the consolidated financial statements.

### *Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

3



*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CONCACAF as of December 31, 2016 and 2015, and the changes in unrestricted net assets, functional expenses, and cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Emphasis of Matters*

As described in Note 8, CONCACAF believes it qualifies as a tax-exempt organization in the United States, while one of its subsidiaries is a for-profit, taxable corporation. However, CONCACAF had previously not timely filed tax-exempt applications or returns for itself, nor income tax returns for its subsidiary. Accordingly, there is a significant uncertainty to the recorded United States income tax liability of approximately $69,000 and $214,000 as of December 31, 2016 and 2015 respectively, and such liability may be substantially revised in the future. Our opinion is not modified with respect to this matter.

As described in Note 10, there is an ongoing investigation by the U.S. Department of Justice (DOJ) regarding certain former officials of CONCACAF. Although CONCACAF does not believe that it will be impacted financially as a result of this investigation, there is no assurance that the investigation will not ultimately have a material impact on its financial statements. Our opinion is not modified with respect to this matter.

BDO USA, LLP

April 10, 2017                                          Certified Public Accountants

4

# The Confederation of North, Central America and Caribbean Association Football (CONCACAF)

## Consolidated Statements of Financial Position

| December 31, | 2016 | 2015 |
|---|---:|---:|
| **Assets** | | |
| **Current assets** | | |
| Cash and cash equivalents (Note 3) | $ 31,205,208 | $ 26,518,696 |
| Accounts receivable, net (Note 4) | 20,121,497 | 23,999,478 |
| Prepaid expenses and other assets, net | 1,276,528 | 744,372 |
| **Total current assets** | 52,603,233 | 51,262,546 |
| Property and equipment, net of accumulated depreciation (Note 5) | 191,304 | 1,032,695 |
| Other assets, net of accumulated amortization (Note 6) | 294,339 | 295,969 |
| **Total noncurrent assets** | 485,643 | 1,328,664 |
| **Total assets** | $ 53,088,876 | $ 52,591,210 |
| **Liabilities and unrestricted net assets** | | |
| **Current liabilities** | | |
| Accounts payable and accrued expenses | $ 16,905,939 | $ 9,885,340 |
| Deferred revenue (Note 7) | 16,681,420 | 19,202,009 |
| Income taxes payable (Note 8) | 68,982 | 213,982 |
| **Total current liabilities** | 33,656,341 | 29,301,331 |
| Deferred revenue (Note 7) | 1,250,000 | 1,250,000 |
| **Total liabilities** | 34,906,341 | 30,551,331 |
| **Commitments and Contingencies (Note 9)** | | |
| **Unrestricted net assets** | 18,182,535 | 22,039,879 |
| **Total liabilities and unrestricted net assets** | $ 53,088,876 | $ 52,591,210 |

*See accompanying notes to consolidated financial statements.*

# The Confederation of North, Central America and Caribbean Association Football (CONCACAF)

## Consolidated Statements of Activities

| Year ended December 31, | | 2016 | | 2015 |
|---|---|---|---|---|
| **Revenue and support (Note 2):** | | | | |
| Broadcasting, sponsorship & ticketing | $ | **52,188,286** | $ | 90,522,269 |
| Financial assistance - FIFA | | **7,920,000** | | 5,500,000 |
| Dues, match levies and fines | | **549,389** | | 3,420,559 |
| Total revenue and support | | **60,657,675** | | 99,442,828 |
| Gain on asset transfer (Note 5) | | **-** | | 600,000 |
| Total revenue, support and gains | | **60,657,675** | | 100,042,828 |
| | | | | |
| **Expenses:** | | | | |
| **Program services (Note 1):** | | | | |
| Gold Cup | | **782,246** | | 24,798,779 |
| Champions league | | **11,487,151** | | 7,022,919 |
| Other events | | **11,618,084** | | 17,628,769 |
| Development | | **3,091,984** | | 2,477,839 |
| **Total Program services (pages 7 and 8)** | | **26,979,465** | | 51,928,306 |
| | | | | |
| **Supporting services (Note 1):** | | | | |
| Governance | | **2,881,723** | | 6,191,609 |
| Member services | | **7,056,033** | | 2,057,624 |
| General and administrative (Note 11) | | **27,352,846** | | 22,872,547 |
| **Total Supporting services (pages 7 and 8)** | | **37,290,602** | | 31,121,780 |
| | | | | |
| **Total expenses** | | **64,270,067** | | 83,050,086 |
| | | | | |
| Change in unrestricted net assets before income taxes | | **(3,612,392)** | | 16,992,742 |
| Income tax expense (Note 8) | | **(244,952)** | | (155,666) |
| | | | | |
| **Change in unrestricted net assets** | | **(3,857,344)** | | 16,837,076 |
| Unrestricted net assets, at beginning of year | | **22,039,879** | | 5,202,803 |
| | | | | |
| **Unrestricted net assets, at end of year** | $ | **18,182,535** | $ | 22,039,879 |

*See accompanying notes to consolidated financial statements.*

# The Confederation of North, Central America and Caribbean Association Football (CONCACAF)

## Consolidated Statement of Functional Expenses for the year ended December 31, 2016

| | Program Services | | | | | Supporting Services | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Gold Cup | Champions League | Other Events | Development | Total Program Services | Governance | Member Services | General & Administrative | Total Supporting Services | Total |
| Travel, Lodging, & Entertainment | $ 52,241 | $ 727,615 | $ 1,717,376 | $ 712,650 | $ 3,209,882 | $ 856,151 | $ 36,329 | $ 599,080 | $ 1,491,560 | $ 4,701,442 |
| Personnel | 534,731 | 1,604,189 | 1,425,945 | 1,328,411 | 4,893,276 | 997,072 | 644,992 | 4,308,424 | 5,950,488 | 10,843,764 |
| Production Costs | 9,316 | 2,517,616 | 1,722,124 | 17,053 | 4,266,109 | 132,144 | - | 565,412 | 697,556 | 4,963,665 |
| Professional Fees | 30,000 | 66,950 | 62,170 | 99,577 | 258,697 | 172,316 | - | 17,604,125 | 17,776,441 | 18,035,138 |
| ONE CONCACAF Program | - | - | - | - | - | - | 5,575,000 | - | 5,575,000 | 5,575,000 |
| Team Travel Allowances | - | 3,920,000 | - | - | 3,920,000 | - | - | - | - | 3,920,000 |
| Member Assistance | - | - | 1,403,922 | - | 1,403,922 | - | 1,226 | - | 1,226 | 1,405,148 |
| Rent | 73,488 | 220,463 | 195,967 | 103,776 | 593,694 | 66,770 | 23,329 | 555,080 | 645,179 | 1,238,873 |
| Marketing & Public Affairs | 43,680 | 138,237 | 115,602 | 1,060 | 298,579 | - | - | 444,147 | 444,147 | 742,726 |
| Union Assistance | - | - | 3,258,457 | - | 3,258,457 | - | - | - | - | 3,258,457 |
| Supplies & Equipment | - | 549,412 | 605,206 | 256,332 | 1,410,950 | 106,232 | - | 337,851 | 444,083 | 1,855,033 |
| Communications & Technology | 37,313 | 111,939 | 89,329 | 52,692 | 291,273 | 33,902 | 11,845 | 281,839 | 327,586 | 618,859 |
| Per Diems & Honorariums | - | - | 5,120 | 156,525 | 161,645 | 424,983 | - | 486,554 | 911,537 | 1,073,182 |
| Printing & Postage | - | 217,831 | 215,668 | 175,480 | 608,979 | 47,020 | - | 70,207 | 117,227 | 726,206 |
| Union Office Support | - | - | 28,934 | - | 28,934 | - | 762,634 | 148,483 | 911,117 | 940,051 |
| Game Officials | - | 354,510 | 392,089 | 169,756 | 916,355 | - | - | - | - | 916,355 |
| Depreciation & Amortization | - | - | - | - | - | - | - | 297,526 | 297,526 | 297,526 |
| Impairment | - | - | - | - | - | - | - | 591,050 | 591,050 | 591,050 |
| Field Boards & Decor | - | 899,276 | 196,219 | - | 1,095,495 | - | - | - | - | 1,095,495 |
| Miscellaneous | - | 6,505 | 60,070 | 16,586 | 83,161 | 43,791 | 209 | 693,864 | 737,864 | 821,025 |
| Prize Money | - | - | - | - | - | - | - | - | - | - |
| Awards & Ceremonies | - | 148,176 | 73,174 | - | 221,350 | - | - | - | - | 221,350 |
| Insurance | - | - | 46,772 | - | 46,772 | - | - | 358,044 | 358,044 | 404,816 |
| Utilities | 1,477 | 4,432 | 3,940 | 2,086 | 11,935 | 1,342 | 469 | 11,160 | 12,971 | 24,906 |
| | $ 782,246 | $ 11,487,151 | $ 11,618,084 | $ 3,091,984 | $ 26,979,465 | $ 2,881,723 | $ 7,056,033 | $ 27,352,846 | $ 37,290,602 | $ 64,270,067 |

# The Confederation of North, Central America and Caribbean Association Football (CONCACAF)

## Consolidated Statement of Functional Expenses for the year ended December 31, 2015

| | Program Services | | | | Total Program Services | Supporting Services | | | Total Supporting Services | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Gold Cup | Champions League | Other Events | Development | | Governance | Member Services | General & Administrative | | |
| Travel, Lodging, & Entertainment | $ 10,692,437 | $ 1,075,863 | $ ¹1,568,743 | $ 588,493 | $ 13,925,536 | $ 3,267,678 | $ 265,331 | $ 523,722 | $ 4,056,731 | $ 17,982,267 |
| Personnel | 1,507,940 | 452,382 | 1,055,558 | 1,097,408 | 4,113,288 | 990,150 | 507,510 | ¹3,110,365 | 4,608,025 | 8,721,313 |
| Production Costs | 5,336,562 | 1,738,810 | 3,030,839 | 63,475 | 10,169,687 | 211,140 | - | 1,358,009 | 1,569,149 | 11,738,836 |
| Professional Fees | 301,995 | 41,485 | 359,866 | 40,883 | 744,229 | 397,271 | - | 12,726,694 | 13,123,965 | 13,868,194 |
| Win in CONCACAF Grant | - | - | - | ¹(100,000) | (100,000) | - | - | - | - | (100,000) |
| Team Travel Allowances | 489,000 | 2,480,000 | ¹(263,496) | - | 2,705,504 | - | - | - | - | 2,705,504 |
| Member Assistance | - | - | 2,962,909 | - | 2,962,909 | - | 162,999 | - | 162,999 | 3,125,908 |
| Rent | 191,337 | 57,401 | 133,936 | 119,300 | 501,974 | 54,109 | 34,551 | 595,849 | 684,509 | 1,186,483 |
| Marketing & Public Affairs | 342,542 | 167,239 | 195,654 | 130,986 | 836,421 | 52,705 | - | 707,832 | 760,537 | 1,596,958 |
| Union Assistance | - | - | 1,495,987 | - | 1,495,987 | - | - | - | - | 1,495,987 |
| Supplies & Equipment | 356,632 | 174,738 | 220,852 | 101,883 | 854,105 | 91,047 | - | 461,516 | 552,563 | 1,406,668 |
| Communications & Technology | 152,160 | 45,648 | 106,512 | 94,873 | 399,193 | 43,030 | 27,477 | 473,849 | 544,356 | 943,549 |
| Per Diems & Honorariums | 10,900 | 1,600 | 52,374 | 100,986 | 165,860 | 442,400 | - | 9,000 | 451,400 | 617,260 |
| Printing & Postage | 302,487 | 109,375 | 260,818 | 210,406 | 883,086 | 156,273 | - | 228,755 | 385,028 | 1,268,114 |
| Union Office Support | - | - | - | - | - | - | 1,019,033 | - | 1,019,033 | 1,019,033 |
| Game Officials | 624,159 | 265,528 | 862,342 | 23,300 | 1,775,329 | - | - | - | - | 1,775,329 |
| Depreciation & Amortization | - | - | - | - | - | - | - | 681,649 | 681,649 | 681,649 |
| Field Boards & Decor | 1,197,623 | 335,524 | 493,269 | - | 2,026,416 | - | - | - | - | 2,026,416 |
| Miscellaneous | 319,858 | 37,979 | 181,055 | 3,508 | 542,400 | 484,746 | 40,046 | 1,888,938 | 2,413,730 | 2,956,130 |
| Prize Money | 2,750,000 | - | 4,751,510 | - | 7,501,510 | - | - | - | - | 7,501,510 |
| Awards & Ceremonies | 59,017 | 38,222 | 157,416 | - | 254,655 | - | - | - | - | 254,655 |
| Insurance | 160,381 | - | - | - | 160,381 | - | - | 94,693 | 94,693 | 255,074 |
| Utilities | 3,749 | 1,125 | 2,625 | 2,338 | 9,837 | 1,060 | 677 | 11,676 | 13,413 | 23,250 |
| | $ 24,798,779 | $ 7,022,919 | $ 17,628,769 | $ 2,477,839 | $ 51,928,306 | $ 6,191,609 | $ 2,057,624 | $ 22,872,547 | $ 31,121,780 | $ 83,050,086 |

¹ - Consolidated Statement of Functional Expenses was adjusted for items related to prior years that offset expenses in the current year (see Footnote 11 for details).

# The Confederation of North, Central America and Caribbean Association Football (CONCACAF)

## Consolidated Statements of Cash Flows

| Year ended December 31, | 2016 | 2015 |
|---|---|---|
| **Cash Flows from Operating Activities** | | |
| Change in unrestricted net assets | $ (3,857,344) | $ 16,837,076 |
| Adjustments to reconcile change in unrestricted net assets to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 297,526 | 681,649 |
| Impairment of property and equipment (Note 5) | 591,050 | - |
| Provision for bad debts (Note 4) | 690,542 | 348,240 |
| Gain on asset transfer (Note 5) | - | (600,000) |
| Non-cash broadcast production expenses (Note 5) | - | 600,000 |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in: | | |
| Accounts receivable | 3,187,439 | (16,608,014) |
| Prepaid expenses and other assets | (584,055) | 1,253,301 |
| Increase (decrease) in: | | |
| Accounts payable and accrued expenses | 7,020,599 | 3,032,321 |
| Deferred revenue | (2,520,589) | (12,241,030) |
| Income taxes payable | (145,000) | 26,394 |
| Net cash provided by (used in) operating activities | 4,680,168 | (6,670,063) |
| **Cash Flows from Investing Activities** | | |
| Disposals of property and equipment, net | 64,130 | - |
| Purchases of property and equipment | (57,786) | (22,254) |
| Net cash provided by (used in) investing activities | 6,344 | (22,254) |
| Net increase (decrease) in Cash and Cash Equivalents | 4,686,512 | (6,692,317) |
| Cash and Cash Equivalents, at beginning of year | 26,518,696 | 33,211,013 |
| Cash and Cash Equivalents, at end of year | $ 31,205,208 | $ 26,518,696 |
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid during the year for income taxes | $ 406,000 | $ 343,098 |

*See accompanying notes to consolidated financial statements.*

## 1. Organization

The Confederation of North, Central America and Caribbean Association Football ("CONCACAF" or the "Confederation") was incorporated in the Bahamas as a nonprofit organization in 1994. The purpose of CONCACAF is to organize and promote football tournaments and the development of football among its 41 member constituent countries located in the Caribbean, Central America, and North America. CONCACAF has its head office in Miami, Florida, with another office in New York, New York in the United States. In 2017, CONCACAF opened a new office in Kingston, Jamaica.

CONCACAF is one of six regional football confederations that comprise the Fédération Internationale de Football Association ("FIFA"), the world-governing body of football. FIFA is responsible for promoting and organizing the game of football throughout the world. CONCACAF is recognized as the governing body of football for national teams located in the Caribbean, Central and North America regions as well as certain countries in South America whose member associations belong to CONCACAF.

CONCACAF generates a substantial portion of its revenue from commercial rights contracts for sponsorship, television and radio broadcast, and similar agreements with third parties. Certain of these contracts have been entered into by CONCACAF through CONCACAF Marketing and TV, Inc. ("CMTV"), a wholly-owned subsidiary. CMTV was incorporated as a for-profit corporation in Florida in 2003.

CONCACAF is also the parent and sole owner of CONCACAF (Cayman) Ltd. ("Cayman"), which began operations in the Cayman Islands on October 31, 2012. Cayman was formed as an ordinary company with the main purpose of serving as the office of CONCACAF's former President, who was terminated in May 2015 (See Note 10). In early 2016, CONCACAF closed its offices in the Cayman Islands.

CONCACAF and its wholly owned subsidiaries, CMTV and Cayman, are hereinafter collectively referred to as the "Organization".

CONCACAF supports two regional unions: the Unión Centroamericana de Fútbol ("UNCAF") headquartered in Guatemala (and with whom CONCACAF shares office space with) and the Caribbean Football Union ("CFU") headquartered in Jamaica with offices in Antigua. These unions organize regional and qualification tournaments to various CONCACAF competitions. The member associations comprising of Canada, Mexico and the United States belong to the North American Football Union ("NAFU"). Each member association of CONCACAF is also a member of a Union based on its geography. On March 15, 2017, CONCACAF opened a new office in Jamaica, and intends to open a new office in Guatemala in 2017, and support both offices with additional staffing to manage competitions and development in those regions.

On May 27, 2015, the United States Department of Justice for the Eastern District of New York (the "DOJ") announced that a number of high ranking soccer officials and representatives of sports marketing companies, which included five officials belonging to the CONCACAF region, including the then-President of CONCACAF, Jeffrey Webb, as well as a then current Executive Committee member, had been indicted for racketeering, wire fraud and money laundering conspiracies, and corruption (the "DOJ Indictments & Investigation"). On December 3, 2015, the DOJ announced a superseding indictment in the matter naming an additional 16 defendants as charged with similar crimes as the initial indictment, which included seven additional officials belonging to the

CONCACAF region, including the then acting President, Alfredo Hawit, and two former members of the CONCACAF Executive Committee. In the wake of the initial indictment, the Executive Committee of CONCACAF appointed a special committee comprised of three current members of the executive Committee to recommend governance and operational reforms. CONCACAF retained Sidley Austin LLP (and other firms) to conduct an internal investigation in  connection  with  the allegations asserted in the Indictment and Superseding Indictment and related issues (the "Investigation").   On July 4, 2015, the Executive Committee announced approval of expansive governance and operations reforms (the "Reform Framework") setting forth significant operational changes aimed at improving governance, increasing public disclosure, and strengthening anti-corruption controls within the Confederation.   The Special Committee also engaged Sidley Austin LLP and an operational and financial consulting firm to advice on new governance reform and compliance efforts including the Reform Framework implementation.  Proposals contained in the Reform Framework fall into three categories: Corporate Governance; Fraud Prevention and Compliance; and Transparency. Officials from the Confederation, with the assistance of its outside legal and its operational business advisors, imposed new practices on the operations of the organization to implement proposals in the Reform Framework.   These proposals also required significant changes to the statutes of the Confederation. In February 2016, the Congress unanimously approved sweeping changes to the statutes of the Confederation enacting proposals contained in the Reform Framework. In accordance with its statutes, in August 2016, the Confederation established a fully independent Audit & Compliance Committee and a majority independent Compensation Committee.

The nature and purpose of the Organization's primary program services are as follows:

Gold Cup

The Gold Cup, which is held every two years in the region, is the premier men's national team championship for CONCACAF. The competition determines the regional champion to decide which national team will represent CONCACAF in the FIFA Confederations Cup.  If two different nations become champions during the four year FIFA World Cup cycle then a playoff match is required (the CONCACAF Cup) to determine the representative.

Champions League

The CONCACAF Champions League is the Organization's annual club championship and determines the region's best club team. The champion will represent CONCACAF in the FIFA Club World Cup. The competition is played over the course of nine months with the Group Stage commencing in the Fall of one year and the Championship Stage taking place in the Spring of the following year.

During July 2016, CONCACAF announced that it would increase travel allowances for participating teams for the 2016/17 Scotiabank CONCACAF Champions League ("SCCL") from $40,000 per trip to $70,000 per trip to help defray the teams' cost of travel during the tournament.  This resulted in an increased commitment of $1.86 million for the SCCL 2016/2017 edition relative to prior years' SCCL travel allowances.  CONCACAF also then announced the introduction of $1.2 million of prize money for this tournament.

### Other Events

Other Events represents the Organization's men and women youth tournaments that serve as qualifying events for the youth tournament editions of the FIFA World Cup. It also includes Beach Soccer and Futsal (indoor game) tournaments, biennial and quadrennial events respectively, which also serve as the qualifying events for the FIFA World Cup editions. Additionally, it includes Men's and Women's World Cup qualifiers, Men's and Women's Olympic qualifiers and Union (CFU and UNCAF) qualifying tournaments for CONCACAF championships.

### Copa America Centenario

In September 2014, CONCACAF entered into a joint venture with Confederación Sudamericana de Fútbol ("CONMEBOL"), the confederation that is the governing body for football in South America, for the purpose of organizing and promoting the Centennial edition of South America's continental championship, the Copa America Centenario to be held in the United States for the first time and to feature national teams from both CONCACAF and CONMEBOL. In November 2014, CONCACAF entered into a Local Organizing Committee Agreement with the United States Soccer Federation to govern the event and venue planning, ticket and hospitality revenue and the related costs with such events (the "Original LOC Agreement"). The Original LOC Agreement was subsequently terminated and replaced with a new Local Organizing Committee Agreement for similar activities, which was executed by both parties in October 2015 (the "LOC Agreement"). The Organization also entered into an agreement with Datisa S.A. ("Datisa") for the broadcasting and sponsorship rights for Copa America Centenario (the "Datisa Confederation Contract") in which Datisa agreed to pay to CONCACAF $35.0 million in installments for such broadcasting and sponsorship rights, of which $14.0 million had been received by CONCACAF as of December 31, 2016 and 2015, respectively. Please refer to Note 7 on "Deferred Revenue" for details related to 2015. CONCACAF and CONMEBOL agreed to terminate the original Datisa Confederation Contract and enter into a new agreement whereby Datisa agreed to transfer all commercial rights to the event licensed to Datisa in the Datisa Confederation Contract back to CONCACAF and CONMEBOL in return for certain consideration in the form of commission payments and a waiver of claims. CONCACAF also agreed to terminate its prior joint venture with CONMEBOL and enter into a new arrangement for the operations of the Event as well as the sharing of commercial revenue with The United States Soccer Federation ("USSF") and CONMEBOL. CONCACAF, USSF and CONMEBOL also engaged Soccer United Marketing ("SUM") and International Management Group ("IMG") to commercialize the event, effectively replacing Datisa as the marketing agent for the event. USSF's wholly-owned subsidiary, CA2016 Marketing, Inc., was given primary responsibility in 2016 for managing the event as well as collecting commercial revenue, paying related expenses, distributing such net revenue to the confederations after expenses and providing accounting of such activities to the parties.

Copa America Centenario was held in the United States in eleven cities in June 2016. In 2014, CONCACAF received $14.0 million of payments in respect of the original Datisa Confederation Contract, which amounts remained as deferred revenue as of December 31, 2015, since the economic treatment of such amounts was effectively confirmed by the various agreements, but was recognized as revenue in 2016. During 2016 and 2015, CONCACAF directly incurred $3,551,867 and $484,216 of expenditures, respectively, related to this tournament. The amounts related to 2016 and 2015, were reported net against revenue recognized in 2016 related to the tournament.

*Financial Results - Copa America Centenario*

In March 2017, the Organization agreed to a final reconciliation of its share of the net revenues under the various agreements related to Copa America Centenario. CONCACAF recorded a net amount of revenue of $34.8 million related to the above agreements which includes certain amounts collected by or paid by CONCACAF directly as well as amounts under the final reconciliation. The net amount also accounts for a $1.0 million reserve for CONCACAF's share of amounts uncollected by CA2016 Marketing as of April 10, 2017 from certain partners and contingency expenses. Accordingly, as of December 31, 2016, CONCACAF is due an additional $12.4 million (of which $3.2 million is billed) from U.S. Soccer and/or CA2016 Marketing, which is net of $12.5 million received in November and December 2016 related to the LOC Agreement, net of the $14.0 million received in 2014 related to the Datisa Confederation Contract, and net of $425,155 received in 2016 related to Broadcasting Services.

## Development

In 2013, CONCACAF launched a series of technical and administrative courses as part of its Development Program. The objective of the Program is to actively engage its 41 Member Associations and assist in the growth and development of football in the region. Courses and training seminars in technical development, referee development and club licensing make up the core initiatives. In 2014, the Organization sponsored "Win in CONCACAF", its largest financial assistance grant program, which helped supplement these programs by providing funds for youth and grassroots initiatives at the Member Association level. In 2015, no such development program to offer financial assistance to Member Associations existed. In July 2016, CONCACAF announced a detailed outline of an annual "ONE CONCACAF" Grant Program to its 41 member associations to be implemented during calendar 2016, replacing Win in CONCACAF. The ONE CONCACAF Program regulatory framework was approved by CONCACAF's Council in September 2016. The ONE CONCACAF program will target regional development goals and is designed to be complementary, but not overlapping with FIFA's Forward Development Program announced in 2016, and will also include a supplementary grant by CONCACAF to non-FIFA member associations.

As part of the ONE CONCACAF program, CONCACAF anticipates funding up to $5.575 million for its member associations for 2017, and annually thereafter, after the formal submission of program documentation individually by CONCACAF's respective 41 Member Associations and approval of qualifying expenditures by CONCACAF. This amount represents $125,000 per 41 Member Associations plus an additional $75,000 for each of the six Member Associations that are not members of FIFA. In 2016, CONCACAF expensed $5,575,000 related to the 2016 ONE CONCACAF Program, and as of December 31, 2016 approximately $3,953,000 remains unpaid and accrued for.

The nature and purpose of the Organization's support services are as follows:

*Governance*

Governance relates to the CONCACAF Council and historically 21 other standing committees previously formed for the purpose of organizing and supervising the Organization's diverse functions in both competitions and administration. The standing committees advise and assist the CONCACAF Council in fulfilling its duties. CONCACAF's governance structure also includes Congress which is the annual meeting of the Organization's Member Associations and serves as the supreme and legislative body of CONCACAF. As a result of the need to reform the operations and governance of the

organization, the CONCACAF Executive Committee (as it was named then) on July 4, 2015 agreed to disband all but three committees. The three remaining committees were the CONCACAF Executive Committee, the Gold Cup Committee, and the Special Committee. The Gold Cup Committee was terminated after the tournament's completion in July 2015 and the Special Committee, which was formed to execute operational control over the organization in the wake of the May 2015 indictments, was terminated in August 2015. All remuneration for members of the CONCACAF was suspended after May 27, 2015, other than out-of-pocket travel expenses and related per diem payments and was recommenced in August 2016. In 2016, the CONCACAF Executive Committee was renamed the CONCACAF Council. In 2016, three additional committees were established by CONCACAF in accordance with its new and revised statutes: the Audit & Compliance Committee, the Compensation Committee, and the Referee Committee. In May 2016, CONCACAF formed six additional standing committees to organize and supervise the Organization's diverse functions in both competitions and administration.

*Member Services*

Member Services designates the financial and administrative support provided to CONCACAF Member Associations and Unions in the form of grants and other funding mechanisms. Additionally, member services describe the international representation of the Organization by the President and General Secretary.

*General and Administrative*

General and Administrative includes expenses such as administrative personnel cost, professional fees, and other expenses that are not directly allocated to a specific program or function but which provide for the overall support and direction of the Organization.

As a result of the DOJ Indictments and the Investigation and the steps to develop and implement the Reform Framework, CONCACAF created an "Investigation and Reform Implementation" cost category within general and administrative costs to record the expenses related to these events, including investigations, operational and crisis management, operational assessments and Reform Framework implementation costs. Please refer to Note 10 for further detail. In addition, as part of this work, CONCACAF cancelled, disputed, settled and litigated numerous contracts with questionable vendors and other parties. Please refer to Note 9 for further detail.

**2. Summary of Significant Accounting Policies**

**(a) *Principles of Consolidation***

The accompanying consolidated financial statements include the accounts of CONCACAF and its wholly owned subsidiaries, CMTV and Cayman. All material intercompany balances and transactions between the entities have been eliminated in the consolidated financial statements.

**(b) *Basis of Presentation***

The consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States of America, as applicable to not-for-profit organizations.

**(c) *Financial Statement Presentation***

The classification of a not-for-profit organization's net assets and its support, revenue and expenses is based on the existence or absence of donor-imposed restrictions. It requires that the amounts for each of the three classes of net assets: permanently restricted, temporarily restricted, and unrestricted - be displayed in a statement of financial position and that the amounts of change in each of those classes of net assets be displayed in a statement of activities.

These classes are defined as follows:

(i) **Permanently Restricted** – Net assets resulting from contributions and other inflows of assets whose use by the Organization is limited by donor-imposed stipulations that neither expire by passage of time nor can be fulfilled or otherwise removed by actions of the Organization. There were no permanently restricted net assets at December 31, 2016 and 2015.

(ii) **Temporarily Restricted** – Net assets resulting from contributions and other inflows of assets whose use by the Organization is limited by donor-imposed stipulations that either expire by passage of time or can be fulfilled and removed by actions of the Organization pursuant to those stipulations. When such stipulations end or are fulfilled, such temporarily restricted net assets are reclassified to unrestricted net assets and reported in the consolidated statement of activities as net assets released from restriction. There were no temporarily restricted net assets as of December 31, 2016 and 2015.

(iii) **Unrestricted** – The part of net assets that is neither permanently nor temporarily restricted by donor-imposed stipulations.

**(d) *Cash and Cash Equivalents***

The Organization considers all investments in certificates of deposit and similar instruments with maturities of three months or less as cash equivalents.

### (e) Concentration of Credit Risk

During 2016, CONCACAF maintained its cash in bank deposit accounts with US Century Bank and International Finance Bank. During 2015, CONCACAF maintained its cash in bank deposit accounts at JPMorgan Chase Bank, Royal Bank of Canada (Cayman), Fidelity Bank (Cayman), US Century Bank, BAC Florida Bank and International Finance Bank, which at times, its U.S. deposits may exceed federally insured limits. The total amount of cash which exceeded these limits as of December 31, 2016 and 2015 amounted to approximately $30,705,000 and $26,019,000, respectively. CONCACAF has not experienced any losses in such accounts and does not currently believe it is exposed to significant credit risk with respect to its deposits. As of December 31, 2016, CONCACAF holds two certificate of deposits, one with International Finance Bank and another with US Century Bank.

In connection with the operations and financial management agreements entered into by CONCACAF with CA2016 Marketing Inc. and CONMEBOL in connection with the Copa America Centenario, CA2016 Marketing, as the marketing agent for the event, controls a number of bank accounts into which proceeds from commercial, broadcasting, sponsorship and other revenues relating to the Copa America Centenario event are being collected prior to being distributed amounts to CONCACAF and CONMEBOL. As of December 31, 2016, CA2016 Marketing still maintains cash in such accounts that are owed to CONCACAF. CA2016 Marketing has customary insurance coverage to mitigate a risk of loss of such funds under the terms of the event agreement and is subject to a customary indemnity under these agreements. To its knowledge, CONCACAF has not experienced any losses in such accounts and does not currently believe it is exposed to significant credit risk with respect to such cash amounts.

### (f) Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenue and expenses during the period. Actual results could differ from those estimates. Significant estimates used by management include the useful lives of depreciable property and equipment, allowances for doubtful accounts, amounts relating to revenue recognition, accounts receivables and deferred revenue, including any recorded measurable value-in-kind revenue and expenses.

### (g) Accounts Receivable

Accounts receivable are comprised primarily of financial assistance grants from FIFA, match levies and fees due from member associations, teams playing in tournaments and competitions, and contractual broadcast, sponsorship and other commercial revenue. The Organization closely reviews all outstanding accounts receivable and follows up on delinquent amounts. Delinquency status is determined based on the recent payment history of the customer or member. Amounts are considered uncollectible only when a customer is unable to provide collateral for the amount outstanding, commit to a payment plan or CONCACAF is otherwise unsure of the other party's ability to repay such amount. Collections of past due amounts from members may be enforced by restricting member access to tournaments and limiting access to other CONCACAF resources.

*(h) Fair Value of Financial Instruments*

As of December 31, 2016 and 2015, the CONCACAF's financial instruments were carried at fair value in the accompanying consolidated statements of financial position. The fair value of the Organization's short-term financial instruments, including cash and cash equivalents, accounts receivables, and accounts payables and accrued expenses equaled the respective carrying value due to the short-term nature of these instruments.

*(i) Property and Equipment*

Property and equipment, including leasehold improvements, are initially recorded at cost. Replacements and major improvements are capitalized while general maintenance and repairs are charged to expense as incurred. Depreciation and amortization are computed on a straight-line basis over estimated useful lives of the assets, which is five years for furniture, equipment and vehicles, three years for computer equipment, software and studio equipment, and the shorter of the useful life or the lease term for leasehold improvements.

*(j) Asset Impairment*

The Organization reviews the carrying values of its long-lived and identifiable intangible assets for possible impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. The Organization assesses recoverability of these assets by estimating future undiscounted cash flows. Any long lived assets held for disposal are reported at the lower of their carrying amounts or fair value less cost to sell. Any long lived assets to be disposed of by abandonment are reported at the estimated value expected to result from the use and eventual disposition of the asset. As of December 31, 2016 there were no assets that were determined to be impaired. However, the Organization recorded the effects of a lease exit and the related write-down of certain related assets during March 2016. Please refer to Property and Equipment (Note 5) and Commitments and Contingencies (Note 9) for further detail.

*(k) Revenue Recognition and Deferred Revenue*

*FIFA FAP - Financial Assistance Program*

FIFA provides financial assistance grants to the Organization to support its mission of organizing and promoting football competitions and development within its region of jurisdiction. Funding from FIFA is recognized ratably over the calendar year. The use of financial assistance funds is designated towards the cost of specific activities, primarily in connection with hosting and promoting competitions and development. During August 2016, FIFA formally announced that its new FIFA Forward program for development expenditures will replace the FIFA FAP Program, and the development grants thereunder for confederations will be increased from $5.5 million per annum to $10.0 million per annum on a four-year cycle basis ending in 2018.

During 2016, CONCACAF filed a 2016 FIFA Forward application for a net $10.0 million of qualifying expenditures, which was revised to be an application of $7.92 million in late January 2017. Accordingly, during 2016, CONCACAF accrued $7.92 million of revenue under the new FIFA Forward program, based on the final application filed, which amount remains unpaid as of December 31, 2016. On March 28, 2017, final application was approved by FIFA.

*Match Levies and Fees*

Levies and fees based on matches and competitions are recognized as revenue in the month in which the respective games and competitions are held. Annual dues from members are recognized ratably over the calendar year.

*Broadcast, Sponsorship, and Promotion Agreements*

The Organization has entered into various commercial agreements with broadcast networks, promoters, sponsors and others relating to broadcast, marketing, promotion and sponsorship rights relating primarily to Gold Cup, Copa America Centenario and Champions League tournaments. Prior to the original joint venture agreement mentioned in Note 1 being formalized, which was subsequently terminated and replaced with other agreements, the Organization entered into an agreement with Datisa S.A. for the broadcasting and sponsorship rights for Copa America Centenario. The month-long tournament was played in the United States in June 2016.

Many of these agreements are for multiple years, and provide for fixed minimum annual licensing payments, variable payments based on ticket sales or other factors, or some combination of both. Generally, revenue from each agreement is recognized in the period in which the underlying tournament is held. In certain contracts that provide for multiple deliverables, management evaluates whether there is objective evidence of fair value for each individual element delivered and, if so, to account for each element of the transaction separately, based on relevant revenue recognition policies. An allocation of revenue is made to all elements for which fair value is determinable, using the relative selling price method. To the extent there are any contingent fees or commissions related to the negotiation of such contracts, the Organization currently treats such expenses as a period expense.

In determining whether the Organization serves as principal or agent in the Copa America Centenario arrangement, CONCACAF follows the guidance in the Financial Accounting Standards Board ("FASB") Accounting Standard Codification ("ASC") Subtopic 605-45 *"Principal Agent Considerations"* ("ASC 605-45"), to analyze if revenue should be reported gross or net, based on an assessment of whether the Organization is acting as the 'principal' in the transaction or acting as an 'agent' in the transaction. To the extent that the Organization acted as an agent for the Copa America Centenario, revenues from this event recognized during 2016 are reported on a net basis. The determination of whether the Organization is serving as principal or agent in a transaction is judgmental in nature and based on an evaluation of the terms of the arrangement.

*Deferred Revenue*

All monies received in excess of revenue deemed earned are recorded as deferred revenue in the accompanying consolidated statements of financial position. Deferred revenue represents revenues collected but not earned as of year-end. Please refer to Note 1 for further detail related to the deferral as of December 31, 2016, and the recognition of revenue in 2016, of $14.0 million of revenue received under the original Datisa Confederation Contract related to Copa America Centenario.

*Unbilled Revenue*

Revenue that is earned each year but not yet billed is included in unbilled receivables in the accompanying consolidated statements of financial position.

### (l) Contributions and Promises to Give

Contributions and promises to give are recorded as revenue when either unsolicited cash is received or when donors make a promise to give. Contributions and promises to give are classified as either unrestricted, temporarily restricted, or permanently restricted support. Contributions of property and equipment are recorded at the fair market value of the property and equipment at the time of contribution.

All contributions are considered to be available for unrestricted use unless specifically restricted by the donor.

### (m) Functional Classification of Expenses

The cost of providing the Organization's programs and other activities has been summarized on a functional basis in the consolidated statements of activities as well as in the consolidated statements of functional expenses. Expenses that can be identified with a specific program or support service are charged directly to that program or support service and are reflected as such.

During 2016 the Organization reached various settlements with multiple vendors related to services provided to the Organization in 2015. The results of all settlements are properly reflected in the consolidated financial statements as of and for the years ended December 31, 2016 and 2015, respectively.

### (n) Income Taxes

During 2012, CONCACAF applied for exemption (both retroactive and prospective) from income taxes under Section 501(c)(6) of the Internal Revenue Code (the "Code"). CONCACAF's management believes they have operated and continue to operate the entity in accordance with their exempt status application. CMTV operates as a taxable entity under Subchapter C of the Internal Revenue Code. Cayman is a tax exempt entity under Cayman Islands Laws.

*Uncertain Tax Positions*

Under ASC 740, *"Income Taxes,"* and Accounting Standards Update ("ASU") 2009-06, *"Implementation Guidance on Accounting for Uncertainty in Income Taxes and Disclosure Amendments for Nonpublic Entities,"* an organization must recognize the tax benefit associated with tax positions taken for tax return purposes when it is more likely than not the position will be sustained upon examination by a taxing authority. CONCACAF does not believe there are any unrecognized tax benefits that should be recorded. All years are open for examination by taxing authorities. CONCACAF recognizes any corresponding interest and penalties associated with its income tax position in provision for taxes in the accompanying consolidated statements of activities.

### (o) Reclassification

Certain amounts in the 2015 financial statements have been reclassified to conform to current year presentation. There was no impact to prior year results.

### 3. Cash and Cash Equivalents

Cash and cash equivalents are comprised as follows:

| December 31, | 2016 | 2015 |
|---|---|---|
| Checking (non-interest-bearing) | $ 30,130,174 | $ 25,011,168 |
| Certificates of deposit | 1,075,034 | 1,507,528 |
| | $ 31,205,208 | $ 26,518,696 |

At December 31, 2016 and 2015, there was approximately $0 and $900,000, respectively, of cash balances which were deposited in CONCACAF bank accounts specifically designated for the 2016 FIFA Financial Assistance Programme ("FAP"). This designation of these funds was released by FIFA during 2016.

### 4. Accounts Receivable

Accounts receivable are comprised as follows:

| December 31, | 2016 | 2015 |
|---|---|---|
| Grants receivable – FIFA (net) | $ 6,551,753 | $ 9,017,881 |
| Accounts receivable - members and other | 5,146,992 | 9,027,082 |
| Unbilled receivables | 1,181,051 | 6,349,803 |
| Unbilled receivables – Copa America Centenario | 8,204,847 | - |
| Allowance for doubtful accounts | (963,146) | (395,288) |
| | $ 20,121,497 | $ 23,999,478 |

Grants receivable at December 31, 2016 consists of net amounts due from FIFA for the 2016 FIFA FORWARD grant, for a total of $7.9 million offset with amounts owed to FIFA of $1.4 million. Grants receivable at December 31, 2015 consists of net amounts due from FIFA for a portion of the 2014 FIFA FAP grants and the 2015 FIFA FAP grants, for a total of $10.0 million, which were collected from FIFA in August 2016.

Accounts receivable represent amounts owed from members and other parties which were substantially collected subsequent to the year end, or reserved for in such fiscal year.

Unbilled receivables represent income that is earned in accordance with the Organization's revenue recognition policy described elsewhere herein which will be billed and collected in the future in accordance with the provisions of the underlying commercial agreements.

### 5. Property and Equipment

Property and equipment is comprised as follows:

| December 31, | 2016 | 2015 |
|---|---|---|
| Equipment and software | $ 3,366,135 | $ 3,410,767 |
| Furniture and fixtures | 1,018,534 | 1,119,921 |
| Leasehold improvements | 3,345,718 | 3,287,932 |
| | 7,730,387 | 7,818,620 |
| Less accumulated depreciation | (7,539,083) | (6,785,925) |
| | $ 191,304 | $ 1,032,695 |

Depreciation and amortization expense was $243,997 and $594,048 for the years ended December 31, 2016 and 2015, respectively.

The additions and deletions of property and equipment are presented as follows for the years ended December 31, 2016 and 2015:

| December 31, | 2014 | Additions | Deletions | 2015 | Additions | Deletions | 2016 |
|---|---|---|---|---|---|---|---|
| Equipment and software | $ 4,588,004 | $ 22,254 | $(1,199,491) | $ 3,410,767 | $ - | $(44,633) | $3,366,134 |
| Furniture and fixtures | 1,119,921 | - | - | 1,119,921 | - | (101,386) | 1,018,535 |
| Leasehold improvements | 3,287,932 | - | - | 3,287,932 | 57,786 | - | 3,345,718 |
| | 8,995,857 | 22,254 | (1,199,491) | 7,818,620 | 57,786 | (146,019) | 7,730,387 |
| Accumulated depreciation | (7,391,369) | (594,047) | 1,199,491 | (6,785,925) | (243,997) | 81,889 | (6,948,033) |
| Impairment | - | - | - | - | (591,050) | - | (591,050) |
| Net book value | $ 1,604,488 | $ (571,793) | $ - | $ 1,032,695 | $ (777,261) | $ (64,130) | $ 191,304 |

During 2016, the Organization impaired approximately $591,000 of Cayman related assets as a result of the closing of the Cayman office in early 2016. During 2015, the Organization transferred approximately $1.2 million of fully depreciated assets to a broadcasting company in exchange for $600,000 of valued credits towards broadcast production expenses from August 2014 to October 2015 resulting in $600,000 gain on transfer of assets which is recorded as gain on asset transfer in the consolidated statement of activities for the year ended December 31, 2015. The Organization entered into a settlement agreement with the broadcasting company during September 2016 to settle all broadcast expenses due. Balances of such broadcast production expenses were accrued for as of December 31, 2015 and were paid in September 2016.

## 6. Other Assets

Other assets are comprised as follows:

| December 31, | | 2016 | | 2015 |
|---|---|---|---|---|
| Trademarks and Website, net of accumulated amortization | $ | 155,511 | $ | 209,039 |
| Security deposits | | 138,828 | | 86,930 |
| | $ | 294,339 | $ | 295,969 |

Amortization expense was $53,529 and $87,601 for the years ended December 31, 2016 and 2015, respectively.

## 7. Deferred Revenue

Deferred revenue composed of revenues from broadcast, marketing, promotion and sponsorship rights relating primarily to Gold Cup, Copa America Centenario and Champions League tournaments to be held in future years as follows:

| December 31, | | 2016 | | 2015 |
|---|---|---|---|---|
| **Current** | | | | |
| Gold Cup | $ | 12,151,066 | $ | - |
| Champions League | | 3,657,378 | | 4,682,222 |
| Copa America Centenario | | - | | 14,089,787 |
| Others | | 872,976 | | 430,000 |
| Total current | | 16,681,420 | | 19,202,009 |
| | | | | |
| **Noncurrent** | | | | |
| Others | | 1,250,000 | | 1,250,000 |
| Total noncurrent | | 1,250,000 | | 1,250,000 |
| | $ | 17,931,420 | $ | 20,452,009 |

In 2014, CONCACAF received $14.0 million in installment payments in respect of the original Datisa Confederation Contract, which amounts remained as deferred revenue as of December 31, 2015 since the economic treatment of such amounts was effectively confirmed by the various Copa America Centenario agreements. In 2016, CONCACAF recognized $14,089,787 of previously deferred revenue in income. Please refer to Note 1 for further detail.

## 8. Income Taxes

*CONCACAF: U.S. Federal, State and Local Income Taxes*

CONCACAF has been operating as an association of national football ("soccer") federations exempt from U.S. federal income tax under Section 501(c)(6) of the Internal Revenue Code of 1986, as amended. CONCACAF's exempt status was terminated as of May 17, 2010 due to the failure to file Forms 990 for the tax periods ended December 31, 2007, December 31, 2008 and December 31, 2009, in a timely manner. CONCACAF requested retroactive reinstatement of its tax exempt status in December 2012 with the filings of Form 1024 and Forms 990 for the 2007 to 2011 tax years. CONCACAF believes that it is entitled to retroactive reinstatements because (i) its failure to file was due to reasonable cause and (ii) CONCACAF has acted in a responsible manner to mitigate the failure to file and prevent similar failures in the future. CONCACAF has computed its U.S. federal, state, and local income tax provision on the assumption that the requested relief will be granted.

During April 2014, the Internal Revenue Service ("IRS") commenced its review of CONCACAF's request for retroactive reinstatement of its tax exempt status. As the IRS has discretion in this regard, there can be no assurance that CONCACAF's request will be granted. If CONCACAF is not granted retroactive relief for prior taxable years, its U.S. federal, state, and local income tax liability, not including penalties and interest, could exceed $18 million. As of December 31, 2016, CONCACAF's request for retroactive reinstatement is pending with the IRS.

Moreover, even if retroactive relief is granted, as with any tax exempt entity, the IRS or another U.S. taxing jurisdiction could challenge one of more aspects of CONCACAF's Forms 990 as filed. If so successfully challenged, CONCACAF could owe additional federal, state, and local taxes.

*CMTV: U.S. Federal, State and Local Income Taxes*

CMTV is a for-profit corporation which was organized in Florida in 2003. Prior to February 2013, CMTV had not filed any income tax returns. In February 2013, CMTV filed federal income tax returns for its tax years ended December 2006 to 2011. Subsequent to this time, CMTV filed federal income tax returns for its tax years ended December 2012 to 2015. CMTV has filed its federal income tax return for its tax year ended December 31, 2015. CMTV intends to timely file its federal income tax return for the tax year ended December 31, 2016.

In 2013, CMTV made certain state and local income tax filings, which CMTV believes will satisfy its reporting obligations for those jurisdictions for pre-2012 tax years. CMTV was notified that these filings resulted in abatement of certain income tax penalties and interests upon filing CMTV's 2012 income tax returns.

Because CONCACAF and CMTV never entered into any written agreement that sets forth the relationship between the two entities, CMTV's federal income tax returns have reflected, and CMTV's state and local returns also reflect, what is believed to be the substance of CMTV's economic arrangement with CONCACAF. Estimated liabilities for CMTV's U.S. federal, state and local income taxes have been included in CONCACAF's consolidated tax provision. CMTV has no significant deferred income tax assets or liabilities.

The estimated liabilities for CMTV's U.S. federal, state and local income taxes reflected in CONCACAF's consolidated tax provision are based on what CONCACAF believes are reasonable,

supportable positions. However, there can be no assurance that any of the U.S., a particular state, or a particular local taxing jurisdiction will not challenge these positions. The probability that a challenge will be made and, if made, will be successful cannot be reliably determined as of April 10, 2017.

As of December 31, 2016 and 2015, CMTV had an income tax liability of approximately $69,000 and $214,000, respectively. Provision for taxes for December 31, 2016 and 2015 consists of current domestic taxes of approximately $245,000 and $326,000, respectively. The Organization recorded an overall tax expense of approximately $245,000 for the year ended December 31, 2016 and $156,000 for the year ended December 31, 2015, which consists of the 2015 year tax provision of approximately $326,000, offset by tax overpayments of approximately $170,000 determined in respect of 2015 related to prior years.

The effective income tax rate differs from the U.S. statutory rate of 34% primarily due to the consolidation of CONCACAF, which is accounted for as an entity exempt from income tax, and CMTV, a taxable entity. Income is reported for income tax purposes on a separate basis.

*CONCACAF and CMTV: Non-U.S. Income Tax Liability*

CONCACAF believes that neither it nor CMTV has engaged in any activity which has resulted in any unpaid net income tax liability in a foreign jurisdiction through December 31, 2016.

*CONCACAF and CMTV: NY State Income Tax Liability*

During 2015 and 2016, the New York State Department of Taxation and Finance conducted an audit of certain New York income taxes of CMTV and CONCACAF for Fiscal 2011 to 2014, which was finalized in August 2016 and resulted in a total of $34,080 of additional income tax, interest and penalties for Fiscal 2011 to Fiscal 2014. This amount was recorded in the year ended December 31, 2015.

## 9. Commitments and Contingencies

The Organization leases office space in Miami, Florida, New York, New York, and Kingston, Jamaica. The future minimum lease payments under these leases (with original terms in excess of one year) are approximately as follows:

*December 31,*

| | | |
|---|---|---|
| 2017 | $ | 703,295 |
| 2018 | | 245,618 |
| 2019 | | 25,800 |
| 2020 | | 4,328 |
| | $ | 979,041 |

Rent expense was $1,238,874 and $1,186,483 for the years ended December 31, 2016 and 2015, respectively.

During the year ended December 31, 2016, the Organization also had a lease related to its Cayman Islands' office, which it decided to stop paying related rent after it exited such lease in March 2016. The Organization and the landlord under such lease had a dispute due to the fact that multiple lease agreements existed where the two parties could not agree on which lease was the governing document for lease rate and term. On November 4, 2016, the Organization reached a settlement with the landlord, George Town Financial Center, Ltd, for an agreed sum of $260,000. In addition, to the settlement, the Organization paid $87,500 in rent for January 2016 through March 2016. Therefore, for 2016, the rent expense for the Cayman Island office totaled $347,500.

In October 2016, the Organization executed an addendum to the current lease in its Miami headquarters for additional space commencing November 1, 2016 through the remaining term of the lease ending in April 2018. The table above properly reflects such future lease costs.

As part of the implementation of the Reform Framework described in Note 1 and Note 10, CONCACAF and its advisers conducted a significant review of numerous contracts, including existing vendor contracts for expenses, recurring payments without contracts, revenue contracts and employment contracts. These contracts were analyzed for their validity from a legal standpoint, their usefulness to the Organization, and the integrity of the opposite party. Through this process, CONCACAF ended relationships with questionable vendors through a variety of means, including contract cancellation, litigation, negotiated settlement and other means.

## 10. Investigation & Reform Implementation Costs - U.S. DOJ Indictments

On May 27, 2015, the DOJ unsealed an indictment naming and/or identifying dozens of football officials and media company executives as defendants and/or unindicted co-conspirators, including several then-current and former officials of CONCACAF. The indictment was filed in the Eastern District of New York, Case No. 15-CR-0252 (RJD) (RML) (the "Indictment"). The Indictment asserts several claims against and among the named defendants, including but not limited to, bribery, fraud and money laundering schemes in connection with the issuance of certain media and marketing rights contracts for high-profile soccer tournaments, as well as involving payments in exchange for votes relating to FIFA elections and/or votes relating to the selection of World Cup host nations. The Indictment did not name CONCACAF as a defendant, and identified CONCACAF as a "victim" of the alleged schemes affecting football in the CONCACAF region. On December 3, 2015, the DOJ issued arrest warrants for 16 additional soccer officials, including current and former officials associated with CONCACAF in connection with a Superseding Indictment filed in the Eastern District of New York on November 25, 2015, Case No. 15-CR-0252 (S-1) (R.TD) (the "Superseding Indictment"). The Superseding Indictment continued to assert several claims against all defendants including bribery, fraud and money laundering and expanded the number of alleged schemes as well as defendants allegedly involved in participating in them. CONCACAF was not named as a defendant in the Superseding Indictment and was identified again as a "victim" of the alleged schemes set forth therein. CONCACAF is cooperating with the DOJ in connection with these matters. CONCACAF retained Sidley Austin LLP (and other firms) to conduct an Investigation, as well as to advise on new governance reform and compliance efforts including the Reform Implementation. See Note 1 for further detail.

As a result of the DOJ Indictment, the Superseding Indictment, the Investigation and the steps to develop and implement the Reform Framework described in Note 1, CONCACAF created an "Investigation and Reform Implementation" cost category within general and administrative costs

to record the expenses related to these matters, including investigations, crisis management and reform implementation costs. There are approximately eleven vendors included in this expense category that are working directly on the Investigation and Reform Implementation. During the years ended December 31, 2016 and 2015, CONCACAF spent a total of $14,523,132 and $10,174,366, respectively, in Investigation and Reform Implementation costs.  Expenditures for this work are expected to continue during 2017, but at reduced levels.

Due to the ongoing DOJ investigation, there can be no assurance that CONCACAF will not be impacted financially as a result of these matters. The Organization currently believes, however, that the investigation will not have a material impact on the consolidated financial statements.

### 11. 2014 Accrual Reversals During 2015

As a result of the DOJ Indictment, the Superseding Indictment, and decisions by the Executive Committee described in Note 1 and Note 10, the Organization reversed certain accruals in 2015 related to 2014.  During December 2015, the CONCACAF Council voted to reverse a previously approved bonus of $1.0 million to the former President of the Organization. This bonus pertained to 2014 services. In addition, the CONCACAF Council also voted to reverse previously approved 2014 amounts for certain support for youth tournament participation and member association support totaling approximately $570,000. Reversal of these amounts are reflected in the supporting services and program services in the consolidated statements of activities and functional expenses for the year ended December 31, 2015.  There are no such expense reversals in the year ended December 31, 2016.

### 12. Related Party Transactions

CONCACAF made the following payments to related parties during the year ended December 31, 2015:

- Payments of $243,798 to One of a Kind for office remodeling services and furniture.  One of a Kind is owned by the spouse of a former General Secretary of CONCACAF.

- Payments of $35,505 to Computer Technology Solutions Ltd. for IT maintenance services in the Cayman Islands.  Computer Technology Solutions Ltd. is owned by a cousin of CONCACAF's former President, Jeffrey Webb.

- Payments of $5,071 to Captain's Aviation Services Ltd. for travel related services in Jamaica. Captain's Aviation Services Ltd. is owned by an existing Council member.

There were no similar payments made to related parties during the year ended December 31, 2016.

### 13. Subsequent Events

The Organization has evaluated subsequent events through April 10, 2017, the date these consolidated financial statements were available to be issued.