UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

               - against -

JUAN ANGEL NAPOUT, *et al.*,

               Defendants.
--------------------------------------------------------x

**RESTITUTION ORDER**
15-CR-252 (PKC)

PAMELA K. CHEN, United States District Judge:

On December 22, 2017, a jury convicted Juan Angel Napout and Jose Maria Marin (collectively, "Defendants") of various counts of RICO conspiracy, conspiracy to commit wire fraud, and conspiracy to commit money laundering.  Marin was sentenced on August 22, 2018 (Dkt. 1015) and Napout was sentenced on August 29, 2018 (Dkt. 1008).  However, pursuant to 18 U.S.C. § 3664(d)(5), the Court deferred ruling on restitution pending further briefing and submissions by the government, Defendants, putative victims, and interested parties.  (8/21/18 scheduling order.)  The Court held oral argument regarding restitution on October 4, 2018 and November 8, 2018.

Before the Court are the restitution requests of the government and putative victims Confederación Sudamerica de Fútbol ("CONMEBOL"), Confederation of North, Central America and Caribbean Association Football ("CONCACAF"), Fédération Internationale de Football Association ("FIFA") (collectively, the "soccer organizations"), and three former employees of Traffic Sports USA, Inc. ("Traffic USA"), pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, seeking: (1) compensation for lost revenue; (2) legal fees and related costs incurred responding to government requests during the investigation and prosecution of Defendants; and (3) disgorgement of salary and benefits paid to Defendants.

# BACKGROUND[1]

On August 6 and 15, 2018, in advance of Marin's and Napout's respective sentencings, the soccer organizations and the former Traffic USA employees submitted requests for restitution as putative victims pursuant to the MVRA.  (Dkts. 965, 966, 967, 968, 986, 988, 989.)  On August 21, 2018, the Court issued an order stating that it would defer ruling on restitution and set a schedule for further briefing by the government, Defendants, the putative victims, and interested parties.  (8/21/18 scheduling order.)   The soccer organizations and the former Traffic USA employees filed supplemental restitution letters between August 30, 2018 and September 7, 2018.  (Dkts. 1003, 1006, 1013.)  On September 21, 2018, Traffic USA and Traffic Sports International, Inc. (collectively, "Traffic"), two sports marketing companies that have pled guilty to various offenses related to their involvement in the FIFA bribery conspiracy, filed a joint brief as interested parties.  (Dkt. 1023.)  That same day, Defendants filed their respective briefs in opposition to the restitution requests.  (Dkts. 1025 (Marin), 1026 (Napout).)  The government submitted its brief regarding restitution on September 26, 2018.  (Dkt. 1030.)  On October 1, 2018, the Court granted CONCACAF's (Dkt. 1036) and CONMEBOL's (Dkt. 1037) requests to file under seal billing records and other documentation supporting their requests for attorneys' fees and costs (10/1/18 docket entry), and Defendants replied to the government's restitution letter (Dkts. 1041 (Marin), 1042 (Napout)).  On October 3, 2018, CONCACAF submitted a letter (Dkt. 1044) downwardly revising its request for restitution and summarizing the anticipated testimony of its proposed expert witness, Professor Victor Matheson, a sports economist, at the October 4, 2018 restitution hearing.

---

[1] The Court assumes the parties' familiarity with the facts in this case and thus recites them only to the extent relevant to the Court's analysis.

The Court held an initial restitution hearing on October 4, 2018.  In addition to hearing oral argument, the Court received testimony from CONCACAF's expert, Professor Matheson, over Defendants' objections.  (Dkts. 1047 (Napout), 1048 (Marin).)  At the close of the hearing, the Court set an additional briefing schedule to allow the soccer organizations to produce all billing records and expense documentation supporting their restitution claims related to salaries, benefits, attorneys' fees, costs, and related investigative expenses.  (10/4/18 minute entry; 10/9/18 docket entry.)  On October 11, October 25, and October 26, 2018, after consulting with the government, the soccer organizations submitted the relevant records and expense documentation.  (Dkts. 1051, 1052, 1060, 1061, 1062, 1063, 1065.)  Defendants filed their respective oppositions on November 5, 2018.  (Dkts. 1071 (Marin), 1072 (Napout).)  The Court held a second restitution hearing, at which the Court heard additional oral argument, on November 8, 2018.  (11/8/18 minute entry.)

## LEGAL STANDARD

Federal courts "have no inherent power to order restitution" and, therefore, "[a] sentencing court's power to order restitution . . . depends upon, and is necessarily circumscribed by, statute."  *United States v. Zangari,* 677 F.3d 86, 91 (2d Cir. 2012).  The statute at issue here, the MVRA, provides that a sentencing court "shall order" defendants convicted of specified crimes to "make restitution to the victim[(s)] of the offense" in addition to "any other penalty authorized by law."  18 U.S.C. § 3663A.  In relevant part, a defendant must "reimburse the victim[(s)] for lost income . . ., transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  *Id.* § 3663A(b)(4).  "[R]estitution may be awarded only in the amount of losses directly and proximately caused by the defendant's conduct."  *United States v. Gushlak*, 728 F.3d 184, 194-95 (2d Cir. 2013); *see also Zangari*, 677 F.3d at 91 ("Because the purpose of restitution is essentially compensatory, and

3

because the MVRA itself limits restitution to the full amount of each victim's loss, a restitution order must be tied to the victim's actual, provable, loss.") (citations, emphasis, and internal quotation marks omitted) (collecting cases).  The government bears the burden of establishing the loss amount under the MVRA and "[a]ny dispute as to the proper amount . . . of restitution shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).  However, "the MVRA requires only a reasonable approximation of losses supported by a sound methodology."  *Gushlak*, 728 F.3d at 196.

## DISCUSSION

### I.      Which Parties Qualify as Victims Under the MVRA

As an initial matter, the Court finds that FIFA, CONCACAF, and CONMEBOL qualify as victims under the MVRA, because each soccer organization suffered losses as a direct result of the offenses of which Defendants were convicted.  18 U.S.C. § 3663A(a)(2).  However, as discussed *infra*, the Court does not find that the former employees of Traffic USA qualify as victims.

### II.     FIFA

#### A.  FIFA - Salaries and Benefits

FIFA asks that Defendants Marin and Napout be ordered to pay restitution to reimburse FIFA for "100% of the benefits, *per diems*, and travel expenses FIFA paid to [Defendants] during [their] period of misconduct"—$97,663 for Marin and $121,446.30 for Napout.  (Dkt. 966, at 8; Dkt. 988, at 9-10.)  FIFA argues that Defendants violated FIFA's Code of Ethics, which they were duty-bound to follow, by receiving personal financial gain in carrying out their FIFA responsibilities.  (*See* Dkt. 988, at 2-5 (discussing FIFA's Code of Ethics).)  According to FIFA, "[b]y depriving FIFA of [their] honest services, [Defendants] unfairly obtained money from FIFA . . . when attending FIFA events[.]"  (Dkt. 966, at 5.)  Thus, FIFA maintains, it is entitled to recoup

the entire amount of benefits it paid to, or on behalf of, Defendants during their tenures as FIFA officials.[2]  Defendants respond that FIFA has failed to connect specific expense payments to Defendants' offense conduct and has failed to provide adequate documentation of these payments. (Dkt. 1071, at 1-2; Dkt. 1072, at 7.)  The Court finds that FIFA has adequately documented its expense payments to Defendants.  Therefore, the Court turns to the amount Defendants owe FIFA in restitution.

As argued by Defendant Marin, FIFA's request that they be compensated for the full amount of salaries and other benefits "ignores settled law in this circuit."  (Dkt. 1071, at 1.) Victims are entitled to restitution for salaries and benefits "in the amount of the difference in the value of the services that [the employee] rendered and the value of the services that an honest [employee] would have rendered."  *United States v. Bahel*, 662 F.3d 610, 650 (2d Cir. 2011) (citation and internal quotation marks omitted).  "There is no question that a portion of an individual's salary can be subject to forfeiture where . . . an employer pays for honest services but receives something less."  *Id.* at 649.  Where it would be "unduly complex to try to delineate" which part of the funds received by the defendant-employee were "paid for honest services and which part was paid for dishonest services", *id.* at 650 (internal quotation marks omitted), courts have calculated the amount of restitution to which the employer is entitled by applying a percentage reduction to the total.  *See, e.g.*, *United States v. Ebrahim*, No. 12-CR-471 (JPO), 2013 WL 2216580, at *3 (S.D.N.Y. May 21, 2013) ("[T]he Court has determined that AT&T is entitled [to] 20 percent of [the defendant's] salary from the relevant period. . . .  Such a figure is consistent

---

[2] Marin was Chairman of the FIFA World Cup Local Organizing Committee from 2012 to 2014 and a member of the FIFA Organizing Committee for the Olympic Soccer Tournaments. (Dkt. 966, at 2.)  Napout was a member of FIFA's Disciplinary Committee from 2002 to 2015 as well as Vice President of FIFA and a member of FIFA's Executive Committee from May through December 2015.  (Dkt. 988, at 2.)

with precedent in this circuit."); *United States v. Skowron,* 839 F. Supp. 2d 740, 749 (S.D.N.Y. 2012) (awarding Morgan Stanley 20% of a defendant-employee's compensation as victim of employee's insider trading scheme and cover-up), *aff'd*, 529 F. App'x 71 (2d Cir. 2013).

The Court finds that this approach is appropriate here, because it would be "unduly complex to try to delineate" the amount that FIFA paid to, or on behalf of, Defendants that was strictly related to Defendants' "dishonest services." *Bahel*, 662 F.3d at 650. As proved at trial, Defendants' entire service to FIFA was tainted by corruption, and the criminal schemes in which Defendants participated involved "key aspects of . . . FIFA's core responsibilities." (Dkt. 988, at 8-9.) Defendants' primary responsibility as FIFA officials "was to act as [] steward[s] for the ethical development of soccer around the world" (*id.* at 9), instead of perpetuating and concealing decades-long bribery schemes (Dkt. 1006, at 2-3). Because this core responsibility, which Defendants failed to adequately perform, permeated all aspects of their activities for FIFA, yet cannot be readily connected to any particular payment or payments, the Court finds that Defendants must repay 20% of the benefits they received from FIFA.

Therefore, Defendant Marin is liable for $19,532.60 and Defendant Napout is liable for $24,289.26 to compensate FIFA for 20% of the "benefits, per diems, and travel expenses" paid to, or on behalf of, Defendants.

## B.  FIFA - Attorneys' Fees and Investigative Expenses

FIFA also requests restitution in the amount of $27,808,463.93,[3] consisting of: (1) $16,393,911.51 in attorneys' fees for reviewing documents in connection with the government's

---

[3] Although FIFA made its restitution request in Swiss Francs, for ease and consistency, the Court has converted that request into U.S. dollars at a 1:1 conversion ratio. Banque Nationale Suisse, "Current interest rates and exchange rates", https://www.snb.ch/en/iabout/stat/statrep/id/current_interest_exchange_rates (last visited November 20, 2018).

investigation of Defendants; (2) $1,725,670.00 in attorneys' fees for preparing investigative reports for American and Swiss authorities; (3) $105,601.88 in attorneys' fees for a Quinn Emanuel Urquhart & Sullivan ("Quinn Emanuel") attorney to attend the entirety of Defendants' trial; (4) $9,474,154.56 in fees for Stroz Friedberg, a forensic data consulting company that processed and hosted the millions of documents collected during FIFA's investigation; (5) $28,237.00 in attorneys' fees for preparing Stephanie Maennl[4] to testify at Defendants' trial, as well as fees for her attorneys' presence during her testimony; and (6) $80,888.98 in attorneys' fees to prepare FIFA's restitution request.  (Declaration of William Burck ("Burck Decl."), Dkt. 1061-1, at ¶¶ 43, 49, 52, 54, 58, 61; Dkt. 966, at 10-12.)

In *Lagos v. United States*, the Supreme Court held that the MVRA provides restitution only for investigation expenses incurred during a victim's participation in "government investigations and criminal proceedings" and "does not cover the costs of a private investigation that the victim chooses on its own to conduct."  138 S. Ct. 1684, 1688, 1690 (2018); *see also id.* at 1689 ("Some [restitution] statutes specifically require restitution for the 'full amount of the victim's losses,' defined to include 'any . . . losses suffered by the victim as a proximate result of the offense.'  The Mandatory Victims Restitution Act, however, contains no such language; it specifically lists the kinds of losses and expenses that it covers.") (quoting 18 U.S.C. §§ 2248(b), 2259(b), 2264(b), 2327(b)).  This "narrow interpretation" is meant to alleviate district courts of the "significant administrative burdens" of resolving "these potentially time-consuming controversies as part of criminal sentencing," particularly "in cases involving multimillion[-]dollar investigation expenses for teams of lawyers and accountants."  *Id.* at 1689.

---

[4] Maennl is FIFA's Deputy Head of Corporate Legal and was the government's first witness at trial.  (Dkt. 966, at 10 n.29.)

In keeping with *Lagos*, the Court denies FIFA's first four restitution requests in their entirety. As the Court stated at the October 4, 2018 restitution hearing, it interprets *Lagos* as limiting restitution to expenses incurred for investigatory activities that the government expressly and specifically "invited or requested." Here, as FIFA itself concedes, the government did not approach FIFA and ask it to investigate, but rather, "FIFA proactively approached the Government to open a dialogue after the [May 27, 2015] Indictment was unsealed" because "FIFA was motivated, at least in part, by a desire to demonstrate its cooperation, preserve its victim status, and avoid prosecution in any future indictment." (Dkt. 1061, at 2-3.) As Defendant Napout correctly argues, "[a] corporation acting out of self-preservation cannot turn around and have its costs reimbursed through restitution." (Dkt. 1072, at 3.) Similarly, even if, as FIFA contends, the government "suggested that a Quinn Emanuel attorney attend the trial in the event that any issues arose that directly impacted FIFA", (Burck Decl., at ¶ 53), this request appears to relate to FIFA's potential criminal exposure, not the government's investigation. Therefore, FIFA's requests for (1) $16,393,911.51 in attorneys' fees for FIFA's internal investigation; (2) $1,725,670 in attorneys' fees for preparing investigative reports for American and Swiss authorities; (3) $105,601.88 in attorneys' fees for a Quinn Emanuel attorney to attend Defendants' entire trial; and (4) $9,474,154.56 in fees paid to Stroz Friedberg are denied.

However, the Court finds that FIFA's requests for attorneys' fees in connection with Stephanie Maennl's testimony and preparing its restitution request are compensable under the MVRA. There is no dispute that Maennl was called as a witness at the government's request, and the Court finds that the legal fees incurred by FIFA to prepare its restitution request were necessary to its "attend[ance] [at] th[e] post-verdict restitution proceeding (for which the Court permitted briefing and ordered certain disclosures of billing records)," thus making them "recoverable under

the [MVRA]." *United States v. Gupta*, 925 F. Supp. 2d 581, 585 (S.D.N.Y. 2013), *aff'd*, 747 F.3d

111 (2d Cir. 2014); *see also Bahel*, 662 F.3d at 647 ("Attorneys' fees are 'other expenses' that are

properly included within a restitution award."); *United States v. Battista*, 575 F.3d 226, 234 (2d

Cir. 2009) (same).

Therefore, the Court turns to the question of whether the requested attorneys' fees are

excessive.  *See* 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of restitution

shall be resolved by the court by the preponderance of the evidence.").  Defendants argue that the

hourly rates charged by the victims' outside counsel were unreasonable and that specific tasks

undertaken by the law firm were unnecessary.  (*See generally* Dkts. 1071, 1072.)

The Second Circuit has not yet ruled on the question of whether district courts "ha[ve] a

duty to scrutinize the [amount of] attorneys' fees" requested pursuant to the MVRA.  *United States*

*v. Donaghy*, 570 F. Supp. 2d 411, 431 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*,

575 F.3d 226 (2d Cir. 2009).  As the Honorable Carol Bagley Amon explained in *Donaghy*:

> Since the goal of restitution is to make the victim whole, there is an argument to be
> made that as long as the Court is satisfied that the attorneys' fees were incurred for
> the purpose of assisting the government in the investigation and prosecution of
> these offenses, and were in fact paid by the victim, the Court need go no further.
> Specifically, it need not further examine the request with the proverbial green
> eyeshade as it might do in reviewing a fee application of a prevailing party in a civil
> case to determine whether the hours were reasonably spent or the hourly rates
> appropriate.  On the other hand, it could also be argued that although reasonable
> attorneys' fees are a 'direct and foreseeable' investigation cost within the scope of
> subsection (b)(4) [of the MVRA], excessive attorneys' fees are not.

*Id*.  However, courts in this circuit have reduced attorneys' fees in connection with restitution

proceedings where they have "exceeded what was reasonably necessary under the MVRA."  *See,*

*e.g.*, *Gupta*, 925 F. Supp. 2d at 587-88 (reducing attorneys' fees by 10% "in an excess of caution"

where "on a few occasions, the number of attorneys staffed on a task—while perhaps perfectly

appropriate on the assumption that Goldman Sachs wished to spare no expense on a matter of great

importance to it—exceeded what was reasonably necessary under the MVRA"); *United States v. Sazonov*, No. 1:17-CR-00657 (SDA), 2018 WL 922151, at *2 (S.D.N.Y. Feb. 16, 2018) (reducing the attorneys' fees by 15%); *Ebrahim*, 2013 WL 2216580, at *4 ("[T]he Court's review of Sullivan & Cromwell [L]LP's billing records suggests that some of the billing may have been, in some discrete instances, excessive.  It also appears that there was an unnecessary [number] of lawyers involved in certain tasks.  Following Judge Rakoff's lead in *Gupta*, this Court therefore will deduct ten percent of the fees requested[.]"); *United States v. Qurashi*, No. 05-CR-498 (SJF)(AKT), 2009 WL 10677000, at *27 (E.D.N.Y. Sept. 1, 2009) (reducing the attorneys' fees by 10%), *report and recommendation adopted*, No. 05-CR-498 (SJF)(AKT), 2009 WL 10677129 (E.D.N.Y. Sept. 30, 2009), *aff'd and remanded*, 634 F.3d 699 (2d Cir. 2011).

It appears that one of the few cases in this Circuit that has addressed the question of a reasonable hourly rate in connection with restitution proceedings is *Donaghy*.  In that case, a National Basketball Association ("NBA") referee pled guilty to conspiracy to commit wire fraud and conspiracy to transmit wagering information in connection with a betting conspiracy.  During the restitution phase of his sentencing, the defendant argued that the attorneys' fees incurred by the victim, the NBA, to assist the government in its investigation and prosecution were excessive. 570 F. Supp. 2d at 431-32.  In rejecting the defendant's argument, Judge Amon held,

> [w]ithout purporting to set any new standards for appropriate hourly rates in civil attorneys' fees cases, the Court does not find that the hourly rates charged in this case were excessive.  The NBA hired two well-known corporate law firms in one of the world's most expensive markets, New York City.  Wachtell[, Lipton, Rosen & Katz] charged either $600, $700, or $750 per hour for . . . a partner, between $380-$580 per hour for the associates, and $175-$200 per hour for paralegals. These amounts are in line with the rates charged by most of New York City's major corporate law firms. . . .  The NBA is the type of major commercial organization that would likely hire law firms like Arkin [Kaplan Rice LLP] and Wachtell, a consequence that should have been foreseeable to the defendants.  Accordingly, the Court finds that the hourly rates paid by the NBA in rendering assistance to the government's investigation of these offenses were not excessive.

*Id.* at 432 (citation omitted).  Applying both the reasoning and the hourly rates adopted in *Donaghy* as a baseline, and adjusting for inflation in the ten years since *Donaghy* was decided, the Court finds that the following hourly rates are reasonable in this case: $700-$850 per hour for partners, $450-$650 per hour for associates and counsel, and $275-$300 per hour for paralegals.  *See also Sazonov*, 2018 WL 922151, at *3 (finding the rates "ranging from a low of $430 to a high of $1420 . . . exceeded that which was reasonably necessary under the MVRA"); *Qurashi*, 2009 WL 10677000, at *26.

Based on a review of the submitted records, and giving due consideration to the government's views on FIFA's attorneys' fees requests and the applicable, though limited, case law on this issue, the Court finds that FIFA's requested attorneys' fees are excessive with respect to the preparation of Maennl's testimony and FIFA's restitution request.  *See id.* at 431 (reviewing the hourly rate, the billing records, and whether "multiple lawyers participated in each task," allowing the "government [to] advise[] the  Court [whether] the staffing and amount of hours spent by outside counsel appeared to be a reasonable response to the assistance it requested," and "bearing in mind [the Court's] own firsthand knowledge of what [submissions] it had asked of the [victim]" to determine whether the request for attorneys' fees in connection with restitution were excessive).

With respect to Maennl's testimony, Defendants argue that FIFA's request for attorneys' fees should be reduced because Maennl only testified for thirty minutes and yet, for example, FIFA seeks over four thousand dollars, consisting of over ten hours of billed time, for a Quinn Emanuel associate "to observe that day's trial and write a summary of it."  (Dkt. 1072, at 3; *see also* Dkt.

1065-2, at ECF[5] 245.)  The Court notes that not only did that associate bill 10.9 hours for observing the trial, but a partner also billed 7.4 hours, at a cost of over five thousand dollars, for the same period of time.  (Dkt. 1065-2, at ECF 245.) The Court agrees with Defendants that the requested attorneys' fees are excessive in terms of staffing[6] and reduces the requested amount by 15%. Therefore, Defendants are liable to FIFA for $24,001.45 in connection with Maennl's testimony.

With respect to FIFA's claim related to the preparation of its restitution request, the Court finds that the requested fees are wildly excessive and must be reduced by 50%.  FIFA's first four restitution arguments, which account for 99.6% of its requested restitution, are patently frivolous in light of the Supreme Court's decision in *Lagos*.  In this regard, the Court notes that the government did not support any of these four requests by FIFA.  The Court must consider FIFA's utter lack of success in assessing whether its request for attorneys' fees is reasonable. *See Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983) ("[W]here the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.").  Therefore, Defendants are liable to FIFA for $40,444.49[7] in connection with FIFA's preparation of its restitution request.

In total, Defendants are liable to FIFA for $64,445.94 in restitution for attorneys' fees and investigative costs.

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[6] Quinn Emanuel's hourly rate is almost entirely within the acceptable range set by the Court.  The associate's time was billed at a rate of up to $497.25 per hour, and the partner's time was billed at a rate of $867 per hour.  (*See, e.g.*, Dkt. 1065-2, at ECF 250.)

[7] This amount represents .4% of the attorneys' fees FIFA is seeking in connection with the preparation of its restitution request.

### III.   CONCACAF

### A.  CONCACAF - Lost Revenue

In its initial submission on September 7, 2018, CONCACAF argued that it should receive restitution for lost revenue in the amount of $27.7 to $32.7 million or, at a minimum, the $10 million in bribes that former CONCACAF president Jeffrey Webb received.  The $27.7 to $32.7 million figure, according to CONCACAF, represented the amount by which CONCACAF's Copa América Centenario ("Centenario")[8] rights were underpriced due to Defendants' failure to create a legitimate bidding process to ensure that CONCACAF secured the actual fair market value of the marketing and media rights for those events.  (Dkt. 1013, at 1-6; *see also* Dkt. 967, at 2; Dkt. 986, at 2-3.)   However, on October 3, 2018, the day before the first restitution hearing, CONCACAF submitted a revised restitution request, claiming that it was only entitled to between $2,893,223 and $7,893,223 in lost revenue for the underpriced Centenario, or, in the alternative, the $10 million in bribes Webb received.  (Dkt. 1044.)  CONCACAF explained that in generating its original, and markedly higher, lost revenue figure, it had incorrectly included the operating costs associated with the Centenario as lost revenue.  (*Id.* at 2.)

The Court finds that CONCACAF is not entitled to any restitution for lost revenue. CONCACAF has failed to provide a "sound methodology" to support its claim.  *Gushlak*, 728 F.3d at 196.  After the unsealing of the first indictment, many of the original contracts for the Centenario tournament, which had not yet occurred, were terminated and renegotiated.  (Dkt. 1030, at 6; *see also* Dkt. 1022, at 7-8.)  After re-negotiation, the total media and sponsorship revenue was ultimately calculated to be $222,822,989, which was divided among the soccer confederations

---

[8] The Centenario was a tournament held in 2016 to celebrate the hundredth anniversary of the Copa América soccer tournament.  (Dkt. 968, at 3-4.)

and sports marketing companies that would be participating in the Centenario, according to pre-existing contracts.  (Dkt. 1045-6, at ECF 2.)  CONCACAF argues that "a legitimately marketed Centenario would have generated between $250 and $270 million in [total] revenue" (Dkt. 1013, at 5) and that CONCACAF's share of the additional revenue, beyond its share of the re-negotiated price of approximately $222 million, would be between $2,893,223 and $7,893,223 (Dkt. 1044, at 3).  CONCACAF derives this $250 to $270 million revenue figure from a combination of two sources: (1) at the time of the original negotiation of the Centenario contract, Datisa[9] paid at least $150 million to obtain the media rights to the Centenario and (2) on a government wiretap, Datisa's principals bragged that the Centenario would yield "at least" $100 million of profit.  (Dkt. 1013, at 4; *see also id.* at ECF 24-25.)

The Court finds that the "methodology" employed by CONCACAF to arrive at the $250 to $270 million revenue figure is far from "sound", *Gushlak*, 728 F.3d at 196, and amounts to sheer speculation.   As Defendants point out, with respect to the second source, "it strains credulity to assume that such boasting [on the wiretap] was based on any serious financial analysis" (Dkt. 1026, at 7; *see also* Dkt. 1022, at 9 (calling CONCACAF's estimations "guesstimates . . . for what might have happened in the real world but for the corruption")), and even if the "conspiratorial boasting" could be used as the basis for the calculation, one of the Datisa principals also states on the tape that the co-conspirators can expect "between 80 and 100 million of profit" from the Centenario (Dkt. 1013, at ECF 25)—a $20 million difference from the figure CONCACAF relies on.  CONCACAF has provided the Court with no metric or methodology by which it can determine what the total revenue for the Centenario would have been but for Defendants' corruption.  While

---

[9] Traffic, Full Play, and a third sports marketing company, Torneos y Competencias (together with its affiliates, "Torneos"), which was operated by co-conspirator Alejandro Burzaco, formed a new company called Datisa in May 2013.  (Dkt. 997, at 5.)

Professor Matheson testified that the short timeline to resell the media rights to the Centenario, as well as the notoriety of the corruption scandal, would have had a negative impact on the resale price, CONCACAF has failed to provide any evidence or information upon which the Court can measure the quantifiable impact.  Moreover, given CONCACAF's admission that its revenue loss was between $2 and $7 million, the Court cannot use the $10 million paid to Webb as an alternative measure of CONCACAF's loss.  Therefore, the Court finds that CONCACAF has failed to prove its entitlement to restitution for lost revenue by a preponderance of the evidence.

### B.  CONCACAF - Attorneys' Fees and Investigative Expenses

CONCACAF also requests restitution in the amount of $1,887,797.03,[10] consisting of: (1) $1,342,837.75 in attorneys' fees in connection with responding to specific investigation requests from the government;[11] (2) $139,390.70 in vendors' fees and expenses; and (3) $405,568.58 in attorneys' fees to prepare CONCACAF's restitution request.[12]  (Dkt. 1063, at 5.)  The government has approved CONCACAF's request for restitution in connection with these activities, but did not review the billing entries and expense records that CONCACAF submitted to the Court.

---

[10] This request, made after conferring with the government, is an 87.6% reduction from CONCACAF's initial submission in which it sought $15,216,634 in legal and fees and related expenses.  (*See* Dkt. 1013, at 1, 7-8.)

[11] This includes two separate billing matters.  The first matter, for which CONCACAF is seeking $915,122.75 in attorneys' fees, began in October 2012 "when the Government first reached out to CONCACAF for assistance related to the Government's investigation."  (Dkt. 1062, at 3; Dkt. 1062-1, at 22.)  The second matter, for which CONCACAF is seeking $427,715 in attorneys' fees, relates to "a limited number of tasks that were in response to Government requests" after the first indictment was unsealed in 2015.  (Dkt. 1062, at 3; Dkt. 1062-2, at 13.)

[12] The Court denies CONCACAF's request to supplement its October 25, 2018 submission with additional billing records related to the ongoing costs of preparing its restitution request.  (Dkt. 1063, at 5 n.4.)

With respect to the first category of CONCACAF's request for attorneys' fees and investigative expenses, i.e., attorneys' fees for responding to specific government requests, Defendants argue that the fees should be reduced because CONCACAF failed to seek the government's review of its requested billing entries and expenses, the billing records are vague, and CONCACAF's internal investigation "was far wider than the two schemes for which Mr. Napout was convicted[,] . . . and thus losses from those schemes were not caused by Mr. Napout or the reasonably foreseeable acts of his coconspirators." (Dkt. 1072, at 4-5; Dkt. 1701, at 2-3.) The Court finds that these arguments are without merit.[13]  A review of the billing records shows that they are sufficiently detailed and appear to be relevant to the government's requests for evidence and information relating to Defendants' investigation and prosecution.  (*See, e.g.*, Dkt. 1060-2, at 6 (telephone calls with DOJ to discuss internal investigation requests), 8 (associates and paralegals preparing materials in connections with a DOJ request).)  Although Napout points to a handful of billing entries out of the thousands that are not obviously related to this case, the Court is satisfied, especially in light of the government's support of CONCACAF's request, that the attorneys' fees have been sufficiently justified.  *See Lagos*, 138 S. Ct. at 1689 (stating that district courts should not be required to wade into "potentially time-consuming controversies" about

---

[13] With respect to Napout's contention that he should not be held responsible for criminal conduct that he asserts was not reasonably foreseeable to him, the Court has already rejected variations on this argument that were made both during trial and sentencing.  As the Court explained on those occasions, and reiterates here, Napout was charged with and ultimately convicted of participation in a RICO conspiracy that involved FIFA and a multitude of soccer organizations across the globe.  Thus, as a legal matter, Napout can be held responsible for the reasonably foreseeable conduct of his co-conspirators, and the losses of their activities caused as part of the overarching conspiracy.  *United States v. Smith*, 513 F. App'x 43, 45 (2d Cir. 2013). With respect to the Centenario and other soccer tournaments corrupted by the wide-ranging bribery schemes that were charged in this case, Napout knew that the agreement of all of the soccer officials was necessary for the bribery schemes to succeed and thus the bribery of all of the other soccer officials, such as Webb, was certainly reasonably foreseeable to Napout.

restitution as part of criminal sentencing); *Gushlak*, 728 F.3d at 196 ("[The] MVRA requires only reasonable approximation of losses supported by sound methodology.")

At the same time, under the hourly rate set forth *supra*, certain of Sidley Austin's hourly rates are excessive. (*See, e.g.,* Dkts. 1062-1 and 1062-2 (charging up to $1,375 per hour for a partner, $795 per hour for a counsel, and $675 per hour for an associate).) However, in this case, Sidley Austin gave CONCACAF a 20% discount for attorneys' fees accrued between 2012 and 2017 and a 10% discount for fees accrued in 2018. (Dkt. 1062-1, at 22; Dkt. 1062-2, at 13.) The Court finds that the already applied 20% discount is an adequate deduction for the attorneys' fees accrued between 2012 and 2017. *See Bahel*, 662 F.3d at 648 (finding attorneys' fees adequate where the law firm represented the victim "for 25-40% below its normal billing rates"). But, this 20% deduction should also be applied to the attorneys' fees accrued in 2018. Therefore, the Court finds that Defendants are liable to CONCACAF for $1,306,624 in attorneys' fees and investigative expenses accrued between 2012 and 2017 and $32,190 for attorneys' fees and investigative expenses accrued in 2018, for a total of $1,338,814.

With respect to the second category of CONCACAF's request for attorneys' fees and investigative expenses, i.e., vendors' fees and expenses, the Court awards CONCACAF the full amount requested. CONCACAF has demonstrated by a preponderance that these fees and expenses were directly related to locating, obtaining, and producing evidence and information requested by the government. The Court finds Defendants are liable for $139,390.70 in vendors' fees and expenses.

With respect to the third category of CONCACAF's request for attorneys' fees and investigative expenses, i.e., attorneys' fees for preparing CONCACAF's restitution request, Defendants argue that CONCACAF should not be compensated for the "entirely unnecessary"

testimony of Professor Matheson, "its original and unsuccessful attempt to seek more than $45 million in restitution," and any withdrawn or abandoned claims. (Dkt. 1072, at 4-6; Dkt. 1071, at 3-4.) Additionally, Defendants argue that any remaining restitution award should be reduced because Sidley Austin's fees and hourly rate are excessively high. (Dkt. 1702, at 5-6.) The Court agrees with all of these points. As an initial matter, although Sidley Austin has already given CONCACAF a 10% discount on attorneys' fees associated with its restitution request (Dkt. 1062-6, at 11), the Court finds that the requested fees and costs are still excessive and that a 20% reduction is more appropriate. Additionally, the Court finds that another 20% should be deducted from CONCACAF's request for attorneys' fees for its initial incorrect lost revenue projection and its failure to seek the government's approval for its requested billing entries and expenses—which were the subject of much wasted briefing and time during the first restitution hearing—as well as for Professor Matheson's testimony. Professor Matheson's testimony added little value to the restitution proceedings as he could not testify about CONCACAF's loss projections and because the economics concepts about which he testified were mostly duplicative of Professor Stefan Szymanski's expert testimony at trial. In light of the 40% total reduction in fees and 20% reduction in costs, the Court finds Defendants liable for $264,549.60 in connection with CONCACAF's preparation of its restitution request.

## IV.    CONMEBOL

### A.  CONMEBOL - Lost Revenue

CONMEBOL argues that it is entitled to restitution for lost revenue in the amount of $85,400,000 in bribes paid to CONMEBOL-related officials between 2010 and 2016—including $6,550,00 to Defendant Marin and $10,500,000 to Defendant Napout—or, in the alternative, "possibly hundreds of millions of dollars" in "[l]ost revenues from numerous editions of

CONMEBOL tournaments, which resulted from the defendants' failure to create a legitimate tender process to ensure that CONMEBOL would secure the actual fair market value of the marketing and media rights for those events." (Dkt. 968, at 8, 12-15; Dkt. 989 (same).) The Court finds that CONMEBOL is not entitled to any restitution on the basis of lost revenue.

Initially, the Court notes that CONMEBOL renegotiated its marketing contracts for the Copa Libertadores for the 2016 through 2022 editions, the Centenario, and the Copa América for the 2019 and 2023 editions. (Dkt. 1030, at 4, 6.) CONMEBOL is not seeking any additional lost revenues for those tournaments. However, the government argues that Defendants are still liable to CONMEBOL for $19,425,000 of lost revenue from the 2015 edition of the Copa América and $35,100,000 of lost revenue from the 2011 to 2015 editions of the Copa Libertadores. The government takes the position that because CONMEBOL was unable to renegotiate the contracts for these tournaments, "the amount of bribes agreed to be paid in connection with the award of a contract forms a sound conservative basis for an estimate of loss to the defrauded entities." (*Id.* at 5 n.7, 16.) Although the Court previously found that this valuation of loss could be used to calculate Defendants' sentencing ranges under the Sentencing Guidelines,[14] the Court does not find it sufficiently reliable to use to estimate loss for purposes of restitution.

The Second Circuit has held that "a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss" unless "there is a direct correlation between gain and loss, such that the defendant's gain can act as a *measure* of— as opposed to a *substitute* for—the victim's loss." *Zangari*, 677 F.3d at 92-93 (emphasis in

---

[14] *See Zangari*, 677 F.3d at 92 (holding that the substitution of ill-gotten gains for a victim's actual loss "[is] permissible for purposes of calculating [a defendant's] adjusted offense level under § 2B1.1 of the Guidelines"); *see also United States v. Certified Envtl. Servs., Inc.,* 753 F.3d 72, 102 (2d Cir. 2014).

original); *see, e.g.*, *United States v. Berardini*, 112 F.3d 606, 607-10 (2d Cir. 1997) (finding a direct correlation between income defendant gained from fraudulent telemarketing sales and victims' losses because every dollar gained by defendant was necessarily lost by victims who paid for the fraudulent products).  No such measure is available here because there is no proof that "[the] loss to [CONMEBOL] is . . . a *necessary* consequence of all the kickbacks [Defendants] received." *United States v. Finazzo*, 850 F.3d 94, 118 (2d Cir. 2017) (emphasis in original).

In *United States v. Finazzo*, the defendant, an executive at the clothing company Aéropostale, received kickbacks from a clothing supplier, South Bay Apparel, Inc. ("South Bay"), to steer contracts to South Bay, pursuant to which Aéropostale bought clothing from South Bay at inflated prices.  In awarding restitution to Aéropostale in the same amount as the kickbacks paid to the defendant, the district court held that there was a "direct correlation" between the defendant's gains and Aéropostale's pecuniary losses.  *Id.*  The Second Circuit reversed, finding that the district court had failed to determine what portion of the bribes was to "steer[] additional business to South Bay at a *non-inflated* price" versus what portion of the bribes was "*solely* justified" by South Bay receiving inflated prices.  *Id.* (emphasis in original).  The panel noted that the former could "increase [the defendant's] worth to [South Bay] and therefore make the kickback scheme profitable for [South Bay], without inflicting pecuniary loss on Aéropostale" and was, therefore, not lost revenue to the victim; whereas the latter constituted direct loss to Aéropostale.  *Id.*; *see also Federal Ins. Co. v. United States*, 882 F.3d 348, 372 (2d Cir. 2018) ("[A]s we have recently observed in the restitution context, it is not necessarily the case that *all* kickbacks paid to a defendant represent inflated costs or excessive billable hours charged to the employer.") (emphasis in original).[15]

---

[15] The Second Circuit gave the following example to highlight this distinction:

20

This case presents an identical scenario.  Neither the government nor CONMEBOL has presented any testimony (expert or otherwise) or documentation in connection with these restitution proceedings to explain what portion of the bribes that were paid to Defendants went to securing the contracts in the first place versus getting the contracts at less than fair market value. As in *Finazzo*, in the former circumstance, the media company could still be making a profit simply by obtaining the contracts through bribes for Defendants, i.e., more than $0, without causing loss to the victim, *Finazzo*, 850 F.3d at 119 n.25, whereas, in the second circumstance, the media company is eating into the victim's profits by bribing Defendants to accept below fair market value contracts.  Indeed, in its submission, the government states that "[t]he Datisa partners agreed to pay millions of dollars in bribes *to secure the contract*" to various editions of the Copa América tournament.  (Dkt. 1030, at 6 (emphasis added).)  This representation, along with others by the government, indicate that at least some, or a portion, of the bribes fall into the first category—i.e., bribes paid solely to secure the media contracts—and did not necessarily result in lost revenue to

---

To illustrate, let us assume that it costs vendors $3 to produce a graphic T-shirt, and that a non-inflated price for vendors selling graphic T-shirts is $5.  Thus, without inflicting loss on Aéropostale, a vendor would gain $2 in profit from every sale to Aéropostale.  Without [the defendant's] presence, [the vendor] would make no sales and therefore gain $0 in profit.  With [the defendant's] assistance, let's assume that [the vendor] would sell Aéropostale 100 graphic T-shirts, and that the price [the vendor] charged Aéropostale would be inflated to $6.  [The vendor] would gain $3 profit per shirt, for a total of $300 of profit.  In this case, [the vendor's executives] might be willing to split the $300 profits with [the defendant].  After all, [the vendor's executives] would still be left with $150 under the scheme, instead of $0 without it.  Meanwhile, though, Aéropostale would only have lost $100—the additional $1 per shirt that it paid above the non-inflated price.  Thus, in this example, even though [the defendant] inflated the price Aéropostale paid, there is not a "direct correlation" between [the defendant's] gain ($150) and Aéropostale's loss ($100).

*Finazzo*, 850 F.3d at 119 n.25.

21

CONMEBOL.   (*See, e.g.*, Dkt. 997, at 5 (noting that, in 2010, CONMEBOL "terminated its relationship with Traffic and sold the rights to the 2015, 2019, and 2023 editions of the Copa América (among other tournaments) to sports marketing company Full Play Group . . . in part due to the promise of $1 million bribe payments"); *id.* at 6 (noting that Torneos had a "company[] practice of making annual bribe payments to CONMEBOL officials in exchange for their support of Torneos as holder of the broadcasting rights to the Copa Libertadores").)

Although CONMEBOL points to Professor Szymanski's trial testimony about the hypothetical depressive effect of bribery on contract prices (Dkt. 989, at 12-14), that testimony is ultimately irrelevant to the question of what portion of the bribe, if any, contributed to that depressive effect.   One could understand Professor Szymanski as arguing that competition "may have been discouraged in the market" by the very presence of bribery, regardless of the bribery's purpose (*id.* at 13); however, the speculative nature of that testimony is insufficient to satisfy the "sound methodology" requirement set forth in *Finazzo*, 850 F.3d at 119-20.   And, even more fundamentally, no party has established what the fair market value would have been for the tournaments at issue.   While the Court understands the potential difficulty of establishing fair market values for these tournaments, given the rampant corruption that seemingly infected all of the comparable tournament contracts, the Court still may not "merely assume" that the entire amount of the many kickbacks that were paid were solely for the purpose of securing lower contract prices and, therefore, are an appropriate measure of lost revenue.   *Finazzo*, 850 F.3d at 118.   Moreover, the Court cannot use the Centenario as a comparable data point because the parties agree that it was a "special," one-time-only tournament versus the more frequent Copa América and Copa Libertadores tournaments.   (*See* Dkt. 989, at 3.)   As Professor Matheson testified, the corruption scandal would have had a greater impact on a one-off event like the Centenario than

long-established events with existing sponsors.  Without data showing the value of media contracts for the 2015 edition of the Copa América and the 2011 to 2015 editions of the Copa Libertadores, absent corruption, the Court cannot find that the payment of bribes to Defendants and their co-conspirators is "directly correlated" to diminutions in the value of these contracts.

While the government cites case law in support of using the bribe amount to approximate lost revenue to CONMEBOL (*see* Dkt. 1030, at 5 n.7), with the exception of *United States v. Vaghela*, 169 F.3d 729 (11th Cir. 1999), these cases are readily distinguishable or simply inapposite.  (Dkt. 1041, at 1-2; Dkt. 1042, at 4 n.3.)  In *United States v. Madison*, the only issue considered was whether the government established a *quid pro quo* to support the basis for honest services fraud.  657 F. App'x 67 (2d Cir. 2016).  In *United States v. Gaytan*, 342 F.3d 10 (9th Cir. 2003) and *United States v. Gamma Tech Industries, Inc.*, 265 F.3d 917 (9th Cir. 2001), the court relied on state law in affirming the district court's restitution order.  The Eleventh Circuit's decision in *Vaghela* presents the closest factual scenario to the instant case.  In that case, a medical laboratory paid kickbacks to the defendant-doctor so that the defendant would refer work to the laboratory.  169 F.3d at 731.  During the initial restitution proceedings, the government asked for restitution in the amount of the Medicare reimbursements the laboratory received due to the defendant's referrals, which the district court granted.  *Id.* at 736.  On appeal, the Eleventh Circuit disagreed, finding that because the government had failed to prove what portion of the Medicare payments the laboratory received were for fraudulent or medically unnecessary services, the government was only entitled to the amount of the kickbacks paid by the laboratory to the defendant (which was less than the amount of the Medicare payments).  *Id.*  In reaching this conclusion, the panel applied the same reasoning that the government urges here, namely, that the laboratory "would not have participated in the kickback scheme if it was not profitable for [the

laboratory], [so] it is not unreasonable to assume that [the government] was overcharged in the amount of the kickbacks, and that the loss [the government] suffered was equivalent to that amount." This reasoning, however, is precisely what the Second Circuit rejected in *Finazzo*. 850 F.3d at 118; *see also Federal Ins. Co.*, 882 F.3d at 372. This Court is bound by *Finazzo*, not *Vaghela*.

Therefore, the Court finds that CONMEBOL is not entitled to restitution for lost revenue.[16]

### B.  CONMEBOL - Salaries and Benefits

CONMEBOL asks that Defendants Marin and Napout be ordered to pay restitution in the amount of $590,000 and $105,000, respectively, which reflects the total salary they each received from CONMEBOL.  (*See* Dkt. 986, at 9-10; Dkt. 1052.)[17]  For substantially the same reasons stated in Section II(A), the Court finds that Defendants must repay 20% of their CONMEBOL salaries.  Therefore, Defendant Marin is liable for $118,000 and Defendant Napout is liable for $21,000 in restitution to CONMEBOL.

---

[16] The Court recognizes that this result may seem harsh, especially given the Court's suggestions during the restitution proceedings that the amount of the bribes was an appropriate measure of lost revenue, i.e., additional sums the media companies would have been willing to pay for the contracts.  However, upon further analysis of the relevant case law, including the Circuit's guidance in *Zangari* and *Finazzo*, the Court concludes that it cannot use the bribe amount to determine restitution unless the government or the victim establishes, by a preponderance, that there is a "direct correlation" between the bribe paid to the defendant and actual loss suffered by the victim.  The Court also recognizes that this ruling may result in disparate outcomes for co-conspirators sentenced in the future, to the extent that CONMEBOL decides to, and can, prove by competent evidence the lost revenue for the 2011 to 2015 Copa Libertadores and the 2015 Copa América.  However, that is an incidental, but foreseeable, consequence of sequential sentencings in a multi-defendant case.

[17] Defendant Marin was a member of CONMEBOL's Executive Committee from 2012 to 2015 and was a member of multiple CONMEBOL standing committees.  (Dkt. 968, at 5.)  Defendant Napout was one of the vice presidents of CONMEBOL from 2007 to 2014 and the president of CONMEBOL from 2014 to 2015.  (Dkt. 989, at 5.)

### C.  CONMEBOL - Attorneys' Fees and Investigative Expenses

CONMEBOL also requests restitution in the amount of $713,191.96, consisting of: (1) $314,656 in attorneys' fees to address Defendant Napout's claim that he entered into a common interest agreement with CONMEBOL; (2) $370,647.50 in attorneys' fees in connection with responding to specific investigation requests from the government; and (3) $27,888.46 in legal fees paid for counsel for Nelson Sanabria, who testified in the government's case.  (Dkt. 1060, at 1-2.)[18]  CONMEBOL is not requesting attorneys' fees in connection with preparing its restitution request.  The government approved CONMEBOL's request for restitution in connection with these activities and, in contrast to CONCACAF's request, reviewed the billing entries and expense records that CONMEBOL submitted to the Court.  (Declaration of Ben O'Neil, Dkt. 1060-1, at ¶¶ 5, 8.)

With respect to the first category of its request for attorneys' fees and investigative expenses, CONMEBOL argues that Napout used the common interest privilege to protect himself from prosecution and that CONMEBOL had to spend more than $300,000 to challenge the validity of the alleged agreement in order to respond to the government's requests for documents that Napout sought to withhold under this asserted privilege.[19]  Napout responds that although Magistrate Judge Robert M. Levy found that there was no common interest privilege (Dkt. 549), he "did not find that Mr. Napout or his counsel had acted in bad faith or attempted to 'victimize' CONMEBOL, merely that the claim of common interest was unwarranted" (Dkt. 1072, at 6).

---

[18] This request is a 91.7% reduction from CONMEBOL's initial submission in which it sought $8,231,859.39 in legal and accounting fees.  (Dkt. 968, at 11-12.)

[19] Napout claimed that he entered into a common interest agreement with CONMEBOL from June 17, 2015 to December 3, 2015 while he was CONMEBOL's President.  (Dkt. 549, at 1-2.)

While Judge Levy did not explicitly state that Defendant Napout acted in "bad faith", that is the clear implication of his decision.[20]  As Judge Levy found, acting in his capacity as CONMEBOL's president, Napout entered into an agreement that was designed to shield him from criminal liability at the expense of CONMEBOL's interest in protecting itself from liability, which later necessitated CONMEBOL's expenditure of over $300,000 in legal fees to challenge the common interest agreement that Napout had entered into.  (Dkt. 549, at 7-8.)  Therefore, the Court rejects Napout's argument that he is simply being "penalize[d] . . . for asserting a privilege."  (Dkt. 1072, at 6.)

Moreover, even if Napout had a legitimate claim, that does not negate CONMEBOL's loss directly related to its participation in the government's investigation and prosecution.  It cost CONMEBOL more than $300,000 to prevent Napout from keeping evidence that the government wanted for its investigation and prosecution.  The Court does not see how this differs from a production cost in response to a government document request.

However, the Court finds that Quinn Emanuel's hourly rates exceed the acceptable rates set *supra*, particularly the rate it charged for its senior associate, who billed at a rate of up to $835

---

[20] In his decision, Judge Levy wrote, in relevant part:

[T]he extensive testimony at the hearing clearly establishes that the purpose of the agreement was to allow Napout to 'run everything by' his defense attorneys in an effort to shield himself from criminal liability from the government's ongoing investigation.  As Pappalardo made clear at the hearing, he and Kendall entered into the common interest agreement because he 'did not want [Napout] in his official capacity as president of CONMEBOL to further implicate himself.'  However, defendant has offered no persuasive evidence that this arrangement furthered any cognizable legal interest of CONMEBOL.  Rather, the record before me describes an arrangement whereby information would flow in only one direction—from CONMEBOL to Napout—and only for Napout's benefit.  It is significant that Napout, acting in his individual capacity, apparently authorized both parties to enter into the common interest agreement and, as a former manager, now seeks to constrain the entity's exercise of control over corporate communications."

(Dkt. 549, at 7-8 (citations omitted).)

per hour, and partners, who billed at a rate of up to $945 per hour.  (*See generally* Dkt. 1061-2.)  The Court finds that a 10% reduction is appropriate.  Therefore, Napout is liable to CONMEBOL for $283,190.40 in restitution relating to attorneys' fees and expenses incurred in connection with the government's litigation over Napout's assertion of the common interest privilege.

With respect to the second category of CONMEBOL's request for attorneys' fees and investigative expenses, i.e., seeking attorneys' fees relating to responding to specific requests from the government, Marin does not oppose CONMEBOL's request, but Napout argues that the entries are vague and should be reduced.  (Dkt. 1072, at 6.)  Based on its review of these entries and in light of the government's review and approval of the fees being sought by CONMEBOL, the Court does not find that the billing entries are vague.  Again, while Napout points to certain billing entries that do not appear to be related to this case, the Court is satisfied, especially in light of the government's support of CONMEBOL's request—the billing entries for which the government specifically reviewed—that the attorneys' fees have been sufficiently justified.  Therefore, for the reasons stated above, the Court finds that a 10% reduction is again appropriate.  Defendants Napout and Marin are liable to CONMBOL for $333,582.75 in attorneys' fees incurred in connection with responding to specific government requests for evidence and information.

With respect to the third category of CONMEBOL's request for attorneys' fees and investigative expenses, i.e., legal fees relating to the representation of government witness Nelson Sanabria, Napout puts forth no argument in opposition and Marin argues that this request should be denied as an unfair surprise because it was filed after the Court's deadline for restitution claims.  (Dkt. 1071, at 4 n.4.)  Although the Court rejects Marin's argument about surprise—finding that CONMEBOL's request was timely and reasonably foreseeable—it is clear that Marin is not responsible for these fees because Sanabria's testimony only related to Napout and his

consciousness of guilt, and would not have been introduced at a trial of Marin alone.  As a result, the entire cost of Sanabria's legal fees are assessed only against Napout.  Moreover, the Court finds that Fox Rothschild's hourly rate is reasonable.  Therefore, Defendant Napout is liable for $27,888.46 in legal fees incurred by CONMEBOL in connection with the representation of Nelson Sanabria.

In sum, the Court finds that Napout is solely liable for liable for $311,078.86 in attorneys' fees and investigative expenses, and that Defendants Marin and Napout are liable for an additional $333,582.75 in fees and expenses.

## V.    Traffic USA Employees

Three former Traffic USA sales employees seek restitution for their salaries, commissions, and benefits.  They allege that they lost their jobs and reputations after Traffic USA and its top executives were indicted.  (Dkt. 965-1, at 3, 6.)  The employees argue, among other things, that they "relied on [Traffic USA's] representations that they had lawfully obtained the marketing rights to CONCACAF and CONMEBOL tournaments.  Had it not been for that, [the employees] would not have joined the company" and, therefore, Traffic USA's "concealment was a direct cause of the[ir] losses."  (*Id.* at 4, 7-8.)  For its part, Traffic opposes the restitution request of its former employees, arguing that they are not victims under the MVRA.  (Dkt. 1022, at 10-11.)

Based on the former Traffic USA employees' own arguments, it is clear that they are not "victims" of Defendants as defined by the MVRA.  A "victim" for purposes of the MVRA is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).

The Court agrees with Traffic's argument that the harm alleged here "is simply too remote from the underlying criminal conduct to satisfy the causation requirement."  (Dkt. 1022, at 10); *see United States v. Follieri*, No. 08-CR-850 (JGK), 2009 WL 151725, at *1 (S.D.N.Y. Jan. 21, 2009) (holding that former employees who alleged that the funds intended to pay their salaries were misdirected by defendant, who pled guilty to conspiracy to commit wire fraud, and that defendant "made misrepresentations" to "induce [the employees] to keep working" did not establish causality under the MVRA).  Moreover, the former Traffic USA employees' reliance on *United States v. Marino*, 654 F.3d 310 (2d Cir. 2011) is misplaced.  The appellant in *Marino* was ordered to pay restitution to investors who lost money as a result of a Ponzi scheme, *id.* at 315-16, which is "a direct and proximate result" of the defendant's fraud, *Follieri*, 2009 WL 151725, at *1 (distinguishing between former employees and people "like investors" who "invest or make loans to the defendant" for purposes of restitution under the MVRA).  By contrast, the loss here, if any, did not directly arise from the criminal conduct of Defendants, but rather, as the former employees themselves assert, was directly caused by Traffic USA's "concealment" of the fact that it had not "lawfully obtained the marketing rights to CONCACAF and CONMEBOL tournaments."  (Dkt. 965-1, at 4, 7-8.)  Therefore, the former Traffic USA employees are not entitled to any restitution from Defendants.

## VI.     Joint and Several Liability

The Second Circuit has held that "[i]f the court finds that more than [one] defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  *Smith*, 513 F. App'x at 45 (citing 18 U.S.C. § 3664(h)).  A district court may impose restitution holding the

defendant liable for the "reasonably foreseeable acts of all co-conspirators," even "where the jury had acquitted the defendant as to some aspects of the conspiracy." *United States v. Boyd,* 222 F.3d 47, 50-51 (2d Cir. 2000).

Here, the Court divides the restitution award into three categories: (1) restitution owed solely by either Napout or Marin; (2) restitution owed jointly and severally by Marin and Napout; and (3) restitution owed jointly and severally by Marin, Napout, and the other defendants convicted of the same bribery scheme or schemes. Therefore, Defendants Napout's and Marin's restitution obligations are as follows:

### Defendant Napout

| Type of Liability | Restitution Owed |
|---|---|
| **Sole Liability** | |
| FIFA | Salary & Benefits: $24,289.26 |
| CONMEBOL | Salary & Benefits: $21,000 |
| CONMEBOL | Common Interest Privilege Attorneys' Fees: $283,190.40 |
| CONMEBOL | Sanabria Legal Fees: $27,888.46 |
| **Total** | **$356,368.12** |
| | |
| **Joint and Several Liability with Defendant Marin Only** | |
| FIFA | Maennl Trial Preparation: $24,001.45 |
| **Total** | **$24,001.45** |
| | |
| **Joint and Several Liability with All Convicted Co-conspirators** | |
| FIFA | Restitution Request: $40,444.49 |
| CONCACAF | Investigative Expenses: $1,338,814 |
| CONCACAF | Vendor Fees: $139,390.70 |
| CONCACAF | Restitution Request: $264,549.60 |
| CONMEBOL | Investigative Expenses: $333,582.75 |
| **Total** | **$2,116,781.54** |
| | |
| **CUMULATIVE TOTAL** | **$2,497,151.11** |

**Defendant Marin**

| Type of Liability | Restitution Owed |
|---|---|
| **Sole Liability** | |
| FIFA | Salary & Benefits: $19,532.60 |
| CONMEBOL | Salary & Benefits: $118,000 |
| **Total** | **$137,532.60** |
| | |
| **Joint and Several Liability with Defendant Napout Only** | |
| FIFA | Maennl Trial Preparation: $24,001.45 |
| **Total** | **$24,001.45** |
| | |
| **Joint and Several Liability with All Convicted Co-conspirators** | |
| FIFA | Restitution Request: $40,444.49 |
| CONCACAF | Investigative Expenses: $1,338,814 |
| CONCACAF | Vendor Fees: $139,390.70 |
| CONCACAF | Restitution Request: $264,549.60 |
| CONMEBOL | Investigative Expenses: $333,582.75 |
| **Total** | **$2,116,781.54** |
| | |
| **CUMULATIVE TOTAL** | **$2,278,315.59** |

However, based on a consideration of each Defendant's level of contribution to the victims' losses and Defendants' respective economic circumstances, the Court will implement a restitution payment plan as to each Defendant, to be determined after the parties' submission of proposed payment schedule(s). *See Smith*, 513 F. App'x at 45-46.

## CONCLUSION

For the reasons stated herein, the government's motion for restitution is granted in part and denied in part. The Court awards the following restitution amounts:

(1) FIFA is entitled to a total of $108,267.80 in restitution;

(2) CONCACAF is entitled to a total of $1,742,754.30 in restitution; and

(3) CONMEBOL is entitled to a total of $783,661.61 in restitution.

By December 4, 2018, the parties shall file either: (1) jointly proposed payment schedules,

or (2) if no agreement can be reached, separate proposals for payment schedules.

SO ORDERED.


/s/Pamela K. Chen
Pamela K. Chen
United States District Judge


Dated: November 20, 2018
      Brooklyn, New York